IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY WARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-1391-KAJ |
| | ) |
| STANLEY TAYLOR; PAUL HOWARD; | ) |
| THOMAS CARROLL; JOHN SALAS; | ) |
| JESSICA DAVIS-BARTON; CERTAIN | ) |
| UNKNOWN INDIVIDUAL EMPLOYEES | ) |
| OF THE STATE OF DELAWARE | ) |
| DEPARTMENT OF CORRECTIONS; | ) |
| and STATE OF DELAWARE | ) |
| DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Jeffrey K. Martin, Esquire, Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware 19806;
Herbert G. Feuerhake, Esquire, The Law Office of Herbert G. Feuerhake, 521 West Street, Wilmington, Delaware 19806; Counsel for Plaintiff.

Michael F. Foster, Esquire, Department of Justice, 820 N. French Street, 6th Floor, Wilmington, Delaware 19801; Counsel for Defendants.

March 30, 2006
Wilmington, Delaware



JORDAN, District Judge

## I. INTRODUCTION

This case involves claims alleging a violation of an inmate's constitutional rights by a corrections facility and several correctional officers. Before me is a Motion to Dismiss for failure to state a claim upon which relief can be granted (Docket Item ["D.I."] 17; the "Motion"), filed by the defendants, Stanley Taylor, Paul Howard, Thomas Carroll, John Salas, Jessica Davis-Barton, certain unknown individual employees of the State of Delaware Department of Corrections, and the Department of Corrections itself (the "Department") (collectively the "Defendants").

Jurisdiction is appropriate under 42 U.S.C. §§ 1983 and 1985 and 28 U.S.C. § 1331. For the reasons that follow, the Motion will be granted in part and denied in part.

## II. BACKGROUND[1]

### A. The Attack on Ward

While serving a three-year sentence for armed burglary, the plaintiff, Timothy Ward ("Ward") was an inmate at the Delaware Correctional Center ("DCC") in the minimum security T-Building. (D.I. 1 at ¶ 10.) In or around May of 2004, another inmate, Robert Johnson ("Johnson"), was transferred to the T-Building after attempting to commit suicide by jumping out of a second-story window in the building where he was previously held. (*Id.* at ¶ 12.)

---

[1] The following background information is based on Ward's allegations, which are assumed to be true for the purposes of this 12(b)(6) motion.

1

On July 10, 2004, due to threats he made to a guard and disruptive behavior in the evenings, Johnson was escorted to the infirmary for his mental condition to be evaluated, but no medical personnel were present at the time. (*See id.* at ¶ 16.) Johnson was then released into the prison population, which was having recreational time in the "yard". (*Id.* at ¶ 17.) Defendant Salas and an individual named Lovett were the correctional officers responsible for the oversight of the recreation break; however, they were inside the T-Building using a computer.[2] (*Id.* at ¶¶ 19, 22.) Ward was in the back of the yard finishing a workout when he was approached by Johnson, who had wrapped his wrist watch around his fist. (*Id.* at ¶ 24.) Johnson, without word, warning, or provocation struck Ward on the right side of his face by his eye socket. (*Id.* at ¶ 25.) Johnson then struck Ward in the jaw, knocking him unconscious. (*Id.*) Johnson then straddled Ward and continued to beat him while inmates tried to pull Johnson away and alert the correctional officers of the attack. (*Id.* at ¶ 26.) When the correctional officers finally arrived and looked at Ward, they believed he was dead. (*Id.* at ¶ 28.)

B. Medical Treatment Following the Attack

After it was discovered that Ward was breathing, he was taken to the infirmary. (*Id.* at ¶ 30.) At the infirmary, it was observed that Ward had lacerations on his face, a knot on his forehead three inches long and an inch and a half wide, and that his skin was discolored. (*Id.*) Infirmary personnel immediately requested that Ward be transferred to the hospital emergency room but the DCC Shift Commander denied that

---

[2] Johnson approached two other inmates and asked whether any guards were supervising the back portion of the yard. Both inmates informed Johnson he was not being supervised at the moment. (*Id.* at ¶ 23.)

2

request. (*See id.* at ¶ 31.) Ward was eventually taken to the hospital where it was determined that he had a broken nose, a dislocated jaw, damage to his eye, a shattered eye socket, numerous broken and missing teeth, other facial fractures, tissue draining, and severe bruises. (*Id.* at 33.) His appearance was characterized as "grotesque". (*Id.*) After four hours at the hospital, Ward was transferred back to the infirmary. (*Id.* at ¶ 34.) He was not examined by a medical doctor at the infirmary but was given Motrin and Darvocet for pain, had two teeth extracted, and was placed on a liquid diet. (*Id.* at ¶ 35.)

On July 11, 2004, Ward's mother and daughter visited the DCC without knowledge of the attack. (*Id.* at ¶ 36.) They found Ward lying in the infirmary covered in blood and still wearing his clothes from the attack. (*Id.* at ¶ 37.) Additionally, Ward's head had swollen to what was approximated as three times its normal size. (*Id.*)

On July 19, 2004 Ward was examined by an oral surgeon who prescribed a soft food diet, Tylenol and Tylenol #3 for the pain, as well as suggesting that Ward see another physician about the injuries to his nose and that he also see an ophthamolgist for treatment of damage to his eye and eye socket. (*Id.* at ¶ 41.) Despite the instructions and reports, the infirmary ordered Ward to start a regular food diet on July 20, 2004, removed his stitches, and released him back into the prison population. (*Id.* at ¶ 42.)

C.   Ward's Continued Requests for Medical Attention

On July 30, 2004 Ward made a medical request because his jaw broke again while he was eating solid food provided by DCC.[3] (*Id.* at ¶ 43.) He also complained of great pain in his face and eye. (*Id.*) Ward was provided no treatment in response to those complaints. (*Id.*) The next day Ward made another medical request, but aside from scheduling an appointment for August 2, 2004, no action was taken by the prison. (*Id.* at ¶ 44.)

At the August 2 appointment, Ward was told to take Naprosyn for his pain. (*Id.* at ¶ 45.) He was also prescribed a consultation with an optometrist, rather than with an opthamologist as had previously been suggested. (*Id.*) On August 8, Ward made another medical request because he believed that exposure to the sun and bright lights was causing his face to swell. (*Id.* at ¶ 46.) Ward reported in his request that the pain was so great he could not chew, eat, or move his mouth in any way. (*Id.*) In response to the request, a medical appointment was scheduled for four days later. (*Id.*) At his August 12 appointment, Ward was scheduled to see an optometrist, but given no pain medication. (*Id.* at ¶ 49.) Ward was seen by the optometrist and given a prescription for sunglasses. (*Id.* at ¶ 52.) The prison, however, never had that prescription filled. (*Id.*)

During these difficulties, Ward was finding the prison counselor, Defendant Davis-Barton, to be rude, argumentative, and unhelpful. (*Id.* at ¶ 53.) She instructed the correctional officer assigned to Ward to make no further calls for a medic for Ward

---

[3] It is unclear from the Complaint to whom Ward was making medical requests.

4

for any reason. (*Id.* at ¶ 55.) Davis-Barton also instructed Ward to make no further requests for medical attention. (*Id.* at ¶ 56.) Still in pain and receiving no medical treatment, Ward reported to the infirmary again on August 23, 2004. (*Id.* at ¶ 58.) He requested pain medication for "extreme pain" and also the liquid nutrition his mother had been sending him due to DCC's failure to provide him with the soft diet he had been prescribed. (*Id.*) None of his requests were granted. (*Id.* at ¶ 59.)

Because Ward's condition had not improved and he had not been seen by a medical doctor since the day of the attack, his mother hired an attorney. (*Id.* at ¶ 60.) Ward's counsel sent a letter to the Governor advising the Governor of Ward's situation. (*Id.* at ¶ 61.) In response, Ward was admitted to the infirmary on September 2, 2004. (*Id.*) While in the infirmary, however, Ward was frequently not given his medication and sometimes not fed. (*Id.* at ¶ 62.)[4] He was "placed in a 10' by 10' glass-enclosed cell and essentially <u>ignored</u>." (*Id.*; original emphasis.) Additionally, Ward was mocked by the guards due to the publicity brought on by a newspaper article that detailed his plight. (*Id.* at ¶ 67.)

On September 9, 2004, through an arrangement made by his attorney, Ward was permitted to be examined by an outside physician, Dr. Pasquale Fucci ("Dr. Fucci"). (*Id.* at ¶ 68.) This was the first time Ward had been seen by a medical doctor since he was taken to the hospital on the day of the attack. (*Id.*) Dr. Fucci determined that Ward must be seen by an opthamologist and by an otolaryngologist. (*Id.* at ¶ 69.) Dr. Fucci

---

[4] Ward was also not allowed to shower or change clothes while in the infirmary. (D.I. 1 at ¶ 63.) He was placed in the infirmary without any notification to his family. (*Id.* at ¶ 65.)

5

was concerned that further medical neglect could cause Ward to lose sight in his right eye. (*Id.*)

At the request of his attorney, Ward was finally released from the infirmary on or about September 11, 2004. (D.I. 1 at ¶ 70.) In mid-September 2004, Ward was removed from the prison population and placed into isolation. (D.I. 1 at ¶ 71.) In late September, Ward was transferred to Sussex County Correctional Institute. (*Id.* at ¶ 73.) On October 5, 2004, Ward was seen by Dr. David Larned, an oculoplastic surgeon who opined that Ward needed surgery. (*Id.* at ¶ 74.) It has also been determined that Ward suffers from hearing loss and that he needs dental surgery. (*See id.* at ¶ 75.)

Ward's Complaint in this case alleges that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. (D.I. 1 at ¶¶ 77-79.) Additionally, Ward claims that the Defendants intentionally violated his First Amendment right to freedom of speech. (*Id.* at ¶¶ 80-81.) He further alleges that his injuries are due to Defendants' customs, practices and policies (*id.* at ¶¶ 82-84) and that the willful actions of the state establish a violation of the Due Process Clause of the Fourteenth Amendment (*id.* at ¶¶ 85-90). Finally, Ward claims that the Defendants conspired to interfere with his civil rights. (*Id.* at ¶ 92.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." A motion to dismiss requires a court to accept as true all material allegations of the complaint. *See Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004). A court may grant a motion to

dismiss only if after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.* 221 F.3d 472, 481-82 (3d Cir. 2000). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV.   DISCUSSION

### A.   Ward's Eighth Amendment Claim

The Defendants move to dismiss Ward's Eighth Amendment claim on the grounds that they are not responsible for Ward's inadequate medical care and, further, that their failure to protect Ward from Johnson does not amount to cruel and unusual punishment. Because Ward has adequately alleged at this stage of the proceedings that the Defendants' denial of medical treatment and failure to protect amounted to cruel and unusual punishment, I will deny the Motion.

#### 1.   Failure to Provide Adequate Medical Care

Ward first alleges that the Defendants' denial of medical care violated his Eighth Amendment rights. Under the Eighth Amendment, the states have a duty to provide "adequate medical care to those it is punishing by incarceration." *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978). The Supreme Court has held that "[i]n order to state a cognizable [Eighth Amendment] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To meet this deliberate indifference

standard, a plaintiff must show that a prison official consciously disregarded a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

The Defendants first argue that they did not exercise deliberate indifference to Ward's medical needs because it is their contracted medical provider, First Correction Medical ("FCM"), which is responsible for providing adequate medical treatment. (D.I. 17 at ¶ 2.) Defendants assert that any complaint concerning the quality of medical care must be brought against its contracted provider. (*Id.* at 5.) The Supreme Court has held, however, that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988). Therefore, the Defendants cannot escape liability simply because they contracted with FCM to provide medical services to prisoners in the State's custody.

The question then becomes whether Ward's allegations that the Defendants denied him medical services are sufficient to frame a claim of deliberate indifference to a serious medical need. The Third Circuit has identified several scenarios that meet the deliberate indifference standard, including "where prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Spruill*, 372 F.3d at 235 (citations omitted). Here, Ward alleges that he suffered from serious pain and, given his facial injuries and swelling, that his injuries were noticeable to the Defendants. (D.I. 1 at ¶¶ 36-37.) Despite orders from the infirmary, DCC failed to provide Ward with a soft food diet, which allegedly caused him to re-break his jaw. (*Id.* at ¶ 43.) Ward also alleges that he was consistently denied his subsequent requests for medical attention,

and, even when those requests were honored, he was only given pain medication. (*Id.* at ¶¶ 43-45.) Additionally, he claims that defendant Davis-Barton's instructions that Ward's medical requests not be honored demonstrate that she and the guards following her orders "consciously disregarded" a substantial risk of serious harm to Ward. (*Id.* at ¶¶ 55-56.) Finally, the alleged facts in the Complaint can be construed to show that Ward's medical needs were "serious." "[E]xtreme pain and real possibility of permanent injury" can qualify as a serious medical need if "fleshed out by further evidence" during discovery. *Spruill*, 372 F.3d at 236. In addition to the extreme pain Ward alleges, Dr. Fucci opined that further medical neglect could cause Ward to lose vision in his right eye. (D.I. 1 at ¶ 69.) Ward will be given the opportunity to develop through discovery evidence to support the allegations in his Complaint. Therefore, to the extent Ward is alleging the denial of medical treatment violated his Eighth Amendment rights, the Motion to dismiss that claim will be denied.

      2.    Failure to Protect

The Defendants argue that Ward's claim regarding their failure to protect Ward from Johnson must fail because it does not meet the deliberate indifference standard. (D.I. 17 at 11.) The Defendants rely (*id.* at 10-11) on several cases that have dismissed Eighth Amendment claims on the grounds that officials did not have subjective knowledge of the threat posed to an inmate by a fellow inmate. *See Hemauer v. Jefferson County Corrections Dept.*, No. 98-5206, 1999 WL 96752, at *4 (6th Cir. Feb. 2, 1999) (granting summary judgment where plaintiff failed to show defendants'

knowledge of risk); *Baker v. Lehman*, 932 F. Supp. 666, 671 (E.D. Pa. 1996) (same); *Jones v. Kelly*, 918 F. Supp. 74, 80 (W.D.N.Y. 1995) (same).

Those cases, however, were all decided at the summary judgment stage, after the development of an evidentiary record. Moreover, I am bound to draw inferences in the plaintiff's favor based on the allegations in the Complaint. *Cf. Hamilton v. Leavy*, 117 F.3d 742, 749 (3d Cir. 1997) (reversing summary judgment against plaintiff because there were facts on record that "could be viewed by a factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids"). Construing the facts here in a light most favorable to Ward, I cannot hold that the Defendants failure to protect Ward could not amount to the sort of deliberate indifference forbidden by the Constitution. The Defendants were aware of Johnson's erratic behavior, as evidenced by their decision to take him to the infirmary. (D.I. at ¶¶ 16-17.) Despite this awareness, when no one was at the infirmary, the guards released Johnson into the general prison population. (*Id.*) Additionally, the guards who were responsible for monitoring the yard when the attack occurred were inside, preoccupied with a computer. (*Id.* at ¶ 22.) Therefore, Ward has adequately alleged that the Defendants' failure to protect amounted to deliberate indifference.

The Defendants also assert that they cannot be held liable without proof that they actually knew of and disregarded an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 837. The Supreme Court in *Farmer* reasoned that an allegedly culpable official "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* The

Defendants contend that the only factual allegation against Salas was that he was on duty the day of the attack, and, further, that the administrative Defendants, i.e., Commissioner Taylor, Bureau Chief Howard and Warden Carroll, are very unlikely to have had actual knowledge of the threat Johnson posed to Ward.[5] (D.I. 17 at 12.) In regard to Salas, Ward has adequately alleged that he had knowledge of the threat. I need not decide at this stage whether the administrative defendants had actual knowledge of the threat posed by Johnson or by the denial of medical treatment because Ward implicates them as defendants due to their alleged failure to train and maintain appropriate customs, practices, and policies.

    B.    <u>Failure to Train and Maintenance of Customs, Policies, or Practices</u>

Defendants contend that Ward has failed to allege facts showing that his injuries are caused by Defendants' policies and a failure to train or maintain safe conditions. (D.I. 1 at ¶ 83.) Both sides raise essentially the same arguments as those raised with respect to the Eighth Amendment claims.[6] Indeed, on those arguments, no further analysis would seem required. However, when dealing with supervisory defendants, as

---

[5] Defendants' brief does not make any contention that Davis-Barton cannot be liable.

[6] Defendants here assert that inadequate medical treatment was provided by the medical contractor and not the defendants. Additionally, defendants argue that they must have taken affirmative action, if they are to be liable under this claim. Ward argues the "deliberate indifference" standard can still be met when the constitutionally cognizable harm is great and there is failure by supervisory officials to respond. Even without adopting Ward's position, Davis-Barton's active role in allegedly instructing Ward not to make medical requests is a satisfactory allegation at this stage of the proceedings. Moreover, the Third Circuit has stated that plaintiffs like Ward cannot be "expected to know without discovery exactly what training policies were in place and how they were adopted". *Carter v. City of Philadelphia,* 181 F.3d 339, 358 (3d Cir. 1999).

opposed to defendants who allegedly had direct knowledge of a serious threat to inmate safety, the standard for deliberate indifference is not the "actual knowledge" standard required in *Farmer*. See *Beers-Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2001). Instead, for Ward to succeed on a claim against supervisors based on prison policy or practices, he must identify a specific policy or practice that the supervisor failed to employ and he must show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

In his Complaint, Ward alleges that the Defendants failed to properly train and supervise DOC personnel so as to protect inmates' safety and physical well-being and to maintain safe conditions, and that Defendants failed to adopt and properly implement practices and policies so as to protect inmates' safety and physical well-being. (D.I. 1 at ¶ 83.) Ward further alleges that the supervisors failure to correct these risks resulted in his injuries. (*Id.* at ¶ 84.) Therefore, the first and fourth prongs of the *Sample's* test are satisfied.

Though the allegations with respect to the second and third prongs fo the *Sample* test are not as plainly met, there are sufficient allegations to permit further development of the record. See *Carter v. City of Philadelphia*, 181 F.3d 339, 358 (3d. Cir. 1999) (reversing district court's dismissal of plaintiff's claim because requiring

plaintiff to identify a policy and attribute it to a supervisor at the discovery stage would be "unduly harsh.").

Finally, the Defendants move to dismiss the policy-and-practice claim based on the affirmative defense of qualified immunity. (D.I. 17 at 16.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The Defendants have the burden of establishing that they are entitled to such immunity. *See Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir. 1989). Unlike the actual knowledge test of *Farmer,* the Defendants must make the objective showing that a reasonable person in their position at the relevant time "could have believed, in light of clearly established law, that the alleged conduct comported with established legal standards." *Id.*

The issue, therefore, is whether the Defendants' conduct was objectively reasonable, and, more specifically, whether prison officials in the Defendants' positions could have believed that their conduct did not expose Ward to risk of serious medical harm. I have already held that Ward has adequately alleged actual knowledge on the part of the Defendants under the *Farmer* test. Because it has been determined that Ward has adequately alleged that Defendants' conduct meets the deliberate indifference standard, the same conduct cannot be objectively reasonable and thus the Defendants' qualified immunity defense cannot bar relief at this stage. *See Carter,* 181

F.3d at 356 (holding that if plaintiff succeeds in establishing that defendants acted with deliberate indifference to constitutional rights, then defendants' conduct was not objectively reasonable and qualified immunity defense is not available).

### C. Ward's First Amendment Retaliation Claim

Defendants move to dismiss Ward's First Amendment retaliation claim. (D.I. 17 at 13). Ward alleges that Defendants intentionally violated his First Amendment rights by punishing him without justification for requesting medical attention and filing a prison grievance. (D.I. 1 at ¶ 81). Because Ward has adequately alleged the elements of a First Amendment retaliation claim, the Motion is denied.

A prisoner alleging a retaliation claim must show: (1) constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).

First, the filing of lawsuits and grievances and contact with newspapers are protected by the First Amendment. *See id.* (filing complaints is protected); *Smith v. Mesigner*, 293 F.3d 641, 653 (3d Cir. 2002) ("[F]alsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts."). As to the second requirement for a retaliation claim, Defendants assert that Ward's transfer was for his own safety and thus not an "adverse action". (D.I. 17 at 12.) Defendants further argue that Ward had no liberty interest in remaining in the general prison population, thus he was not deprived of any constitutional right. (*Id.*) Ward, however, alleges that in addition to the transfer, the

14

Defendants also punished him by refusing his requests for medical care and failing to provide him with food and other requirements. (D.I. 1 at ¶¶ 80-81.) Further, the Defendants' reliance on Ward's lack of liberty interest is misplaced. "[T]he law of this circuit is clear that a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Thus, since Ward does not have to prove a liberty interest, nor did he allege that the transfer was the sole retaliatory measure taken by the department, the Defendants' arguments denying there was an adverse action fail at this preliminary stage.

Third, in order to succeed on a First Amendment retaliation claim, a plaintiff must show that the Defendants' actions were motivated by "a desire to punish an individual for the exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999.) The Defendants claim that Ward's transfer was done for safety reasons and not because he exercised his First Amendment rights, and therefore Ward fails to meet the causation requirement. As noted above, Ward claims additional actions by the Defendants, aside from the transfer, were undertaken in retaliation. Additionally, Ward claims that the transfer itself was retaliatory. (*See* D.I. 22 at 18.) Viewing the facts in his favor, as I must on this Motion, his allegations of causation are sufficient.

Because all three requirements of a First Amendment retaliation claim are adequately alleged, I will deny the Defendants' Motion to dismiss this claim.

  D. <u>Ward's Substantive Due Process Claim Asserting a State Created Danger.</u>

  Finally, Defendants move to dismiss Ward's claim that the State violated his substantive due process rights. Ward alleges that the Defendants, by acting in willful disregard for his safety, created an opportunity for danger that otherwise would not have existed and thus acted in a manner shocking to the conscience and violating the Due Process Clause of the Fourteenth Amendment. (D.I. 1 at ¶ 89.) The Defendants challenge this claim by correctly asserting that Ward cannot rely on substantive due process rights when the Eighth Amendment is more specifically tailored to the alleged violations of his rights. (D.I. 17 at 15-16.)

  The Supreme Court has held that when there is an "explicit textual source of constitutional protection" against physically intrusive governmental conduct alleged by a plaintiff, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that claim of excessive force used by officers in making arrest must be brought under more directly applicable Fourth Amendment and not Fourteenth Amendment); *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (holding that the "Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners."). Because Ward is a convicted inmate, the treatment

he alleges must be challenged under the Eighth Amendment, and thus the Defendants' motion to dismiss the substantive due process claim will be granted. [7]

## V. CONCLUSION

Accordingly, the Defendants' Motion will be granted as to the conspiracy and substantive due process claims and as to any claims against the Department and against the individual Defendants in their official capacities. In all other respects, the Motion will be denied.

---

[7] In his response to Defendants' motion to dismiss, Ward agrees that he has failed to allege a conspiracy under 42 U.S.C. § 1985 as originally contested in his Complaint. Therefore, the motion to dismiss this portion of the Compliant is granted. (D.I. 22 at 22.)

Defendants also raise the defense of sovereign immunity under the Eleventh Amendment. (D.I. 17 at 16-18.) To the extent Ward is suing the individual Defendants in their official capacities the claims are dismissed. Since the Department "is an agency of the State of Delaware" and is protected by the Eleventh Amendment, the claims against the Department are also dismissed. *Evans v. Ford*, No. Civ.A.03-868, 2004 WL 2009362, at *4 (D. Del. Aug. 25, 2004).

Additionally Defendants argue that they cannot be held liable under the doctrine of respondent superior. (D.I. 17 at 19.) Ward alleges, however, that he is not relying on the doctrine, which is consistent with allegations that he is suing the Defendants in their individual capacities. (D.I. 22 at 24.) At this stage in the proceeding, he has alleged adequate claims against the Defendants. Accordingly, he will have the opportunity to further develop those allegations in discovery.