**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **TIMOTHY WARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STANLEY TAYLOR,** | ) | **C. A. No. 04-1391 \*\*\*** |
| **PAUL HOWARD, THOMAS** | ) | |
| **CARROLL, JOHN SALAS,** | ) | |
| **JESSICA DAVIS-BARTON,** | ) | |
| **CERTAIN UNKNOWN INDIVIDUAL** | ) | |
| **EMPLOYEES OF STATE OF** | ) | |
| **DELAWARE DEPARTMENT OF** | ) | |
| **CORRECTION, and** | ) | |
| **STATE OF DELAWARE,** | ) | |
| **DEPARTMENT OF CORRECTION[1],** | ) | |
| | ) | |
| **Defendants/Third Party** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FIRST CORRECTIONAL MEDICAL** | ) | |
| **DELAWARE, LLC,** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

**OPENING BRIEF IN SUPPORT OF
STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED: December 10, 2007    Attorney for State Defendants

---

1  The State of Delaware Department of Correction and all State Defendants in their official capacities were dismissed from this suit pursuant to the Court's Memorandum Opinion and Order of March 30, 2006 (D.I. 26-27).

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CITATIONS ............................................................................................ iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF ARGUMENT ................................................................ 4

STATEMENT OF FACTS ........................................................................ 6

    1.  Background: the Parties, other individuals, and job functions of the State Defendants 6

    2.  The sudden assault on Plaintiff by another inmate on July 10, 2004 ............................ 7

    3.  Plaintiff's subsequent medical treatment at DCC by Third Party Defendant, FCM, and other providers ................................................................ 10

ARGUMENT ................................................................................................ 12

   I.    SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE DEFENDANTS AS TO REMAINING COUNTS I, II, AND III, AS PLAINTIFF HAS ADDUCED NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT HIS ALLEGATIONS OF EIGHTH AMENDMENT OR FIRST AMENDMENT VIOLATIONS IN CONNECTION WITH THE JULY 10, 2004 INMATE ON INMATE ASSAULT ................................................................ 12

    A.  Standard of Review ................................................................ 12

    B.  There is no evidence in the record to support Plaintiff's allegations in Count I that State Defendants, Commissioner Stanley Taylor, Bureau Chief Paul Howard, Warden Thomas Carroll, Correctional Officer John Salas and Correctional Counselor Jessica Davis-Barton, exhibited deliberate indifference to serious medical or other needs of Plaintiff, Timothy Ward ................................................................ 13

        1.  The Legal Standard: "Deliberate Indifference" ................................................ 13

        2.  The Supervisory Defendants, Commissioner Taylor, Bureau Chief Howard and Warden Carroll, had no personal involvement in the events alleged, and there can be no liability against administrative officials on a theory of *Respondeat Superior* .. 16

        3.  There is no evidence whatsoever in the record that Defendant, Correctional Officer John Salas, played any part in Mr. Ward's medical treatment or even had contact with Mr. Ward after the assault ................................................................ 19

4. There is no evidence in the record that Defendant, Correctional Counselor Jessica Davis-Barton played any part in Mr. Ward's medical treatment or was "deliberately indifferent" to any of Mr. Ward's serious needs ...................................................19

C. There is no evidence in the record to support Plaintiff's Eighth Amendment claims that State Defendants, Commissioner Stanley Taylor, Bureau Chief Paul Howard, Warden Thomas Carroll, Correctional Officer John Salas and Correctional Counselor Jessica Davis-Barton, "failed to protect" Plaintiff from a known, serious risk that he would be assaulted by fellow inmate Robert Johnson ..............................................................20

D. There is no legal basis or evidence of record to support the allegations in Count III that any of the supervisory State Defendants are subject to liability on a "failure to train" or "wrongful practices and policies" theory in connection with the inmate on inmate assault of July 10, 2004...............................................................................................................28

1. Plaintiffs have offered no evidence whatsoever of any wrongful training, practice or policy pertinent to the claims at issue........................................................28

2. The "failure to train/wrongful practices and policies" theories of liability asserted in Count III are theories of municipal liability which cannot be maintained against State officials, as a matter of law, by virtue of Eleventh Amendment immunity ...........................................................................................................31

E. There is no legal basis or evidence of record to support Plaintiff's allegations in Count II that Plaintiff was subject to any "retaliation" by any named defendant for engaging in "First Amendment" protected activity ........................................................................33


CONCLUSION ...........................................................................................................................38

UNREPORTED DECISIONS

Brathwaite v. Carroll, 2006 WL 839385 (D.Del. 2006)

## TABLE OF CITATIONS

**Case Name**                                                                                              **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ...................................................................12

Baker v. Lehman, 932 F.Supp. 666 (E.D.Pa. 1996)......................................................................22

Balliet v. Whitmire, 626 F.Supp. 219 (M.D.Pa. 1986), *aff'd* 800 F.2d 1130 (3d Cir. 1986) ........20

Beers Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001) ................................................................31

Bequeath v. L.B. Foster Co., 367 F.Supp.2d 779 (W.D. Pa. 2005) ...............................................13

Brathwaite v. Carroll, 2006 WL 839385 (D.Del. 2006) ...............................................................16

Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004) .................................................32

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................................12

City of Canton v. Harris, 489 U.S. 378 (1989) .......................................................................29, 32

Connick v. Myers, 461 U.S. 138 (1983) ........................................................................................34

Daniels v. Delaware, 120 F.Supp.2d 411 (D.Del. 2000) .............................................16, 17, 22, 27

Estelle v. Gamble, 429 U.S. 97 (1976) ...................................................................................14, 20

Farmer v. Brennan, 511 U.S. 825 (1994)...........................................................14, 21, 22, 27

Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir. 1988)......................................................30

Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997) ...................................................34, 35

Hamilton v. Leavy, 117 F.3d 742 (3d Cir. 1997)......................................................21, 23, 27

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) ..................................................................34

JMK v. Luzerne County Juvenile Detention Center, 372 F.3d 572 (3d Cir. 2004) .......................31

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) ..................................................................29

Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990) ...............................................................13

Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978) .....31, 32, 33

Polk County v. Dodson, 454 U.S. 312 (1981) ...........................................................18

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988) ...........................................16, 18

Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989) ..................................................28, 29

Schneck v. Saucon Valley Sch. Dist., 340 F.Supp.2d 558 (E.D. Pa. 2004).................35

Shehee v. City of Wilmington, 67 Fed. Appx. 692 (3d Cir. 2003).............................34

Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004).....................................................16, 22

Swineford v. Snyder County Pa., 15 F.3d 1258 (3d Cir. 1994) .................................34

Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) ....................................33

Wilson v. Seiter, 501 U.S. 294 (1991)....................................................................14

Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005)...........13, 15, 29, 30, 31


## Statutes, Rules and Other Authorities

United States Constitution, First Amendment ...........................................2, 5, 33, 34, 35

United States Constitution, Eighth Amendment........................................................ passim

United States Constitution, Eleventh Amendment ....................................5, 31, 32, 33

42 U.S.C. §1983...................................................................................................... passim

42 U.S.C. §1985.........................................................................................................2

29 Del.C. §§8902 .........................................................................................................6

29 Del.C. §8903 .........................................................................................................6

29 Del.C. §8903(2)(a) ...............................................................................................6

Federal Rule of Civil Procedure 26(a)(2) ..........................................................2, 30

Federal Rule of Civil Procedure 37(c)(1) ...............................................................30

Federal Rule of Civil Procedure 56(c) .............................................................12, 13, 38

Federal Rule of Civil Procedure 56(e) ......................................................................13

Federal Rule of Evidence 702................................................................................17, 29

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Timothy Ward, filed the Complaint in this matter on or about October 26, 2004, against the following State of Delaware Defendants: (1) Stanley Taylor, Commissioner of Department of Correction (DOC) (now retired); (2) Paul Howard, Bureau Chief of the DOC Bureau of Prisons (now retired); (3) Thomas Carroll, then-Warden of Delaware Correctional Center (DCC) (now employed as Deputy Commissioner of Correction); (4) Lieutenant John Salas, a Correctional Officer employed at DCC; (5) Jessica Davis-Barton, a Correctional Counselor employed at DCC; and (6) State of Delaware Department of Correction[2].  Plaintiff also listed as defendants "Certain unknown individual employees of State of Delaware Department of Correction."  Plaintiff never identified or served any of these "unknown employees."  The last day to move to amend pleadings was October 1, 2006 (D.I. 39, A-124), and the statute of limitations on claims arising from Ward's July 10, 2004 "inmate on inmate" assault expired one and one half years ago.  State Defendants filed a Third-party Complaint against First Correctional Medical, Inc. (FCM), the former contracted medical provider to DOC, based upon FCM's contractual agreement to indemnify.  (D.I. 32).

Plaintiff was an inmate incarcerated at the Delaware Correctional Center (DCC) on July 10, 2004 when he was suddenly assaulted by another inmate in the recreation yard, suffering injuries as a result.  Plaintiff's Complaint against the individual State Defendants alleges violations of the Eighth Amendment for deliberate indifference to Plaintiff's serious medical needs (Count I).  The factual allegations pled by Plaintiff were also construed by the District Court, in its March 30, 2006 Memorandum Opinion, as pleading a claim for violation of the Eighth Amendment on a "failure to protect" theory.  (See D.I. 26 at pp. 9-11).  Count II of Plaintiff's Complaint is a claim for violation

---

2  The State of Delaware Department of Correction and all State Defendants in their official capacities were dismissed from this suit pursuant to the Court's Memorandum Opinion and Order of March 30, 2006 (D.I. 26-27).

of the First Amendment, alleging that Plaintiff was allegedly "punished" by Defendants for First Amendment activity. Count III of Plaintiff's Complaint is an Eighth Amendment claim against the supervisory defendants based on alleged failure to train/wrongful customs, practices and policies. Count IV was a due process claim which was dismissed by the District Court in its Memorandum Opinion, granting in part State Defendants' Motion to Dismiss. (D.I. 26, A-100-101). The Court held that Plaintiff could not maintain substantive due process claims when his allegations were subsumed within the more specific Eighth Amendment claims. Id. Finally, Plaintiff originally plead a claim of "conspiracy" under 42 U.S.C. §1985 (Count V) which, during motion to dismiss proceedings, he agreed did not state a claim, and this Count was also dismissed by the Court. (D.I. 26) (A-101).

As discussed above, State Defendants filed a Motion to Dismiss Plaintiff's complaint on December 14, 2004 (D.I. 17). The Court, by the above referenced opinion dated March 30, 2006, denied the State's motion in part (Counts I, II and III) and granted it in part (Counts IV and V). (D.I. 26). The Court noted that, at the motion to dismiss stage, the Eighth Amendment and First Amendment claims had been adequately pled on the face of the complaint, but that evidence in discovery would be necessary for Plaintiff to ultimately maintain his allegations. (See A-93-94, 96). State Defendants filed an answer to Plaintiff's Complaint on May 1, 2006 (and filed its Third-party Complaint), denying all wrongdoing, and asserting numerous affirmative defenses. (D.I. 29) (A-103-117). FCM filed its Answer to the Third-party Complaint on June 12, 2006. (D.I. 32) (A-118).

The discovery cutoff in this case, as amended by the Court, was September 28, 2007.[3] (D.I. 61). The Scheduling Orders provided that Plaintiff's expert discovery would be due by June 30, 2007. (A-125-130). Plaintiff never produced expert discovery pursuant to Rule 26(a)(2). Plaintiff

and State Defendants each filed and answered written discovery, including Interrogatories, Requests for Production and Requests for Admission.  The only depositions taken during discovery were of Defendant Lt. John Salas, and former Correctional Officer ("CO") Keith Lovett—a non-party.  State Defendants propounded written discovery to third-party defendant FCM[4], however FCM failed to respond to that discovery in any way, and has engaged in no discovery of its own since the inception of this case.

State Defendants produced voluminous documentary evidence (Bates #D0001-D001164) to include:  Plaintiff Timothy Ward's entire institutional and medical file; including all medical documents in DOC's possession pertaining to treatment of injuries suffered in the assault; incident reports and investigative materials concerning the July 10, 2004 assault; all grievances filed by Plaintiff in DOC's possession; the institutional and medical files of Robert Johnson (the inmate who assaulted Ward); staffing and shift reports for the day in question; and DCC inmate housing rules and post orders.  Defendants have also provided the parties with copies of numerous documents obtained in litigation, primarily Timothy Ward's medical records from private providers.  Plaintiff produced approximately 38 pages of documents in discovery.

This is State Defendants' Opening Brief in Support of their Motion for Summary Judgment, pursuant to F.R.C.P. 56, which has been simultaneously filed with the Court.  State Defendants are entitled to summary judgment on all remaining claims for the reasons set forth herein.

---

3  The parties subsequently stipulated to another 30 day extension for fact discovery.  (D.I. 79).
4  *See* D.I. # 66-67.

## SUMMARY OF ARGUMENT

1.    There is no evidence in the record suggesting that any of the named State Defendants exhibited "deliberate indifference to Plaintiff's serious medical needs or other serious needs. The supervisory defendants—the Commissioner, Bureau Chief and Warden, as well as Correctional Officer Lt. Salas, had no personal involvement whatsoever with Timothy Ward's medical or custodial care. Supervisory defendants cannot be held liable on a *respondeat superior* theory. The remaining defendant, Jessica Davis Barton is a correctional counselor who did interact with Plaintiff and his family during his convalescence, but her sole involvement was to advise Ward that he needed to follow prison protocol in submitting sick call slips. There is no evidence in the record from which a reasonable fact-finder could find that Ms. Barton exhibited "deliberate indifference" to Mr. Ward's serious needs.

2.    There is no evidence in the record suggesting that any of the named State Defendants exhibited "deliberate indifference" by "failing to protect" Plaintiff from a known, serious danger of assault. Of the five named defendants, none except Lt. Salas had any personal involvement with the events on July 10, 2004. The evidence shows that Lt. Salas had no knowledge of any risk posed to Plaintiff by inmate Robert Johnson, and certainly did not deliberately disregard the safety of Ward or other inmates. To the extent that Robert Johnson's behavior was of concern to anyone prior to the assault, DOC personnel acted properly and reasonably by having him examined at the infirmary— who cleared Johnson and released him back to his housing unit.

3.    Plaintiff attempts to assert an Eighth Amendment claim against the supervisory State Defendants: the Commissioner, Bureau Chief and Warden, based upon DOC's alleged "failure to train" or the maintenance of wrongful practices and policies, allegedly resulting in Ward's injury. Plaintiff has produced no evidence whatsoever in the record necessary to meet the elements of a

"failure to train" claim.  There is no evidence suggesting that any DOC training/policies were deficient in any way; there is no evidence of other specific training not provided that could reasonably have been expected to prevent the harm, and there is no evidence that Defendants, as policymakers (a fact also not established in the record) exhibited a "deliberate indifference" to known risks posed by the policies.  Such a claim would need to be supported by expert testimony, and Plaintiff has identified no expert.  Moreover, Plaintiff's attempt to bring an Eighth Amendment claim, based upon failure to train, or policies/practices, against State Defendants is barred as a matter of law.  The United States Supreme Court has held that these types of "municipal liability" claims are asserted against the *governmental body itself*.  Such claims may *not* be asserted against State governments or State policymakers in the federal courts due to the State's immunity from suit under the Eleventh Amendment of the United States Constitution.  There are no genuine issues of material fact and no legal basis upon Plaintiff's Eighth Amendment "failure to train" claim can be maintained against State Defendants.

4.     Assuming, *arguendo*, Plaintiff engaged in protected First Amendment activity, he cannot make out a claim of First Amendment "retaliation", as there is no evidence whatsoever that he was "retaliated" against by any named defendant for filing medical grievances.  As with the Eighth Amendment medical care claim, the only defendant with personal involvement was correctional counselor Barton, and the sole evidence in the record as to her is that she advised and encouraged Ward to file written sick call slips if he needed medical treatment—the very documents about which he claims Defendants were aggrieved.  In additional, the extensive medical record shows that Ward did indeed receive medical treatment, both before and after Ms. Barton's alleged actions.

5

## STATEMENT OF FACTS

1.    **Backgound: the Parties, other individuals, and job functions of the State Defendants.**

*Plaintiff, Timothy Ward*, was, on July 10, 2004, a convicted inmate serving a three year sentence for a home-invasion burglary at Delaware Correctional Center (DCC). (A-104). He was assigned to the minimum security "T-2" building as of that date. (A-155; A-009; A-189). *Inmate Robert Johnson (a non-party)*, who assaulted Ward, was assigned to the T-1 building. (A-189). There was no history of any problems or adverse interactions (or, indeed, any interactions at all) between Ward and Johnson prior to July 10, 2004. (A-189). Johnson was not known to have made threats or have been a troublemaker prior to this incident. (A-36, 61-63). Altercations in minimum security were uncommon. (A-61).

Individual *State Defendant Stanley Taylor* was the Commissioner of the Delaware Department of Correction on July 10, 2004. He has since retired. The Commissioner of Correction is nominated by the Governor and holds a statutorily created office as the chief administrator of the DOC, and is responsible for the supervision of the entire agency. 29 Del.C. §§8902, 8903. (A-001). The Bureau Chief is an executive, supervisory official who reports to the Commissioner. 29 Del.C. §8903(2)(a). In July 2004, individual *State Defendant Paul Howard* held this position. The responsibilities of the Bureau Chief include the supervision and provision of overall administrative support for Delaware's five state prisons. (A-002). A Warden is assigned to DCC (and to each Level V facility) as the chief administrative officer of that facility. (A-001-002). In July 2004, the Warden of DCC was individual *State Defendant Thomas Carroll*. Id. The responsibilities of the Warden of DCC include supervision of all administrative functions and institutional programs at the prison. Id.

Individual *State Defendant John Salas* is a DCC Correctional Lieutenant, and held that position on July 10, 2004. (A-008). Correctional officers handle the day to day supervision of

inmates and Correctional Lieutenants have other supervisory responsibilities. (A-008-009). On July 10, 2004, Lt. Salas was assigned as area lieutenant/supervisor of security and staff for three minimum security areas at DCC, including the T-buildings. (Id; A-51). This position was designated as "Unit 13." (A-51). **Former Correctional Officer Keith Lovett (a non-party)**, was responsible for supervising the outside perimeter of the T building area, including the recreation yard on July 10, 2004. (A-51-52, 54, 60; A-20-21). Lovett's position was designated "Unit 28" and is a "roving" patrol within the T perimeter. Id. This was Lovett's regular position for several months before the incident. (A-21). Lovett is no longer employed by DOC and *is not a defendant in this matter*. Individual **State Defendant Jessica Davis-Barton** is a DOC Correctional Counselor, and held that position on July 10, 2004. (A-005). Correctional Counselors assist inmates with paperwork, classifications, work assignments and other institutional matters. They are not medical professionals. (A-004).

**2.      The sudden assault on Plaintiff by another inmate on July 10, 2004.**

On Saturday, July 10, 2004, at approximately 2:30 p.m., Plaintiff Timothy Ward was outside in the recreation yard of the T-buildings with other T-building inmates for recreation time. Another inmate who was in the yard, later identified as Robert Johnson, came up behind Ward, who was sitting on a picnic table, and, without warning, suddenly started punching and beating Ward about the face and head. (Incident Reports, Belanger, Rodriguez). Former CO [non-defendant] Keith Lovett, who was the CO tasked with responsibility for the yard, was inside a T-building at the time of the assault. (A-35, 38-39; A-60-61). Several inmates tried to help Ward, and CO Veronica Drummond, a correctional officer working another area who could see into the T-yard, called a Code 4, which is a medical emergency. (A-255-256; 259). When Lt. Salas heard the medical emergency code called, he ran to the yard to provide assistance. (A-57). CO Drummond, four Lieutenants,

including Salas, canine units, and former CO Keith Lovett (Unit 28) all responded to the Code and provided first aid. (A-258-260). Plaintiff was badly beaten but was conscious and breathing. (A-62). Salas took over the scene from Drummond until medical personnel responded. (A-57). Medical personnel from FCM responded shortly thereafter, and Ward was escorted to the infirmary. Id. FCM Medical personnel determined that Ward needed emergency treatment at the hospital (Med records) and FCM requested that Ward be transported to the hospital in a state vehicle. (A-261; 289). Shift Commander Michael McCreanor refused FCM's request for non-medical transportation and ordered that Ward be transported to Kent General Hospital by ambulance. (A-261-62; 289).

At the time the assault took place, Defendant Lt. Salas was in the T1 building doing security checks, which were part of his responsibility as Unit 13. (A-53). Non-defendant, former CO Lovett (Unit 28) testified that he was inside the T2 building doing an "area check" at the time Plaintiff was assaulted by the other inmate. (A-23). Lt. Salas testified that Unit 28 is supposed to be outside for 99% of his duty time. (A-55; A-22). Unit 28 (Lovett) is the person responsible for monitoring inmates while they are in the yard. (A-55; A-26). Salas testified that it would not have been appropriate for Lovett to spend a significant amount of time in a building while inmates were at yard. (A-60).

Inmate Robert Johnson, who assaulted Ward, had been disruptive in chow hall earlier on the morning of July 10, 2004. (A-27-28; A-255-56). Keith Lovett testified that Johnson made verbal threats, of a sexual nature, towards him, but that Lovett did not actually feel threatened. (A-27-28; A-36). Johnson only directed his remarks to former CO Lovett. He did not voice threats to any other CO's or inmates. (A-36). Johnson did not mention Timothy Ward at any time. Id. Keith Lovett testified that he advised a Lieutenant Harvey about Johnson's odd behavior and that Harvey arranged to have Johnson taken to the infirmary by another CO for evaluation. (A-28-29; A-37). Lt. Harvey

was not physically in the chow hall when inmate Johnson was acting up.  (A-37).

Johnson was brought to medical by a DCC Correctional Officer, and was seen and evaluated by FCM personnel at the infirmary at approximately 1:30 p.m..  (A-37; A-63; A-254).  A report of the evaluation appears in Robert Johnson's medical file.  (A-254).  These notes show that Johnson was seen by a Registered Nurse named Rose Lovegrove[5] [sic], and notes that the inmate was seen at security's [DOC's] request. (A-254).  Johnson reported that he was "okay . . . just really stressed out from work."  Id.  Johnson stated that he "shouldn't have yelled at that man," presumably referring to former-CO Lovett.  The nurse reported that Johnson did not appear agitated and "states has no intention of harming himself or anyone else."  Id.  The nurse issued a referral to have Johnson see by MH [Mental Health] on Monday, July 12, 2004.  Id.

After being seen by the nurse, Johnson was discharged back to his housing unit.  (A-37).  Correctional Officers do not have authority to countermand the medical provider's decision to clear or discharge an inmate, unless there is a further incident.  (A-63; A-38).  The T building inmates were at yard at the time Johnson returned to the unit, and he apparently joined the other inmates who were in the yard.  An inmate is permitted to join a yard in progress if he is returning from a destination.  (A-63; 65).  Salas did not let Johnson out into the yard and does not know who did.  Id.  Lovett testified it would have been the T building housing officer.  (A-28).  At some point during yard, as discussed above, the assault on Ward by Johnson occurred.

The chow hall where the earlier Johnson incident took place was not within Lt. Salas' duty area; Salas was assigned to a different chow hall at the time.  (A-58-59; 63).  After chow, Lovett had a discussion with Salas about the still-unidentified "chow" inmate, but Lovett did not express particular concern about him.  (A-65).  Salas attempted to make his own inquiries as to the identity

9

of the chow inmate. Id. About 15 minutes before the assault, a T-building CO pointed out an unnamed inmate (Johnson) to Salas as the person who had acted up in chow and had been seen by the infirmary. (A-62, 65). The inmate appeared to be headed toward the shower. (A-65). Salas was not acquainted with inmate Robert Johnson, or aware of any issues with him, prior to the assault. (A-61, 63). Lovett also testified he was not aware of any prior issues concerning Robert Johnson. (A-39).

### 3.     Plaintiff's subsequent medical treatment at DCC by Third Party Defendant, FCM, and other providers.

Ward was treated at Kent General Hospital (KGH) following the assault and released the same day, whereupon he was returned to DCC and admitted to the infirmary. (A-261-275). A CT scan at KGH diagnosed a fracture of the facial bones and deviation of the nasal septum. (A-322). Over the course of his 10 day stay in the infirmary, Ward was given various prescription pain medications and placed on a full liquid diet. (A-277-279; A-285). Ward was monitored closely in the infirmary by medical personnel. (A-291 -295). A dental consult was ordered on July 15, 2004. (A-322). On July 17, 2004, Plaintiff stated "he feels a lot better" (A-293), and was reported as "much improved" on July 20th. The liquid diet was discontinued after 10 days per doctor's orders. (A-286). After discharge from the infirmary on July 20th Ward continued to receive prescription pain medication. (A-280-282; A-295). Consults were ordered for in-house optometry and an [outside] maxillofacial surgeon on August 2, 2004. (A-296). Ward was readmitted to the infirmary on September 2, 2004 and reported "I'm doing alright now that I am in here. . . and my appetite is better" (A-302). He was discharged from the infirmary on September 10, 2004. Ward continued to receive outpatient medical treatment by FCM after that date.

---

5  The nurse, like all infirmary medical personnel, is an employee of Third-Party Defendant, FCM.

Ward was recommended for and obtained a number of consultations with outside physicians to evaluate his injuries. Plaintiff was referred for an outside consult with Dr. Norman Lippman, an oral surgeon, and that consult took place on July 19, 2004. (A-294; A-308-309). Dr. Lippman wrote in his assessment that there was "no oral/maxillary/mandibular fracture," that it was OK to change Plaintiff's diet to soft foods and that Dr. Lippman "d[id] not see the need for any treatment" from him. (A-309). Plaintiff had a consult with Dr. Pasquale Fucci, a general practice physician, which took place on Sept. 9, 2004. (A-305; A-311-314). Dr. Fucci recommended ENT and ophthalmology consults. Id. In response, Plaintiff was referred for a consult with Dr. David Larned, an ophthalmologist, and that appointment took place on October 5, 2004. (A-307; A-318). Plaintiff had a consultation with Dr. Paul Howard, an ENT specialist, on November 2, 2004. Id. Dr. Howard recommended consultation with an oral surgeon. Plaintiff was thereafter referred for a consultation with Dr. Michael Cahoon, an oral surgeon, which took place on November 24, 2004. (A-320-321).

**ARGUMENT**

I.     **SUMMARY JUDGMENT MUST BE GRANTED IN FAVOR OF STATE DEFENDANTS AS TO REMAINING COUNTS I, II, AND III, AS PLAINTIFF HAS ADDUCED NO EVIDENCE WHATSOEVER IN THE RECORD TO SUPPORT HIS ALLEGATIONS OF EIGHTH AMENDMENT OR FIRST AMENDMENT VIOLATIONS IN CONNECTION WITH THE JULY 10, 2004 INMATE ON INMATE ASSAULT.**

A.     **Standard of Review.**

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment and judgment shall be entered forthwith, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

Summary judgment is inappropriate only if the dispute of material fact is "genuine", meaning "such that a reasonable jury could return a verdict for the nonmoving party" on the issue. Id. The moving party (the named DOC defendants, here) may satisfy the requirements of Rule 56(c) by showing the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). That showing is amply made herein. In addition, while Defendants have no obligation to come forward with their own evidence negating Plaintiff's claims, the record is replete with such evidence, as discussed more fully herein.

In response, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, . . . [but] must set forth *specific fact*s that indicate a genuine material issue for trial." Fed.

R. Civ. P. 56(e) (emphasis added).  A non-moving party does not meet its responsive burden, and may not successfully oppose a summary judgment motion, by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit.  Bequeath v. L.B. Foster Co., 367 F.Supp.2d 779, 784 (W.D. Pa. 2005), *citing* Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).  To withstand summary judgment, the Plaintiffs' burden is to "introduce evidence from which a rational finder of fact could find in [their] favor." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  If the nonmoving party cannot make this showing, with reference to actual facts of record, the moving party is entitled to judgment as a matter of law.  F.R.C.P. 56(c).

**B.    There is no evidence in the record to support Plaintiff's allegations in Count I that State Defendants, Commissioner Stanley Taylor, Bureau Chief Paul Howard, Warden Thomas Carroll, Correctional Officer John Salas and Correctional Counselor Jessica Davis-Barton, exhibited deliberate indifference to serious medical or other needs of Plaintiff, Timothy Ward.**

**1.   The Legal Standard: "Deliberate Indifference."**

In Count I of the Complaint, Plaintiff alleges that the "Defendants" violated his Eighth Amendment right to be free of cruel and unusual punishments, based upon Defendants' alleged "deliberate indifference" to Ward's serious medical needs.  On the record in this case, Plaintiff cannot meet his burden of proving an Eighth Amendment claim as to any of the named State Defendants as a matter of law.[6]  It is axiomatic, of course, that the Plaintiff bears the burden of proving each necessary element of his §1983 claim.

Plaintiff's Eighth Amendment claim in Count I states, without specific allegations as to

---

6 For purposes of this argument, the Eighth Amendment claims as to the "supervisory" defendants: Retired Commissioner Stanley Taylor, Retired Bureau Chief Paul Howard, and former Warden Thomas Carroll, will be addressed separately from these claims as asserted against the non-supervisory defendants: CO Salas and counselor Davis-Barton.  Commissioner Taylor, Bureau Chief Howard and Warden Carroll will be hereinafter referred to collectively as the "supervisory defendants" or "administrative defendants."

individuals, that "Defendants" subjected Plaintiff to cruel and unusual punishment by denial of or inadequate medical care, food and clothing. Presumably, this broad allegation refers to Plaintiff's claims of deprivations while he was being treated at DCC for injuries sustained in the assault, including his two stays in the infirmary. As a preliminary matter, there is no evidence whatsoever in the record to suggest that any of the supervisory State Defendants (Commissioner, Bureau Chief, Warden) ever had any interaction, at any time, with Ward, nor any knowledge of his condition which could meet the legal standard for §1983 liability on an Eighth Amendment claim. As to the non-supervisory defendants, CO Salas testified at his deposition that he never saw Ward again after the assault, and there is no evidence to the contrary in the record. Only Correctional Counselor Davis-Barton had any interaction with Ward following the assault and there is no evidence in the record which would support Eighth Amendment culpability on her part.

The United States Supreme Court has established a now well-settled test for Eighth Amendment liability based upon medical treatment (or lack thereof) for prisoners. For liability to attach, the plaintiff must prove that the named defendants exhibited "*deliberate indifference* to serious medical needs of [the] prisoner[]." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (emphasis added). The same test is applied for "conditions of confinement" claims, such as Plaintiff's allegations of inadequate food and clothing. <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). Simple negligence will not suffice to maintain a constitutional claim. An "inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary or wanton infliction of pain' . . . [also] a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." <u>Estelle</u> at 105-106.

The term "deliberate indifference" was further refined by the Supreme Court in <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), which held that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement *unless the official knows of and disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837 (emphasis added). The "official" in question is, of course, for §1983 purposes, the named State Defendant. Thus, the named defendant must actually, subjectively, know of a substantial risk presented and affirmatively disregard it. Id at 838. Whether this test is met is a question of fact based upon the record of the case. Id at 842. Further, the mere fact that harm may befall an inmate does not establish or presuppose liability. The Eighth Amendment requires prison officials to assure the "reasonable safety" of inmates. Id at 844. If that is done, the officials will be free from liability even if the harm ultimately was not averted. Id.

The Third Circuit in Woloszyn, *supra*, recognized the important distinction between the criteria for establishing liability on medical vs. non-medical defendants in Eighth Amendment cases:

> The detainee's condition must be such that failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death. Moreover, the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

396 F.3d at 320. The alleged medical need must be *so obvious that a lay person would easily recognize the necessity for preventative action* . . . sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." Id (emphasis added).

Within these legal parameters, it is clear, for the reasons discussed below, that even viewing the record in the light most favorable to the non-moving party, Plaintiff cannot, as a matter of law, meet his burden of proof that any of the named State Defendants exhibited "deliberate indifference" to "serious medical need[s]" of which they were or should have been aware.

15

> **2.    The Supervisory Defendants, Commissioner Taylor, Bureau Chief Howard and Warden Carroll, had no personal involvement in the events alleged, and there can be no liability against administrative officials on a theory of *Respondeat Superior*.**

The conduct of each named defendant, as an individual, must be examined under the "deliberate indifference" test set forth above.  Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  For purposes of summary judgment, the question is whether Plaintiff can adduce evidence showing a genuine issue of material fact that any of the named Defendants personally and purposefully "denied medical care" or other humane conditions of confinement to Timothy Ward.  As to the three "supervisory defendants"—executive DOC officials--the examination is short and clear, and plainly requires judgment as a matter of law in Defendants' favor.

It is perhaps the most fundamental premise of § 1983 jurisprudence that the plaintiff must demonstrate—on the factual record—that a particular defendant has *personal involvement* in the alleged constitutional tort for the claim to even proceed.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Spruill, *supra*.  The plaintiff must "allege and prove a causal connection between the defendants and the alleged wrongdoing in order to recover."  Brathwaite v. Carroll, 2006 WL 839385, *4, (D.Del. 2006)(*citing* Rode, *supra*).  To allege deliberate indifference to medical needs (or other conditions) the Plaintiff "must establish that supervisory officials participated in or had personal knowledge of and acquiesced in the actions which are alleged to have constituted a constitutional dprivation."  Daniels v. Delaware, 120 F.Supp.2d 411, 428 (D.Del. 2000).

In the instant case, there is no evidence whatsoever that the supervisory Defendants Taylor, Howard and Carroll, had any personal involvement in the provision of medical  or custodial services to Plaintiff following the July 10, 2004 assault.  Aside from a single informational memo from Major Holman to Warden Carroll (A-003; A-328), dated September 2, 2004, there is no evidence in the

record that any supervisory defendant was ever made aware of any issues concerning Timothy Ward. Notably, the September 2, 2004 Holman memo showed that DCC was responsive to concerns raised by Ward's family. The memo does not show that any deprivations occurred and, in fact, shows that Ward's needs and his (more accurately, his family's) complaints had been investigated and addressed. This type of memo was one that would have been received by Warden Carroll in the normal course of business and did not call for any action on his part. (A-003).

Furthermore, the record demonstrates Plaintiff could not succeed on a deliberate indifference to medical needs theory even assuming *arguendo* he had named proper defendants (with personal involvement). Timothy Ward's prison medical record (only a small part of which is reproduced in the Appendix) is replete with daily medical notes from Plaintiff's stay in the infirmary; progress notes; referrals to several outside physician specialists and prescription orders. (See A-276-321). Plaintiff obtained consults with at least five outside physician specialists in the four months following his injury. Simply put, Plaintiff *was* receiving medical care for his injuries. "Deliberate indifference cannot be established where an inmate receives treatment, even if that treatment is not exactly the type . . . the inmate requests." Daniels, *supra*, 120 F.Supp.2d at 427. In addition, to meet his burden of proof, Plaintiff would have to produce expert medical evidence as to the alleged constitutional inadequacy of his treatment, and he provided no expert discovery in this case. F.R.E. 702; *see also* Daniels, *supra* (even where parties each had experts and those experts disagreed on the *quality of care* received, this was insufficient evidence to create genuine issue of material fact, since care was indeed rendered).

Turning back to the supervisory defendants: even on the face of the complaint, Plaintiff fails to allege that the three executive administrators were personally involved in the alleged constitutional deprivations of medical care or other conditions. (A-68-83). *In fact, the names of*

*Defendants Taylor, Howard and Carroll do not even appear in the body of the Complaint.* Id. Plaintiff did not take the depositions of any of the supervisory Defendants so, of course, no testimony was elicited which would support his burden of proof. There is no evidence that the Commissioner and Bureau Chief of the DOC had any role in the custodial care of Timothy Ward (or of any DCC inmates). The affidavit of former Warden Carroll explains the purely supervisory nature of the offices held by the supervisory Defendants, and affirmatively states his lack of any personal involvement with Plaintiff.

Clearly, any "deliberate indifference" claims against the supervisory officials would be based solely on a vicarious liability/*respondeat superior* theory. It is well-settled that the theories of *respondeat superior* and vicarious liability are not acceptable bases for liability under § 1983. Rode, *supra*, 845 F.2d at 1207 ("a defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."); *See also* Polk County v. Dodson, 454 U.S. 312, 325 (1981). The fact that a State official may have responsibility for supervising others "is irrelevant" to the constitutional claim. Rode, 845 F.2d at 1208. The allegations must show that the named State official *personally* violated the rights of the plaintiff. The Commissioner, Bureau Chief, and Warden are at the top of the DOC chain of command, and any liability asserted against them for events which took place in this case could only be premised on an impermissible vicarious liability theory. Plaintiff does not and cannot identify a single act or omission against Timothy Ward personally undertaken by Defendants Taylor, Howard or Carroll. Both common sense, and the record, compel the conclusion that personal liability for deliberate indifference on the part of the three supervisory defendants does not exist.

> **3. There is no evidence whatsoever in the record that Defendant, Correctional Officer John Salas, played any part in Mr. Ward's medical treatment or even had contact with Mr. Ward after the assault.**

Defendant, Correctional Lieutenant John Salas, is not a "supervisory" defendant, but is entitled to summary judgment on the Count I "deliberate indifference" medical claim for the same reason as the supervisory defendants discussed above—he had no personal involvement whatsoever with Plaintiff Ward's medical care or conditions of confinement after the assault.  Lt. Salas' involvement in this matter is limited only to his working as a supervisor in the T-building area on the day Ward was assaulted.  In his affidavit, Lt. Salas attested that he had no further contact with Plaintiff after July 10, 2004.  (A-10).  Lt. Salas was deposed in October 2007 and testified only about his activities on the day of the assault.  He is entitled to summary judgment as to the Count I "medical care" claim.

> **4. There is no evidence in the record that Defendant, Correctional Counselor Jessica Davis-Barton played any part in Mr. Ward's medical treatment or was "deliberately indifferent" to any of Mr. Ward's serious needs.**

Correctional Counselor, Jessica Davis-Barton is the only one of the named defendants who had any interactions at all with Plaintiff Ward after the inmate-on-inmate assault of July 10, 2004.  However, there is no evidence in the record which would suggest, let alone create a genuine issue of material fact, that Ms. Barton exhibited constitutionally culpable "deliberate indifference" to serious needs of Mr. Ward.  Ms. Barton's deposition was not taken.  The only evidence in the record as to Ms. Barton's involvement with this matter appears in her affidavit and file notes, referencing contact with Mr. Ward and his family.

As part of her duties as a prison counselor, Ms. Barton assists inmates and their families in navigating various procedures and issues in the prison system.  (A-004).  Ms. Barton's affidavit and notes show that about a month after the assault, she began receiving numerous phone calls from

Plaintiff's mother and sister about his medical care. (A-005-007; A-330; 333-34). Barton made inquiries and responded to the family as much as she could without violating privacy laws. Id. In particular, she received a series of calls from the family complaining that Ward was not being seen by the infirmary. Barton discovered that Ward was not submitting sick call slips, as required by institutional rules, to obtain medical treatment. Id. Barton advised that Ward would have to follow the sick call slip protocol, in the same manner as other inmates. Id. At all times, she treated Ward and his family with respect.[7] Id. As a correctional counselor, Ms. Barton was not herself a medical provider, nor did she play any part in the actual medical treatment of Ward. (A-004). Even if, in her limited function as a counselor, Ms. Barton acted negligently, this would not suffice to maintain a constitutional claim against her. Estelle, *supra* at 105-106. There is simply no evidence of any behavior by Ms. Barton which would allow a reasonable fact finder to find that Ms. Davis-Barton violated the Eighth Amendment prohibition against "cruel and unusual punishment" by exhibiting "deliberate indifference" to Timothy Ward's serious medical needs.

> **C.** **There is no evidence in the record to support Plaintiff's Eighth Amendment claims that State Defendants, Commissioner Stanley Taylor, Bureau Chief Paul Howard, Warden Thomas Carroll, Correctional Officer John Salas and Correctional Counselor Jessica Davis-Barton, "failed to protect" Plaintiff from a known, serious risk that he would be assaulted by fellow inmate Robert Johnson.**

As discussed above, Plaintiff's Eighth Amendment claim in Count I alleges a "deliberate indifference" claim based solely upon alleged denials of or inadequate medical care, food and clothing. (A-80). It should be noted that Count I itself does not actually articulate "failure to protect" as a basis for Eighth Amendment liability. Nonetheless, this Court, in construing Plaintiff's

---

7 Plaintiff's bare allegations in the Complaint that Barton was "rude" or non-responsive to Ward's family would not state a §1983 claim for several reasons. First, constitutional violations (if any) must be personal to the Plaintiff. In addition, "rudeness," even if directed toward the Plaintiff (of which there is no evidence in the record), is *de minimis* conduct which does not state an Eighth Amendment claim. *See* Balliet v. Whitmire, 626 F.Supp. 219 (M.D. Pa. 1986), *aff'd* 800

complaint during the motion to dismiss proceedings, implicitly found that a "failure to protect" (a failure to protect Plaintiff from assault by a fellow inmate) was subsumed within the Eighth Amendment claim. (A-91). While State Defendants question whether a "failure to protect" claim was properly pled on the face of the Complaint, this brief will assume *arguendo* that this claim is properly before the Court.

The legal standard for failure to protect an inmate from harm, including assault by another inmate, is the same as the Farmer v. Brennan standard for medical care claims set forth above—deliberate indifference. In Hamilton v. Leavy, 117 F.3d 742 (3d Cir. 1997), an inmate, who had been subjected to multiple assaults in prison due to his reputation as a "snitch," sued classification officials who reassigned him to the general population of the prison in which he had been previously assaulted. The Third Circuit, recognizing the "duty to protect" theory, applied the legal standards set forth by the Supreme Court in Farmer. Specifically, the plaintiff inmate "must show that the [defendant] official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [he] must also draw the inference." Hamilton, 117 F.3d at 746 (citing Farmer). The defendant officials must have a sufficiently culpable state of mind. Id. In order to avoid summary judgment, the Plaintiff must produce "sufficient evidence" as to both the defendant's awareness of the serious risk and his deliberate indifference to that risk, as well as causation. Id.

As with the medical care claim, the "failure to protect" claim may be disposed of quickly as it applies to the three administrative defendants: the Commissioner, Bureau Chief and Warden. There is no evidence in the record—and Plaintiff does not plead—that any of these executive officials had any personal involvement in the events of July 10, 2004, any interaction with Robert Johnson at any

---

F.2d 1130 (3d Cir. 1986).

time, or that they were in any position to prevent the events that occurred in the recreation yard on that Saturday. Without personal involvement, there can be no §1983 liability. Rode, *supra*, 845 F.2d at 1207; Spruill, *supra*; Daniels, *supra*. *See also* Baker v. Lehman, 932 F.Supp. 666 (E.D. Pa. 1996)(granting summary judgment for administrative prison officials who had no prior knowledge of animosity between inmates involved in prison stabbing). The administrative defendants are entitled to judgment as a matter of law on the "failure to protect" claim.

State Defendants do not believe that Plaintiff intends to assert the "failure to protect" claim against Defendant, Jessica Davis-Barton, nor would the record provide any support for such a claim. There is absolutely no evidence that Ms. Barton—the correctional counselor--had any dealings with Robert Johnson or Plaintiff on the day in question, or that she should have or could have prevented the assault. Indeed, Plaintiff's complaint does not cite Ms. Barton as a player in the case until July 12, 2004, when it is alleged that Plaintiff's mother placed a telephone call to counselor Barton. (A-74). Jessica Davis-Barton is entitled to summary judgment to the extent any Eighth Amendment "failure to protect" claims are asserted against her.

The only named defendant as to whom a "failure to protect" claim might possibly apply is Lt. John Salas, as he was on duty in an area encompassing the T-yard where the assault took place on July 10, 2004. However, the evidence in the record is plainly insufficient to create any genuine issue of material fact as to Lt. Salas' liability on such a claim. In fact, the evidence of record shows that "deliberate indifference" on the part of Lt. Salas clearly does not exist.

It seems fairly undisputed that the "substantial risk" that Plaintiff claims was the "risk" posed by Robert Johnson, the inmate who assaulted Plaintiff. To meet the Farmer test for liability, it must first be shown that Lt. Salas was aware of the risk posed by Robert Johnson toward Timothy Ward on July 10, 2004 (or--to give Plaintiff the benefit of every inference--toward other inmates Johnson

might come into contact with).  Next, it must be shown that Lt. Salas knowingly, consciously and deliberately disregarded this risk, indifferent to the harm that might result.  This second question focuses on "what [the] defendant's mental attitude actually was."  Hamilton, 117 F.3d at 747.  There is no evidence to support either of these required elements, as to Lt. Salas, on the record of this case.

Robert Johnson was not known to be a risk to Plaintiff.  Indeed, there is no evidence in the record that, before July 10, 2004, this minimum security prisoner was a particular risk to any inmate.  Plaintiff, in answers to Interrogatories, admits that he had no prior interactions (adverse or otherwise) with Robert Johnson prior to this assault.  (A-189).  The only prior unusual event concerning Robert Johnson was that, five months prior to the assault, he apparently tried to jump out of a window in another building after learning of his father's death.  (A-189-190).  While this behavior may have been self-injurious, it was not suggestive that Johnson was predisposed to assault Ward or anyone else.  It was also unknown to Lt. Salas.  (A-66).

There is no question that the assault by Johnson against Ward in the yard was sudden and unprovoked.  Plaintiff must therefore hang his case for "deliberate indifference" on Johnson's behavior in chow hall on the morning in question.  However, even giving Plaintiff the benefit of every reasonable inference, the "chow hall" evidence does not create a genuine issue of material fact which would support Eighth Amendment liability against Defendant Salas.  While Plaintiff might prefer to proceed under a theory of some sort of "imputed" misconduct or negligence, based upon Keith Lovett's knowledge or opinions about Robert Johnson, this is not the legal standard for §1983 liability.  The only relevant inquiry is whether the named defendant, *Lt. Salas,* should personally have known that Johnson posed a risk to Ward (or other inmates) and whether he consciously disregarded that risk.  The record shows that neither of those elements is met.

Defendant Salas was not present in the lunchtime chow hall where Robert Johnson uttered his

crude remarks toward former CO Lovett.  At that time, Salas was supervising a different chow hall in

a different location.  Thus, Salas certainly had no first-hand knowledge of what Johnson had said or

done, or what his demeanor was.  It is also important to take note of the limited nature of the threats

made by Johnson in chow.  Former CO Keith Lovett, testified that Johnson made verbal threats of a

sexual nature directed specifically toward Lovett.  Lovett testified that he laughed off the remarks

and did not actually feel threatened.  (A-28, 36).  Lovett was specifically questioned about the scope

of Johnson's "threats":

> Q.     Now, Robert Johnson's comments in the chow hall were directed at you
> personally, correct?
> A.     Yes.
> Q.     Were they directed at any other C/O's?
> A.     Not that I recall.
> Q.     Were they directed at any other inmates?
> A.     No.
> Q.     Did he mention Tim Ward in chow hall?
> A.     No.
> Q.     Did you feel actually threatened by Robert Johnson at that time?
> A.     Not in the least bit.

(A-36).

While Lovett did not feel threatened, he testified that he did have enough concern about

Johnson's behavior to report the comments to a superior, Lt. Harvey.[8]  (A-28-29).  Lt. Harvey took

Lovett's concern seriously enough to have Robert Johnson taken to the infirmary to be examined.

(A-29, A-37).  At the infirmary, contrary to the allegation in the Complaint that "no medical

personnel" were present (A-70), Johnson was indeed examined by a Registered Nurse, and a record

of the evaluation was placed in his medical file.  (A-254; A-29, A-37).  The nurse noted that Johnson

---

8  Plaintiff has made an extremely untimely attempt to amend his Complaint to add Lt. Paul Harvey as a Defendant, by
Motion to Amend filed on December 7, 2007, a mere business day before these summary judgment proceedings began.
While State Defendants will strongly oppose this motion to amend, even if Lt. Harvey's conduct were to be considered,
*arguendo*, for purposes of this motion, Harvey would be entitled to summary judgment as no reasonable fact finder could
believe he acted with "deliberate indifference," when it is undisputed that he arranged to have Robert Johnson evaluated

was being seen at DOC's request.  (A-254).  Johnson told the nurse he was "okay" and that he "shouldn't have yelled at [Lovett]."  The nurse's assessment was that Johnson did not appear agitated and "state[d] [he] has no intention of harming himself or anyone else."  Id.  The nurse issued a referral to have Johnson followed up by Mental Health on Monday, July 12, 2004.  Id.  Johnson was then cleared by medical to return to his housing unit.

All of the events described to this point occurred without Lt. Salas' knowledge or participation.  Lt. Salas first heard about the "inmate who acted up in chow" when he himself returned from another chow hall to the T-complex.  An officer told Salas "in passing" that there was an incident in one of the chow halls.  (A-64).  The offending inmate was not identified by name, but Salas learned that it was one of the T inmates.  (A-64-65).  Lt. Salas, although no action was requested of him, did not ignore the information he was given, but affirmatively tried to obtain more information about the "chow hall inmate."  (A-65).  Salas spoke to Keith Lovett and to the T building officers.  Id.  Lovett described the chow inmate as having "act[ed] out" but did not express particular concern about him.  (A-65).  One of T building officers pointed out a (then unnamed) inmate to Salas as the chow inmate, who had just returned from the infirmary.[9]  (A-62; A-65).  At that point, the chow inmate was in the building and appeared to be heading toward the showers.  Id.  10 to 15 minutes later, the Code was called.  (A-63, A-65).  It is not known who let Robert Johnson go from the building out to the yard (which was not in itself against policy), but it was not Lt. Salas.  (A-63, A-65).

Thus, the fact pattern presented by the record is that Defendant Salas had no personal knowledge of Robert Johnson's conduct during chow.  Johnson's "threats" during chow were only

---

by the infirmary, in light of his reportedly erratic behavior.
9 Salas was unfamiliar with the inmate, and did not know Robert Johnson by name or by sight prior to July 10, 2004.  (A-61, A-63).

verbal and were directed toward a single CO, and not toward Ward or any inmates. Johnson's behavior was reported to a Lieutenant [Lt. Harvey] who responded by having Johnson promptly taken to Medical. Medical evaluated and cleared Johnson who, according to the medical notes, was stable and non-threatening at that point. When informed that an unidentified T-inmate had acted up during chow, Salas immediately proceeded to make inquiries of the T-officers. The inmate, who was not known to Salas, had returned from the infirmary, was not acting unusually and appeared to be headed toward the showers. The next thing Salas knew, a Code had been called.

To the extent there is fault in this case, it would seemingly lie with Former CO Keith Lovett. However, even Lovett's conduct would not rise to the level of constitutional culpability. Mr. Lovett was the correctional officer who was specifically tasked with supervision of the outside perimeter of the T buildings and, in particular, the T-yard when the inmates were at recreation. This was admitted by Lovett himself. (A-20-21). According to Lt. Salas, Lovett should not have been inside a building doing an "area check" while the inmates were at yard. (A-60). However, at most, this conduct by Lovett would constitute negligence which does not rise to the level of "deliberate indifference." There is no evidence Lovett had a culpable mindset toward Plaintiff, or a willful disregard for the safety of the T inmates, particularly in light of the concerns he himself voiced about Robert Johnson. Of course, this analysis is moot, as Mr. Lovett was never named as a defendant in this case, despite Plaintiff's full awareness of Lovett's participation soon after the assault took place.[10] (A-190-191; 193 (plaintiff noting in interrogatory answers information obtained and discussions he had with Lovett after the assault)). Lovett's actions or inactions may not be vicariously attributed to Lt. Salas

---

10 Also of note, Keith Lovett prepared a personal "email diary" of the events of July 10, 2004 because he was afraid he might be personally sued after the assault. (A-39, A-41). Around the time this litigation was instituted, Keith Lovett handed Lt. Salas a printout of this email and told him not to show it to anyone else. (A-64). Salas disregarded this instruction and properly turned the document over to attorneys for the State.

or to any other State Defendant, as §1983 liability will not sound based on vicarious liability or *respondeat superior* theories.

A prison official's duty under the Eighth Amendment is to ensure reasonable safety—not to be an insurer or guarantor against all harms—whether foreseeable or not. Farmer, 511 U.S. at 844. Turning the focus to the only Defendant whose conduct is at issue on the "failure to protect" claim— Lt. Salas—on the record here presented it seems impossible that a reasonable juror could find that Lt. Salas exhibited deliberate indifference--a culpable mindset—toward Timothy Ward or any of the inmates in his charge. Rather, the record shows that he (and other DCC officers) acted reasonably and responsibly, and that the attack by Johnson could not have been anticipated—and certainly could not have been averted by Lt. Salas.

A §1983 action cannot be maintained simply because harm ultimately befell the Plaintiff. Farmer, 511 U.S. at 844; Hamilton, 120 F.Supp.2d at 747-48. "If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind." Daniels v. Delaware, *supra*, 120 F.Supp.2d at 421 (citing Hamilton). In Hamilton, *supra*, the named defendants could not avoid summary judgment in the face of evidence that they were personally aware of a long history of threats and assaults against the "snitch" inmate, and knowingly chose to place him in the general population where he had been assaulted before. By contrast, Lt. Salas did not know Robert Johnson (the "chow inmate") was a threat to other inmates. Lt. Salas, upon learning (without specifics) that the "chow inmate" had acted up, was actually in the process of making inquiries about this event when the attack occurred. Lt. Salas knew the chow inmate had been seen and released by Medical. Lt. Salas did not place the "chow inmate" in the yard with Plaintiff, nor even know that he was in the yard. To the questionable extent that Lt. Salas knew that Johnson was a "risk" to inmates at all, no reasonable juror could find that he acted with a

27

culpable state of mind which would constitute "deliberate indifference" to the safety of inmates.

> **D.    There is no legal basis or evidence of record to support the allegations in Count III that any of the supervisory State Defendants are subject to liability on a "failure to train" or "wrongful practices and policies" theory in connection with the inmate on inmate assault of July 10, 2004.**

>> **1.    Plaintiffs have produced no evidence whatsoever of any wrongful training, practice or policy pertinent to the claims at issue.**

As with the claims of "deliberate indifference" to medical needs or conditions of confinement, there is well-settled caselaw in the Third Circuit addressing the legal standard of proof on a claim of inadequate policies, practices or training allegedly resulting in injury to an inmate.  In contrast to the direct liability Eighth Amendment claims, "failure to train" and policy claims are brought only against supervisory or administrative officials.  Thus, the only Defendants who could potentially be liable under Count III are the supervisory defendants—Commissioner Taylor, Bureau Chief Howard and Warden Carroll.  However, like the direct liability claims in Count I, there is no evidence in the record by which a reasonable fact finder could conclude that any of these supervisory Defendants were liable under the Eighth Amendment for deliberate indifference as to training or policies/practices, resulting in injury to Timothy Ward.  Defendants are therefore entitled to summary judgment as to Count III for the reasons set forth herein.

The plaintiff's burden in asserting this type of claim was articulated by the Third Circuit in Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989).  The Court found that for liability to attach to a government policymaker, the plaintiff must identify specific training (or policies) which defendants failed to employ that could reasonably be expected to prevent the harm, and must further demonstrate that:

> 1) The existing custom and practice without the [plaintiff-identified] specific alternative practice created an unreasonable risk of harm;
> 2) the policymaker was aware of the unreasonable risk;

3) the policymaker was indifferent to the unreasonable risk, and
4) constitutionally significant harm resulted from the deficient policy or practice.

885 F.2d at 1118 (*citing* City of Canton v. Harris, 489 U.S. 378 (1989)).  In Woloszyn, *supra,*

396 F.3d at 324-26, a case that dealt with inmate suicide, the Third Circuit further elaborated on

the test, noting that the §1983 plaintiff must:

> demonstrate that the risk reduction associated with the proposed training is so great and
> so obvious that the failure of those responsible for the content of the training program to
> provide [the specific training established in (1)] can reasonably be attributed to a
> deliberate indifference to whether the particular injury befalls the inmates.

Id at 325 (*also citing* City of Canton).

Plaintiff's complaint makes a bare allegation of deficiencies in policies and procedures

pertaining to "inmates' safety and physical well-being" and "safe conditions." (Compl. ¶83).  Three

years after suit was filed, Plaintiff's claim remains a bare allegation.  Plaintiff conducted no

discovery as to DCC's training procedures or policies/practices as to any of the extremely broad

areas under which this claim is brought.  Simply put, there is no evidence at all in the record

addressing any of DCC's training practices or policies, and certainly no evidence suggesting that any

particular training, policies or practices were deficient.

Plaintiff does not meet the first prong of the Third Circuit test, as he does not "identify

[other] specific training not provided that could reasonably be expected to prevent the [harm] that

occurred." Woloszyn, *supra* at 325.  Moreover, the test outlined in Sample and Woloszyn, upon

which a plaintiff must make a prima facie case, involve penalogical and medical issues beyond the

scope of the lay juror, and would require expert opinion testimony.  *See* Federal Rule of Evidence

702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148-49 (1999).  As to the issue of how, if at all,

Robert Johnson should have been handled differently, Plaintiff himself, by arguing inadequate care

by the infirmary, recognizes that medical expertise would be necessary to recognize and address

Robert Johnson's alleged mental illness.  On the issues presented here, such as security and inmate safety, and mental health screening of inmates, lay jurors are certainly not equipped to determine what specific training (or policy) is adequate for correctional officers to protect inmates from a potentially dangerous individual; how existing policies or practices were allegedly deficient, or the risk reduction associated with one type of training versus another.  Woloszyn, *supra*, 396 F.3d at 325.  All of these questions would require expert opinion as to the propriety of existing or alternative training and/or policies, and the obviousness of the risk of any given policy or practice to the policymakers.  As noted above, Plaintiff did not identify any expert witnesses on his behalf, and so can address none of these issues, either on summary judgment or at trial.[11]

Notably, in Woloszyn, the plaintiff did produce an expert's report and affidavit in the record, but the Court granted summary judgment nonetheless, finding the expert's submission to be deficient, as his findings were broad and conclusory and did not identify the *specific type* of training which allegedly should have been provided.  *See also* Freedman v. City of Allentown, 853 F.2d 1111, 1117 (3d Cir. 1988)(mere conclusory allegations of failure to train insufficient to maintain constitutional claim).  Certainly, the Third Circuit would also find that where, as here, the Plaintiff has proffered *no expert opinion* whatsoever as to deficiencies (if any) in DCC's training/policies, *nor any evidence suggesting a specific type* of training or policy which was allegedly absent, that the Plaintiff can not meet his burden of proving deliberate indifference for "failure to train."

In addition to the failure of proof under the legal test, Plaintiff's case also suffers the fatal defect of producing no factual evidence linking the named supervisory Defendants, Taylor, Howard

---

11 Plaintiff's deadline to provide expert discovery, according to the Court's scheduling orders, was approximately July 2, 2007.  (A-125; 130).  Plaintiffs never named an expert nor provided any expert discovery as required by F.R.C.P 26 (a)(2)(B).  Plaintiff's failure to provide required discovery bars his use of such information at trial or motion.  F.R.C.P. 37(c)(1).

and Carroll to any DCC training/policies that did exist.  There is certainly no evidence that they were on notice of other training which would have avoided the alleged harm, nor any evidence remotely suggesting that, in implementing policies or procedures, the supervisory Defendants exhibited a "deliberate indifference" to whether Ward or other inmates were in danger of being assaulted. Woloszyn, *supra*.  The primary way a plaintiff would make out a supervisory liability claim for deficient policies or training is to show that defendant officials failed to respond "in the face of an awareness of a pattern of such injuries."  Beers Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001)(citing Sample).  There is certainly no evidence in the record of a "pattern" of inmate assaults at DCC or, indeed, of any similar incidents which took place before this one, which might have put Defendants on notice of a potential problem with training or practices.  The only evidence on this point is actually to the contrary.  Any kind of altercation in the minimum-security T-building area was a rare event.  (A-61).

   2.  **The "failure to train/wrongful practices and policies" theories of liability asserted in Count III are theories of municipal liability which cannot be maintained against State officials, as a matter of law, by virtue of Eleventh Amendment immunity.**

   In addition to the utter lack of factual evidence in the record to support a "failure to train" claim, Plaintiff's attempt to bring this claim against the supervisory State Defendants, is legally barred, in any event, by virtue of the State Defendants' Eleventh Amendment immunity, which bars all claims in federal court which are premised upon the actions of the State as a sovereign entity.  A §1983 claim for deliberate indifference to deficient training or policies is a claim brought against a *governmental body itself.  See* Monell v. Department of Social Services of City of New York, 436 U.S. 658 (1978); JMK v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 580 (3d Cir. 2004)("plaintiff must identify a policy or custom *of the entity* that caused the constitutional

violation"). Such a claim can be asserted in federal court against a municipal governmental entity, but *not* against a State agency or State actor. Id. In recognizing the theory in Monell, the Supreme Court held that "Congress did intend *municipalities and other local government units* to be included among those persons to whom §1983 applies." 436 U.S. at 689 (emphasis added). The Court included a footnote to this holding that clearly set forth its recognition of the distinction between municipal liability and state government liability (or lack thereof) under §1983. The Court stated:

> there [is no] basis for concluding that the Eleventh Amendment is a bar to municipal liability. . . . Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.

Id at 691, *fn*. 54; *see also* Id at 694 (holding that the policy/practice claim seeks relief for an injury for which "the *government as an entity* is responsible . . ." (emphasis added). The corollary to the holding above is that *State* officials, who are obviously "part of the State" for Eleventh Amendment purposes, are *not* subject to liability in the federal courts on governmental policymaking claims.

This limited holding of Monell makes sense, because matters of policy, custom and training are attributes belonging to the governmental entity itself, and not to individuals (at least not outside their official capacity as policy makers).[12] A later U.S. Supreme Court case, elaborating on Monell, City of Canton v. Harris, held unequivocally that policy/custom claims are claims against the governmental *entity* only: "a municipality can be found liable under §1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under §1983." 489 U.S. 378, 385.[13] *See also* Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004) (failure to train is a violation of §1983 by the "municipality *itself*"). To hold State supervisory officials liable for policies or practices which are creatures of the

---

12  The Court in Monell took pains to note that the municipality could not be held liable on a *respondeat superior* theory for improper acts of an employee. 436 U.S. at 691.

13  *Accord* Canton at 389 (only where there is deliberate choice of failure to train "can *a city be liable*"); Id (city liable

State itself would circumvent the fundamental principle that, under the Eleventh Amendment, State officials are subject to suit in their individual capacity only, not in their official capacity as policymakers. It would further have the effect of holding newcomers to the office potentially liable for policies which were put into place by their predecessors, for which they had no personal responsibility.

Thus, as <u>Monell</u> recognized, since this type of claim is one which sounds against the governmental entity itself, it follows that the entity in question must be subject to suit in the federal courts. Unlike municipalities, *State* agencies are immune from suit under the Eleventh Amendment. The Delaware Department of Correction is immune from suit under a "failure to train/policy and practice" (or any other) §1983 claim. Nor can actions (if any) of individual State Defendants subject the State to vicarious liability. While, as stated above, Plaintiff has not linked the named Defendants to any particular training programs or policies, even if there was evidence that the supervisory defendants were responsible policymakers, these DOC officials would have been acting in their official capacity as the alter ego of a Delaware State agency. Just as no claim can be asserted against the agency (DOC) by virtue of the Eleventh Amendment, no "failure to train" claim could sound against the DOC Commissioner, the Bureau Chief or the Warden in their official capacities, as they are not "persons" subject to suit under §1983. *See* <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58 (1989).

    **E.**    **There is no legal basis or evidence of record to support Plaintiff's allegations in Count II that Plaintiff was subject to any "retaliation" by any named defendant for engaging in "First Amendment" protected activity.**

The final claim asserted by Plaintiff also fails to find evidentiary support in the record, and is subject to disposition by summary judgment. In Count II, Plaintiff purports to state a claim of

---

where "*municipal policy causes* a constitutional deprivation"); at fn. 7 ("*a city must exhibit* deliberate indifference . . . ").

violation of the First Amendment, suggesting that Plaintiff was "punished" for "seeking medical care" and filing prison grievances.  Plaintiff provides no further details as to what "punishment" occurred (or by whom), but a review of the factual allegations suggest (and this Court construed during motion to dismiss proceedings) that Plaintiff is alluding to his placement in protective custody in September 2004, as a result of an altercation with another inmate.  (A-98-99).  State Defendants will assume for purposes of this argument that Ward's grievances[14] and other requests for medical care (if any) constitute "First Amendment" speech or "petitions."  The same legal test, set forth below, applies for both speech and petition claims.  Hill v. City of Scranton, 411 F.3d 118, 126-27 (3d Cir. 2005).

A claim of First Amendment retaliation is analyzed under a three-step process.  Green v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997).  First, the plaintiff must demonstrate that he engaged in protected activity, i.e. exercised his constitutional right to free speech.  Shehee v. City of Wilmington, 67 Fed. Appx. 692, 693 (3d Cir. 2003).  Second, plaintiff "must show the protected activity was a substantial or motivating factor in the alleged retaliatory action."  Green, 105 F.3d at 885 (citing Swineford v. Snyder County Pa., 15 F.3d 1258, 1270 (3d Cir. 1994).  Finally, a defendant may defeat the plaintiff's claims by showing that the same actions would have been taken even absent the protected conduct.

Speech is a protected activity only if it relates to a matter of public concern.  Connick v. Myers, 461 U.S. 138, 146-47 (1983).  It seems highly questionable whether Plaintiff's "grievances" and sick call slips which pertained to his own medical condition and treatment modalities he wished

---

14  There is a disparity in the record between what grievances are actually on file with DOC, and other grievances Plaintiff claims to have submitted of which DOC has no record.  However, this point need not be resolved in order to address the threshold, dispositive issue of whether Plaintiff has proffered any evidence that he was "punished" by one of the named defendants as a result of his alleged First Amendment activities.

to have employed, constitute a "matter of public concern."  However, as noted above, State Defendants will assume *arguendo,* solely for purposes of this motion, that Plaintiff's medical grievances constituted First Amendment speech or petitions.  Plaintiff's claims fail to meet the legal standard set forth above simply because there is no evidence of "retaliatory action" taken by any named defendant against him, let alone taken because of the fact that Ward filed grievances.  The first question is whether, indeed, the defendant "[took] an action adverse to [the plaintiff]."  Schneck v. Saucon Valley Sch. Dist., 340 F.Supp.2d 558, 568 (E.D. Pa. 2004).  If there was no "retaliatory action," it logically follows that Plaintiff cannot "show [that his] protected activity was a substantial or motivating factor in the [] retaliatory action."  Green, 105 F.3d at 885.

As with the other constitutional claims there is no evidence whatsoever in the record to show that any named State Defendant "punished" or retaliated against Plaintiff in any way.  As discussed above in the argument pertaining to the Eighth Amendment "deliberate indifference" claims, four of the five Defendants--Taylor, Howard, Carroll and Salas--had no contact with Ward following the assault. Thus, clearly, they could not have taken "retaliatory action" against him for his "speech" in connection with his medical care.  These defendants' involvement (or lack thereof) with Plaintiff's medical care and conditions of confinement are addressed at Argument I(B), *supra*, and will not be reiterated herein, except to note that the record is clear that no named defendant engaged in conduct with respect to Plaintiff's medical or other needs which could be considered "punitive" by any reasonable fact-finder.

As discussed above, the sole Defendant who did come into contact with Ward during his confinement after the assault was the correctional counselor, Jessica Davis-Barton.  Plaintiff makes a bare allegation that Barton told Plaintiff and/or an unnamed correctional officer that Plaintiff should not make any further medical requests.  There is no evidence in the record whatsoever to support this

claim. In fact, the sole evidence that does exist shows that Ms. Davis-Barton told Plaintiff that he was required to file normal protocol by submitting sick call slips. (A-006; A-333-35). Thus, far from being aggrieved by Mr. Ward's alleged speech or petitions, Ms. Davis-Barton was encouraging Plaintiff to submit the very documents which he identifies as an exercise of his First Amendment rights. Id. Further, the record clearly shows that Plaintiff continued to receive medical treatment following this alleged action by Ms. Davis-Barton. (A-328, *see also* A-276-321). Thus, her actions had no adverse affect on his ability to receive care. Finally, Ms. Davis-Barton's advice to follow prison protocol by submitting sick call slips was advice she would (and should) have given to any inmate. (A-006). No reasonable fact finder could find, on this record, that Ms. Davis-Barton was motivated to "retaliate", or did retaliate, against Plaintiff for asserting his First Amendment rights.

As to Plaintiff's "transfer" to protective custody in September 2004, the evidence in the record is undisputed that this reassignment took place as a result of an altercation Plaintiff had with another inmate named Kareem Woodlin, in which a TV was broken. (A-336-340). None of the five State Defendants had any involvement in this transfer decision. Given Plaintiff's assault and injuries only three months earlier, a Shift Commander (non-defendant) noted that there was "concern for [Ward's] safety." (A-337). There is no other evidence whatsoever to suggest that this transfer to protective custody was undertaken for any reason other than a proper, administrative reason. There is also no evidence that Ward suffered harm as a result of the transfer. Indeed, one might imagine Ward suing on a theory of "failure to protect" if he had been involved in this altercation with another inmate and *not* been moved from the housing unit where the fight took place, especially given his physical vulnerability and ongoing convalescence from the injuries sustained in July 2004. Again, it bears repeating that there is no evidence that any named Defendant had any personal involvement in the "transfer" decision. For this reason, all of the named State Defendants are entitled to summary

36

judgment as to Count II.

## CONCLUSION

For the foregoing reasons, State Defendants respectfully request this Honorable Court grant

Summary Judgment in their favor as to all Counts against them, pursuant to Rule 56(c).

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**


By:____/s/ Stephani J. Ballard_____
STEPHANI J. BALLARD (I.D. No. 3481)
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

DATED:  December 10, 2007          Attorney for State Defendants

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TIMOTHY WARD, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY TAYLOR, | ) | **C. A. No. 04-1391 \*\*\*** |
| PAUL HOWARD, THOMAS | ) | |
| CARROLL, JOHN SALAS, | ) | |
| JESSICA DAVIS-BARTON, | ) | |
| CERTAIN UNKNOWN INDIVIDUAL | ) | |
| EMPLOYEES OF STATE OF | ) | |
| DELAWARE DEPARTMENT OF | ) | |
| CORRECTION, and | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| **Defendants/Third Party** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL | ) | |
| DELAWARE, LLC, | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on December 10, 2007, she caused the attached, *Opening Brief in Support of State Defendants' Motion for Summary Judgment* to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire            Daniel McKenty, Esquire
Martin & Wilson, P.A.                 Heckler & Frabizzio
1508 Pennsylvania Ave., Suite 1C      P.O. Box 128
Wilmington, DE 19806                  Wilmington, DE 19899-0128

Herbert G. Feuerhake, Esq.
521 West St.
Wilmington, DE 19801

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for State Defendants