IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,                                    )
                                                 )
            Plaintiff,                           )
                                                 )
v.                                               )
                                                 )
STANLEY TAYLOR,                                  )         C. A. No. 04-1391 ***
PAUL HOWARD, THOMAS                              )
CARROLL, JOHN SALAS,                             )
JESSICA DAVIS-BARTON,                            )
CERTAIN UNKNOWN INDIVIDUAL                       )
EMPLOYEES OF STATE OF                            )
DELAWARE DEPARTMENT OF                           )
CORRECTION, and                                  )
STATE OF DELAWARE,                               )
DEPARTMENT OF CORRECTION,                        )
                                                 )
            Defendants/Third Party               )
            Plaintiffs,                          )
                                                 )
v.                                               )
                                                 )
FIRST CORRECTIONAL MEDICAL                       )
DELAWARE, LLC,                                   )
                                                 )
            Third-Party Defendant.               )

---

## APPENDIX TO OPENING BRIEF IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT VOLUME 1

DEPARTMENT OF JUSTICE
STATE OF DELAWARE

STEPHANI J. BALLARD, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

DATED: December 10, 2007

**VOLUME 1**
**TABLE OF CONTENTS**

Affidavit of Thomas L. Carroll ...........................................................................................A000001

Affidavit of Jessica Davis Barton.......................................................................................A000005

Affidavit of John Salas ......................................................................................................A000008

Deposition of Keith Lovett.................................................................................................A000011

Lovett E-mail – Exhibit 3 to deposition ............................................................................A000045

Deposition of John Salas ...................................................................................................A000047

Complaint dated October 26, 2004.....................................................................................A000068

Memorandum Opinion issued March 30, 2006 ..................................................................A000084

Order dated March 30, 2006...............................................................................................A000102

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,                                  )
                                               )
      Plaintiff,                         )
                                               )
v.                                             )
                                               )
STANLEY TAYLOR, et. al.,                       )          C. A. No. 04-1391 ***
                                               )
      Defendants/Third Party             )
      Plaintiffs,                        )
                                               )
v.                                             )
                                               )
FIRST CORRECTIONAL MEDICAL                     )
DELAWARE, LLC,                                 )
                                               )
      Third-Party Defendant.             )

### Affidavit of Deputy Commissioner of Correction, Thomas L. Carroll

1.    I have been employed by the State of Delaware Department of Correction since

April 1, 1980. I currently hold the position of Deputy Commissioner of Correction. In

that position, I report directly to the Commissioner of Correction, Carl C. Danberg. The

Commissioner of Correction is a statutory appointee of the Governor who is ultimately

responsible for all operations of all Department of Correction facilities, bureaus and

activities. The Commissioner of Correction directly supervises a staff of approximately 7

employees of the DOC. As of July 2004, the Commissioner of Correction was Stanley

Taylor, who has since retired.

2.    On July 10, 2004, I held the position of Warden of the Delaware Correctional

Center in Smyrna. I held the position of Warden at DCC from October 1, 2001 to

September 1, 2007. In that position my job duties were administrative and supervisory in

nature. These duties included responsibility to direct administrative functions and

institutional programs of the Delaware Correctional Center, a correctional facility

housing more than 2,000 inmates at all security levels. Additionally, as the Warden of DCC, I was also responsible for the planning and enforcement of orders of executions mandated by State law. As Warden, I did not have personal responsibility for the actual daily supervision of inmates at the facility, and there were several levels in the chain of command between the Correctional Officers, who did have custodial/supervisory responsibilities, and my office. This included the following levels: Deputy Warden, Security Superintendents, Shift Commanders, Executive Officers, Unit Managers and building or area supervisors.

3.       I am familiar with the position of Bureau Chief for the Bureau of Prisons ("Bureau Chief"). In July 2004, that position was held by Paul Howard, who has since retired. The job duties of the Bureau Chief are (and were in July 2004) administrative and supervisory in nature. These duties include the supervision and provision of overall administrative support for Delaware's five state prisons. The Bureau Chief of Prisons supervises a staff of approximately 7. The Bureau Chief does not (and did not in July 2004) have personal responsibility for the actual daily supervision of inmates at DOC facilities, and there were several levels in the chain of command between the Correctional Officers, who did have custodial/supervisory responsibilities, and the Bureau Chief's office. This included the following levels: Warden, Deputy Warden, Security Superintendents, Shift Commanders, Executive Officers, Unit Managers and building or area supervisors.

4.       I have been named as a defendant in this lawsuit. To the best of my knowledge and belief, I have never met the Plaintiff in this case, former DCC inmate, Timothy Ward, nor Mr. Ward's family, nor Robert Johnson, the inmate who assaulted Ward on

July 10, 2004. I did not learn of the July 10, 2004 incident, or of inmates Ward or Johnson until some time after the assault when I was advised of the incident by a subordinate staff member. At the time I received notification, the matter was already under investigation by the Institutional Investigator.

5.    I had no personal involvement with, nor was I advised of any problems concerning, inmate Ward's medical care or housing assignments following the July 10, 2004 assault. I am aware that Major Holman sent me a Memorandum in September 2004, concerning Inmate Ward. As Warden of DCC, I would periodically receive correspondence concerning any number of inmate issues. Although I have no present recollection of receiving Major Holman's memo, it appears from the document that Major Holman and staff responded to Mr. Ward's needs and concerns, and I did not take any further action.

6.    In my position as Warden, I was familiar with how medical treatment was provided to DCC inmates. The infirmary is staffed by medical personnel employed by DOC's contracted medical provider. In July 2004, the medical provider was First Correctional Medical (FCM). If an inmate is taken to the infirmary for evaluation, it is up to the medical provider who sees the inmate whether the inmate should be admitted, treated or released, and what follow-up evaluation, if any, should be instituted. There is always an FCM physician on-call who can be contacted if the nurses have any question or concern as to how to handle a patient.

7.    Aside from rendering first aid, Correctional Officers can not and do not make treatment determinations concerning inmates. Such determinations are left to the medical provider.

**A000003**

8.    I am familiar with the position of "Correctional Counselor." Correctional Counselors are employed at DCC and other Level V facilities and assist inmates with paperwork, classifications, work assignments and other institutional matters. Correctional Counselors are not medical professionals and do not provide medical services to inmates.

BE IT REMEMBERED that on this ____5th____ day of __December__ , 2007, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **THOMAS L. CARROLL**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of his knowledge, information and belief.

THOMAS L. CARROLL

SWORN TO AND SUBSCRIBED before me on this 5th day of December, 2007.

Notary Public

LEA M. DULIN
Notary Public, State of Delaware
Commission No.# 20071216497
My Commission Expires 5/10/2009

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,           )
                           )
        Plaintiff,      )
                           )    C.A. No. 04-1391 KAJ
      v.               )
                           )    JURY TRIAL DEMANDED
STANLEY TAYLOR; PAUL HOWARD;  )
THOMAS CARROLL; JOHN SALAS;   )
JESSICA DAVIS-BARTON; CERTAIN  )
UNKNOWN INDIVIDUAL EMPLOYEES )
OF THE STATE OF DELAWARE       )
DEPARTMENT OF CORRECTION; and  )
STATE OF DELAWARE DEPARTMENT )
OF CORRECTION,           )
                           )
        Defendants,    )

## AFFIDAVIT OF JESSICA BARTON

1.      I am employed at the Delaware Correctional Center ("D.C.C.) as a Master

Counselor.  I have reviewed the complaint in the above matter and disagree

with inmate Timothy Ward's claims that he was not given adequate medical

care at D.C.C., that his requests for medical care were ignored, or that he was

punished for requesting medical care.

2.      As part of my duties as a counselor, I interviewed Mr. Ward for the first time

on May 4, 2004 at D.C.C., Building T-2.  He was 42 years old, a white male

serving a sentence of three years for the Charge of Burglary 2nd and

PDWDCF.  He was interested in working and listed his employment skills for

me.  We discussed his desire to work and treatment needs.  While he reported

previous drug abuse and some prior treatment, he seemed well-adjusted and

did not report any problems in the building with staff or other inmates.

3.    I met with him periodically after May 4, 2004 to review his progress.

4.    After Mr. Ward was injured in a fight on July 10, 2004, I received numerous phone calls from his mother, June Ward (1-410-770-5765), and his sister Louise Ward, concerning his condition. After the first call, on August 10, 2004, I checked with the Health Services Administrator, Terry Hastings, R.N., and learned that on the day of the incident he was immediately sent to the infirmary at D.C.C. and seen by the Doctor and evaluated. He was then sent to an outside hospital (on the same day) for more tests and evaluation. He saw an oral surgeon, and spent some time recuperating in the D.C.C. infirmary.

5.    I advised the family that, because of privacy laws I was limited in what I could tell them, but that Mr. Ward could tell them anything he wanted by phone. The mother and sister continued to call frequently, sometimes calling three to four people at D.C.C. per day, claiming that Mr. Ward was not receiving adequate care.

6.    After Mr. Ward was released from the infirmary, I received calls from the mother and sister stating that he could not gain access to the infirmary. I discovered that Mr. Ward was not following the required protocol by submitting sick call requests, but was asking the building officer to call for him, which was not per regulation. His last two visits to the infirmary were initiated in that fashion.

7.    I advised Louise Ward on August 10, 2004 that Mr. Ward must request services and utilize the system at D.C.C. in the appropriate manner like all other inmates.

8.     On the same day, I learned that Mr. Ward had been eating pretzels, contrary to his medical directive to eat soft foods. His own habit was exacerbating the problem with recovery from his injuries. I advised the Wards that he must comply with treatment protocol as well.

9.     In September, 2004, there was an altercation in the T-2 Building at D.C.C. between Mr. Ward and Kareem Woodlin. As a result of it, and the incident on July 10, 2004, Mr. Ward was moved to protective custody. He has not been my client since then and I have had no further contact with him.

10.    During all my discussions with Mr. Ward and his family I have attempted to meet all their emotional needs while observing the regulations of the correctional center. I treated him and his family with respect and deference in compliance with the law.

BE IT REMEMBERED that on this _8_ day of __December__, 2004, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **JESSICA BARTON**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

_Jessica M. Barton_
JESSICA BARTON

SWORN TO AND SUBSCRIBED before me on this _8th_ day of _December_, 2004.

_Katherine A. Shelby_
Notary Public

**A000007**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,             )
                           )
          Plaintiff,     )
                           )     C.A. No. 04-1391 KAJ
        v.            )
                           )     JURY TRIAL DEMANDED
STANLEY TAYLOR; PAUL HOWARD;   )
THOMAS CARROLL; JOHN SALAS;     )
JESSICA DAVIS-BARTON; CERTAIN   )
UNKNOWN INDIVIDUAL EMPLOYEES )
OF THE STATE OF DELAWARE        )
DEPARTMENT OF CORRECTION; and   )
STATE OF DELAWARE DEPARTMENT )
OF CORRECTION,             )
                           )
         Defendants,   )

## AFFIDAVIT OF JOHN SALAS

1.     I am employed at the Delaware Correctional Center ("D.C.C.") as a Correctional Lieutenant. I have reviewed the lawsuit in the above matter and deny that I, or the Department of Correction, in any way violated Timothy Ward's Constitutional rights on July 10, 2004, or any other day.

2.     Prior to beginning my active employment as a correctional officer, I attended a six-week training academy at the Department of Correction. During that period, I and all other potential officers were instructed in all aspects of corrections work, including safety and security measures, personal defense, the rights of incarcerated persons, measures to be taken in medical or security emergencies, the use of firearms and diverse other topics. I am aware that all correctional officers are required to take the six-week training course and be updated regularly thereon.

**A000008**

3.   On July 10, 2004 I was assigned as supervisor of security (area lieutenant) for three buildings at D.C.C. They were all minimum security. "S"-1 Building housed 200 inmates, "E" Building housed 200 inmates, and dorms "T"-1 and "T"-2 housed approximately 50 inmates each. Mr. Ward resided at "T"-2. My responsibilities included going from building to building checking with staff, answering questions, and ensuring that standard operating security measures were being followed. Staff at "S"-1 Building included 1 Sergeant and 3 correctional officers, "E" Building 3 correctional officers, and 1 correctional officer each at dorms "T"-1 and "T"-2.

4.   At approximately 2:30 p.m. on July 10, 2004 I was making my last check in "T" Building (my shift ended at 3:30 p.m.). I received a call on my hand-held radio from correctional officer Drummond from unit 29, saying that there was a "code 4" (medical emergency) in "T" Building's yard. C/O Drummond called from another yard from "T" Building, separated by a fence. I ran out of the building looking first in the front, and then the rear of the building's yard for any disturbance. I found 10-15 inmates standing around Mr. Ward who was sitting propped up by another inmate. He was bleeding. I immediately took the place of the inmate and instructed correctional officers Lovett and Drummond (who were with me) to get a first-aid kit. One of them returned within 2-3 minutes with a kit. I attempted to clean the blood off Mr. Ward's face and awaited the medical team to arrive. (Mr. Drummond had called them while I was assisting Mr. Ward.) The team arrived within 5 minutes, with their medical gear. (They came from the Infirmary by a small powered cart to

carry their supplies).  Mr. Ward was conscious the entire time, and was unable to say who assaulted him.

As soon as the medical team arrived I released Mr. Ward to them.

5.    After the above-described incident I had no further contact with Mr. Ward. Before the incident I did not know Mr. Ward or of him in any way.  I was not aware that anyone had a plan to assault him or that he (ward) had a reputation in any way.

6.    It was suspected that the assault was committed by an inmate named Robert Johnson but no witnesses were willing to testify against him, nor did he admit to the assault.  No prior contact, arguments, or dealings between the two were discovered.  It was a one-time incident which no one could predict.


BE IT REMEMBERED that on this _8_ day of _December_, 2004, personally appeared before me, the Subscriber, a Notary Public for the State and County aforesaid, **JOHN SALAS**, who, being by me duly sworn according to law did depose and say that the foregoing statement is correct to the best of her knowledge, information and belief.

JOHN SALAS

SWORN TO AND SUBSCRIBED before me on this 8th day of _December_ 2004.

Notary Public

**A000010**



## WILCOX & FETZER LTD.

## In the Matter Of:

# Ward

## v.

# Taylor, et al.

## C.A. # 04-1391 (KAJ)

## Transcript of:

## Keith F. Lovett

## October 24, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Ward v. Taylor, et al.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


TIMOTHY WARD,                        )
                                     )
        Plaintiff,                   )
                                     ) Civil Action
v.                                   ) No. 04-1391(KAJ)
                                     )
STANLEY TAYLOR; PAUL HOWARD;         )
THOMAS CARROLL; JOHN SALAS;          )
JESSICA DAVIS-BARTON; CERTAIN        )
UNKNOWN INDIVIDUAL EMPLOYEES OF      )
THE STATE OF DELAWARE DEPARTMENT     )
OF CORRECTION; and STATE OF          )
DELAWARE DEPARTMENT OF               )
CORRECTION,                          )
                                     )
        Defendants,                  )
                                     )
v.                                   )
                                     )
FIRST CORRECTIONAL MEDICAL           )
DELAWARE, LLC,                       )
                                     )
        Third-Party Defendant.       )


        Deposition of KEITH F. LOVETT taken
pursuant to notice at the law offices of Martin &
Wilson, 1508 Pennsylvania Avenue, Wilmington,
Delaware, beginning at 9:15 a.m., on Wednesday,
October 24, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.


                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com

Ward v. Taylor, et al.

**Page 2**

1  APPEARANCES:
2    JEFFREY K. MARTIN, ESQ.
     MARTIN & WILSON
3      1508 Pennsylvania Avenue
       Wilmington, Delaware 19801
4      - and -
     HERBERT G. FEUERHAKE, ESQ.
5      521 West Street
       Wilmington, Delaware 19801
6    For the Plaintiff
7    STEPHANI J. BALLARD, ESQ.
     STATE OF DELAWARE DEPARTMENT OF JUSTICE
8      820 North French Street
       Wilmington, Delaware 19801
9    For the Defendants
10   GERALD J. HAGER, ESQ.
     HECKLER & FRABIZZIO
11     800 Delaware Avenue - Suite 200
       The Corporate Plaza
12     Wilmington, Delaware 19801
13   ALSO PRESENT:
     TIMOTHY WARD
14
           - - - - -
15
16
17
18
19
20
21
22
23
24

**Page 3**

1           KEITH F. LOVETT,
2    the deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5               EXAMINATION
6    BY MR. MARTIN:
7    Q.  Good morning, Mr. Lovett. My name is Jeff
8    Martin.
9         First of all, I want to ask you why you
10   are here today?
11   A.  I assume it's about an incident that happened
12   at DCC some time ago.
13   Q.  Did you receive a subpoena to be here?
14   A.  Yes, sir.
15   Q.  Would you have come here voluntarily without
16   the subpoena?
17   A.  No, I wouldn't have.
18   Q.  Okay. As I said, my name is Jeff Martin and I
19   represent Tim Ward in this matter, along with my
20   colleague to my right, Herb Feuerhake.
21         I want to ask first have you had your
22   deposition taken before today in any matter?
23   A.  For this incident?
24   Q.  Or for any matter whatsoever.

**Page 4**

1    A.  I have in the past, yes, sir.
2    Q.  You have. When did you have a deposition taken
3    previously?
4    A.  I believe I had a car accident probably about
5    ten years ago, fifteen years ago.
6    Q.  Okay.
7    A.  And I was involved in another court case with
8    the Department of Corrections.
9    Q.  And was your deposition taken in that one as
10   well?
11   A.  It's some time ago. It might have been. I'm
12   not 100 percent.
13   Q.  What was the nature of that case?
14   A.  I secured illegal drugs while performing my
15   duties at the Department of Correction, Delaware
16   Correctional Center, and I was called to testify by
17   the state for that incident.
18   Q.  Was that a criminal matter?
19   A.  Yes, sir.
20   Q.  And you don't have a recollection as to whether
21   your deposition was taken?
22   A.  No, sir.
23   Q.  Did you testify at trial?
24   A.  Yes, sir.

**Page 5**

1    Q.  Do you have any recollection as to the name of
2    the inmate?
3    A.  No, sir.
4    Q.  And approximately how long ago was that?
5    A.  Probably about, I'd say about a year ago, year
6    and a half.
7    Q.  Do you recall the name of any people involved
8    in that matter, including the prosecutors?
9    A.  No, sir. No, sir.
10   Q.  All right. Well, I'll be asking questions
11   today of you and then following that Ms. Ballard may
12   be asking you questions, as well as Mr. Hager.
13         We don't expect to be more than a couple
14   of hours, hopefully less. It just depends on how
15   quickly we can get through this, but I want you to
16   know that you can feel free to take a break at any
17   time. You need not tell us why you need to take a
18   break, but please just say you need to take a break.
19   Okay?
20   A.  Mm-hmm.
21   Q.  I ask you to listen very carefully to the
22   questions, each question that's asked of you. It will
23   be the intent of each of the attorneys to ask
24   straightforward questions. There are no trick

2 (Pages 2 to 5)

Ward v. Taylor, et al.
Keith F. Lovett

**6**

1  questions that we're going to set up for you.
2       But if you do not understand the question,
3  please just tell us because if you respond to a
4  question, we're going to assume that you understood
5  the question that was asked. Okay?
6    A. Yes, sir.
7    Q. The other thing I would ask you to do -- and
8  this is difficult at times. These next two things are
9  a little difficult. One is please let me or whoever
10  the attorney is finish our question completely before
11  you respond. Okay?
12    A. Yes.
13    Q. And, similarly, we'll give you the same
14  courtesy.
15       And the reason is Mr. Fetzer is taking
16  everything down and it's a little difficult to take
17  down two people at one time. Okay?
18    A. Yes, sir.
19    Q. And, lastly, I would ask that you try to not
20  only keep your voice level up, perhaps higher than it
21  is right now --
22    A. Yes, sir.
23    Q. -- so we can all hear, but also try to make
24  sure all your responses are verbal. Mr. Fetzer is not

**7**

1  going to take down a nod of the head or a shake of the
2  head. Okay?
3       And also try to avoid the uh-huh/uh-uh
4  syndrome that we all lapse into from time to time.
5  Try to say yes or no. And if I hear you say that,
6  I'll ask you for a clarification whether you meant yes
7  or no. Okay?
8    A. Yes.
9    Q. Do you have any questions of us before we
10  proceed?
11    A. No.
12    Q. Okay. Did you do anything to prepare for your
13  deposition testimony today?
14    A. No.
15    Q. What is your overall recollection of the
16  incident in question?
17    A. I don't have one.
18    Q. Let me ask you first about your background and
19  where you work, et cetera.
20       Can you please give me your current home
21  address?
22    A. 122 Whitehall Road, Elkton, Maryland, 21921.
23    Q. And how long have you lived there?
24    A. A year and a half.

**8**

1    Q. And with whom do you reside?
2    A. My children, my daughter and two stepchildren,
3  and my girlfriend.
4    Q. Do you expect to live there for some period of
5  time?
6    A. Yes.
7    Q. Are you currently employed?
8    A. Yes.
9    Q. By whom?
10    A. State of Delaware Department of Transportation.
11    Q. And what is the nature of the position you have
12  with --
13    A. Senior sign installer. Sorry.
14    Q. No. That's okay. You anticipated my question,
15  which is a natural thing. But, again, just pause for
16  a moment, if you would, before you respond.
17    A. Yes.
18    Q. I'm sorry. Did you say senior sign installer?
19    A. Yes.
20    Q. And for how long have you held that position?
21    A. A little over two years.
22    Q. When you first joined DelDOT, was that the
23  position that you accepted?
24    A. Yes, sir.

**9**

1    Q. And where is it that you work?
2    A. Bear, Delaware.
3    Q. And they have an operation right there?
4    A. Area 10.
5    Q. I'm sorry?
6    A. Area 10.
7    Q. Okay. What is area 10?
8    A. That's just a shop location.
9    Q. And what is the actual location in Bear?
10    A. I don't know the exact number, the exact
11  address, but it's on Route 7 between 273 and 40.
12    Q. And do you anticipate continuing to work for
13  DelDOT for some period of time?
14    A. Yes, sir.
15    Q. Prior to working for DelDOT, by whom were you
16  employed?
17    A. State of Delaware Department of Corrections.
18    Q. In what capacity?
19    A. As a correctional officer, correctional
20  sergeant. Before leaving the institution, I was
21  promoted to the rank of sergeant.
22    Q. When did you begin working for Department of
23  Correction?
24    A. I'm not 100 percent sure of my hiring date.

3 (Pages 6 to 9)

Ward v. Taylor, et al.
Keith F. Lovett

**10**

1  Q. Well, how many years did you have in with DOC?
2  A. Three-and-a-half years.
3  Q. And when you were hired by Department of
4  Correction, were you hired as a correctional officer?
5  A. Yes.
6  Q. And do I understand that you continued in that
7  capacity for three plus years before becoming or
8  before being promoted to sergeant?
9  A. Probably about two-and-a-half.
10  Q. So the last year working at Department of
11  Correction you were a sergeant?
12  A. Yes.
13  Q. And how was it that you were promoted to the
14  rank of sergeant?
15  A. I interviewed for the position.
16  Q. Was there some type of testing that you took?
17  A. No.
18  Q. And whose decision was it that you should be
19  promoted to sergeant?
20  A. I'm assuming the warden.
21  Q. The warden? I'm sorry.
22  A. I'm assuming the warden made that decision.
23  Q. And the warden at that time was?
24  A. Betty Burris.

**11**

1  Q. You believe she was warden rather than
2  assistant warden?
3  A. I don't recall. I'm assuming she was warden.
4  She might have been assistant.
5  Q. All right. For your three-and-a-half years at
6  Department of Correction, did you work at various
7  institutions?
8  A. No.
9  Q. You worked only at one?
10  A. Yes, sir.
11  Q. And that was the Smyrna facility?
12  A. Yes, sir.
13  Q. Otherwise known as Delaware Correctional
14  Center?
15  A. Yes, sir.
16  Q. All right. We'll get back to your duties and
17  responsibilities in a moment.
18      Let me just complete your work background.
19  I neglected to ask you your age.
20  A. 33.
21  Q. Before you worked for Department of Correction
22  were you employed?
23  A. Yes, sir.
24  Q. Where were you employed?

**12**

1  A. Elderwood Village of Dover.
2  Q. And what is that?
3  A. Assisted living community.
4  Q. And in what capacity were you employed?
5  A. Maintenance manager.
6  Q. For how long were you employed as maintenance
7  manager?
8  A. I'm not 100 percent sure. Probably somewhere
9  within an eight-month range.
10  Q. Why did you leave that position?
11  A. The company was going to be bought out by
12  another company in which case the facility started
13  deteriorating and I decided I would like to move on.
14  Q. Did you leave voluntarily?
15  A. Yes.
16  Q. Did you have another job lined up when you
17  left?
18  A. I had been filling out applications for the
19  State of Delaware at the time, but no.
20  Q. How long of a gap did you have in your
21  employment?
22  A. Probably about four months.
23  Q. After which you were accepted to the Department
24  of Correction position?

**13**

1  A. Yes, sir.
2  Q. And did you receive training to become a
3  correctional officer at that point?
4  A. Yes, sir.
5  Q. And what was the extent of the training that
6  you had?
7  A. I attended the correctional academy in Dover.
8  I think it was eight weeks training at their facility.
9  Q. After which you became a correctional officer?
10  A. Yes, sir.
11  Q. Did you have any trouble completing that
12  course?
13  A. No, sir.
14  Q. Let me go back.
15      Before you worked for the assisted living
16  facility, had you been employed before that?
17  A. Yes, sir.
18  Q. And where were you employed?
19  A. At that time it was a transition in my life. I
20  moved from Brooklyn, New York where I was employed by
21  Keyspan Energy/Brooklyn Union Gas Company.
22  Q. In what capacity?
23  A. Main construction and repair.
24  Q. And how long were you employed in that

4 (Pages 10 to 13)

**A000015**

Ward v. Taylor, et al.
Keith F. Lovett

**14**

1 capacity?
2   A.  Four years.
3   Q.  You said a moment ago this was a transition
4 time in your life.  What do you mean by that?
5   A.  I just moved.
6   Q.  What caused you to move from New York to
7 Delaware?
8   A.  The people were very nice in Delaware.
9   Q.  Do you still feel that way?
10   A.  No.
11   Q.  And is that why you're now in Maryland?
12   A.  No.
13   Q.  Well, why are you in Maryland?
14   A.  It's where my other half lives or where she
15 wanted to live and continue to live.
16   Q.  Before you worked for the Brooklyn Gas Company/
17 Keyspan Energy, had you been employed?
18   A.  No.
19   Q.  What's your educational background?
20   A.  I graduated high school, James Madison High
21 School in Brooklyn, New York and also attended classes
22 at Kingsborough Community College, Brooklyn, New York
23 for two years.
24   Q.  Do you recall how many credits you received?

**15**

1   A.  Not off the top of my head, no.
2   Q.  What were you studying at the community
3 college?
4   A.  Business administration.
5   Q.  Have you since that time enrolled in any
6 college programs?
7   A.  For a short stint, yes, I did at Del Tech in
8 Dover.
9   Q.  And when was that?
10   A.  Right at the time when I was hired into the
11 Department of Correction, but I am now going back to
12 school.
13   Q.  As to the Del Tech program, how many courses
14 did you take there?
15   A.  Possibly three.
16   Q.  And was that also business administration?
17   A.  No.
18   Q.  What was that?
19   A.  Just some college entry courses that needed to
20 be completed.
21   Q.  All right.  Now, you said that you have
22 reenrolled in some college?
23   A.  Now?
24   Q.  Yes.

**16**

1   A.  No.  I will be going to Cecil County Community
2 College for teaching.
3   Q.  You're seeking a teaching degree?
4   A.  Yes, sir.
5   Q.  And when do you expect to enroll in Cecil
6 County?
7   A.  I'm hoping by January for the next semester.
8   Q.  What type of teaching degree are you seeking?
9   A.  Art.  Art, science and history.
10   Q.  I'm sorry?
11   A.  Art, science and history.
12   Q.  And when do you anticipate completing that
13 degree?
14   A.  Hopefully within a year and a half.
15   Q.  What is your career goal beyond that?
16   A.  As far as?
17   Q.  Do you expect to teach?
18   A.  I would like to teach art history, if possible,
19 yes, sir.
20   Q.  At what level?
21   A.  I would hope on the elementary level.  It's
22 important for me to get into a teaching program that I
23 can teach history and art history and theory and that
24 type of thing and not so much expressing art.

**17**

1   Q.  Okay.  Well, let me turn now or return to your
2 time at DCC for those three-and-a-half years.
3        Following your academy stint of eight
4 weeks, you became a C/O and as I understand it you
5 served as a correctional officer for the next
6 approximately two-and-a-half years?
7   A.  Yes.
8   Q.  Let's look at your assignments during that
9 two-and-a-half year period of time.
10        Did they vary during that time?
11   A.  Yes.
12   Q.  Okay.  Tell us the assignments that you had,
13 please.
14   A.  I was assigned to different buildings on a
15 daily basis.  Most of the time I did not work in the
16 same area.  I was a C/O in all of the buildings within
17 the institution.
18   Q.  Was it customary for C/O's to rotate the way
19 you did?
20   A.  In what capacity?
21   Q.  Well, I understand what you just said is you
22 worked in all of the buildings and you would move
23 around from one building to another.
24   A.  Yes.  Yes.

5 (Pages 14 to 17)

Ward v. Taylor, et al.
Keith F. Lovett

18

1   Q. That was —
2   A. Yes.
3   Q. — customary?
4   A. Yes.
5   Q. When you went from one building to the next,
6   did you receive any type of training as to the
7   particular issues with regard to that building?
8   A. No.
9   Q. Did you ever request that type of instruction?
10  A. Possibly. In going to a new area I would
11  probably go out of my way to speak to the lead worker,
12  which would be a sergeant or a corporal, and request
13  any information about that area that I might not have
14  been aware of, feeding times.
15  Q. I'm sorry?
16  A. Feeding, gym, religion, other activities
17  time-wise that I was not aware of that might have
18  helped me do my job better.
19  Q. Do I understand correctly that you did this out
20  of your own initiative?
21  A. Sometimes a lead worker might approach me with
22  information, but, yes, most of the time I took my own
23  initiative to gain information about the area.
24          But also, let me also say that while

19

1   coming onto the shift you would be provided with a
2   breakdown of the shift before, activities, any
3   incidents, anything that was going to happen as far as
4   activities are concerned.
5          And there was also a logbook which you
6   were encouraged to look through. A briefing was
7   something that was very important and was expected on
8   the start of your shift.
9   Q. All right. Going back to what you last said,
10  you said a briefing was important. Is it your
11  testimony that you received those briefings before
12  each shift?
13  A. On most occasions, yes. I just didn't want to
14  go on record as saying that, you know, no instruction
15  was given and nothing was being said at the end of
16  shifts or before shifts. It's customary and policy
17  that you're given a briefing when you come on a shift
18  and when you leave your shift, you should.
19          Sometimes with staffing issues, you know,
20  you may not always get that briefing, but...
21  Q. What do you mean by that, "staffing issues"?
22  A. If people are, you know, waiting to go home or
23  come to buildings to fill buildings staffing-wise.
24  Q. Were there staffing problems that you perceived

20

1   throughout your stay at DOC?
2   A. Yes.
3   Q. What was the nature of those staffing problems?
4   A. The institution was understaffed and officers
5   were forced, frozen to remain at the facility to work
6   overtime shifts and also being on the standby list,
7   which was commonly known as the freeze list.
8   Q. And what effect, if any, did the staffing
9   problems have with the running of the prison?
10         MS. BALLARD: Objection to the form.
11         You can answer.
12  A. Do you want my opinion or do you want fact?
13  Q. Well, I would like your observation.
14  A. Observation? I think the prison was
15  understaffed, in which case it made for a lot of
16  unhappy people staff-wise and it was unfair that the
17  staff could not go home to their families because the
18  prison was understaffed.
19  Q. Do you believe that had any effect on the
20  security within the prison?
21         MS. BALLARD: Objection to the form.
22  A. No.
23  Q. When you talked about being understaffed, is it
24  fair to say that on some shifts you would not have a

21

1   full complement of officers to work in a particular
2   place?
3   A. That's not true. Officers were made to stay at
4   the facility. It was commonly known as being frozen.
5   Buildings were staffed to what the institution
6   considered proper staffing for each individual area.
7   Q. Proper or minimum staffing?
8   A. I would say minimum.
9   Q. And through your own observations when you were
10  frozen for one onto another shift — and let me ask
11  you first: Did you have any experiences where you
12  were frozen beyond one extra shift?
13  A. No.
14  Q. So the only — go ahead.
15  A. One single frozen shift, but I don't believe
16  they can freeze you for multiple shifts unless it was
17  an institutional lockdown or state of emergency, in
18  which case I never have been on for.
19  Q. Well, you were there when the place was locked
20  down two days after Tim Ward's episode after Cassie
21  was brutally assaulted?
22  A. Yes.
23         MS. BALLARD: Objection to the form.
24  Q. So you didn't get frozen for —

6 (Pages 18 to 21)

**A000017**

Ward v. Taylor, et al.
Keith F. Lovett

**22**

1 A. I was frozen, but I wasn't frozen for two
2 shifts. I was frozen for the one additional shift,
3 the 4:00-to-12:00 shift, in which case at 12:00 p.m. I
4 went home.
5 Q. Do you believe that you were as effective as a
6 C/O at the end of doing two shifts in a row as you
7 were during that first shift?
8 A. Yes.
9 Q. You do?
10 A. Yes, sir.
11 Q. Were you able to rest at any time during those
12 frozen shifts?
13 A. Yes.
14 Q. And how so?
15 A. During lockdowns and counts there's a lot of
16 off-time while working in the prison. During counts
17 inmates are locked down and other than doing counts,
18 you usually would be waiting around to send inmates to
19 chow or there might be a rec. going on on a tier, in
20 which case inmates were on the tier so you weren't
21 doing a lot of physical activity, in which case you're
22 able to catch up with yourself in between being
23 frozen.
24 Q. Was it your experience that you witnessed other

**23**

1 officers sleeping?
2 A. No.
3 Q. Sorry?
4 A. No.
5 Q. No?
6 A. No.
7 Q. You never saw another correctional officer
8 sleep on the job?
9 A. No. And I have never slept on the job. And I
10 wasn't even, in no way was I trying to state that
11 anybody has ever slept while working at that
12 institution while I was on shift. I have never
13 observed another officer sleeping or I've never slept
14 while working in a position working at the Delaware
15 Correctional Center.
16 And I didn't even want that to be on
17 record that I even associated anybody with downtime
18 meaning sleeping. Downtime meant time to catch up
19 with paperwork and that type of thing, write passes
20 and things like that, but nowhere within -- I don't
21 want the opinion to even go in the direction that
22 anybody ever slept on the job.
23 So if you took that downtime as sleeping,
24 you were wrong.

**24**

1 Q. No. I think you made yourself perfectly clear.
2 I was just asking you whether you had ever made that
3 observation.
4 A. No. You seemed very direct about the sleeping
5 and I've never even thought about that in that type of
6 an environment.
7 Q. Okay. Before we talked about some of the
8 staffing problems that you observed, I was asking you
9 about your work going from building to building at DCC
10 as a correctional officer.
11 And as I understand it, you sometimes
12 received some information from another officer at the
13 building as to various issues related to the building
14 and sometimes you did not, correct?
15 A. Yes.
16 Q. Do you know whether there were any type of
17 written protocols or guidelines for each of the
18 buildings that you could refer to?
19 A. As I stated before, a logbook was kept for each
20 area, each building and information was entered into
21 that logbook. You can look back in the logbook and
22 get a synopsis of what had transpired on the shift
23 before, again along with communication with other
24 C/O's who worked that area the prior shift.

**25**

1 Q. Where was the logbook kept?
2 A. In the office.
3 Q. And did you have access to that at any time you
4 wanted it?
5 A. Yes.
6 Also, not only had I been assigned to
7 buildings, I was also assigned to various areas in
8 which case I was working an area the day this incident
9 happened. And while doing area checks in various
10 buildings, I would initial and log within those
11 logbooks my visit to the building as an area check.
12 Q. All right. I'm a little confused about the
13 nature of the logbook and I want to just try to
14 understand.
15 Was this one record, one book per building
16 or area?
17 A. In each building that housed multiple tiers,
18 each tier had its own logbook that was placed at the
19 head of that tier or if it was a single building
20 inside the sergeant's office.
21 Q. So for any one building there could be several
22 logbooks?
23 A. Yes.
24 Q. And when you referred to the area that you were

7 (Pages 22 to 25)

Ward v. Taylor, et al.
Keith F. Lovett

26

1 assigned to on the date of the Tim Ward incident, was
2 there a particular logbook that you used for that?
3    A.  Yes.
4         Also, in addition, in my case working the
5 area I worked, there's also a log sheet, an area check
6 sheet that I filled out prior to the incident and that
7 sheet was also signed by the area lieutenant. I don't
8 100 percent remember the policies as far as timing and
9 how often that sheet needed to be filled out, but I
10 believe that sheet needed to be checked and signed, I
11 believe two area checks per shift for C/O and also the
12 area lieutenant also had to do an area check and sign
13 that sheet.
14    Q.  Now, are you referring specifically to the area
15 that you were assigned to for Tim Ward's —
16    A.  All areas within the institution have those
17 area check sheets that need to be filled out by people
18 who work in areas.
19    Q.  All right. Is there a distinction between an
20 area and a building?
21    A.  Yes.
22    Q.  Okay.
23    A.  I'm sorry.
24    Q.  No. I'm sorry. That's why I asked you the

27

1 question.
2    A.  Yes.
3    Q.  Are there any other distinctions like area
4 versus building versus tier?
5    A.  Yes.
6    Q.  Well, how many various items are there that we
7 can —
8    A.  I can refer to two from memory. That would be
9 an area check sheet that would be filled out by a
10 person who is working a specific area and then there's
11 also officers that work in individual tiers in the
12 buildings. So there's people who are assigned in the
13 building and there's also people who are assigned to
14 various areas who do area checks throughout the
15 institution in specific areas that you're responsible
16 for.
17    Q.  But the building, referring to the building
18 specifically, that would include various tiers within
19 the building?
20    A.  Yes.
21    Q.  So the tiers would be kind of a subset of the
22 building, as I understand it?
23    A.  Yes.
24    Q.  Were there any other categories that were

28

1 incorporated into the building?
2    A.  I don't know if this is relevant, but when I
3 was assigned as a sergeant in C building, which is a
4 building after being promoted to sergeant, in the back
5 of the building there's an area, the hole I guess you
6 can refer to it as, is in the back of C building.
7         So that was also another area that had to
8 be checked and different security measures were used
9 in that segregation area.
10    Q.  Other than the written logbooks, is it your
11 testimony that you were not aware of any written
12 protocols for each building or area?
13    A.  I hadn't mentioned it before, but also there is
14 an SOP that I did not refer to.
15         Again, I haven't been in the correctional
16 environment for a while so all of these things are
17 just popping into my head now and I'm being refreshed
18 in my head.
19    Q.  And that's fine and that's what the process is
20 all about sometimes, so I appreciate that.
21    A.  In each building there's an SOP book. There
22 are different books for each individual area. Those
23 are referred to as SOP, standard operating procedure.
24         And in each of those books there was

29

1 detailed information about the needs of each
2 individual area. In every area you can find an SOP
3 book that would be located in the sergeant's office
4 and if you had any questions, you can always refer
5 back to the SOP for the building. Like I said, each
6 building had its own individual SOP and mandates for
7 each individual building staffing and how each
8 individual building was run.
9    Q.  And to the best of your recollection, these SOP
10 books were kept in the sergeant's office?
11    A.  Yes, sir.
12    Q.  During the time you were a C/O — and I'm going
13 to distinguish that time, between that and the time
14 you became or were promoted to sergeant, so I want to
15 focus on the C/O time.
16    A.  Okay.
17    Q.  Because I believe you were a C/O at the time of
18 this incident with Tim Ward?
19    A.  Yes.
20    Q.  Did you ever have occasion to refer to any of
21 these SOP books?
22    A.  Yes.
23    Q.  And in what circumstances did you review these
24 books?

8 (Pages 26 to 29)

**A000019**

Ward v. Taylor, et al.
Keith F. Lovett

---

30

1    A. When I was new to the institution while going
2    into a new area, I would brief over the SOP's for the
3    building just to try to familiarize myself with the
4    standing operating procedure of that building which
5    would help me be more effective at my position as C/O.
6    Q. Was this something that was required of you to
7    do?
8    A. I don't know if it was required. It was, it
9    was suggested by lead workers and your peers. It was
10   I guess -- it was just, it was something that would
11   help you do your job better and, again, lead workers
12   would definitely point you towards those books if you
13   had any questions and if you needed more detailed
14   information.
15   Q. What do you mean by "lead workers"?
16   A. Lead workers would be a correctional sergeant
17   or correctional corporal. Each building was staffed
18   with a lead worker. Other than the dorm-type
19   settings, each building would have a sergeant or a
20   corporal as a lead worker and then other correctional
21   officers.
22   Q. Okay. What was the area to which you were
23   assigned on the date of Tim Ward's incident?
24   A. I don't remember the call number for the area,

---

31

1    but I was, I was assigned as I guess you can call it a
2    rover or a -- I don't remember the terminology.
3    Again, it has been a while.
4        But I was responsible for the gates at the
5    T's. I was responsible for the area within the T's
6    and the walkway up to JV tower.
7        MS. BALLARD: Up to what?
8        THE WITNESS: JV tower.
9    A. And also responsible for W building and
10   surrounding areas within that area.
11       MS. BALLARD: Can we just agree for the
12   record so it's clear we're talking about July 10,
13   2004?
14       Was that your question?
15       MR. MARTIN: No. It's your question, but
16   I'll adopt it.
17       MS. BALLARD: You said the date of the
18   incident. I just want to be clear when he's
19   testifying what date he's talking about where he was
20   working.
21       MR. MARTIN: Yes.
22       MS. BALLARD: Okay.
23   BY MR. MARTIN:
24   Q. You just have given us a lot, Mr. Lovett. I

---

32

1    wonder if you could draw a brief diagram of the areas
2    that you've just identified so that would help us in
3    future questions.
4    A. All right.
5        MR. MARTIN: We can go off the record
6    here.
7        (Discussion off the record.)
8    BY MR. MARTIN:
9    Q. Take your time. This is not any artist's
10   rendering. So if you could just identify the areas
11   that you just have spoken about, the T's, the W, the
12   tower, and just maybe label them it would be helpful
13   for all of us to get a better picture of that area.
14   A. Do you want me to do that now?
15   Q. Please.
16   A. (Witness complies).
17       MR. MARTIN: Why don't we go off the
18   record for a minute here?
19       (A brief recess was taken.)
20       MR. MARTIN: I believe you now have had an
21   opportunity to draw a sketch on a piece of legal pad.
22   I would like to mark that as Lovett
23   Exhibit 1.
24       (Lovett Deposition Exhibit No. 1 was

---

33

1    marked for identification.)
2    BY MR. MARTIN:
3    Q. Now referring to Lovett 1, I think that you've
4    indicated all of the areas that you mentioned in your
5    testimony that preceded your drawing.
6        Does this represent your assigned area on
7    July 10, 2004?
8    A. No. Part of my assigned area. I added some
9    other landmarks in there.
10   Q. So, in other words, Lovett 1 includes your
11   assigned area and then it has additional areas?
12   A. Yes.
13   Q. We'll identify that in a moment.
14       And I recognize you don't remember the
15   designation of this area. Perhaps that will come up.
16   We may have some documents later on that may refresh
17   your recollection on that.
18       But had you ever worked this particular
19   area before July 10, 2004?
20   A. Yes.
21   Q. On how many occasions?
22   A. Multiple.
23   Q. Is that more than ten or twenty?
24   A. During that time I was assigned to that

---

9 (Pages 30 to 33)

Ward v. Taylor, et al.
Keith F. Lovett

34

1  position on a regular basis, so I would probably say
2  probably more than twenty.
3      Q.  When you say, "during that time," what are you
4  referring to?
5      A.  When I got that position — can you ask that
6  question again? I kind of....
7      Q.  I'll have to go back and ask Mr. Fetzer.
8          (The reporter read back the pending
9  question.)
10         THE WITNESS:  Working that particular area
11  I guess within, within those past months leading up to
12  that date, I was assigned to that position on a daily
13  basis.
14  BY MR. MARTIN:
15     Q.  So that was a regular spot for you?
16     A.  During that time, meaning that before I made
17  sergeant when I inherited that position, during that
18  time is what I mean. Sometimes you would based on
19  your days off you may fall into a position on the
20  roster where, you know, if you do well at that
21  position and it corresponds with your days off, you
22  may get it on a regular basis.
23         Before getting that position or working
24  that area, which nothing was set in stone that you

35

1  would have that every day, it just so happened that I
2  was assigned to that area every day because it worked.
3          Before then I would go to different
4  buildings, but then when I was assigned to that
5  position on a daily basis I was there.
6      Q.  I think I understand. But for what period of
7  time before this incident had you been assigned there
8  on a regular basis?
9      A.  From my recollection and my memory, I would
10  probably say three to four months.
11     Q.  Okay.
12     A.  But it was not a permanent assignment. You
13  would just, you would see the shift commander in the
14  morning and you would be assigned to a position. It
15  just so happened that I would have that position a few
16  months leading up to this incident.
17     Q.  And that was assigned by the shift commander?
18     A.  Yes.
19     Q.  And who was that shift commander?
20     A.  The captain.
21     Q.  And who was that captain?
22     A.  I don't recall on that day.
23     Q.  So the shift commander may have switched from
24  day to day?

36

1      A.  Yes.
2      Q.  But it was a correctional captain who had that
3  position?
4      A.  Yes.
5      Q.  Was Belanger, B-e-l-a-n-g-e-r, a shift
6  commander?
7      A.  I don't recall.
8      Q.  Do you recall whether this area -- and we'll
9  just call this your assigned area, okay, unless we can
10  find out exactly what that area was designated?
11         But as to your assigned area, do you
12  recall whether there were any SOP's that you reviewed?
13     A.  Not on that particular day.
14     Q.  Well, how about any day previous to that?
15     A.  I might have read over the SOP for that
16  position.
17     Q.  But you have no recollection of having done so?
18     A.  No.
19     Q.  How was it that you learned how to deal with
20  that position or how to be an effective C/O in that
21  position?
22     A.  The first time I was assigned to that position
23  I would have asked for a briefing from the person who
24  worked that shift before me and who might have worked

37

1  it on a daily basis to inform me on the
2  responsibilities of that area.
3      Q.  Now, do you have a specific recollection of
4  that happening?
5      A.  No.
6      Q.  I think what you were testifying to was your
7  general procedure. Is that fair to say?
8      A.  Yes.
9      Q.  Was this a difficult area to be assigned?
10     A.  I don't understand your question when you
11  say "difficult."
12     Q.  I'll try to rephrase it.
13         Did this assigned area present any special
14  challenges for you as a correctional officer?
15     A.  Yes.
16     Q.  And what were they?
17     A.  I believe you had to be effective at that
18  particular area and that gate because a lot of
19  contraband would come through that gate and you would
20  have to be an effective correctional officer to stop
21  people at the gate, do searches and be aware of things
22  that were happening around you.
23         I made it my goal to do my job better, to
24  take great care in paying attention to the things that

10 (Pages 34 to 37)

Ward v. Taylor, et al.
Keith F. Lovett

## 38

1 were happening around me at that gate because I knew a
2 lot of stuff came through that gate and it was my
3 responsibility to be effective at my job and to try to
4 prevent contraband from coming through that gate while
5 I was at that position.
6     Q. Now, what is your recollection, if any, as to
7 how many people had this assigned area at the same
8 time? I'm talking about correctional officers.
9     A. I don't understand your question.
10     Q. Was this an area, this assigned area that we're
11 talking about, was this an area for one correctional
12 officer, two or more?
13     A. It was, it was assigned to two people. If my
14 memory serves me right, I was unit 28. There's also a
15 29 who is responsible for other areas. I'm not 100
16 percent specific on those areas as my memory has taken
17 some away from me, but I believe that 29 was
18 responsible for W building and S building and also E
19 building, which I failed to draw on my diagram, on my
20 map.
21     Q. But I guess I'm a little confused because I
22 asked you whether this assigned area -- and we'll try
23 to write out what this specific area was in a moment,
24 but I want to know whether that was assigned to one

## 39

1 correctional officer or two and I heard your testimony
2 saying it was two officers.
3     A. Okay. Can I rephrase that?
4     Q. Yes.
5     A. Again, a lot of this stuff is coming from my
6 memory, so as you're talking a lot of it is coming
7 back so please excuse me. You know, I have not
8 thought about this in a few years now.
9         As unit 28 from my recollection I was
10 responsible for the T's, in that T area. Unit 29 was
11 responsible for W building and some of the other areas
12 around it. I'm not 100 percent specific on it because
13 I don't remember. I only remember little parts of it.
14         Again, I knew my area from working that on
15 a regular basis during that time that I was
16 responsible for the T buildings and the areas going up
17 to JV tower along the walkway.
18     Q. All right. Let's refer to Lovett 1.
19         And could you identify your assigned area
20 on July 10, 2004?
21     A. My area was from the gate, from the gate at JV
22 tower, which JV controlled mechanically, along that
23 walkway (indicating), the whole T area and going up to
24 the W gate.

## 40

1     At W gate 29 was up there and 29 would run
2 W gate.
3     Q. Now, what I haven't asked you but I'm assuming
4 given your testimony is that this was an outside
5 position?
6     A. Yes. But as part of that position and part of
7 that post, you were also required to do area checks in
8 the buildings, in which case there's a record of me
9 doing area checks during the date of that incident.
10     Q. And can we identify on this diagram, if you
11 know, the place where Tim Ward was found after being
12 assaulted on July 10, 2004?
13     A. I don't recall 100 percent the exact location.
14 I know that there was a park bench. Excuse me. I'm
15 sorry. A picnic table on or near the basketball court
16 when I responded outside.
17     Q. All right. We see a basketball court drawn
18 right above buildings T1 and T2, right?
19     A. Yes.
20     Q. Is it your recollection that the picnic table
21 was somewhere between the basketball court and the T1
22 and T2 buildings?
23     A. Yes.
24     Q. And do you have any further recollection as to

## 41

1 whether it was closer to, and I'm talking about the
2 picnic table now, closer to the T1 building or the T2
3 building?
4     A. No, I do not.
5     Q. Do you recall the shift that you worked on that
6 occasion?
7     A. 8:00 to 4:00.
8     Q. And was that your customary shift?
9     A. Yes.
10     Q. Do you recall whether you had been frozen the
11 day before or a day or two before that?
12     A. I do not recall.
13     Q. Do you recall having been frozen while you had
14 this assigned area for a few month period prior to Tim
15 Ward's incident?
16     A. I don't understand your question.
17     Q. Do you recall that during the time you had been
18 assigned to this area, and I understand it as a few
19 months before this incident occurred, whether during
20 that time you had ever been frozen in that position?
21     A. Yes, I had.
22     Q. And approximately how many times had you been
23 frozen during that period of time that you worked?
24     A. I don't recall.

11 (Pages 38 to 41)

Ward v. Taylor, et al.
Keith F. Lovett

42

1   Q.  Do you recall the last time you were frozen
2   before this incident?
3   A.  I don't recall.
4   Q.  But it's safe to say that your regular shift
5   was 8:00 to 4:00 p.m.?
6   A.  Yes.
7   Q.  And how was it that you learned about the
8   incident with Tim Ward?
9   A.  I don't understand your question.
10  Q.  Do you recall your first notice that an
11  incident had occurred involving an inmate out in the
12  yard?
13  A.  Yes.
14  Q.  And how were you notified?
15  A.  An inmate had come back into the building.  I
16  don't exactly recall what the inmate said, but he
17  alluded to the fact that an incident had taken place
18  out at the time I was doing an area check in T2.
19  Q.  Now, what is your recollection of what you were
20  doing by way of an area check in T2 at that time?
21  A.  At the time I was filling out the area check
22  sheet when that inmate came in and signing the
23  logbook.
24  Q.  Was there a correctional officer assigned to

43

1   the building T2?
2   A.  Yes.
3   Q.  And do you recall who that was?
4   A.  No.
5   Q.  How many correctional officers were assigned to
6   that building?
7   A.  Just one.
8   Q.  And do you recall approximately how many
9   inmates were housed in T2?
10  A.  I do not.
11  Q.  How about the T1 building, do you recall how
12  many officers, correctional officers were assigned to
13  that building?
14  A.  One officer.
15  Q.  Do you recall the approximate time of day when
16  you were notified by an inmate that something had
17  occurred outside?
18  A.  I do not.
19  Q.  You've used this term area check a couple of
20  times and I meant to ask you what that means.
21  Could you describe that to us, please?
22  A.  As part of your responsibilities of working
23  that unit number you would have to perform area checks
24  within your assigned area, which would mean going into

44

1   buildings, doing walk-throughs through the buildings,
2   also assisting officers in the building with
3   shakedowns and overall security of that assigned area.
4   In addition, you would do fence checks and
5   walk-throughs within your area.  You —
6   Q.  I'm sorry.  You said fence checks and walk --
7   A.  Fence checks and walk-throughs through the
8   areas.
9   In addition, you would also check locks
10  and chains that we use to secure the T gates to make
11  sure that they had not been tampered with or were
12  missing or were messed up in any way.
13  Q.  Some of those area checks you just described
14  are obviously outside the building?
15  A.  Yes.
16  Q.  Could you be specific in terms of what type of
17  area checks you performed in the buildings, either T1
18  or T2?
19  A.  You would go in the building.  You would do an
20  area check in the bathroom.  You would check the
21  bathrooms using your senses of observation, sight,
22  smell, hearing.  You would go in the bathroom and
23  observe the bathroom area.  You would do a walk
24  through the area within the T buildings.  You would

45

1   check, you would check the overall areas of the
2   building.  You would check that the doors were
3   secured.  There's an exit door that needed to be
4   secured in each building.
5   Q.  Let me ask you because it's not clear to me.  I
6   understand that there's an officer that's assigned to
7   in this case the T2 building.
8   What responsibilities did you have that
9   differed from the officer who was assigned to the
10  inside of the building?
11  A.  None that I can recall inside the building.
12  You were sort of assisting in his area checks as well.
13  Q.  Do you recall on this particular occasion why
14  you went in to do area checks at that time?
15  A.  There's an SOP for that position that states
16  how many area checks you need to do.  There's no
17  specific time, but you have to complete a set number
18  of area checks.
19  Q.  Was it possible for you to complete that number
20  of area checks by doing that outside, by checking the
21  fence and the gates and the locks, that type of thing?
22  A.  Yes.
23  Q.  All right.  So that SOP did not require you to
24  go into the T1 or T2 building to complete your area

12 (Pages 42 to 45)

**A000023**

Ward v. Taylor, et al.
Keith F. Lovett

46

1  checks?
2  A. It did.
3  Q. How so?
4  A. Part of your area check you would have to go in
5  and do area checks within the building in addition to
6  the outside areas that you were responsible for.
7  Q. All right. But I understood from your
8  testimony a moment ago that the SOP required that you
9  do a certain number of area checks during your shift,
10  correct?
11  A. Yes.
12  Q. And then I asked you whether you could complete
13  that number, fulfill that responsibility for that
14  number by doing area checks on the outside, and I
15  believe your answer was yes.
16      So that's why I'm a little confused as to
17  why you felt that you had to go inside the building.
18  A. Area checks? As part of your overall
19  responsibility for doing area checks, you were
20  responsible for doing area checks within the building
21  as well as the surrounding areas as part of one area
22  check.
23      When you signed off that you did an area
24  check, it was stating that you did an area check

47

1  within the building, which would be the T's, and also
2  that you did an area check within the surrounding area
3  that you were responsible for, the walkway up the JV
4  tower, the walkway in the back going to the W
5  building, the basketball courts in addition to the
6  building. So each individual area check was
7  considered one. It was just separate areas that you
8  had to complete within that responsibility.
9      Is that clear?
10  Q. No. I'm still a little foggy on that and let
11  me try to make sure I understand the situation.
12      You will agree that the SOP that you
13  referred to required you to do a certain number of
14  area checks during your shift?
15  A. Yes.
16  Q. Okay. Do you recall what that number was?
17  A. I believe two, but I am not 100 percent certain
18  because it has been some time.
19  Q. Okay. So during that eight-hour period of
20  time, you were required to do approximately two, it
21  could have been more, it could have been less I guess,
22  area checks?
23  A. It could have been more.
24  Q. It could have been more.

48

1      So how long would it take to do an area
2  check on average?
3  A. I don't recall.
4  Q. I mean, was it five or ten minutes?
5  A. I don't want to say what it was because I can't
6  recall 100 percent, so I'm not going to say.
7  Q. All right. But as I understood your earlier
8  testimony, you said that during your shift you had to
9  perform a certain number of area checks. I asked you
10  now how many. You think it was approximately two.
11      I then asked you could you have completed
12  those area checks, the number that you were required
13  to do without going into one of those buildings, to
14  which I believe you said you could.
15      Is that fair or not?
16  A. No.
17  Q. Okay.
18  A. I think you're probably -- I think you're
19  separating the outside from the inside. The outside
20  and the inside is part of one area check. It's one
21  complete unit, one complete area check. You check
22  outside, check the fence line, check the locks, check
23  the building, check the surrounding building, check
24  the bars, check the gates, check the coverings on the

49

1  windows, so on and so forth.
2      After you do your outside, you do the
3  inside. You do a walk-through within the building.
4  You go in the bathroom. You walk up through the
5  building. You check that the fire door is secured.
6  At that time after you're done with one complete area
7  check, you sign the sheet saying that you've completed
8  an area check.
9      Is that a little bit more clearer?
10  Q. That's a little clearer. Thank you.
11      But I understand that you had some
12  discretion as to when you would do the area check. Is
13  that fair to say?
14  A. Yes.
15  Q. And did you have a certain time when you
16  normally did the area checks or did you vary them?
17  A. I tried to vary them, but they would always be
18  done in a time that didn't correspond with other
19  responsibilities.
20      Also, as part of working that position I
21  was also responsible for transporting inmates to the
22  chow hall at chow time. So, of course, I couldn't do
23  an area check and take inmates to the chow hall at the
24  same time. I tried to vary it so it was done at

13  (Pages 46 to 49)

Ward v. Taylor, et al.
Keith F. Lovett

50

1    different times to keep from inmates picking up on a
2    pattern of my behavior and my work habits.
3        Q.   Okay. Do you recall whether you transported
4    the inmates to the chow hall on this particular
5    occasion, meaning July 10, 2004?
6        A.   Yes.
7        Q.   You did?
8        A.   Yes.
9        Q.   How long did that take you to do?
10       A.   There is a process of getting inmates to the
11   chow hall. The start of that process is do a building
12   count and once that building count is confirmed with
13   JV tower and control that an accurate count for the
14   institution is made, the buildings are lined up within
15   the institution to be sent to chow.
16           Do you want a specific time of the time
17   line it takes to get inmates to the chow hall?
18   Because I can give you a breakdown for that.
19       Q.   Yes. And I would also like to know whether it
20   was a standard time during your three months or
21   whatever of working that assigned area.
22       A.   There are different times. Each building would
23   be sent to chow in different time frames. It was not
24   done at the same time every day to prevent a routine

51

1    from being picked up by the inmate population.
2            Also, in addition, counts needed to be
3    made throughout the institution. Once there was a
4    green, which meant that all the buildings calculated
5    up to the right number of inmates, JV tower would
6    start sending inmates to chow. The process of that
7    happening would be inmates would be called, the
8    building officer would be called by JV tower and
9    instructed to send their inmates out into the
10   boulevard or into the area in which they were being
11   held at the T gates.
12           At that time I would remain outside with
13   those inmates. When JV called me on the radio to send
14   the inmates through, I would open the gate, send the
15   inmates through, walk the inmates to the chow hall and
16   then sometimes be asked to stay at the chow hall and
17   run chow with that building.
18           A lot of times I would have to do that.
19   So I would take my inmates, bring them, both T1 and
20   T2, bring them to the chow hall, run chow, bring the
21   inmates back, secure the inmates in their building,
22   secure that T gate and make sure the inmates were
23   secured in their building and housing units till the
24   next count.

52

1        Q.   After the inmates were secured back into the T1
2    and T2, at some point there was an opportunity to go
3    out to the yard, correct?
4        A.   For me or for them?
5        Q.   For them.
6        A.   After chow was completed or when JV tower got a
7    green and there's an after-chow count also conducted
8    and called into JV, sometimes being that chow would
9    run late and that there's many buildings that they
10   would have to feed and it would go into the afternoon,
11   once a green and an after-chow count was complete,
12   inmates would be allowed to go out and rec. in the
13   yard, in which case part of my responsibilities as a
14   unit in that area is to observe the yard and be out
15   and about, working the T gates and constantly being
16   aware of the area in which I was assigned to.
17       Q.   And that was your responsibility when the
18   inmates were out in the T yard?
19       A.   Yes.
20           MR. MARTIN: Let's go off the record for a
21   moment.
22           (Discussion off the record.)
23           MR. MARTIN: Let's mark this as Lovett 2,
24   please. It's an incident report I believe filed by

53

1    Officer Lovett.
2            (Lovett Deposition Exhibit No. 2 was
3    marked for identification.)
4    BY MR. MARTIN:
5        Q.   Mr. Lovett, please take a few moments or
6    however much time you will need to to review that and
7    hopefully you will recall that that's your incident
8    report.
9        A.   (Reviewing document) Okay.
10       Q.   First of all, does that help you refresh your
11   recollection as to the designation of the assigned
12   area?
13       A.   Yeah.
14       Q.   And what was that?
15       A.   That I was correct in that my unit was 28 and
16   the other unit was 29.
17       Q.   But was there some designation for the area
18   that you covered?
19       A.   Not in this, not in this report, no. I just...
20       Q.   Does this help refresh your recollection at all
21   regarding the incident?
22       A.   Partially, yes.
23       Q.   So as I understand it, you were in building T2
24   doing an area check at the time an inmate came in and

14 (Pages 50 to 53)

Ward v. Taylor, et al.
Keith F. Lovett

54

1    said there was an inmate who was injured out on the
2    yard, correct?
3      A.  Yeah.
4      Q.  Do you recall how long you had been in building
5    T2 before this incident occurred?
6      A.  I do not.
7      Q.  Do you recall where you had been before coming
8    into building T2 to do the area check?
9      A.  I don't.  But -- I don't know if I'm allowed to
10   assume, but I would assume that I was in T1 performing
11   duties, as well as being out on the basketball court
12   and the surrounding areas.  I wouldn't stand in one
13   area.  I would walk around.  I would go to T1.  I
14   would go to T2.  I would just go and check out and
15   make sure everything was okay in those buildings.  I
16   would walk down the walkways in different areas.
17     Q.  And, in particular, when inmates were out in
18   the yard, correct?
19     A.  When inmates were out in the yard, I would, I
20   would be outside.  But also it also depended on, you
21   know, the situation.  You know, if there's one inmate
22   outside, I would be more inclined to go and do
23   building checks and walk around and that type of
24   thing.

55

1          My responsibilities weren't to be in one
2    specific place the whole time, in which case is why I
3    went from building to building as well as different
4    areas within what I was responsible for.
5      Q.  By the way, I didn't ask you this.  But were
6    you armed with anything that could have caused injury
7    to an inmate who may have attacked you?
8      A.  As part of my equipment, I was issued capstun.
9      Q.  Which is like a Mace?
10     A.  Yes.
11     Q.  Did you ever have to use that during your
12   career as a correctional officer?
13     A.  No.
14     Q.  Did you have any type of a stick, a nightstick
15   or something like that?
16     A.  No.
17     Q.  So capstun was the only weapon you had other
18   than your physical force?
19     A.  Fists, yes.
20         (Discussion off the record.)
21   BY MR. MARTIN:
22     Q.  So let's try to focus on July 10, 2004.  Do you
23   recall whether that is indeed the incident report that
24   you did on that occasion?

56

1      A.  It was put in the computer by me and it looks
2    familiar as to how I would write it to the incident
3    that had happened, so I would say it's mine.
4      Q.  Do you recall whether you did any other
5    incident reports?
6      A.  I imagine I did.  There were two separate
7    incident reports that would have to be completed.
8    This is the one, this is a 404.  You would also have
9    to complete some other paperwork in addition to this.
10   One was a more narrative.
11     Q.  Which one?  The 404 or the other?
12     A.  To be honest, I don't recall it's been such a
13   long time.  One would be a brief description of the
14   incident.  Another one would be a more longer
15   narrative explanation and detailed report.
16     Q.  As you look at this one, does it occur to you
17   that this is the brief narrative or the more involved
18   narrative?
19     A.  Again, I can't judge it to the other one that
20   was filed, but I would say that this is pretty, pretty
21   detailed.
22     Q.  All right.  You termed this report, Lovett 2,
23   as a 404?
24     A.  Yes.

57

1      Q.  And is that number contained on this?
2      A.  Wait.  Hold on.
3          Yeah.  Yeah.  On the bottom there's an
4    area which says it was a 404 (indicating).
5          MR. MARTIN:  Do you see it?
6          MR. FEUERHAKE:  Is he talking about right
7    there (indicating)?
8          MR. MARTIN:  Fine.
9    BY MR. MARTIN:
10     Q.  All right.  So referring again to Lovett 2
11   under the section in the middle of the report it says,
12   "Immediate Action Taken: filed 404"?
13     A.  Yeah.
14     Q.  Well, would it make sense to you that when you
15   put the immediate action taken you filed a 404 that
16   you were referring to another document?
17     A.  Again, it's been a while, but I would assume it
18   was referring to this document (indicating).  I could
19   be wrong because it has been a while.  I can't
20   remember the other piece of paperwork that, the other
21   type of report that was filed, but I'm assuming that
22   this is the 404 report.
23         Again, there was one that was more, you
24   know, detailed and one that was a quick narrative.

15  (Pages 54 to 57)

Ward v. Taylor, et al.
Keith F. Lovett

58

1    MR. MARTIN: Ms. Ballard, as you know, I'm
2 going to make a further request for that document.
3    MS. BALLARD: This type of incident report
4 are all the incident report, is the only type of
5 incident report known to me about this incident or
6 other incidents. It's possible the 404 or the other
7 thing he's talking about is a computer entry, which
8 would be some kind of summary of this, but I don't
9 know.
10    This is all we have.
11    MR. MARTIN: Given this witness's
12 testimony, I'm going to ask that you go back and check
13 with the powers that be and hopefully --
14    MS. BALLARD: I will check, but I can tell
15 you we produced all of the incident reports that are
16 known to me anyway.
17 BY MR. MARTIN:
18    Q. Okay. Do you recall having gone to chow hall
19 earlier that day with inmates?
20    A. Yes.
21    Q. Do you recall any particular incidents that
22 occurred at chow hall?
23    A. Well, I don't, I don't, I don't know who I am
24 supposed to be talking to.

59

1    I don't know if I'm supposed to be talking
2 to you to find out what --
3    MS. BALLARD: No. Answer his questions.
4    A. What I'm -- I don't know what I'm supposed to
5 say, to be honest with you.
6    MS. BALLARD: You're supposed to answer
7 his questions to the best of your ability and then I
8 might ask you some questions also.
9    A. Because, again, there's -- you know, this
10 situation, I don't know how deep to go into it. I
11 don't know. I don't know.
12    Q. Sir, we're here to try to get the facts of what
13 happened. Okay?
14    A. All right.
15    Q. And the facts are the facts. The truth is the
16 truth. You've sworn to tell the truth and I know that
17 you're telling the truth.
18    A. Yep.
19    Q. And I would ask you to tell us everything that
20 you recall.
21    A. Okay.
22    MS. BALLARD: Can we get a question on the
23 table or repeat the question?
24    MR. MARTIN: I asked him about chow hall

60

1 and what he remembered, if anything, about chow hall
2 that day.
3    THE WITNESS: Okay.
4    MS. BALLARD: Which chow hall? There's
5 three chows a day, I think.
6 BY MR. MARTIN:
7    Q. Do you recall which chow hall you went to that
8 day?
9    A. The number?
10    Q. Yes.
11    A. No, I don't. From my recollection that day, I
12 recall taking T1 and T2 to the chow hall and I recall
13 entering the chow hall. I remember running chow. I
14 recall Robert Johnson acting out in the chow hall. I
15 recall Robert Johnson telling me he was going to fuck
16 me in the ass. I recall being called a white mother
17 fucker and he was going to fuck me in my white ass.
18    Q. Had you known Mr. Johnson before that time?
19    A. No, I did not.
20    Q. Were you aware or did you become aware of what
21 had happened with Mr. Johnson before he came into the
22 chow hall that day?
23    MS. BALLARD: Objection to the form.
24    Q. You may answer.

61

1    A. Meaning?
2    Q. That he had had some problems where he tried to
3 jump out a window of another building.
4    MS. BALLARD: Objection to the form.
5    A. No, I did not.
6    It might have been referenced or
7 information about that inmate might have been
8 referenced while that incident was happening, him
9 being verbally abusive towards me.
10    Q. Well, excuse me. But do you recall someone
11 saying something that Johnson is having problems and
12 has had problems?
13    MS. BALLARD: Objection to the form.
14    A. No. I wasn't really aware of the inmate before
15 he started acting out in the chow hall.
16    Q. Can you describe specifically how he was acting
17 out and what may have triggered that?
18    A. I don't know, to be honest. Inmates will do
19 lots of things for lots of reasons.
20    He just became verbally abusive. I think
21 that the other inmates were egging him on, in which
22 case I think that kind of started him in behaving the
23 way that he did that day verbally.
24    Q. Why did he go after you at least verbally?

16 (Pages 58 to 61)

**A000027**

Ward v. Taylor, et al.
Keith F. Lovett

---

**62**

1　A.　Because I was probably the biggest, whitest guy
2　in the chow hall.
3　Q.　Did you go up to him?
4　A.　No, I did not. I probably kind of laughed.
5　Q.　You probably -- I'm sorry. You laughed?
6　A.　I probably laughed at the fact that he told me
7　he was going to fuck me in the ass. I thought that
8　was kind of funny, but...
9　Q.　But you believe he directed his anger towards
10　you because you're the biggest white guy in the area?
11　A.　Probably, yes.
12　Q.　And also you were the man as well?
13　A.　I don't know.
14　Q.　You were the correctional officer?
15　A.　I don't know about being the man or anything
16　else. I just know that I was running the chow hall.
17　Q.　So what recollection do you have after that?
18　A.　From my recollection, I believe I probably made
19　contact to the lieutenant who was running chow.
20　Q.　And who was that?
21　A.　I don't recall.
22　Q.　Was it Lieutenant Salas?
23　A.　I don't recall. It could have been.
24　Q.　And then what happened?

---

**63**

1　A.　I remember contacting somebody, whoever might
2　have been in charge at the time, and notified them
3　that this guy needed to be removed. To be honest, I
4　don't recall him being removed. I recall, I recall
5　him just being left to be verbally abusive at the time
6　and kind of blow it off.
7　　　In fact, I think it was kind of probably
8　taken that it wasn't worth the hassle of dragging him
9　out of the chow hall in that situation and creating a
10　further disturbance.
11　Q.　So is your recollection that Johnson was not
12　removed from the chow hall?
13　A.　From my recollection of that date -- and,
14　again, I don't have anything sitting in front of me to
15　say what happened that day -- I do not believe he was
16　removed from the chow hall. I believe that he was
17　left to misbehave in that situation.
18　Q.　Did you have any concern about him as a result
19　of his verbal attacks on you?
20　A.　Of course I did.
21　Q.　And what were your concerns?
22　A.　The guy was having some sort of mental problem
23　and he might be an issue.
24　Q.　Did you believe that Robert Johnson should be

---

**64**

1　permitted to go out into the T yard?
2　A.　No.
3　Q.　Do you know how it was that Robert Johnson was
4　permitted to go out to the T yard?
5　A.　Through the door.
6　Q.　I'm talking about the correctional officers, if
7　any, who allowed him to go out into the rec. yard
8　following this incident.
9　A.　Yes.
10　Q.　And what is that?
11　A.　He was allowed to go out to rec., I believe.
12　He was out in the yard, so evidently the officer
13　working the T building let him out to rec.
14　Q.　Do you recall who that officer was?
15　A.　No, I don't.
16　Q.　There's no mention of that on the report?
17　A.　No.
18　Q.　And when you say T building, do you know that
19　Johnson was being housed in the T buildings?
20　A.　Yes.
21　Q.　Do you remember which one?
22　A.　Just from recollection of the incident, he was
23　housed in T1.
24　Q.　Did you consider that an incident that occurred

---

**65**

1　in chow hall with regard to Johnson speaking out the
2　way he did?
3　　　MS. BALLARD:　Objection to the form.
4　A.　I don't understand what your question is.
5　Q.　Did you make any incident reports or any type
6　of report to any superiors as a result of observing
7　Robert Johnson in chow hall?
8　A.　No, I did not.
9　Q.　Is there any reason why you did not?
10　A.　It wasn't worth it. It wasn't worth the effort
11　for nothing to happen.
12　Q.　I'm sorry?
13　A.　It wasn't worth the effort for nothing to
14　happen and it would just have been more paperwork and
15　more aggravation for me. Sometimes you got to let
16　things go.
17　　　Do you know what? You guys forgot a big
18　piece of what happened in the whole story and I'm
19　going to drop it down right now what happened. So
20　this is true and honestly when this whole thing, when
21　I found out that I would have to come here -- I don't
22　support inmates by any means. I don't support nothing
23　about inmates.
24　Q.　You don't support Tim Ward, do you?

---

17　(Pages 62 to 65)

Ward v. Taylor, et al.
Keith F. Lovett

66

1    MS. BALLARD: Objection to the form.
2    A.  As far as you made the statement that Tim
3    considers me a friend, I'm not a friend to any inmate.
4        What happened that day was wrong.  It
5    could have been prevented.  After that incident
6    happened, I went to Lieutenant Harvey, told Lieutenant
7    Harvey "This guy's got some problems.  This dude's got
8    some major fucking problems.  He's going to bust
9    loose.  Something is going to go down."
10   Q.  Excuse me.  But tell me, when did you see
11   Lieutenant Harvey?  Right after this happened?
12   A.  Right after.  When the inmates were brought
13   back to the building, I went to Lieutenant Harvey and
14   said, "Lieutenant Harvey, this dude's a problem.  This
15   dude is going to go crazy.  I don't want to be around
16   when it happens."  I said, "You better do something,"
17   in which case C/O Dunn took Robert Johnson over to the
18   infirmary.  The infirmary said there was nothing wrong
19   with him; he was fine.  He went back to the building
20   and then did what he did.
21       And I don't know if you guys have that on
22   record, if you even knew that that had happened, but
23   that was something that I really had planned to keep
24   to myself, but being that I'm here I don't want to

67

1    come off that I'm hiding anything or anything.  And as
2    much as I don't support inmates suing anybody and I
3    can't stand fucking inmates, to be honest with you,
4    I'm not going to sit here and bullshit through this
5    thing.  I'm going to tell you the truth.  I'm going to
6    tell you exactly what happened no matter who stands to
7    gain the most out of this situation.
8        That situation could have been prevented
9    and I'm just going on record as saying that.  No
10   matter what happens here, I want to be honest and I
11   want to be truthful to the whole situation and that's
12   it because I've been struggling with that situation
13   for a while.
14   Q.  Well, we all appreciate your candor.  We know
15   it's a difficult situation for you to keep inside and
16   appreciate that you can put it out on the table for
17   us.
18       Let me ask some follow-up questions, if I
19   may.
20   A.  Okay.
21   Q.  What was Harvey's first name?
22   A.  Lieutenant.
23   Q.  Male or female?
24   A.  Male.

68

1    Q.  Did he have a first name other than lieutenant?
2    A.  I don't know.
3    Q.  What was Harvey's response to your great
4    concern that you expressed to him immediately after
5    this happened?
6    A.  He kind of blew it off.
7    Q.  Did he acknowledge that he knew anything about
8    Robert Johnson?
9    A.  Yes.  He probably, he probably had said
10   something to the fact that he was just, he was just
11   talking shit and he was, you know, just, just, just
12   another crazy inmate.
13   Q.  How long did you talk with Lieutenant Harvey?
14   A.  Just for a couple of minutes.  The lieutenant
15   would be out on the boulevard at the boulevard gate.
16       I distinctly remember going back and going
17   back after the inmates were secured in the building
18   and told Harvey what had happened.  I was more alarmed
19   at the fact that Robert Johnson was kind of glassy
20   eyed and he kind of was real shitty looking when the
21   incident had taken place in the chow hall.  And I
22   didn't feel uncomfortable or anything with him in the
23   chow hall.  I did feel like, you know, he could have
24   incited other inmates to misbehave, but fortunately

69

1    the situation went very smoothly after that.  I think
2    that the other inmates kind of laughed at him and the
3    fact that he was misbehaving and acting the way that
4    he was.  I think that I showed great restraint in
5    dealing with what he was doing in the chow hall, but
6    his glassy-eyed look and his look of craziness really
7    brought me to want to contact Lieutenant Harvey on the
8    situation.
9        I kind of felt like sometimes people don't
10   want to do things, don't want to write incident
11   reports, people don't want to aggressively deal with
12   situations as they happen in the form of paperwork,
13   removing an inmate or whatever.  And I felt like it
14   was important that I went to Harvey and let him know
15   that this guy was definitely going to be a problem and
16   somebody needed to do something.
17   Q.  I have a few more questions, but I'm just going
18   to take a moment, if I can.  If you need to use the
19   bathroom or get some water, I'll be back in a moment.
20   Okay?
21   A.  Okay.
22       (A brief recess was taken.)
23   BY MR. MARTIN:
24   Q.  Going back to what Johnson said to you in chow

18 (Pages 66 to 69)

**A000029**

Ward v. Taylor, et al.
Keith F. Lovett

70

1  line that day, do you recall him telling you that he
2  had a 7-inch dick with a birthmark?
3    A.  No.
4    Q.  You don't recall that?
5    A.  No.  I just remember him saying that he was
6  going to fuck me in my white ass and I think he told
7  me he was going to make me suck his dick is what he
8  said.
9        MR. MARTIN:  Off the record.
10        (Discussion off the record.)
11  BY MR. MARTIN:
12    Q.  All right.  Did you have any discussions about
13  Robert Johnson with anyone other than Lieutenant
14  Harvey?
15    A.  I might -- I mean, you know, there were
16  probably a hundred and something inmates that just
17  heard him saying that to me, so walking back I
18  probably talked to an inmate or two about it just in
19  generalizing.
20        And also I might have said something to
21  the building officer when I returned back and secured
22  the building.
23    Q.  Do you recall who that building officer was?
24    A.  I have no idea.

71

1    Q.  Now, as I understand it -- or let me ask you
2  the difference between an area check and a patrol
3  duty.
4        Is there a difference or a distinction
5  between the two?
6    A.  A patrol is a position for a specific area
7  whereas an area check is an act that you complete.
8    Q.  Do you recall how long it would take you on
9  average to complete an area check?
10    A.  Again, it was different times.  I would say
11  probably half an hour, 45 minutes.
12    Q.  And do you recall how long you were doing this
13  area check on the date in question before somebody
14  came in, an inmate came in and told you about Tim
15  Ward?
16    A.  No, I don't.
17    Q.  I had asked you specifically, I mean I had
18  asked you about how long it took to do an area check.
19  Let me ask you specifically about an area check in T2.
20        How long would that take?
21    A.  Throughout the building?  Again, there was no
22  set protocol of where I had to be and when I had to be
23  there.  I just had to complete these area checks and
24  go over certain areas.  I could have been in the

72

1  building for five minutes, ten minutes, sometimes
2  more, sometimes less.  There was no exact time frame.
3        I might go in there and might have been
4  talking to the person who was the building officer.  I
5  might have been talking to him about the building or I
6  might have been talking to him about incidents that
7  occurred throughout the day.  I might have been
8  filling out paperwork.  I might have been writing up
9  an incident report.
10        So it takes different amounts of time.
11  There's no set time.
12    Q.  After you spoke with Lieutenant Harvey to
13  express your concerns about inmate Johnson, did you --
14  I'm not just talking about that day, July 10, 2004,
15  But on any day subsequent, did you talk with any of
16  the other senior officers about what you had observed
17  and what you had told to Lieutenant Harvey?
18    A.  I don't recall.
19    Q.  What was your understanding, if any, as to the
20  investigation that was completed by the department as
21  a result of the Tim Ward incident?
22        MS. BALLARD:  Objection to the form.
23    A.  I don't understand your question.
24    Q.  Well, were you aware that there was an

73

1  investigation that ensued as a result of Tim Ward
2  being injured in the yard?
3    A.  My recollection is seeing Tim's family on TV
4  and imagining there would be a lawsuit in the future
5  where I might have to come and speak to somebody
6  regarding the incidents and that's all I knew.  And I
7  only took the lawsuit part as expecting what an inmate
8  would do.
9    Q.  Were you aware that Mr. Richardson,
10  Investigator Joseph Richardson was assigned to
11  investigate what occurred on July 10, 2004?
12    A.  No, I wasn't.  In fact, after the incident had
13  happened, I wasn't aware of anything that went on
14  after that and being that the hostage situation had
15  occurred just a day or two after, things were kind of
16  clouded for a while in the prison.
17    Q.  But you don't have any recollection of speaking
18  with Investigator Richardson about your observations?
19    A.  No, I do not.  I might have, I might have
20  spoken to him.  But as I sit here, no, I don't
21  remember ever speaking to him about that incident.
22    Q.  Please tell me, if you will, why you were so
23  reluctant to tell us about what happened in the chow
24  hall and then your discussion with Lieutenant Harvey.

19 (Pages 70 to 73)

Ward v. Taylor, et al.
Keith F. Lovett

74

1    MS. BALLARD:  Objection to the form.
2    Q.  You may answer.
3    A.  The truth is that, the truth is I, I did not
4    want to say any more than I had to say, than anything
5    that was out on the table.  In my own words, I think
6    it's bullshit how inmates sue the state every other
7    minute of the day.  I think that it's a waste how
8    inmates just try to sue anybody that they can.  Though
9    I did not know Tim, I had no involvement with Tim at
10   any time, I didn't want to be any more involved in
11   this situation than I had to be.  I didn't want to
12   support inmates.  I didn't even want to be here.
13       But also inside of me I knew that what had
14   happened was wrong and in my heart I knew it could
15   have been prevented and I know that I did everything I
16   can do to prevent it from happening.  And to put
17   everything on the table, I never once ever saw Tim as
18   a threat in any way and, in fact, in seeing him in the
19   building I had really thought he was a well-rounded
20   inmate.
21       But to be completely honest, I didn't want
22   to have any more to do with this case than I had to.
23   And on my side, being on the C/O side, you don't want
24   to contribute to an inmate in any way and that's how I

75

1    honestly felt in my heart.  But, again, the other
2    stuff was weighing on me and I did not know if it was
3    out in the open.
4        I hope that answered your question.
5    Q.  Well, how do you feel now that you know it was
6    not out in the open what Lieutenant Harvey?
7        MS. BALLARD:  Jeff, Jeff, Jeff, I object
8    to that.  You have a lot of this information already
9    produced in discovery.
10       MR. MARTIN:  Let's go off the record.
11       MS. BALLARD:  Let's not go off the record.
12       MR. MARTIN:  Well, then, I'll tell you
13   what, Stephani, there's going to be hell to pay for
14   this because this was a major coverup.
15       MS. BALLARD:  Jeff, this witness, who is
16   no longer employed, is giving his point of view.  You
17   cannot tell me there was a coverup here.  Ask him
18   questions.
19       MR. MARTIN:  I'm not referring to this
20   witness.  That's why I wanted to go off the record,
21   Stephani.  But if you want to keep it on the record,
22   that's fine.  We'll keep it on the record and we'll
23   prosecute to the fullest extent.
24       MS. BALLARD:  Jeff, we have given you

76

1    hundreds of pages of discovery.  Your paralegal has
2    called me twice because she can't find it.  You have
3    what we have.  There is no coverup.
4        MR. MARTIN:  Where is Lieutenant Harvey's
5    statement?
6        MS. BALLARD:  I don't know what you're
7    talking about.
8        MR. MARTIN:  Fine.  We'll deal with it
9    later.
10   BY MR. MARTIN:
11   Q.  Okay.  Mr. Lovett, let's try to, let me try to
12   finish my questions for you and I appreciate your --  I
13   suggested at the outset you would be here for a couple
14   of hours and it's a little longer than that and I do
15   apologize for that.
16   A.  Also I want to say I don't want to make anybody
17   mad and I don't want --  I don't know who knows what or
18   who knows and I don't think anybody did anything
19   wrong.  I know that I wanted to be as truthful as
20   possible with the situation and that's what I'm trying
21   to do.
22       And to be honest with you, now that all
23   this stuff is on the table I feel a lot better about
24   it because, you know, I don't feel like I'm being

77

1    dishonest in any way.  And I don't want to come in
2    here and bull crap you people and feel like I'm lying
3    or something is going to come up and somebody is going
4    to be pointing fingers at me because, again, in this
5    whole situation I just tried to do the right thing and
6    every day that I went to my job at the jail I tried to
7    do the right thing and in which case the reason I'm
8    not working there is because I want to do the right
9    thing in my life and not being there is the right
10   thing.
11       That's it.
12   Q.  Let me ask you what happened after the inmate
13   came in and reported that there was an inmate that was
14   injured outside.
15       What happened then?
16   A.  From my incident report, I'm expecting that I
17   probably received a call on the radio at the same time
18   and heard that there was a code in the yard.  I'm
19   imagining this probably happened probably at the same
20   time, in which case I responded to the yard.
21   Q.  Do you recall responding to the yard?
22   A.  Yes.
23   Q.  How long did it take you to respond to the
24   yard?

20 (Pages 74 to 77)

Ward v. Taylor, et al.
Keith F. Lovett

---

78

1    A.  A couple of seconds.
2    Q.  And what observations did you make?
3    A.  At what time?
4    Q.  At the time you went out to the yard initially.
5    A.  From my incident record, I observed inmate Tim
6    Ward sitting on the picnic table covered in blood,
7    blood appeared to be coming from cuts to his face.
8        That's what I observed.
9    Q.  Do you recall how many correctional officers
10   were working in that area at the time?
11   A.  No, I do not.  But if a code was called, then
12   officers were probably responding from other areas.
13   Q.  So was there a code called?
14   A.  From my paperwork, it's stating I responded to
15   a code 4 by unit 29 in T yard.  Unit 29 apparently
16   called a code 4.
17   Q.  Okay.  Was that before or after you got out to
18   the scene?
19   A.  It was before because in my paperwork, in my
20   report it states that I responded to a code 4 by unit
21   29 in T yard.
22   Q.  That's a little bit different than what I
23   understood from your testimony, meaning that you told
24   us before that you were alerted while you were doing

79

1    this area check in T2 by an inmate and that's what
2    took you outside.
3        Does this refresh your recollection
4    that --
5    A.  I don't recall being called on the radio.  I
6    recall an inmate saying something about it.  I'm
7    assuming that these incidents of the inmate coming in
8    the building and hearing the code over the radio
9    probably happened at the same time.  My recollection
10   is that an inmate notified me that a situation had
11   happened outside.
12       In my paperwork I'm also stating that I
13   responded to a code.
14   Q.  Okay.  Now, did you have a portable radio that
15   day?
16   A.  Yes, I did.
17   Q.  Was that radio functioning?
18   A.  Yes, sir.
19   Q.  Had you had any problems with your radios
20   before that?
21   A.  No, sir.
22   Q.  And the code 4 was a standard code for an
23   inmate issue, an injury?
24   A.  I don't know.  I don't remember my 10 codes as

80

1    far as codes are concerned, but I imagine it was
2    probably inmates fighting.
3    Q.  All right.  And did you remain out in the yard
4    until medical attention was received and rendered?
5    A.  Yes.
6        Also, in addition, I probably secured,
7    secured the area, secured inmates back into their
8    housing units and tried to clear the area as quickly
9    as possible.
10   Q.  What were your recollections, if any, as to the
11   approximate number of inmates out in the yard when you
12   went out there?
13   A.  I don't, I don't recollect any.  I'm sure there
14   were inmates in the yard.  I just don't remember how
15   many.
16       The incident happened so quickly that it
17   escalated so quickly in the sense of when medical
18   personnel arrived, when other units arrived,
19   everything just kind of went real fast from there.
20   Q.  Do you recall some kind of a concern about how
21   Mr. Ward was going to be transported to the hospital?
22   A.  It wasn't my position to make that decision.
23   Q.  I just wondered if you had heard anything about
24   whose ambulance he would travel in?

81

1    A.  It wasn't my position to make that decision.
2        MR. MARTIN:  I believe that's it.  I'll
3    give the other attorneys an opportunity to ask
4    questions.  I may have a couple of follow-ups.
5        MS. BALLARD:  I have a number of
6    questions.
7        Do you need to take a break?
8        THE WITNESS:  No, I don't.
9        MS. BALLARD:  Because we have been
10   going --
11       THE WITNESS:  No.  I'm fine.
12   BY MS. BALLARD:
13   Q.  We have never spoken before today.  Is that
14   correct?
15   A.  Yes, ma'am.
16   Q.  Have you spoken with Mr. Martin, Tim Ward's
17   attorney, before today?
18   A.  No, I have not.
19   Q.  Did you speak with him outside in the office
20   before the deposition?
21   A.  For a second.  He welcomed me to the office.
22   Q.  Did he say anything about the case or today's
23   deposition?
24   A.  He just said that he would try to get me out of

21  (Pages 78 to 81)

Ward v. Taylor, et al.
Keith F. Lovett

82

1  here as soon as possible and he appreciated me coming.
2     Q.  You said at one point, I believe -- and you
3  correct me if I'm wrong. I think you told Mr. Martin,
4  you said, "Tim considers me a friend."
5        Where did that come from?
6     A.  I think that his attorney was trying to comfort
7  me in the fact that it wasn't being sued here, that
8  this wasn't about me and that he didn't consider me an
9  enemy.
10    Q.  That Tim Ward did not consider you an enemy?
11    A.  Yeah. I guess that he wasn't out to sue me;
12 that it was a civil case with the state.
13    Q.  Did you at any point consider Tim Ward a
14 friend?
15    A.  No.
16    Q.  To your knowledge, did he consider you a
17 friend?
18    A.  No. I was kind of afraid that I would be sued
19 personally. That concerned me. But many people have
20 been sued within the Department of Corrections, so I
21 kind of felt that it wasn't something that I had to
22 worry about because I had known other officers had
23 been sued in the past. I didn't think it was a
24 problem, but it was in the back of my mind being that

84

1  trying to get in contact with me regarding this case.
2     Q.  We were trying to get in contact with you.
3  Have you -- I'm sorry. Go ahead.
4     A.  I'm sorry. I chose not to reply. I figured
5  you guys would go away. This is the third case I've
6  been involved with with the State of Delaware. I
7  don't want to be involved with cases with the State of
8  Delaware. I wanted to quit my job and be done with
9  it.
10       I thought you guys were going to go away.
11    Q.  Okay. You said three cases. You mentioned one
12 earlier which was a criminal matter involving some
13 contraband. I guess you mean this case.
14       What's the third case?
15    A.  I think that, I think that somebody might have
16 named me in another incident, a QRT incident.
17    Q.  QRT?
18    A.  Yeah.
19    Q.  Which is the quick response team?
20    A.  (The witness nodded). I don't know for sure,
21 but I kind of got a feeling. People like to sue
22 people real quick.
23    Q.  Do you think that you were named in a lawsuit?
24    A.  I'm not 100 percent. But, again, I was kind of

83

1  I have a family and this was something that, you know,
2  that I wanted to end as quickly as possible.
3     Q.  What in connection with the incident made you
4  think you might be sued, you personally?
5     A.  Inmates sue people and they sue anybody that
6  they can to try to get something off of them. I
7  didn't know who had my back either.
8     Q.  What do you mean by that?
9     A.  I didn't know, you know, if Tim decided he was
10 going to sue me, who was going to support me. I could
11 barely afford a pair of sneakers. I can't afford
12 lawyers and all this stuff that I thought might have
13 been coming with the situation, in which case is why I
14 didn't really want to be involved with it.
15    Q.  Has Tim Ward contacted you at any point since
16 the incident?
17    A.  No.
18    Q.  Has his family contacted you?
19    A.  No.
20    Q.  Has any attorney saying that he represents Tim
21 Ward contacted you?
22    A.  Other than e-mails that I received, no.
23    Q.  What e-mails did you receive?
24    A.  That somebody, possibly from your office, was

85

1  wondering if something was going to come down the
2  pike.
3     Q.  But you're not involved in any lawsuits?
4     A.  No.
5     Q.  Correct?
6     A.  No. The other one was completed and there's
7  this one.
8     Q.  And the QRT suit would have been an inmate
9  presumably alleging some kind of excessive force?
10    A.  Yes.
11    Q.  But to your knowledge, nothing came of that?
12    A.  No.
13    Q.  You said you got shift briefing at your
14 assigned building before each shift. Is that correct?
15    A.  At the post. When you handed over equipment,
16 you would get a little briefing. There weren't
17 really -- in that position there wasn't really
18 anything to brief. A lot of times they would send
19 somebody, you know, who would, who had never done that
20 job before and you would kind of give them a briefing
21 as to their responsibilities.
22    Q.  You said, "in that position." You mean in the
23 T building position that you had?
24    A.  As in unit 28.

22 (Pages 82 to 85)

Ward v. Taylor, et al.
Keith F. Lovett

86

1    Q. As unit 28?
2    A. Yes.
3    Q. Was it typical just in general that you got a
4    shift briefing before going onto your shift?
5    A. As unit 28, sometimes if something had happened
6    the prior shift, a fight or some type of trouble in
7    chow hall or something to that effect, somebody would
8    let you know.
9    Q. Okay. When you came onto your shift on July
10   10th, 2004, you don't have any recollection one way or
11   the other if you were briefed or not?
12   A. No.
13   Q. Tell me more about the logbook you described.
14   What actually goes in that logbook? Is it a
15   handwritten book? What is the logbook? What goes in
16   the logbook?
17   A. The logbook? A check-in time and a check-out
18   time.
19   Q. For each C/O?
20   A. For people doing area checks, rovers. You
21   would come in and you would log in the book that you
22   were there for an area check and then you would log
23   out 10-1 that everything is cool on the way out.
24   Q. Was there one logbook for each T building?

87

1    A. Yes. And also there was a board, a -- what the
2    hell do they call that? A note board, a note board
3    thing, whatever the hell it is.
4    Q. A blackboard?
5    A. No.
6        MR. MARTIN: A clipboard?
7    A. A clipboard. I'm sorry. My brain isn't
8    working right.
9        A clipboard where the paper for the area
10   checks would be kept. You would go in and you would
11   sign in and then you would sign out at the end of your
12   area check.
13   Q. Into the logbook?
14   A. Into the logbook and also into the --
15   Q. Onto the clipboard?
16   A. Onto the clipboard.
17   Q. Do you know where the documents from the
18   clipboard went?
19   A. As far as?
20   Q. Were they put into some other book later?
21   A. They were picked up after they were filled out
22   when they, I guess -- when the whole page was filled
23   out, they would collect a couple of pages and then the
24   area lieutenant would take them and file them

88

1    someplace.
2    Q. Are you familiar with shift commander's
3    reports?
4    A. Yes.
5    Q. Are they the same as logbooks or does
6    information from the logbook go into a shift
7    commander's report?
8        Do you know?
9    A. From my knowledge, the shift commander's report
10   is an overall narrative report of the day's events on
11   that shift, inmate movements and any type of
12   incidents.
13   Q. You mentioned some buildings had tiers and some
14   buildings were single buildings.
15       Was T building, were the T buildings each
16   single buildings?
17   A. The T buildings are dorm-styled setting.
18   Q. So no tiers?
19   A. No tiers. It's a single-level, dorm-styled
20   building. It's set up like a dorm, whereas other
21   buildings have tiers, lockable tiers.
22       This was a low security, minimum security
23   area.
24   Q. That's what I was going to ask you. This was a

89

1    minimum --
2    A. A minimum security area. The front door to the
3    building was shut and locked, but the rest of the
4    building was accessible.
5    Q. Accessible? How do you mean?
6    A. For inmate movement to the bathroom and such.
7    They weren't locked onto the tier.
8    Q. So T1 was minimum security, right?
9    A. Yes.
10   Q. And tier 2 was minimum security, correct?
11   A. Yes.
12   Q. You mentioned the hole. Is that the same as
13   the SHU building?
14   A. No. It's a -- in the back of Charlie building
15   there's a hole area where I believe there's four cells
16   on each side which are used as the hole, segregation
17   area.
18   Q. Is that disciplinary housing?
19   A. Yes. Inmates who are fighting and that type of
20   thing are brought to that location.
21   Q. I'm not clear on your testimony on the SOP's,
22   the standard operating procedures. The ones that you
23   were talking about, are they institution-wide policies
24   meaning DCC policies or were there SOP's just for

23  (Pages 86 to 89)

Ward v. Taylor, et al.
Keith F. Lovett

90

1  particular buildings or particular areas or what were
2  they?
3     A.  There's an overall institutional SOP policy and
4  there's also individual area SOP's.  For say the T
5  buildings, each T building would have a separate
6  notebook type of setup with the SOP's for that
7  building in that area.
8        If I remember correctly, the SOP's for
9  unit 28 and 29 were housed with those SOP's for the
10  building there because the primary responsibility in
11  the area is the T area, so you would routinely be in
12  the T's on a daily basis if you needed to look for
13  those SOP's.
14     Q.  So there was a SOP for your unit number?
15     A.  Yes.
16     Q.  And I believe you said there were also SOP's
17  pertaining to staffing at the particular buildings,
18  like number of guards?
19     A.  I believe in the buildings, yes, in the
20  building there was SOP's that listed the standard
21  operating procedures for that housing unit.
22     Q.  Do you remember other SOP's that were building
23  specific in addition to unit SOP's or staffing SOP's?
24     A.  I'm sorry.  There's all this noise going on

92

1         I was unit 28, which meant I was
2  responsible for, I was responsible for the T area, the
3  walkway, the walkway up to W building, the basketball
4  courts.
5     Q.  Okay.  Do you recall what area unit 13 was
6  assigned to?
7     A.  Unit what?
8     Q.  13.
9     A.  I do not.  It's been a while.  I don't remember
10  the assignments.
11     Q.  Okay.  Would it be consistent with your
12  recollection that on July 10, 2004 unit 29 was a C/O
13  named Veronica Sabb, S-a-b-b, or possibly Veronica
14  Drummond at the time?
15     A.  Yeah.
16     Q.  Was that a yes?
17     A.  Yes.  Drummond was unit 29.
18     Q.  Do you recall what unit C/O Salas was on that
19  day?
20     A.  I think Salas was a lieutenant at that time.  I
21  don't remember his exact unit number.
22     Q.  Do you remember what area he was responsible
23  for that day?
24     A.  No, I do not.

91

1  around me that I can't think.
2     Q.  I know.
3        Do you remember any other building
4  specific and let's say T building specific SOP's other
5  than pertaining to staffing or to the units assigned
6  to the buildings?
7     A.  No.
8     Q.  I just want to clarify for the record.  You
9  were testifying about when you were assigned to a
10  position and you were talking about the T area you
11  patrolled.
12        I take it when you said a position, you
13  mean the area, not a job classification position,
14  correct?
15        Does that make sense?
16     A.  No.
17     Q.  Okay.
18     A.  Explain.
19     Q.  When you're using the word "position," you're
20  not talking about a type of C/O job; you're talking
21  about the physical position, meaning the area?
22     A.  No.  When I say a position, I mean the unit.
23  You're assigned to unit 28, unit 29, unit 30 and your
24  responsibility is per that unit number.

93

1     Q.  When the inmates had yard, did all the T
2  inmates have to go outside at that time or could they
3  stay in the building if they wanted to?
4     A.  They could stay in the building if they wanted
5  to, but the door was locked.
6     Q.  So they made a choice either to stay inside –
7     A.  Yes, to stay inside or go outside.
8     Q.  You have to let me finish my question.
9     A.  I'm sorry.
10    Q.  Just so he can take it down.
11        So at the time you were doing your area
12  check, there could have been inmates in the T2
13  building?
14     A.  Yes.
15     Q.  When you were doing your area check when
16  inmates, when some inmates were outside at yard, did
17  you go into, say, cells that were empty and unoccupied
18  at the time to do checks?  I guess you didn't have
19  cells in that building.
20     A.  There were no cells.  There were bunks.  And I
21  would try to do, I would try to give consideration and
22  I would do any type of checks or searches that I had
23  to do with inmates present just because of me.  I try
24  to work with people and though many inmates probably

24  (Pages 90 to 93)

**A000035**

Ward v. Taylor, et al.
Keith F. Lovett

94

1  didn't see it that way, I really tried to work with
2  people the best that I could and be considerate of
3  their needs as well.
4      Q.  I'm going to ask you about the Robert Johnson
5  incident at chow hall that you testified about.
6          Do you recall was this breakfast chow or
7  lunch chow?
8      A.  It would be lunch.
9      Q.  Do you know approximately what time that chow
10  was that day?
11      A.  No, I do not.  It was, it was somewhere in the
12  midafternoon.  I would imagine somewhere around 12:00
13  and -- I mean between 11:00 and 12:00.
14      Q.  And I believe you said that you never noticed
15  Robert Johnson before that day?
16      A.  No, I did not.
17      Q.  Do you have any idea how long he had been
18  housed in T before that day?
19      A.  No, I do not.
20      Q.  How did it first come to your attention?  Was
21  he sitting there eating and suddenly started yelling
22  at you?
23      A.  Pretty much, yes.
24      Q.  Was he sitting down?

95

1      A.  Yes.
2      Q.  Did he stand up?
3      A.  Can I go back for a second?
4      Q.  Sure.  Go ahead.
5      A.  Again, I don't remember 100 percent.  He might
6  have been standing in line for chow or he might have
7  been sitting.  I don't remember 100 percent.
8          And also somebody had said something about
9  an inmate jumping out of a window at W.  I had heard
10  that story, but I was not aware that it was Robert
11  Johnson.  I only found out more about Robert Johnson
12  after that incident and then the incidents that
13  happened after he was in the SHU.
14      Q.  So you also were not aware that that jumping
15  out of the window occurred many months before this
16  incident?
17      A.  No.  I had heard about it.  You hear a lot of
18  things.  I just wasn't -- I didn't know it was him
19  that had done that.
20      Q.  Had you heard anything before July 10, 2004
21  about Robert Johnson making threats to anyone?
22      A.  No.
23      Q.  Did he have a reputation as a troublemaker or
24  anything like that?

96

1      A.  Afterwards?
2      Q.  Before.  Before.
3      A.  No.  I had heard -- I mean you hear things
4  afterwards that, you know, the type of things that he
5  did inside the building and whatnot, you know.
6      Q.  But you as a C/O working in that area for at
7  least some months prior to this incident --
8      A.  No, I did not.
9      Q.  -- hadn't heard anything about him?
10      A.  No.  I didn't work in the buildings.  Let's say
11  I wasn't responsible for the building, the housing
12  unit.  I was responsible for, you know, doing area
13  checks in the building and around, so I really didn't
14  have to work with those specific inmates on a daily
15  basis.
16          I just kind of got them during chow time
17  and got them outside and those who were more
18  personable out on the basketball court or in the rec.
19  yard and that type of thing.
20      Q.  Now, Robert Johnson's comments in the chow hall
21  were directed at you personally, correct?
22      A.  Yes.
23      Q.  Were they directed at any other C/O's?
24      A.  Not that I recall.

97

1      Q.  Were they directed at any other inmates?
2      A.  No.
3      Q.  Did he mention Tim Ward in chow hall?
4      A.  No.
5      Q.  Did you feel actually threatened by Robert
6  Johnson at that time?
7      A.  Not in the least bit.
8      Q.  Why do you say that?
9      A.  Well, I just never got that feeling from an
10  inmate.
11      Q.  I believe you said you contacted Lieutenant
12  Harvey.
13          What's Lieutenant Harvey's first name?
14      A.  I don't know.
15      Q.  And you said that Johnson should be removed
16  from the chow hall?  Was that your testimony?
17      A.  Yes.  While in the chow hall, I believe I made
18  a phone call to whoever was running the chow halls at
19  that time.  It might have been Harvey.  It might have
20  been somebody else.  I can't recall exactly who it
21  was, but I distinctly remember talking to somebody
22  about him needing to be removed.
23          And it was, it was kind of brought down
24  that just let him do what he needs to do and then

25  (Pages 94 to 97)

Ward v. Taylor, et al.
Keith F. Lovett

98

1  we'll deal with it later, as long as he's not acting
2  violent, disorderly and threatening. It was brought
3  to me, whoever I spoke to, it was like, it was like
4  well, if he doesn't stand up, do you know what I mean,
5  like he wants to scrap or something, then let him,
6  just let him run his mouth and we'll deal with it
7  later.
8     Q.  And so Lieutenant Harvey was not physically
9  there at the chow hall, correct?
10    A.  No. There was another C/O in the chow hall
11  when that happened, I believe.
12    Q.  Do you know who that was?
13    A.  No, I do not. I know I wouldn't run a chow
14  hall by myself.
15       Actually, I have run chow halls by myself,
16  but at that time I think there was somebody in the
17  chow hall with me. I just don't recall who it was.
18    Q.  So the information that Lieutenant Harvey got
19  he got from you by phone, correct?
20    A.  Correct. Or I'm not 100 percent certain that
21  it was Harvey that I spoke with on the phone while I
22  was in the chow hall. I know I spoke to Harvey face
23  to face after the chow hall when I brought the inmates
24  back to the building and went back out and talked to

99

1  Harvey face to face.
2     Q.  Do you know if you spoke with Harvey before or
3  after Robert Johnson went to the infirmary?
4     A.  No.
5     Q.  You're not sure?
6     A.  No, I don't recall talking to him.
7     Q.  You don't recall talking to Harvey?
8     A.  Yeah.
9     Q.  I thought you said you spoke to him.
10    A.  After, after he went to the infirmary.
11    Q.  So you think you spoke to Harvey before Johnson
12  went to the infirmary?
13    A.  Yes.
14    Q.  And I believe you said an Officer Dunn took --
15    A.  Took Robert Johnson to the infirmary and then
16  probably ten minutes later brought him back.
17    Q.  Was that at your request that he took him to
18  the infirmary?
19    A.  I would hope that my input helped in getting
20  him looked at.
21    Q.  Do you know who told Officer Dunn to take
22  Robert Johnson to the infirmary?
23    A.  I'm assuming it was Harvey.
24    Q.  And are you aware that Robert Johnson was seen

100

1  by the infirmary?
2     A.  Yep. Yes.
3     Q.  What's your understanding of what happened
4  there?
5     A.  I think that in my opinion he went there for
6  five, ten minutes, the nurse said he was okay and sent
7  him back to the building. I was upset with that
8  personally because I felt that he needed more type of
9  attention and the way that he was behaving said he
10  needed more type of attention, but the nurse said he
11  was fine.
12       I also believe that he was not seen by a
13  psychologist. He was seen by a regular nurse who sent
14  him back to the building. I took that personal
15  because I felt like I was going to have to deal with
16  him. I felt like he was a problem and that somebody
17  needed to make a decision about him that didn't make
18  the right decision with him and sent him back to the
19  building regardless if he did whatever he did
20  afterwards. I still felt like he was a problem and,
21  in fact, I remember talking to Dunn about how much
22  bullshit it was the fact that he got sent to the
23  infirmary and then got sent right back.
24    Q.  You said they didn't make the right decision.

101

1  Do you mean the people at the infirmary?
2     A.  Yes.
3     Q.  And you earlier said that you thought this
4  incident could have been prevented.
5        Do you mean if the infirmary had taken
6  further action?
7     A.  Yes. I think if he would have, if they would
8  have taken further action when he was in chow hall and
9  removed him out of the chow hall and dealt with him on
10  that level, something could have been prevented. I
11  think that the wheels in motion would have prevented,
12  at least it may have been somebody else but it
13  wouldn't have been Tim.
14    Q.  What to you mean by it may have been somebody
15  else?
16    A.  He might have snapped out at some other time,
17  but it wouldn't have been that time if somebody had
18  done something about the incident that was happening
19  in the chow hall and all the other things that led up
20  to the incident with Tim.
21    Q.  So if medical personnel had held him for
22  observation, you think this would not have happened at
23  that time?
24    A.  If I'm allowed to say in my personal opinion,

26 (Pages 98 to 101)

**A000037**

Ward v. Taylor, et al.
Keith F. Lovett

---

102

1  yes, I do feel that way.
2      Q.  Did the C/O's have any choice if medical
3  personnel sends somebody back to their —
4      A.  No, we do not.
5      Q.  So you can't second-guess the decisions made by
6  the infirmary personnel, correct?
7      A.  Not in the least bit, no.
8      Q.  When you created the incident report that's
9  marked Lovett 2 in front of you, is there a reason you
10  didn't put anything in there about how Robert Johnson
11  had been acting out in the morning?
12      A.  Because I was writing an incident report based
13  on the incident that happened out in the yard.
14      Q.  Is there a reason you didn't do a supplement or
15  another report about the history that you observed
16  with Robert Johnson?
17      A.  Again, so many things happened at the prison
18  that you would be writing all day and all night. You
19  couldn't do your job effectively if you were there
20  writing all the time.
21          And I think probably two weeks before we
22  were able to do these on the computer, you had to do
23  them by hand, which was a real pain in the butt. And
24  if you were writing incident reports, you would have

---

103

1  to do a 404 and the other paper to go along with it
2  and you would be writing all day and all night so some
3  things you just had to let go.
4          And that was one of my — I had other
5  responsibilities. I had to do, I had to do my area
6  checks. I had to get inmates resecured. I had to do
7  this. I had to do that. I really didn't have time to
8  sit down and write that report.
9      Q.  Are you saying that on this date, July 10,
10  2004, it was computerized or you had —
11      A.  It was computerized, yes, at that time, right
12  here (indicating). But prior to that, a few weeks
13  prior to that, we would have to handwrite all our
14  reports, as well as the supplemental paperwork that
15  goes along with it.
16      Q.  So at least you personally, you wouldn't
17  typically do an incident report if an inmate was just
18  acting out verbally?
19      A.  Well, when I first came to the prison, I would.
20  But as time went by, I started realizing —
21          MS. BALLARD:  Are you getting this? It's
22  kind of noisy.
23      A.  — I started realizing that I was basically
24  wasting my time on a lot of issues and sometimes it

---

104

1  just, you know, didn't pay to do that. It didn't pay
2  to write paperwork on people unless there was an
3  issue.
4      Q.  If an inmate had been violent towards another
5  inmate or towards a C/O, you would have done —
6      A.  Of course, yes.
7      Q.  My question was: You would have done an
8  incident report on that?
9          Does the chow hall appear on your map
10  there, Lovett 1?
11      A.  No.
12      Q.  Can you sort of give us an orientation where
13  the chow hall appears on Lovett 1?
14      A.  I could draw you another map if you want.
15      Q.  You don't have to do that.
16          Why don't you just verbally describe it?
17      A.  The T gates are right here (indicating) and
18  there was a fence line right here. The boulevard gate
19  is right there (indicating). The boulevard is the
20  main drag where the chow halls are located. There's
21  receiving is right here and then the chow halls are
22  lined up along the boulevard right here.
23          So we walked from here (indicating). I
24  secured this gate. I resecured the gate with a lock

---

105

1  and key and a chain. Then I walked the inmates to the
2  boulevard gate, which is mechanically controlled by
3  the bird's nest overlooking the boulevard gate. That
4  gate opens and inmates are brought to the chow hall,
5  lined up on the wall, fed chow, sat, throwing away,
6  back out the door, back up through the same path that
7  you came.
8      Q.  How long of a walk is it from chow back to T?
9      A.  Well, inmates would drag their feet and
10  whatnot, so it would probably be about five minutes,
11  six minutes.
12      Q.  Do you remember if Robert Johnson was acting up
13  on the walk back to T buildings from chow hall before
14  he went to the infirmary?
15      A.  No, he wasn't. I remember being — my position
16  as far as walking the inmates back is that you always
17  walk behind the inmates. You never walk in front of
18  the inmates for security.
19          And I remember just kind of chatting with
20  the inmates that, you know, we just were kind of
21  laughing at the situation that happened. They were
22  just kind of like shaking their heads a little bit.
23      Q.  As unit 28 were you the only C/O responsible
24  for patrolling the yard area when the inmates were out

27 (Pages 102 to 105)

**A000038**

Ward v. Taylor, et al.
Keith F. Lovett

106

1  at yard?
2  A.  That area I believe, yes, because 29 would be
3  monitoring that gate (indicating) during rec. time
4  and she would have been responsible for inmates having
5  passes to go from W to other areas.  This (indicating)
6  gate would be locked during the day, you know, most of
7  the time that gate would stay locked during rec. times
8  to prevent you from having to go and open it up every
9  two seconds.
10      So inmates would actually have to come
11  down and walk down the path to go to JV and JV would
12  have to open up the gates so they could get on the
13  compound to get to where they had to go.  It was kind
14  of like a check and balance type situation but, you
15  know, just kind of to prevent --
16  Q.  So the question being who is responsible for
17  the yard when the inmates are out at yard, that is
18  unit 28, correct?
19  A.  In that location, yes.
20      On the W gates it would be unit 29.
21  Q.  But unit 29 is not responsible for the T area,
22  correct?
23  A.  No.  What I got after the incident was you can
24  see through right in that area and she kind of

107

1  observed some of what happened.
2  Q.  Okay.  Did you at some point send an e-mail
3  from your home e-mail account to somebody summarizing
4  the Robert Johnson incident you discussed?
5  A.  I don't recall.  Did I?
6  Q.  I'm asking you if you recall.  This would have
7  been approximately September of 2004.
8  A.  I might have.  I think I might have to kind
9  of -- actually, I do recall writing, writing an
10  incident report to somebody just to kind of protect
11  myself so I wouldn't forget what happened.
12  Q.  You're saying an incident report.  You don't
13  mean an official DOC --
14  A.  No.  Just kind of a synopsis.  I thought I
15  actually, I thought I had written it and e-mailed it
16  to myself, actually.  I don't remember.
17      I remember writing something.  I don't
18  remember who I sent it to.  I might have sent it to a
19  friend or somebody to hold onto it just in case.
20  Q.  But you wrote some type of synopsis to protect
21  yourself?
22  A.  Yes.  Just so I wouldn't forget anything
23  because from the very beginning, you know, inmates
24  were talking and I mean the first words were "Oh,

108

1  you're at fault, you're at fault, he's going to sue
2  you, he's going to sue you, he's going to sue you."
3  So I just wanted to make sure I had my ducks in a row
4  just in case I ended up in a lawyer's office
5  somewhere.
6  Q.  Is there anything that you put in that synopsis
7  to yourself that you didn't tell us here today?
8  A.  No.  Other than things that I couldn't remember
9  because of time, I think I've been pretty much
10  truthful and open.  Not pretty much, but I mean
11  absolutely truthful and open on everything single
12  thing that's come out of my mouth so far.
13  Q.  Do you remember hearing, prior to the incident
14  do you remember hearing that Robert Johnson had any
15  mental health problems, mental health issues?
16  A.  Not prior to the incident.
17      MS. BALLARD:  I think that's all I have.
18  Thank you.
19      MR. MARTIN:  Off the record for a minute.
20      (Discussion off the record.)
21  BY MR. HAGER:
22  Q.  I have just a couple of questions for you.  I'm
23  Jerry Hager and I represent First Correctional
24  Medical.

109

1  A.  Okay.
2  Q.  Did you see Robert Johnson being escorted to
3  the infirmary?
4  A.  Yes, I did.
5  Q.  And who did you say was escorting him?
6  A.  It was Dunn.
7  Q.  That would be 29?
8  A.  No.  I don't know what unit number he was.  He
9  was on the other side of the compound.
10  Q.  And did you see him bring him back in ten or
11  fifteen minutes?
12  A.  Yes.  Probably ten minutes.
13  Q.  Did you hear anybody say what happened at the
14  infirmary?
15  A.  I might have asked Dunn what had happened,
16  yeah.
17  Q.  And what did he tell you?
18  A.  Just that, you know, a nurse saw him and sent
19  him back and said he was all right, just like that.
20  Q.  He didn't tell you anything else?
21  A.  No.
22  Q.  Did he tell you what nurse?
23  A.  No.
24  Q.  Did you ever make a report of anything you said

28 (Pages 106 to 109)

Ward v. Taylor, et al.
Keith F. Lovett

<table>
<tr><td>

110

1   to Lieutenant Harvey?
2   A. No.
3   Q. Did you ever make a report of anything you said
4   to the supervisor on the telephone at the chow hall?
5   A. No.
6   Q. Do you know if any of those people ever made a
7   report?
8   A. I couldn't tell you. I don't know.
9   MR. HAGER: That's all I have.
10   MS. BALLARD: Jeff, before you go again,
11   if you are going to go again, I think there might be
12   an incorrect name.
13   BY MS. BALLARD:
14   Q. Is it Officer Phillip Dunning as opposed to
15   Dunn?
16   A. No. Dunn, he was the officer who worked the T
17   buildings. Dunn was a rover. Dunn is the one that
18   brought Robert Johnson to the infirmary.
19   Dunning works the buildings.
20   MS. BALLARD: Okay. Thanks.
21   BY MR. MARTIN:
22   Q. Just as a point of clarification, I may have
23   asked this and I just don't remember. After you wrote
24   your report that's been marked as Lovett 2, did you

</td><td>

112

1   accommodation on that.
2   THE WITNESS: I'm not really interested.
3   I'm fine with what I said today. Like I said, I tried
4   to be as honest as possible and actually — I am as
5   honest as possible. I'm trying to be as
6   straightforward as possible and honest in everything
7   that's come out of my mouth and tried to get every bit
8   of recollection I could out of my head.
9   I just wanted to make sure that I was
10   honest and that nothing was left out.
11   MR. MARTIN: All right. Do you know what?
12   If we may just pause for a moment and go off the
13   record.
14   (Discussion off the record.)
15   MR. MARTIN: I've asked counsel,
16   Ms. Ballard, to reference this document that she's
17   suggesting, an e-mail from Mr. Lovett. As I
18   understand it, she's refusing to tell me the Bates
19   number. She said she's not going to make my case for
20   me. While this witness is here --
21   MS. BALLARD: I can put my position on the
22   record.
23   MR. MARTIN: Excuse me. I am on the
24   record, ma'am.

</td></tr>
<tr><td>

111

1   speak with any investigators about the incident
2   involving Tim Ward or the incident regarding Robert
3   Johnson?
4   A. I don't recall. I might have. A lot of time
5   has passed since then and I haven't given a lot of
6   thought to what had happened that day.
7   Q. All right. But you still have a recollection
8   of doing two incident reports close to the time of
9   this incident, do you not?
10   A. I remember doing this report (indicating).
11   Q. And you're referring to Lovett 2 for the
12   record.
13   A. Yes. And usually when you did this type of
14   report, another incident report would accompany it. I
15   just don't -- I think it's a 437 or 237 or something.
16   I don't remember the number.
17   Again, it has been quite a while.
18   MR. MARTIN: Thank you. I think that's
19   all I have.
20   MS. BALLARD: I think you're done.
21   MR. MARTIN: Now, you have an opportunity
22   to read the transcript that Mr. Fetzer will prepare.
23   Unfortunately, you would have to probably do that up
24   in his office, unless we can make some type of

</td><td>

113

1   MS. BALLARD: You're stating what I told
2   you and I can do that myself.
3   MR. MARTIN: No. I'm going to put on the
4   record what I want. You can put on what you want.
5   Okay?
6   MS. BALLARD: Go ahead. Go ahead.
7   MR. MARTIN: This witness, this is a great
8   difficulty for this gentleman to come up here and I
9   think all attorneys recognize what this man has done
10   and we all appreciate it. I don't want to have to
11   re-call him again.
12   And I want to have a copy of what you have
13   referenced as an e-mail so that I can know whether I
14   need to ask this gentleman any further questions at
15   this point. I think that's a more-than-reasonable
16   response or request in view of the circumstances here
17   today.
18   MS. BALLARD: Jeff, if I had the Bates
19   number here, I would give it to you so you could find
20   it in your production. I don't have the Bates number
21   here. I don't choose to give you the document because
22   you have it and it's up to you to prepare for your
23   deposition and I don't want the document in the
24   record. I mean I don't want to put it in from my side

</td></tr>
</table>

29 (Pages 110 to 113)

**A000040**

Ward v. Taylor, et al.
Keith F. Lovett

114

1   for DOC.
2           If you want to put it in, you can look at
3   your production, pull it out and ask the witness about
4   it.
5           MR. MARTIN: Okay. We'll have to go off
6   the record here and I'm going to have to make an
7   effort --
8           MS. BALLARD: Actually, Jeff, actually,
9   Jeff, do you know what I will do? I'll call my
10  paralegal and if she can quickly find the Bates
11  number, I will give it to you. Okay?
12          MR. MARTIN: Thank you.
13          (A brief recess was taken.)
14          MR. MARTIN: Would you mark this as 3?
15          (Lovett Deposition Exhibit No. 3 was
16  marked for identification.)
17  BY MR. MARTIN:
18  Q.  While we were off the record we located the
19  document that I had inquired about. It was produced
20  by the state in their regular course of document
21  production and it's Bates stamped D00431 and D00431A.
22          Mr. Lovett, I have had an opportunity -- I
23  gave you this document that's now marked as 3. Have
24  you had an opportunity to review it?

115

1   A.  Yes.
2   Q.  Does it look familiar to you?
3   A.  Yes, it does.
4   Q.  And how would you identify it?
5   A.  I remember writing a diary. I don't remember
6   who it was, but somebody told me to do it just so I
7   had it. Do you know what I mean? So if this would
8   ever have come to court I would have a way of, you
9   know, kind of remembering what happened that day.
10          And actually after reading it, some of the
11  other stuff that had happened as part of that is
12  starting to pop into my head.
13  Q.  Let me ask first, this was dated September 3,
14  2004. What I don't think I asked you was your final
15  day of working for the Department of Correction.
16          Do you recall when that was?
17  A.  No, I do not.
18  Q.  Was that in 2004?
19  A.  It might have been. I don't remember the exact
20  time or date of any of that stuff happening.
21  Q.  Do you recall whether you wrote this e-mail
22  when you were still employed by the Department of
23  Correction?
24  A.  I'm sure I did.

116

1   Q.  Do you know to whom you sent this e-mail?
2   A.  I'll tell you what. As far as I know, somebody
3   had broken into my Yahoo and got it somehow.
4   Q.  I'm sorry. What do you mean they broke into
5   your Yahoo?
6   A.  Because I don't know how anybody would have
7   gotten this unless I sent it to them, sent it to them
8   to hold onto.
9   Q.  So you're not aware of how the state received
10  this?
11  A.  No. I do remember writing this and I
12  remembered some other stuff about that day in chow
13  hall.
14  Q.  What different recollections were triggered as
15  you read through this?
16  A.  First and foremost that I remember working the
17  chow hall that day with Sergeant Thomas. Sergeant
18  Thomas had a reputation of being very relaxed and, you
19  know, just really didn't care.
20          And now that I think about it, I was upset
21  at how Sergeant Thomas, you know, went about dealing
22  with the situation in the chow hall and when Robert
23  Johnson acted up. I remember Sergeant Thomas saying
24  to me "Don't worry about it unless he steps to you,

117

1   you know, just let him do his thing or whatever." And
2   I remember like Sergeant Thomas just blowing off the
3   situation.
4           And I remember going to Harvey afterwards
5   and I'm not like one of those people that would ever
6   snitch on anybody or even talk about anybody, but I
7   remember that, you know, Sergeant Thomas really p'd me
8   off that day because I felt like he didn't have my
9   back in the situation.
10  Q.  Are any other recollections refreshed as a
11  result of reading this?
12  A.  And then the fact that I received a phone call
13  from somebody. I don't remember who it was or
14  whatever. I do remember receiving a phone call around
15  that time and stating to the person on the other end
16  of the phone that I could not talk about it and that
17  if they had any questions they can contact the
18  Department of Correction attorneys.
19  Q.  All right. You said, you told us earlier you
20  have been working for the Department of Transportation
21  for over two years.
22          Do you recall when you joined them?
23  A.  It would have been a month after I left DOC. I
24  went on FMLA and then from FMLA I went right to work

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

**A000041**

Ward v. Taylor, et al.
Keith F. Lovett

**118**

1  for Department of Transportation.
2    Q.  And can you give us an approximate date of
3  that?
4    A.  June, June 12th.
5    Q.  June 12th?
6    A.  It might have been June 12th.
7    Q.  Of '05?
8    A.  Yeah.
9    Q.  Does that help you remember when you left the
10  Department of Correction?
11    A.  Yeah.  Because I went on FMLA for a month and
12  had a baby and right after that I went right to the
13  Department of Transportation.
14    Q.  So was that sometime in May?
15    A.  Yeah.  Actually, it would have to be in June.
16  I'm sorry.  Because I had a month off of FMLA when my
17  daughter was born and she was born in May, May 11th,
18  so it would have to be somewhere around June, June
19  12th, June something, somewhere around there.
20    Q.  All right.  You're talking about your start
21  date with DOT, correct?
22    A.  Yes.
23    Q.  But your end date with DOC, that was back in
24  May of '05?

**119**

1    A.  Probably, yes.
2    Q.  Why is it that you chose to leave DOC?
3    A.  I didn't like, I didn't like how the
4  administration was putting me in a position that they
5  were going to end up getting me hurt.
6    Q.  Are you talking about being physically hurt?
7    A.  Partially, yeah.
8    Q.  Why do you say that?
9    A.  Just that I wasn't happy with the way the
10  institution was being run and I felt like I was being
11  put in positions on a daily basis that I couldn't
12  control.
13    Q.  So you were concerned about your own physical
14  safety and security?
15    A.  Yeah.  Definitely.
16    Q.  Do you feel that the safety and security of the
17  inmate population was at risk as well?
18        MS. BALLARD:  Objection to the form.
19    A.  Yes.
20    Q.  Okay.
21    A.  Yes, without a doubt.
22    Q.  I think I may have asked this and I apologize.
23  I don't mean to repeat.
24        Do I understand that you never did a

**120**

1  report with regard to what happened in the chow hall
2  involving Robert Johnson on July 10, 2004?
3    A.  No, I did not.
4    Q.  Did you ask to do a report?
5    A.  I asked here, yes, I asked Harvey if I should
6  do a report and he said to hold off.
7    Q.  Did you have any understanding as to what that
8  meant, to hold off?
9    A.  Not to write it.
10    Q.  Okay.
11    A.  Not to write it.
12    Q.  And when did you have that discussion with him?
13  Was that before or after Tim Ward was assaulted by
14  Johnson?
15    A.  It would be before.
16    Q.  And did you have any understanding as to why
17  Lieutenant Harvey asked you to hold off or not write
18  it?
19    A.  No, I did not.  I knew that he had said that he
20  was going to try to get him seen by mental health.
21        MR. MARTIN:  Okay.  Thank you.  That's all
22  the questions I have.
23  BY MS. BALLARD:
24    Q.  I have a couple more in follow-up.

**121**

1        Does this refresh your recollection as to
2  your retirement, not retirement, but resignation date
3  from DOC?
4    A.  Yes.
5    Q.  What was the date?
6    A.  June 1, 2005.
7    Q.  Thank you.
8        You were asked some questions about the
9  safety of the inmate population in terms of physical
10  safety.  Were you just expressing your personal
11  opinion when you gave your answer?
12    A.  Yes.
13    Q.  So Lieutenant Harvey told you to hold off doing
14  a report on Robert Johnson, correct?
15    A.  For what happened in the chow hall, yes.
16    Q.  For what happened in the chow hall.  Isn't it
17  correct that the Cassie Arnold hostage situation took
18  place approximately two days after the Tim Ward
19  incident?
20    A.  Yes.
21    Q.  Did Lieutenant Harvey follow up with you again
22  after the Arnold incident about the Ward incident?
23    A.  No.
24    Q.  And I believe you said that you didn't recall

31  (Pages 118 to 121)

**A000042**

Ward v. Taylor, et al.
Keith F. Lovett

122

1  whether or not you were interviewed by Investigator
2  Richardson?
3     A.  I do not.
4     Q.  Is it possible you were?
5     A.  I don't know.
6        MS. BALLARD:  That's all I have.
7  BY MR. HAGER:
8     Q.  I just have a couple.
9        You saw the recount in the e-mail of when
10 Mr. Johnson was taken to the infirmary.  You had
11 testified -- and this is on page 2, the top of the
12 page, first full paragraph of page 2, "When chow was
13 over."
14       You had testified earlier that you had
15 talked to Dunn, Correctional Officer Dunn after
16 Johnson came back from the infirmary as to what
17 happened.
18       Do you still think it was Dunn that you
19 talked to or do you think it was Harvey you talked to
20 about what happened?
21    A.  I'm sure it was Dunn I talked to because Dunn
22 had brought him over to the infirmary and brought him
23 back to the T buildings.
24    Q.  But your e-mail says on page 2 "I then asked

123

1  Lieutenant Harvey if everything was ok, he stated that
2  there were no mental health staff on duty."
3     A.  I'm sure I spoke to Dunn as well.
4     Q.  Dunn as well?
5     A.  I wouldn't have talked to Harvey.  I wouldn't
6  be comfortable in talking to Harvey.  You know, Harvey
7  wasn't a real open type of person.  He was very -- he
8  kind of had his friends or whatever, so I wouldn't
9  conversate with Harvey at any time.
10       I was more in tune with asking Dunn what
11 happened.  I was more interested because, like I said,
12 that situation in the chow hall, I mean it was just an
13 uncomfortable situation and I was just -- for
14 everybody involved, I thought that it would be good if
15 that guy got seen by somebody and at least try to find
16 some resolution of what that guy was going through.
17    Q.  I understand.  But in this e-mail it says that
18 you did talk to Harvey after Johnson returned.
19    A.  I probably talked to Harvey and talked to Dunn
20 as well.
21       MR. HAGER:  Okay.  Thank you.
22       THE WITNESS:  I might just have brushed it
23 because chow runs very long.  You know, chow runs into
24 the afternoon, so I might have walked out there and

124

1  talked to Harvey.
2        MR. HAGER:  Thank you.
3        That's all I have.
4        MR. MARTIN:  Okay.  I think we are indeed
5  concluded this time.  Again, thank you for your
6  patience, sir.
7        And just so that we put on the record I
8  think I understood your preference before was to waive
9  the reading and signing of the transcript.
10       THE WITNESS:  Yeah.
11       MR. MARTIN:  Okay.  Thank you very much.
12       (Deposition concluded at 12:30 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

125

1            INDEX
2  DEPONENT: KEITH F. LOVETT          PAGE
3    Examination by Mr. Martin       3
     Examination by Ms. Ballard      81
4    Examination by Mr. Hager        108
     Examination by Ms. Ballard      110
5    Examination by Mr. Martin       110
     Examination by Ms. Ballard      120
6    Examination by Mr. Hager        122
7
        E X H I B I T S
8
   LOVETT DEPOSITION EXHIBITS        MARKED
9
   1 Hand-drawn diagram by witness        32
10
   2 Incident report        53
11
   3 Two-page e-mail Bates stamped D00431-
12     D00431A        114
13 CERTIFICATE OF REPORTER        PAGE 126
14
15
16
17
18
19
20
21
22
23
24

32 (Pages 122 to 125)

Ward v. Taylor, et al.
Keith F. Lovett

126

1   State of Delaware  )
                       )
2   New Castle County  )
3
            CERTIFICATE OF REPORTER
4
        I, Kurt A. Fetzer, Registered Diplomate
5   Reporter and Notary Public, do hereby certify that
    there came before me on Wednesday, October 24, 2007,
6   the deponent herein, KEITH F. LOVETT who was duly
    sworn by me and thereafter examined by counsel for
7   the respective parties; that the questions asked of
    said deponent and the answers given were taken down by
8   me in Stenotype notes and thereafter transcribed by
    use of computer-aided transcription and computer
9   printer under my direction.
10       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
11  examination of said witness.
12       I further certify that reading and signing of
    the deposition were waived by the deponent and
13  counsel.
14       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18  Kurt A. Fetzer, RDR, CRR
19  Certification No. 100-RPR
20  (Expires January 31, 2008)
21
22  DATED:
23
24

Wilcox and Fetzer, Ltd.     Registered Professional Reporters          302-655-0477

A000044

**YAHOO!** MAIL                                          Print - Close Window

From:   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Date:   Fri, 3 Sep 2004 05:24:00 GMT

To:     ▓▓▓▓▓▓▓▓▓▓▓▓

Subject: diary

These are the events leading up to the assault on Tim ward as I
remember them, I have been advised to write a diary of the incidents that took
place, and led up to the incident. I have spoken to Capt Macranor who
can support my location/area at the time of the incident.

On the date of this incident I was assigned to Unit #28. I worked the
morning and supervised the running of a.m. yard. During that time I was
in and out of the yard, locked and unlocked the yard for staff and
inmates and also conducted area checks in T-1 and T-2. After yard was over,
all t-1/t-2 inmates were returned to their housing units, JVT was
notified at that time t-yard was clear and inmates were secured.

Soon after chow begun. When it was the T's turn to go to chow Lt Harvey
asked that I unit #28 accompany the T's to the chow hall and assist in
running the T's lunch session. I then walked with the T's to the chow
hall. At that time I entered the chow hall I observed Sgt Thomas in with
me. Soon after I observed i/m Robert Johnson talking in the chow hall.
At that time i/m Johnson was advised that there was no talking in the
chow hall and if he continued he would receive a write up. Soon after
i/m Johnson continued talking and was observed talking in a loud manor to
himself. I observed i/m Johnson looking in my direction saying, "you
white motherfuckers", "you mother fuckers are going to get it". I again
informed i/m Johnson that there was no talking in the chow hall. At that
time I/m Johnson became louder and more direct in his words, i/m
Johnson directed his words to me and was oberserved yelling, "Big white boy,
you going to suck my big black dick, yeah... you are going to suck my
dick with honey". also "I am going to fuck you in your ass with my big
black dick, your going to like it". At that time I went to Sgt Thomas,
and asked if i/m Johnson was going to be removed from he chow hall, Sgt
Thomas said no, it was ok because he did not get up from his seat, and
that he was not a threat to us. At that time i/m Johnson began to bang
on his table with both hands, and continued yelling obscenities. At
that time many inmates were up out of their seats running to other tables
and laughing. The chow hall was very loud. Soon after the T's were
released back to their buildings. I again asked Sgt Thomas about the
situation and he advised me again that he was not a threat!!!.

At that time the T's were secured in their buildings and JVT was
notified. At that time I went over to sp20/sp21 where Lt Harvey was running
chow, I then asked to speak to him and he agreed. I then notified him of
the incident that just took place. I told him I was not a snitch and
was not concerned about the Sgt in the chow hall but more about inmate
Robert Johnson, and that he seemed like he wasn't thinking straight. At
that time he notified me that he was familiar with that inmate and that
he had a past incident with him. He also notified me that he was the
guy who jumped out the window in W building, he also told me he was
assaulted by the same inmate in the infirmary. I at that time asked Lt
Harvey did he want me to write a report on the chow hall incident, he stated   D00431
that he knew the inmates history and that I should hold back a while

✳ NOTE: REDACTIONS APPEAR IN ORIGINAL DOCUMENT ✳

and he would go see him after chow.

When chow was over, Lt Harvey came to T-1, then called unit 25/26 to help escort Robert Johnson to the infirmary. Within 10 mins Robert Johnson was returned to T-1, I then asked Lt Harvey if everything was ok, he stated that there were no mental health staff on duty, so he was seen by a nurse who then informed Lt Harvey that he would be seen by mental health on Monday.

At that time I went to T-2 to eat my lunch, and wait for code green and afternoon yard to begin. After getting a code green and yard beginning I went out to the yard and patrolled the yard area. I also operated the T-3 gates letting staff and inmate workers in and out of the area. At approximately 1430 hours I returned to T-2 and signed in on the area check/sign in board. Approximately 5 mins later, unit #29 C/O Drummond came over the radio yelling there was a code in T-yard. I then left T-2 in response and found I/m Tim Ward sitting on the picnic table with his head down. He was observed dripping blood from his face, at that time I ran back to T-2 and secured the first aid kit. I returned to the T-yard put on my rubber gloves and opened the kit. I removed the contents and began opening bandages and handing them to the officers who had arrived on the scene. I/m Tim Ward was observed conscious, but in a dazed and confused state. At that time medical arrived and transported i/m Ward to the infirmary. During this time other units that arrived help secure all T inmates in their buildings.

On or about August 27 at approximately 1400 hours I was contacted by phone at ext #2357 by a lawyer representing Tim Ward, I advised him that I could not talk to him per policy and that I needed to talk to someone at the prison before I talked to him. He thanked me for my time and stated if he didn't hear from me that he would know that I was not allowed to talk to him. After hanging up the phone I notified Staff Lt Reynolds that I received a call, at that time he directed me to call Mike Little. After talking to Mike Little he said that if I was called again to refer all questions to the State Attorney Generals office in Wilmington.

These are all accounts of the incidents and following incidents as I remember them to the best of my ability.

Get your name as your email address.
Includes spam protection, 1GB storage, no ads and more
Only $1.99/ month - visit http://www.mysite.com/name today!

D00431A

**A000046**



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Ward

## v.

# Taylor, et al.

## C.A. # 04-1391 (KAJ)

---

## Transcript of:

## John E. Salas

## October 24, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A000047

Ward v. Taylor, et al.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,                          )
                                       )
        Plaintiff,                     )
                                       )  Civil Action
v.                                     )  No. 04-1391(KAJ)
                                       )
STANLEY TAYLOR; PAUL HOWARD;           )
THOMAS CARROLL; JOHN SALAS;            )
JESSICA DAVIS-BARTON; CERTAIN          )
UNKNOWN INDIVIDUAL EMPLOYEES OF        )
THE STATE OF DELAWARE DEPARTMENT       )
OF CORRECTION; and STATE OF            )
DELAWARE DEPARTMENT OF                 )
CORRECTION,                            )
                                       )
        Defendants,                    )
                                       )
v.                                     )
                                       )
FIRST CORRECTIONAL MEDICAL             )
DELAWARE, LLC,                         )
                                       )
        Third-Party Defendant.         )

                Deposition of JOHN E. SALAS taken
pursuant to notice at the law offices of Martin &
Wilson, 1508 Pennsylvania Avenue, Wilmington,
Delaware, beginning at 12:40 p.m. on Wednesday,
October 24, 2007, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Ward v. Taylor, et al.

**2**

1   APPEARANCES:
2      JEFFREY K. MARTIN, ESQ.
       MARTIN & WILSON
3      1508 Pennsylvania Avenue
       Wilmington, Delaware 19801
4      For the Plaintiff
5      STEPHANI J. BALLARD, ESQ.
       STATE OF DELAWARE DEPARTMENT OF JUSTICE
6      820 North French Street
       Wilmington, Delaware 19801
7      For the Defendants
8      GERALD J. HAGER, ESQ.
       HECKLER & FRABIZZIO
9      800 Delaware Avenue - Suite 200
       The Corporate Plaza
10     Wilmington, Delaware 19801
11  ALSO PRESENT:
       TIMOTHY WARD
12
           - - - - -
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1           JOHN E. SALAS,
2   the deponent herein, having first been
3   duly sworn on oath, was examined and
4   testified as follows:
5           EXAMINATION
6   BY MR. MARTIN:
7   Q. Good afternoon, Mr. Salas.
8       Are you currently employed by the
9   Department of Correction?
10  A. Yes, sir.
11  Q. And is your current rank lieutenant?
12  A. Yes.
13  Q. All right, Lieutenant. My name is Jeff Martin
14  and I think we've had some prior matters together. As
15  I recall, the Cassandra Arnold matter you were
16  involved in. I'm not sure that we have met before.
17      This is the opportunity to have your
18  deposition taken in this case. And as attorney for
19  Tim Ward, the gentleman on my right, I'll be asking
20  you a series of questions primarily regarding the
21  incident that occurred on July 10, 2004.
22      I would ask you to listen very carefully
23  to each question that I ask and if you do not
24  understand the question, please let me know.

**4**

1   Otherwise, I'll be happy to restate the question for
2   you. Okay?
3   A. Certainly. Yes.
4   Q. Try to keep your answers verbal and audible so
5   the court reporter can pick up anything that you say.
6   Try to avoid saying uh-huh or uh-uh because when they
7   come out on the transcript there's a little ambiguity
8   what they mean. Instead try to use yes or no.
9   A. Yes, sir.
10  Q. Okay. If you need a break at any point, please
11  just say so. You need not tell us the reason for
12  needing a break, but by all means I would like you to
13  do that.
14      I expect that this deposition will
15  probably be on the order of maybe an hour, hour and a
16  half, something like that as best as I can tell right
17  now.
18      However, we just had a prior deposition
19  and I kind of understated that by about 50 percent,
20  unfortunately, but I don't expect your deposition to
21  really go that much longer here today unless there's
22  something that comes out in the questioning or the
23  answers that needs some further examination.
24      Have you ever had a deposition taken

**5**

1   before?
2   A. No, sir.
3   Q. And how long have you been with the Delaware
4   Department of Correction?
5   A. Approximately nine-and-a-half years.
6   Q. And did you join the Department of Correction
7   as a correctional officer?
8   A. Yes, sir.
9   Q. And you have now risen to the rank of
10  lieutenant. Is that correct?
11  A. Yes, sir.
12  Q. Were there any interim steps between that,
13  between correctional officer and lieutenant?
14  A. Yes. I spent approximately two years as a
15  correctional sergeant.
16  Q. Okay. And when did you serve as a correctional
17  sergeant?
18  A. From the year 2002 to the beginning of 2004.
19  Q. All right. So you then served as a
20  correctional officer before being promoted to sergeant
21  for what? Three or four years?
22  A. Approximately, yes, sir.
23  Q. And how was it that you were promoted to the
24  rank of sergeant?

2 (Pages 2 to 5)

Ward v. Taylor, et al.
John E. Salas

6

1    A.  I took the examination and passed the
2    interview.
3    Q.  And by whom were you interviewed?
4    A.  At the time it was -- I'm trying to think of
5    the major's name.  It was a Captain Belanger and staff
6    lieutenant -- I can't recall his name.  They're still
7    a present -- one of them is retired and the other is
8    still a present employee at Delaware Correctional
9    Center.
10   Q.  Do you know whether there's an examinational
11   process that's necessary to become promoted to
12   sergeant?
13   A.  To the best of my knowledge, yes.
14   Q.  And when were you promoted to the rank of
15   lieutenant?
16   A.  March 2004.  Sorry.  2004, 2003.  Four.
17   Q.  2004.  Okay.
18        And the next rank would be captain if you
19   were so promoted?
20   A.  Staff lieutenant and then captain.
21   Q.  Staff lieutenant first.  All right.
22        And in order to become lieutenant, did you
23   take an exam?
24   A.  Yes, sir.

7

1    Q.  And did you also have an interview?
2    A.  Yes, sir.
3    Q.  Is that the same process for staff lieutenant?
4    A.  Yes, sir.
5    Q.  Do you request the promotion or do the other
6    officers come and invite you to be promoted to another
7    rank?
8    A.  I requested.  There was supposedly an opening
9    and I submitted my application and met the
10   requirements, tested and passed the interview.
11   Q.  Did you review any documents in preparation for
12   today's deposition?
13   A.  No, sir.
14   Q.  Could you tell me briefly your background
15   before joining the Department of Correction?
16   A.  I was in the Marine Corps for 21 years.
17   Q.  I'm sorry.  The Marine Corps?
18   A.  Yes, sir.
19   Q.  And what was your rank and what were your
20   various positions, if you had more than one, in the
21   Marine Corps?
22   A.  I retired as a staff sergeant.  I was in the
23   infantry for four years, my initial first four years.
24        I went into the electrical equipment

8

1    repairman field.  I spent three years as a recruiter.
2    Q.  And where were you stationed throughout your 21
3    years?
4    A.  Mostly it was Camp Pendleton, California,
5    Hawaii and Okinawa, Japan, and three years in Albany,
6    Georgia.
7    Q.  What is it that brought you to Delaware?
8    A.  Retirement and my ex-wife was from
9    Pennsylvania.
10   Q.  How old are you now, Lieutenant Salas?
11   A.  I'll be fifty in January.
12   Q.  And what was your highest level of education?
13   A.  I have a bachelor's degree in business
14   management.
15   Q.  And where did you obtain that?
16   A.  Wilmington College.
17   Q.  And what year?
18   A.  2003.
19   Q.  Are you pursuing any higher degrees?
20   A.  None at the moment.
21   Q.  Do you recall the incident involving Tim Ward
22   on July 10, 2004?
23   A.  Yes, sir.
24   Q.  And what is it that you recall about that

9

1    incident?
2    A.  Well, I was the area lieutenant.  I was the
3    area lieutenant for buildings S, echo and the T's, T1
4    and T2.
5    Q.  All right.  Let me first ask you before we get
6    to your particular recollection, how about if you tell
7    me what your responsibilities were as area lieutenant
8    for S, E and the T's?
9    A.  Security.  I basically had the security
10   personnel and the inmates housing and those buildings.
11   Q.  Now -- I'm sorry.  Go ahead.
12   A.  Inmate conduct.
13   Q.  At the time of this incident, July 10, 2004,
14   was this a regular position that you held, meaning
15   this responsibility as area lieutenant for these
16   various buildings?
17   A.  No.
18   Q.  Did you have any regular responsibilities at
19   the time of this incident?
20   A.  No.  I am the relief lieutenant and I go
21   basically where I'm assigned to the morning of the
22   workday.
23   Q.  And for how long had you been in that position
24   of relief lieutenant?

3  (Pages 6 to 9)

Ward v. Taylor, et al.
John E. Salas

10

1    A.  Since I was promoted.
2    Q.  So since you became a lieutenant?
3    A.  Yes.
4    Q.  And this incident occurred July 10 of '04. You
5    were promoted to lieutenant in March of '04.
6        So it would have been a matter of a few
7    months?
8    A.  Yes, sir.
9    Q.  How long, by the way, did you continue in that
10   capacity as relief lieutenant following this incident?
11   A.  To approximately a year ago.
12   Q.  Is it the custom to assign the position of
13   relief lieutenant to the person who has been most
14   recently promoted?
15   A.  Basically, yes.
16   Q.  So it's a seniority type of thing?
17   A.  Yes, sir.
18   Q.  And can you give me an idea, Lieutenant, how
19   many lieutenants might have been working at DCC on
20   July 10, 2004?
21       Let me be a little bit more specific. I'm
22   asking about the total number of lieutenants that you
23   had at DCC, recognizing that there are a couple of
24   different shifts and everyone is not working at the

11

1    same time.
2    A.  And you want me to give what, sir?
3    Q.  Well, the gross number of lieutenants, if you
4    know.
5    A.  No, sir, I don't.
6    Q.  And it's fair to say that there would be more
7    lieutenants than there would be staff lieutenants?
8        MS. BALLARD: Objection to the form.
9    Q.  You may answer.
10   A.  It's safe to say.
11   Q.  I mean, as you go up the hierarchy, the fewer
12   numbers of officers. Is that fair to say?
13   A.  Yes, sir.
14   Q.  Now, this particular assignment that you had on
15   July 10, 2004 as area lieutenant for S, E and the T
16   buildings, had you worked this assignment before this
17   date?
18   A.  I believe I may have, yes.
19   Q.  So that suggests to me that you're not entirely
20   sure that you had worked there before July 10, 2004.
21   Is that fair to say?
22   A.  Yes, sir.
23   Q.  Could you give me an idea as to the number of
24   positions or different areas of responsibility within

12

1    DCC that you as a relief lieutenant had responsibility
2    for?
3    A.  The breakdown of the areas, sir?
4    Q.  Or if you could just give me maybe the
5    number of positions.
6        Are there just five positions that a
7    relief lieutenant would work in or are there
8    twenty-five?
9    A.  Approximately six that I can think of.
10   Q.  And this one, it's fair to say that you were
11   not terribly familiar with this particular area that
12   you worked on on the date of the incident. Is that
13   fair to say?
14   A.  I don't understand the question.
15   Q.  Okay. On July 10, 2004 I understand that you
16   may or may not have worked in this particular area
17   previously, correct?
18   A.  Yes, sir.
19   Q.  By the way, does this area have any type of
20   designation, "this area" being the area for S, E and
21   the T's?
22   A.  At that time it fell under unit 13.
23   Q.  Unit 13?
24   A.  Yes.

13

1    Q.  And when you say, "unit 13," this is the call
2    number you would use on your radio?
3    A.  Yes, sir.
4    Q.  And that would also signify the various posts
5    the various officers have throughout the prison,
6    correct?
7    A.  Yes.
8    Q.  Were you familiar with unit 28 or 29?
9    A.  Yes.
10   Q.  And what was your understanding as to what was
11   unit 28?
12   A.  Unit 28 is the inside patrol for the T's, T3,
13   T2, T1, that area.
14   Q.  Now, you said, "inside patrol for the T's."
15   What do you mean by that?
16   A.  Inside the perimeter, inside the compound.
17   Q.  Inside the compound. And did that include both
18   work inside the T buildings as well as outside?
19   A.  Basically, it is outside of the building. The
20   officers -- T1 and T2 are one-man posts. There's an
21   officer inside the buildings, in each one of the
22   buildings.
23   Q.  So there's an officer at each of the T
24   buildings and then in addition you have --

4 (Pages 10 to 13)

A000051

Ward v. Taylor, et al.
John E. Salas

---

**14**

1   A. An outside officer, which is unit 28.
2   Q. Do you remember what the designations were for
3   T1 or T2 inside the building?
4   A. No, I don't.
5   Q. Okay. Were you aware of the designation unit
6   29?
7   A. Yes.
8   Q. By the way, was unit 28 within your area of
9   responsibility?
10  A. Yes.
11  Q. All right. Unit 29, what did that encompass?
12  A. Unit 29 is the inside patrol for W building,
13  the W compound.
14  Q. And was there some linking together of those
15  two compounds?
16  A. They're separated by a fence.
17  Q. Separated by a fence meaning that unit 28 would
18  be on one side and unit 29 would be on the other?
19  A. Yes, sir.
20  Q. And what type of fence separates the two?
21  A. A regular chain-link fence, I believe is what
22  it's called.
23      And the other fact is that you would have
24  to go through unit 28's area to get to unit 29's post.

**15**

1   Q. And why is that?
2   A. By design, I believe.
3   Q. So as a lieutenant you would have to go through
4   the unit 28 area to get to the unit 29 area?
5   A. Yes, sir.
6   Q. Do you recall what shift you were working that
7   day?
8   A. Yes, sir.
9   Q. Which shift was that?
10  A. 8:00 to 4:00.
11  Q. Was that a normal shift for you?
12  A. That was my assigned shift, yes, sir.
13  Q. Did you ever work any other shifts than that?
14  A. As a lieutenant?
15  Q. Yes.
16  A. No, sir.
17  Q. All right. Is it fair to say there were three
18  shifts?
19  A. Yes, sir.
20  Q. And did you ever have the experience of being
21  frozen, meaning that you would have to stay beyond
22  4:00 o'clock until another officer came in?
23  A. Not as a lieutenant.
24  Q. So the freezing practice, and I'm talking about

**16**

1   that time frame of July of 2004, was limited to the
2   correctional officers and sergeants?
3   A. No. It applies to lieutenants if there was a
4   need for it on the oncoming shift.
5   Q. And meaning that you would be held over at
6   times?
7   A. There's a possibility, sir. There's always
8   that possibility.
9   Q. Well, let me ask you rather than the
10  possibility what was the reality of whether you were
11  held over?
12      Let's take a month before this incident.
13  Do you recall whether you were ever held over?
14  A. No.
15  Q. You don't recall or you were not?
16  A. I was never -- I was not held over.
17  Q. Did there come a time where you were held over?
18  A. No, sir, not as a lieutenant, from the time I
19  was promoted to the date in July.
20  Q. Do you have a recollection as to who the other
21  officers were on July 10, 2004 during your shift who
22  were in your area?
23  A. No, sir. Just unit 28.
24  Q. And what did you know about unit 28?

**17**

1   A. He was the inside patrol for the T's.
2   Q. I mean, did you know him by name?
3   A. Yes, sir.
4   Q. And what was his name?
5   A. Lovett.
6   Q. And unit 29 you said was also within your area,
7   correct?
8   A. No. Unit 29 belongs to unit 14's area.
9   Q. Okay. I apologize. Thank you for that
10  correction.
11      So that fence literally divides not just
12  28 and 29 but units 13 and 14? Is that fair to say?
13  A. Yes, sir.
14  Q. Do you recall who unit 14 was on that date in
15  question?
16  A. No, sir.
17  Q. And the only officer that you recall that was
18  within your area on that date was unit 28?
19  A. Yes, sir.
20  Q. I mean, it's fair to say that T1 and T2 were in
21  your area as well, correct?
22  A. Yes, they are.
23  Q. But you don't recall who those particular
24  officers were?

---

5  (Pages 14 to 17)

**A000052**

Ward v. Taylor, et al.
John E. Salas

18

1    A. No, sir.
2    Q. Now, above you in the chain of command, who did
3    you report to?
4    A. The shift commander, I believe, the 8:00-to-
5    4:00 shift commander at that time was Captain
6    Belanger.
7    Q. Is that who you would directly report to?
8    A. Yes, sir.
9    Q. And was there someone above Captain Belanger in
10   the chain of command?
11   A. Staff Lieutenant Reynolds.
12   Q. Now, Reynolds would be above or below Belanger?
13   A. Below.
14   Q. And what was Reynolds' first name, if you
15   remember?
16   A. Kurt.
17   Q. Anyone else other than Staff Lieutenant
18   Reynolds and Captain Belanger?
19   A. No, sir.
20   Q. Where were you when you learned about the
21   attack on Tim Ward?
22   A. I was, I believe I was in T1 when the medical
23   emergency was called, although when the medical
24   emergency was called I did not know who it was for.

19

1    Until I arrived at the scene is when I was informed
2    that it was Mr. Ward.
3    Q. Do you know the gentleman seated to my right as
4    Mr. Ward?
5    A. No, sir.
6    Q. And what were you doing in T1 at the time the
7    medical emergency was called?
8    A. I was doing my security checks, my area checks,
9    looking over the dorm housing facility, checking the
10   officers' office and just overall security.
11   Q. Was that part of your responsibilities for
12   working as unit 13?
13   A. Yes, sir.
14   Q. And how did you know that that was part of your
15   responsibilities?
16   A. Through -- ask the question again, please.
17   Q. Yes. Sure.
18       You just told us you were performing part
19   of your responsibilities by doing security and area
20   checks and I think you said it was T1 --
21   A. Right.
22   Q. -- at the time of this incident.
23       And I'm asking you how was it that you
24   learned that they were part of your responsibility to

20

1    do them?
2    A. We have a checklist to perform during our tour
3    of duty.
4    Q. Where does that checklist come from?
5    A. The security superintendent, I believe.
6    Q. And do you recall who the security
7    superintendent was at that time?
8    A. Major Holman.
9    Q. When was it that Major Holman gave you or made
10   available to you this checklist?
11   A. Sorry. I can't tell you. I don't know.
12   Q. All right. As I understand it, you had not
13   worked unit 13 very often at the time of this incident
14   on July 10, 2004, correct?
15   A. Right.
16   Q. So what I'm trying to understand is how was it
17   that you learned what your responsibilities were while
18   working unit 13?
19   A. It was basically the same responsibility no
20   matter what area you're working in. The checklist is
21   a universal checklist that we always go by. It's two
22   pages long.
23   Q. So it applied to you in your position as relief
24   lieutenant no matter which of the six different areas

21

1    you worked in?
2    A. Yes, sir.
3    Q. Were there any type of protocols or SOP's that
4    applied to this particular area that has been
5    designated unit 13?
6    A. Yes, sir.
7    Q. And where are they found?
8    A. In the shift commander's office, primary
9    control and they should be in the housing units
10   themselves.
11   Q. Now, do you recall whether you reviewed any of
12   these documents before July 10, 2004?
13   A. Basically, yes. Just about every area I work
14   in I try to get out the SOP and look over it to make
15   sure I have a good understanding of what is expected
16   of me and how to perform my duties.
17   Q. Do you have a specific recollection of this
18   area that you have identified as unit 13, meaning that
19   you recall reviewing the SOP's or the protocols?
20   A. No, sir. I don't have a specific date.
21   Q. Do you have any recollection of having reviewed
22   these documents as to what may have been different or
23   unusual about unit 13 as compared to another sector
24   that you would have to manage?

6 (Pages 18 to 21)

Ward v. Taylor, et al.
John E. Salas

---

**22**

1    A. Can you repeat the question, sir?
2    Q. Yes.
3         MR. MARTIN: Let me ask Mr. Fetzer to read
4    it back.
5         If you don't understand it, please let me
6    know. I'll be glad to restate it.
7         (The reporter read back the pending
8    question.)
9         THE WITNESS: You're looking for a
10   recollection of a specific date? Because they're
11   broken down to levels of security. Unit 13 and unit
12   14's area is considered minimum and the other side of
13   the compound is considered medium to medium high.
14        And the other areas are the SHU and the
15   MHU is also considered to be medium to medium high. I
16   don't know if that answers your question, sir.
17   BY MR. MARTIN:
18   Q. In part and I appreciate that.
19        In terms of these documents -- and I have
20   been calling them SOP's and protocols. Perhaps I
21   should ask you what is the proper title or how should
22   they be designated?
23   A. They're referred to as post orders.
24   Q. Post orders.

---

**23**

1    A. And SOP's.
2    Q. Do those post orders and SOP's designate the
3    type of staffing, correctional officer staffing that
4    should be in unit 13?
5    A. I can't recall. The staffing requirement level
6    should be in the SOP. It should be in the SOP, but I
7    can't recall as to the numbers. I don't really
8    concern myself with that. That's for the shift
9    commander and above to worry about.
10   Q. Well, so you didn't concern yourself with the
11   staffing levels?
12   A. The staffing level is -- the areas in the
13   building are assigned, their staffing personnel in the
14   morning, in the beginning of the shift.
15   Q. All right. I'm not sure I understand that, but
16   let's go back.
17        You say in the beginning of the shift what
18   happens as to staffing levels?
19   A. We are assigned our work areas.
20   Q. You, in this case being a lieutenant, you're
21   given your work area?
22   A. Right.
23   Q. And you don't know that until you come in to
24   work that morning?

---

**24**

1    A. Right.
2    Q. All right. But you are senior man in this
3    particular area or senior officer -- I apologize --
4    meaning unit 13, correct?
5    A. Yes.
6    Q. What is your understanding, if any, as to the
7    staffing requirements for unit 13?
8    A. The staffing requirements is one person in T1,
9    one person at T2, one officer I should say each, one
10   unit, one person, one officer at unit 28. In S1 it is
11   four officers that are assigned to that building and
12   in echo, E building, there are three officers assigned
13   to that and there's a unit 27 which is their inside
14   patrol.
15   Q. And how is that determined?
16   A. It is determined above me, sir.
17   Q. Above your pay grade. Is that right?
18   A. Yes, sir.
19   Q. But you understand and you understood on July
20   10, 2004 that there were supposed to be officers in
21   these various units or locations, correct?
22   A. Yes, sir. On that date in July I understood
23   that those are the numbers of officers that were
24   working in my area.

---

**25**

1    Q. Now, what was your understanding on July 10,
2    2004 as to the areas of responsibility for unit 28?
3    A. Unit 28 is supposed to perform a perimeter
4    check when he first comes on duty, make sure that the
5    outside perimeter of the buildings is safe, there's no
6    holes in the fence, there's no weapons, for anything
7    that's not supposed to be there. And he's supposed to
8    check on the officers because it's a one-man post
9    inside to see that they're okay in each one of the T
10   buildings.
11        They're supposed to monitor inmate
12   movements, verify passes, make sure everybody who
13   passes through his area, through his gate have the
14   proper passes or credentials.
15   Q. Is there a particular station or location where
16   unit 28 is supposed to be?
17   A. Yes, sir. Within that, within that fenced
18   perimeter of the T's.
19   Q. Is there anything more specific?
20   A. Not specific. He is basically, what it is
21   is you would refer to it as a rover, a moving patrol.
22   Q. And did you have any understanding as to how
23   much time would be outside versus inside the
24   buildings?

---

7 (Pages 22 to 25)

Ward v. Taylor, et al.
John E. Salas

26

1  A. No, sir, not at the time. He is supposed to
2  check to make sure that the officer inside is alive
3  and well and, you know, safe, but 99 percent of the
4  time should be outside. That's my understanding.
5  Q. Now, what was your understanding, if any, as to
6  whether an officer should be present when inmates were
7  out in the recreational yard in the T area?
8  A. Yes. He is supposed to monitor inmate activity
9  when they're out in the yard area and perform all his
10  other duties at that time too. And that's opening and
11  closing the gates, that's checking passes for inmate
12  movement, that's periodically checking on the officer
13  inside to make sure that he is safe and the inmates
14  inside are safe.
15  Q. What about is unit 28 expected to do area
16  checks inside the building when inmates are outside in
17  the rec. yard?
18  A. To check on the officer, yes. As far as the
19  area checks, that's the inside officer's
20  responsibility.
21  Q. So is it your testimony, then, that the area
22  checks done inside the buildings, and we'll limit this
23  to T1 and T2, were to be done only by the inside
24  officers in T1 and T2?

27

1  A. To the best of my understanding, yes.
2  Q. Now, would you agree that the unit 28 had
3  responsibility to do area checks outside the building?
4  A. Yes, sir.
5  Q. And where were those area checks to be
6  conducted?
7  A. The whole area outside of the buildings within
8  the fence line.
9  Q. And was there some type of requirement that an
10  officer such as officer or unit 28 do a certain number
11  of area checks during his or her shift?
12  A. Normally it's roughly three checks around when
13  you first come on to make sure that it is safe at the
14  beginning of the shift and once around the middle of
15  the shift and another time just about prior to the end
16  of the shift.
17  Now, this is a little unique area from the
18  others because he does it more than that. He was
19  supposed to have done it more than that because at the
20  end of the yard he's supposed to clear the yard of the
21  inmates to make sure that they're not outside, that
22  they're in the buildings. So it's a constant checking
23  of your area, of that area.
24  Q. I think I understood your testimony and I don't

28

1  want to mischaracterize it, but when the inmates are
2  out in the recreational area, I believe you said it
3  was the responsibility of in this case unit 28 to be
4  out in that yard.
5  Is that fair to say?
6  A. Yes, sir.
7  Q. And I think you also cited an exception, to
8  make sure that the officer in T1 or T2 might be alive
9  and well?
10  A. Yes. It's a roving position. That means that
11  he's supposed to monitor the gates, walk around the
12  building and in that process also check, open the
13  doors because he's got access to the building and to
14  look in and see or check on the officer inside to make
15  sure that he is safe. And it's a continuous movement
16  because there's traffic going through his area into
17  unit 29's area.
18  So he has to monitor inmate movement,
19  staff movement within his area.
20  Q. Do you believe that one officer can effectively
21  handle the number of responsibilities that you've just
22  indicated for unit 28?
23  MS. BALLARD: Objection to the form.
24  Q. You may answer.

29

1  A. Is it my personal belief, sir?
2  Q. Yes.
3  A. No. It's too great of a responsibility.
4  That's my personal belief.
5  Q. And have you ever expressed that, your belief,
6  to anyone higher than you in the chain of command?
7  A. Not formally.
8  Q. All right. How about informally?
9  A. Maybe in passing.
10  Q. If you believe that the responsibility is too
11  great for one officer, why is it that you have not
12  relayed that up your chain of command?
13  A. I believe it's opportunity-wise and I had just
14  gotten promoted and I'm still under observation as to
15  how to -- or the whole area because it's a large
16  compound and I'm in the learning process of learning
17  all the responsibilities. And that is one of the
18  reasons why it hasn't -- I wasn't too sure at the time
19  whether that is sufficient or not.
20  Q. But it did give you concern?
21  A. Yes, sir. Being in the compound gives me
22  concern every day I walk in.
23  Q. But you had specific concern about --
24  A. No, sir.

8 (Pages 26 to 29)

Ward v. Taylor, et al.
John E. Salas

30

1    Q. I'm sorry?
2    A. Not a specific concern. You had asked me the
3    question whether I believe, my personal belief. At
4    that time that was -- it's not a specific concern. It
5    was a belief that to perform all the duties that it
6    could just really be overwhelming for one person.
7    Q. Do you feel any differently now after having
8    been a lieutenant for a few years?
9    A. Yes, sir.
10   Q. You do feel differently now?
11   A. Do I feel differently now as to my initial --
12   Q. Well, let me ask you specifically so we're not
13   guessing as to what question we're responding to.
14         You've been a correctional lieutenant now
15   for almost three-and-a-half years by my count.
16   A. Yes.
17   Q. Do you feel any differently now as you sit here
18   today about the responsibilities of unit 28 as to
19   whether that should be handled by one or two people?
20         MS. BALLARD: I'm going to object to the
21   form of the question.
22   A. No, sir, I don't feel any differently now
23   because as everybody, as the whole state knows that
24   we're understaffed.

31

1    Q. All right. And let me make sure I understand
2    your concern about being understaffed.
3         Let's go back to July, early July of 2004.
4    Do you believe that --
5    A. Sir, can we take the terminology away? You're
6    saying it's my concern. It's not like I go in there
7    every day -- you know, I work within my parameters.
8    That's something that the upper echelon of management,
9    they concern themselves with that.
10   Q. I understand. I'm just asking you do you
11   believe, other than unit 28 on July 10, 2004 do you
12   believe you were understaffed in any other manner at
13   least as to unit 13?
14         MS. BALLARD: Objection to the form.
15   A. Yes. Because in one of the buildings we have
16   increased the management staff from four in S1 to now
17   we increased it to five.
18   Q. And that was sometime after July of 2004?
19   A. We increased it about a year ago, roughly, yes.
20   Q. To get back to your understanding of unit 28's
21   responsibilities. Let me strike that question and ask
22   you to tell me what you recall after you received a
23   call when you were in I think you said building T2.
24   You received a medical emergency call.

32

1    A. T1, sir.
2    Q. You were in T1. You were in T1 at the time of
3    the call.
4         Do you recall whether there were any other
5    officers in T1?
6    A. Yes. The officer that was assigned to that
7    building.
8    Q. And you don't remember that person's name?
9    A. No, sir. I would have to go back and look at
10   the record.
11   Q. Just bear with me for a moment, please.
12         You don't recall any other officers in
13   that building?
14   A. If I tried to name one, I would be guessing,
15   sir. No. I would have to check the records of who
16   was assigned that day.
17   Q. Were you aware at that time that there were
18   inmates out in the recreational yard?
19   A. Yes, sir. It was during yard time.
20   Q. And did you make any observations as to the
21   yard time before you went into the T1 building?
22         MS. BALLARD: Objection to the form.
23   A. I don't understand your question, sir.
24   Q. As I understand it, while you were in the T1

33

1    building you realized that it was yard time. Is that
2    fair to say?
3    A. I didn't just realize it. Yard was called
4    through the radio.
5    Q. Now, how long had you been in the T1 building
6    before this medical emergency call came over the
7    radio?
8    A. Probably a few minutes. I can't recall.
9    Q. And when was it in relation to your entering
10   the building that yard time was called through the
11   radio?
12   A. It's not a set time. I couldn't tell you. It
13   varies. I couldn't come --
14   Q. No. I'm not asking about in general.
15         I'm asking what your recollection is, if
16   any, as to when you went into that building, T1, is it
17   fair to say that yard time had already been called?
18   A. Yes, sir.
19   Q. Okay. So what I'm trying to determine if you
20   recall is how long before you went into that building
21   had yard time been called?
22   A. I couldn't tell you.
23   Q. And what was the purpose for going into the T1?
24   It was because you were doing some security and area

9 (Pages 30 to 33)

**A000056**

Ward v. Taylor, et al.
John E. Salas

34

1    checks, correct?
2    A.  Yes, sir.
3    Q.  And what was this other officer doing, if you
4    recall, at the time you were in that building?
5    A.  I believe he was in his office. There's an
6    office for the tier officers.
7    Q.  And even though this building didn't have
8    tiers, he was still considered a tier officer?
9    A.  Well, I just call him that. He was the
10   building officer and he has one floor, so...
11   Q.  All right. So you recall being in building T1
12   for just a few minutes before this medical emergency
13   was called, correct?
14   A.  Roughly, sir, yes.
15   Q.  And then did you go immediately out to the
16   yard?
17   A.  Yes. The instant I heard the medical emergency
18   that it was identified in the T's, T yard, it's in my
19   area, the first thing I believe I did is look into the
20   rest of the building and it wasn't in the building.
21   It couldn't have been in there. I was in there.
22   Nothing had happened.
23        So I ran out of the building and it was
24   pointed that it was towards the rear of the T's. So I

35

1    went to the rear. I saw the officer there, called the
2    code. There was a few inmates sitting down at one of
3    the tables. And then I saw Mr. Ward with blood all
4    over his face, tilted back sitting down at one of the
5    benches.
6         I had gone over to Mr. Ward. I propped
7    him up to make sure he was okay, tried to talk to him
8    to prevent shock. He was bleeding all over the place.
9    I was trying to ask him if he had remembered or who
10   had done this to him, and I wasn't getting any type of
11   verbal response. He didn't give me any verbal
12   response to my questions. And I knew he was alive,
13   but he seemed badly hurt and bloody.
14        And at that time after propping him up so
15   he was sitting upright, I waited for medical and other
16   officers to respond to the medical emergency. Upon
17   the medical personnel arriving, then I turned it over
18   to the nurses that responded and they placed Mr. Ward
19   on a stretcher and took him off.
20   Q.  You said that you propped him up, meaning he
21   was in a supine position when you found him?
22   A.  He was sitting down and bent backwards.
23   Q.  Do you recall anybody taking any photographs?
24   A.  Later on Lieutenant Harvey had gone to take

36

1    photographs.
2    Q.  I'm sorry. Lieutenant Harvey did what?
3    A.  Had gone, was the one that was taking the
4    pictures.
5    Q.  Where did he take photographs?
6    A.  I couldn't tell you. Probably in the
7    infirmary.
8    Q.  All right. Do you know whether he came and
9    took any photos while Tim Ward was still outside?
10   A.  No, I don't. I don't recall.
11   Q.  Do you recall while Tim Ward was outside
12   whether anyone took photographs?
13   A.  I don't recall.
14   Q.  What was your general recollection as to the
15   number of inmates who were around or out in the T yard
16   when you went out there?
17   A.  When I arrived at the scene, there was
18   approximately three or four other inmates sitting on
19   the other picnic table.
20   Q.  All right. Do you recall seeing any other
21   inmates?
22   A.  No, sir.
23   Q.  Do you recall seeing unit 28 out there?
24   A.  Eventually he had responded out, yes. I'm not

37

1    sure whether I was running back there with him or
2    whether I got there, we got there at the same time.
3         What I recall is that now officer 29 was
4    at the scene and it was unit 29 -- I took over from
5    unit 29 after I had seen Mr. Ward, meaning that I took
6    over control of the situation and I was there. I
7    brought Mr. Ward up and then I was directed to make
8    sure that medical personnel were shown where the
9    incident was, you know, upon their arrival or their
10   way there.
11   Q.  When did you learn, if at all, as to what
12   happened to Mr. Ward?
13        MS. BALLARD: Objection to the form.
14   A.  I don't understand your question, sir.
15   Q.  Did you find out then or sometime thereafter
16   what happened to Mr. Ward that caused his injuries?
17   A.  He was well bloodied. I'm not sure what caused
18   his injuries. I know that someone must have attacked
19   him to cause those injuries.
20   Q.  Do you know whether that assailant was in the
21   courtyard or rec. yard when you went out there?
22   A.  No, sir.
23   Q.  No, he was not?
24   A.  No, I don't recall.

10. (Pages 34 to 37)

Ward v. Taylor, et al.
John E. Salas

38

1  Q.  Did you ever learn the identity of the
2  attacker?
3  A.  Much later.  It was probably the day after the
4  initial attack.
5  Q.  And what did you learn and from whom?
6  A.  From Captain Belanger, the shift commander.
7  Q.  And what did he tell you?
8  A.  That they had identified who was the assailant
9  through their investigation.
10  Q.  And did he tell you who that was?
11  A.  The inmate was named, yes.
12  Q.  And what was his name?
13  A.  I don't even know the inmate's name.
14  Q.  So you learned from Captain Belanger, perhaps
15  the next day, that they had identified the assailant
16  as another inmate whose name you cannot recall at the
17  moment.  Is that fair to say?
18  A.  Yes, sir.
19  Q.  What else did you learn from Captain Belanger?
20  A.  Concerning?
21  Q.  Well, did you find out anything more about this
22  inmate?
23  A.  That it was the same inmate that had a
24  commotion during noon meal the previous day.

39

1      Johnson?  Robert Johnson?  Does that...
2  Q.  That's correct.  I mean, that's the name that
3  we have been working with, but yes.
4      So you found out that the person who
5  struck Tim Ward was the same one who had a problem at
6  the lunch chow?
7  A.  Yes, sir.
8  Q.  And what was your understanding, if any, as to
9  what happened there?
10  A.  My understanding is that Mr. Lovett was having
11  a confrontation with an inmate during chow, one of the
12  chows.  I don't recall which one of the four, but that
13  there was a minimum of verbal confrontation.
14  Q.  Did you ever talk to Lovett about this?
15  A.  Yes.  We had numerous conversations after the
16  incident.
17  Q.  And can you tell me what you and Lovett
18  discussed in those numerous conversations?
19  A.  It was just pertaining to what had happened
20  that day as far as Mr. Johnson, his display in the
21  chow hall.  He was taken over to the infirmary to be
22  evaluated and then returned back to the T's that same
23  afternoon.
24  Q.  Now let me just stop you for a moment.  I want

40

1  to make sure.
2      Did you have any knowledge of this at the
3  time it was happening, the fact that this Robert
4  Johnson had caused a commotion at chow hall and was
5  eventually returned to the T's?
6  A.  Do I have any knowledge of the incident?
7  Q.  No.  What I tried to ask is whether at the time
8  this was actually happening on July 10, 2004, did you
9  have any knowledge that Johnson had just acted out
10  verbally against Lovett, he was taken to the infirmary
11  at some point and then returned to the T's?
12      Did you know that at that time?
13      MS. BALLARD:  Objection to the form.
14  A.  At what time, sir?
15  Q.  At the time it was happening.
16  A.  No.  I heard about it after chow and I don't
17  recall whether I knew of it at the time it was
18  happening.
19  Q.  Let me ask you about your policies and
20  procedures then.
21      As I thought I understood, you were the
22  area lieutenant for this particular area involving the
23  T buildings, as well as the T rec. yard, correct?
24  A.  Yes.  Yes.

41

1  Q.  So under the procedures that you had in place
2  being the area commander, if you will, were you not
3  supposed to receive notice from the correctional
4  officers, the correctional sergeants that this type of
5  thing was happening?
6      MS. BALLARD:  Objection to the form.
7  A.  Well, sir, we had chow activity going on when
8  it was happening.  I was also assigned to monitor the
9  noon meal.  I was inside a chow hall.  What had
10  occurred was in a different chow hall and it's an
11  ongoing, you know, process where there's not enough
12  time, there isn't time to sit down and debrief me of
13  what had happened in that chow hall.  It was taken
14  care of by the lieutenant.
15      Each chow hall had a lieutenant in it and
16  that lieutenant took care of the situation in that
17  chow hall.  At that moment that's their primary
18  responsibility.
19  Q.  Well, let me ask you:  Who to the best of your
20  knowledge was the lieutenant in the chow hall with
21  Mr. Johnson?
22  A.  I couldn't tell you.
23  Q.  Well, what I was asking is eventually within
24  apparently a short period of time Mr. Johnson was

11  (Pages 38 to 41)

Ward v. Taylor, et al.
John E. Salas

42

1  returned from apparently the infirmary back to one of
2  the T buildings where he was housed having just been
3  involved in this situation with Lovett. What I'm
4  trying to understand is the procedures by which you as
5  the area commander would be notified of events that
6  occurred within your sector.
7      MS. BALLARD: Objection.
8  Q. This is post-chow.
9  A. The event didn't happen in my sector. It
10 happened in the chow hall.
11 Q. Well, but the actor who was responsible for the
12 event was your responsibility, was he not?
13 A. So is approximately 400 other inmates, sir.
14 Q. Yeah. But this is a guy who just threatened to
15 rape one of your correctional officers.
16 A. I didn't know that.
17     MS. BALLARD: Objection to form.
18     Go ahead.
19 A. I don't know the whole contents of the incident
20 when it happened.
21 Q. I understand that.
22 A. Now --
23 Q. Go ahead.
24 A. He was sent over to the infirmary for

43

1  evaluation.
2      Now, it's also my understanding that after
3  the evaluation from the infirmary and he was sent back
4  that everything was...
5  Q. Let me stop you right there because what you're
6  talking about is not contemporaneous, is it? In other
7  words, you didn't know that at the time? You didn't
8  know --
9      MS. BALLARD: At what time?
10 Q. At the time Johnson was being returned to T1 or
11 T2, you did not know that he had been evaluated by the
12 infirmary?
13 A. No, I didn't know. I knew that he was sent
14 over to the infirmary for evaluation.
15 Q. But you knew that subsequent to this incident,
16 correct?
17 A. Right.
18 Q. Right. Again, I'm just trying to understand
19 what the policies and procedures were with regard to
20 reporting to you as the area commander what was going
21 on with one of your inmates who just threatened to
22 rape a correctional officer.
23     MS. BALLARD: Objection.
24 A. The reporting goes to the shift commander on

44

1  that case, sir.
2  Q. Okay. So the reporting would bypass you as the
3  area commander and go directly to the shift commander?
4  A. Yes, sir. It happened during noon meal. It
5  did not happen in my area of responsibility. It
6  happened while we were performing noon feeding.
7  Q. And while I appreciate that, that it happened
8  during the lunch period, as area commander who was
9  receiving back an inmate who has just threatened to
10 rape a correctional officer, wouldn't that be
11 something that would be reportable or should be
12 reported to --
13 A. It should have been reported, sir. It should
14 have been reported by Mr. Lovett, who was threatened,
15 but I was not aware of the contents of the situation
16 that happened in that chow hall.
17     MS. BALLARD: I want to place an objection
18 to that last question.
19 Q. Are you aware that Mr. Lovett did, in fact,
20 report this to Lieutenant Harvey?
21 A. No.
22 Q. No, you're not aware of that?
23 A. No. Was Lieutenant Harvey the chow hall
24 lieutenant? See, I don't know who the chow hall,

45

1  which chow hall or what chow hall. I was busy with my
2  activities in my chow hall when that happened.
3  Q. All right. What was your understanding, if
4  any, as to what Lieutenant Harvey's responsibilities
5  on that day were, if you know?
6  A. He was one of the other lieutenants assigned an
7  area. Unless I go back and check the records, I don't
8  want to say he was unit 12 or 11 and be mistaken.
9  Q. All right. You said that you had numerous
10 conversations with Officer Lovett after this incident
11 took place.
12     Did you have any discussion with Lovett
13 with regard to his contact with Lieutenant Harvey?
14 A. No. None that I can recall.
15 Q. What other conversations do you recall that you
16 had with Officer Lovett?
17 A. How could this have occurred? Who or how
18 could -- where was Mr. Johnson? He was trying to
19 figure out how he could have come out from the
20 building back into the yard or what the motives were,
21 just basically investigative type. What was the
22 motive for the beating? Was there a weapon involved?
23 Those type of questions.
24 Q. Did you ever learn whether there was a weapon

12 (Pages 42 to 45)

Ward v. Taylor, et al.
John E. Salas

46

1  involved?
2  A. No, sir.
3  Q. Did you ever find out that Johnson may have
4  used a wristwatch?
5  A. No, sir. I may have heard something being said
6  about a wristwatch, but I never learned. I didn't do
7  the investigation on the incident.
8  Q. Who is it that did the investigation of the
9  incident?
10  A. I'm not sure if Lieutenant Harvey did it, but
11  he was one of the characters or one of the
12  participants in the investigation.
13  Q. And how do you know that?
14  A. Just by him taking the pictures.
15  Q. Now, did you ever speak with Lieutenant Harvey
16  about this incident?
17  A. Off and on. I don't really recall because it
18  was general conversation. When they determined that
19  Johnson, they had got that information through I
20  believe it was some of the informants or somebody, one
21  of the other inmates that may have witnessed it that
22  came up with that information.
23  Q. Do you know of anyone else that did an
24  investigation of this incident?

47

1  A. No, sir.
2  Q. Now, do you recall whether you ever filled out
3  any type of incident report regarding this situation?
4  A. I don't believe I did, but I don't recall.
5  Q. Do you believe that given your circumstances
6  that an incident report would not be needed from you?
7  MS. BALLARD: Objection to the form.
8  A. Can you repeat the question, sir?
9  Q. Yes.
10  I'm wondering if you believe that under
11  the policies and procedures of the DOC that you didn't
12  have to do an incident report based upon your
13  participation in this incident?
14  MS. BALLARD: Objection to the form.
15  A. Everybody in response to a code should have
16  filled out a report.
17  Q. That is the policy and procedure. Is that
18  right?
19  A. Yes, sir.
20  Q. Is it also part of the policy and procedure for
21  a person who conducts an investigation, to include
22  taking photographs, would they do a report as well?
23  MS. BALLARD: Objection to the form.
24  A. I believe so, to go over the reports, I mean to

48

1  go over the photographs.
2  Q. Do you believe that this incident could have
3  been prevented?
4  A. Sir, I can't answer that question because -- I
5  just can't answer that question.
6  You know, are you asking at that time or
7  are you asking now?
8  Q. Both. Back then did you feel like this should
9  have been prevented?
10  A. Should have been?
11  MS. BALLARD: Objection.
12  Q. I'm sorry. Could have been prevented. Could
13  this have been prevented? Did you feel that after you
14  went out to the scene and talked to people about what
15  happened?
16  MS. BALLARD: I'm going to object to the
17  form.
18  A. Sir, it could have been prevented had the
19  building been locked down, had the institution been
20  locked down and there was no movement. That's a
21  hindsight question and that's the best way that I can
22  answer it.
23  Q. What was your understanding, if any, as to the
24  correctional officer supervision of the T yard at the

49

1  time of this incident?
2  A. Which correctional officer?
3  Q. Were there any?
4  A. I don't understand your question.
5  Q. What is your understanding as to whether there
6  were any correctional officers who were supervising
7  the T yard at the time of this incident?
8  A. To my understanding, it was being supervised by
9  Mr. Lovett, unit 28.
10  Q. Was it your understanding that Lovett was there
11  at the time?
12  A. At the incident?
13  Q. Yes.
14  A. I can't pinpoint where he would be at any given
15  time. I know he's supposed to be within the confined
16  area of the fence, of the T's.
17  Q. If I were to tell you that Officer Lovett
18  testified that he was in one of the T buildings doing
19  an area check, do you believe that was appropriate?
20  A. If he was doing an area check, no.
21  If he was checking on the officer to make
22  sure the officer was alive and safe, yes.
23  Q. Now, if Officer Lovett was not in the T yard at
24  the time of this incident, were there any other

13 (Pages 46 to 49)

Ward v. Taylor, et al.
John E. Salas

| 50 | | 52 |
|---|---|---|
| 1  correctional officers who were supervising that area? | | 1  Was that a high-risk area? Was it maximum |
| 2  A. No. | | 2  security, anything like that? |
| 3  Q. Was there any visibility from the JV tower as | | 3  A. No. It's minimum, minimum security. |
| 4  to this area? | | 4  Q. Was it typical to have inmate altercations in |
| 5  A. Not, not to where the incident had occurred I | | 5  unit 13 area? |
| 6  don't believe because the JV tower, there's a lot of | | 6  A. No, it's not typical. Most of the inmates in |
| 7  obstruction. The only other officer would be unit 29 | | 7  unit 13's area don't get into that much trouble. |
| 8  may have some sort of visual to the back, if they were | | 8  Q. Had you ever heard of the inmate Robert Johnson |
| 9  right at their fence gates. They have a visual of | | 9  before this incident on July 10, 2004? |
| 10  that back area. | | 10  A. No. |
| 11  And that would be the officer, Ms. Sabb, | | 11  Q. Did you recognize him by sight? |
| 12  who had called the medical emergency code. She's | | 12  A. No. |
| 13  married now. I don't recall her maiden name, but | | 13  Q. And did you testify that you had been working |
| 14  Ms. Sabb was her married name. | | 14  as unit 13 for some months prior to this incident? |
| 15  MS. BALLARD: Drummond. | | 15  A. No. I testified that I may have been unit 13 |
| 16  THE WITNESS: Drummond. That's right. | | 16  prior to this. I don't recall because I don't have a |
| 17  MR. MARTIN: All right. Let me just check | | 17  set assigned area. I was a relief lieutenant at the |
| 18  my notes. I believe I'm going to be complete. | | 18  time, meaning whenever there's vacancies. |
| 19  Thank you, sir. That's all the questions | | 19  Q. The staffing you testified to, one C/O in T1, |
| 20  I have. | | 20  one C/O in T2, the roving unit 28, are those staffing |
| 21  BY MS. BALLARD: | | 21  levels set up by official DOC policies? |
| 22  Q. I just have a few questions. | | 22  A. I don't know if it was DOC or DCC. |
| 23  When you were a correctional officer | | 23  Q. I'm sorry. Institution policies? |
| 24  before you were promoted to lieutenant, did you ever | | 24  A. Yes. |

| 51 | | 53 |
|---|---|---|
| 1  yourself work as unit 28? | | 1  Q. Which would be DCC in this case? |
| 2  A. No. | | 2  A. Right. |
| 3  Q. Did you work a certain assigned unit as a C/O | | 3  Q. You were asked some questions about whether DCC |
| 4  or were you assigned to random different units? | | 4  was understaffed. |
| 5  A. I spent -- I came down to Delaware Correctional | | 5  Were you just giving your personal opinion |
| 6  Center for a sergeant promotion, so I was basically | | 6  when you answered those questions? |
| 7  filling in sergeant spots prior to being promoted to | | 7  A. Yes. Because the way I was asked was whether |
| 8  lieutenant. | | 8  that was my belief and that's a personal opinion. |
| 9  I spent my correctional officer time in | | 9  Do you want me to elaborate? |
| 10  Gander Hill. | | 10  Q. You can elaborate. |
| 11  Q. Okay. So when you came to DCC, you were | | 11  A. My belief is that in an institution such as |
| 12  already a sergeant or you were just promoted to | | 12  Delaware Correctional Center there should always be |
| 13  sergeant? | | 13  two people, you know, for team purposes, for backup |
| 14  A. Just promoted. | | 14  purposes, but that's in the ideal, ideal environment. |
| 15  Q. When we refer to these units, the unit means an | | 15  For safety purposes though that's the way that I feel, |
| 16  individual person, right? It's not a group of people? | | 16  that there should always be two people. |
| 17  Unit 28 is one person? | | 17  Q. But that's your opinion? |
| 18  A. One person, yes. | | 18  A. Right. |
| 19  Q. And you're unit 13? | | 19  Q. Were you aware of a practice whereby DCC would |
| 20  A. Yes, ma'am. | | 20  cover its shifts sometimes by having the correctional |
| 21  Q. Unit 13 is one person? | | 21  officer stay on for an extra shift? |
| 22  A. Yes. | | 22  A. Yes. |
| 23  Q. You were asked if there was anything difficult | | 23  Q. Is that called freezing? |
| 24  or unusual about the area that unit 13 patrols. | | 24  A. Yes, sir. |

14 (Pages 50 to 53)

Ward v. Taylor, et al.
John E. Salas

54

1    Q. And was that to maintain minimum staffing
2  levels?
3    A. Right.
4    Q. When you got out to the yard after the code was
5  called, can you just describe a little more what
6  Mr. Ward's condition was? I'm not clear.
7        Was he conscious when you arrived there?
8    A. When I arrived there, yes, he was conscious.
9  He was breathing. He was also bloody. I tried to ask
10 him is he okay. Well, it's kind of a stupid question
11 to ask somebody if they were okay when they were
12 bleeding, but I did ask that question.
13       I asked him if he remembers who had done
14 this, who had assaulted him like this. And I tried to
15 reassure him that medical help is on the way. It's
16 called treat for shock, you know, just to make sure he
17 stays conscious until qualified medical personnel
18 arrive.
19   Q. Did he make any verbal responses to you?
20   A. From what I recall, it's like gurgling sounds.
21 But I -- no, he didn't say, voice a response to me.
22   Q. But you were satisfied that he was breathing
23 okay at that time?
24   A. I was just happy he was alive.

55

1    Q. Was Mr. Ward sitting on the bench part of the
2  picnic table or on top of the table?
3    A. On the bench part, on the seat of the picnic
4  table.
5    Q. He was sitting on the seat part facing out or
6  facing towards the table?
7    A. Facing towards the table. But he was, he
8  was -- I'm not sure how to describe it or what the
9  word was, but he was bent backwards, meaning that I
10 guess after he was assaulted he had fallen offbalance
11 and was bent backwards.
12   Q. Was he leaning on the table?
13   A. No.
14   Q. He was just sort of leaning back?
15   A. Yes.
16   Q. On the seat?
17   A. Yes. Without a backrest.
18   Q. And you do not recall seeing anyone out there
19 at the picnic table taking pictures, is that correct?
20   A. That's correct. Because a camera was gotten
21 much later after Mr. Ward had to my understanding, to
22 my recollection Mr. Ward had already been taken to the
23 infirmary.
24   Q. Now let's go back to the questions you had

56

1  about the inmate who acted out at chow.
2        At what point did you become aware that
3  some inmate had acted out at noon chow?
4    A. It was after chow, I believe, right after chow
5  activities was completed.
6    Q. And who told you that?
7    A. I don't recall who it was. I'm not even sure
8  if it was Mr. Lovett that had said something. I just
9  was informed that there was an incident and
10 Mr. Lovett's name came up and that the inmate was
11 taken to the infirmary.
12   Q. At that point when you were first informed
13 about the chow incident, were you aware that the
14 inmate that acted out was Robert Johnson?
15   A. No.
16   Q. Were you aware that the inmate that acted out
17 was Robert Johnson at any time prior to the time that
18 Mr. Ward was assaulted?
19   A. Can you repeat that question?
20   Q. Were you aware that the chow inmate was Robert
21 Johnson at any point before Mr. Ward was assaulted?
22   A. No, not by name. Prior to Mr. Ward being
23 assaulted, I was shown the inmate that had been
24 returned to T2, I believe, to his housing unit.

57

1    Q. I'm sorry. Did you say that you were shown
2  him?
3    A. Yes. That the housing officer -- I went to the
4  housing unit and I asked the officer, because I was
5  told that he had already been returned back to his
6  building, who the inmate was and it was pointed at
7  that time who I now I believe is Robert Johnson.
8    Q. Okay. So somebody pointed out an inmate whose
9  name you didn't know, correct?
10   A. Correct.
11   Q. And that was obviously before the assault?
12   A. Yes.
13   Q. Was the inmate in the building at the time?
14   A. Yes. That was within maybe ten minutes of the
15 assault or fifteen.
16   Q. So was that before yard was called?
17   A. I believe yard was already going on in that
18 time frame.
19   Q. Mr. Lovett testified that inmates could be
20 either inside or outside during yard. Is that your
21 understanding also?
22   A. My understanding is that when they depart the
23 building to go out for yard, they stay out in the yard
24 until yard is completed. They do not return back into

15 (Pages 54 to 57)

Ward v. Taylor, et al.
John E. Salas

| 58 | 60 |
|---|---|
| 1 the building or they should not be allowed to go in<br>2 and out of the building during yard activity. It's<br>3 either you stay in or you stay out.<br>4    Q. So they can choose --<br>5    A. One or the other activity, yes.<br>6    Q. Can they be in the building when yard starts<br>7 and then choose to go out and stay out for the<br>8 remainder of yard?<br>9    A. If they were returning from a destination,<br>10 let's say yard had started five minutes prior to an<br>11 inmate coming back from education, once he reports to<br>12 the building officer he then can request to go back to<br>13 the yard, out to yard, and the officer will let him<br>14 out because he wasn't there right when yard was<br>15 sounded.<br>16    Q. Okay. Now, you said the chow hall that Robert<br>17 Johnson was at was not under the scope of your<br>18 responsibilities, correct?<br>19    A. Correct.<br>20    Q. You were covering a different chow hall?<br>21    A. Yes. There are four active chow halls during<br>22 noontime.<br>23    Q. Were you covering your chow hall because you<br>24 were unit 13 or because they just needed a lieutenant | 1 anything like that?<br>2    A. No, unless he is creating another commotion, I<br>3 may send him back. But normally it goes into<br>4 disciplinary and depending on the severity but, no, I<br>5 don't have a say in that.<br>6    Q. So a C/O can't second-guess the medical<br>7 decision to send him back or not, correct?<br>8    A. Correct.<br>9    Q. Are you aware of an investigator named Joe<br>10 Richardson?<br>11    A. Yes. He's one of the facility investigators.<br>12    Q. Are you aware that he may have done an<br>13 investigation of the Tim Ward incident?<br>14    A. Yes. I was aware of that because I was<br>15 questioned too as to part of his investigation.<br>16    Q. So did you give an interview to Mr. Richardson?<br>17    A. Yes.<br>18    Q. I think I already asked you this. But T, the T<br>19 area was a minimum security area, correct?<br>20    A. Yes, at that time.<br>21      MS. BALLARD: That's all I have.<br>22      Wait. Let me check one thing.<br>23 BY MS. BALLARD:<br>24    Q. I'm sorry. I may have asked you this already. |

| 59 | 61 |
|---|---|
| 1 there and you were the one that they chose?<br>2    A. No. The operating procedure is that<br>3 lieutenants supervise chow activities in the chow<br>4 hall.<br>5      No, unit 13 doesn't have a designated chow<br>6 hall. You go by whoever is in charge of chow that day<br>7 what chow hall you're assigned to.<br>8    Q. And you didn't have to supervise the chow hall<br>9 that the T inmates happened to be in, correct?<br>10    A. No.<br>11    Q. Now, it is your understanding that Robert<br>12 Johnson was seen by somebody in the infirmary before<br>13 he assaulted Mr. Ward?<br>14    A. Yes. That's my understanding because he was<br>15 sent to the infirmary for that purpose of being<br>16 evaluated.<br>17    Q. Did you learn that he was seen by a nurse?<br>18    A. No. Learned later on? No, I wasn't, I wasn't<br>19 made privilege to the activity that happened in the<br>20 infirmary when Mr. Johnson was there.<br>21    Q. If an inmate like Mr. Johnson goes to the<br>22 infirmary and he's medically cleared to return to his<br>23 housing area, do you as a lieutenant have any say in<br>24 saying no, we don't want him back, see him again, | 1      Had you ever heard of Robert Johnson<br>2 before July 10, 2004?<br>3    A. No.<br>4    Q. Were you aware that he had any mental health<br>5 problems or anything like that?<br>6    A. No.<br>7      MS. BALLARD: That's all. Thanks.<br>8      MR. MARTIN: Do you have some?<br>9 BY MR. HAGER:<br>10    Q. Did I hear you correctly that if an inmate is<br>11 not acting up when he's coming back, on his way back,<br>12 he was released from the infirmary, you can't overrule<br>13 the infirmary's decision?<br>14    A. No, sir. I have no jurisdiction as to where or<br>15 how the inmate is housed. That is all made -- if an<br>16 incident had occurred after he returns, I report that<br>17 to the shift commander and he goes up the chain to see<br>18 whether the inmate should be moved or not.<br>19    Q. Conversely, if an inmate is released from the<br>20 infirmary and starts acting up on the way back to his<br>21 housing unit, you can then take him back to the<br>22 infirmary if you think it was an infirmary issue?<br>23    A. If it was an infirmary issue, if he was injured<br>24 or medical needs, depending on what he was acting up |

16 (Pages 58 to 61)

Ward v. Taylor, et al.
John E. Salas

62

1  for.
2          MR. HAGER: Thanks. That's all I have.
3          MS. BALLARD: I'm sorry, Jeff. Can I do
4  one more area that I forgot?
5          MR. MARTIN: Sure.
6          MS. BALLARD: Can the witness have a look
7  at Lovett 3, the e-mail?
8          MR. MARTIN: Yes.
9  BY MS. BALLARD:
10  Q.   This is a document that we marked in Keith
11  Lovett's deposition.
12          Can you just take a look at that and let
13  me know if you have seen that document before?
14  A.   (Reviewing document) Yes, ma'am, I have seen
15  this document before.
16  Q.   And how did you happen to see this document
17  before?
18  A.   Mr. Lovett had mentioned something that he was
19  keeping record or track of what had happened from his
20  own inquiries and shared it with me and asked me not
21  to show it to anybody else.
22          After skimming through it, I took the
23  document, this document, not this particular document
24  but the original one and gave it to the attorney out

63

1  of your office with the DOJ, Department of Justice.
2  Q.   Do you remember approximately when Lovett gave
3  you this e-mail and when you turned it over, the month
4  or year?
5  A.   It was in 2004 or -- no. It was a few days
6  prior to me going up to the Attorney General's Office
7  for an interview with the attorney. I don't recall
8  the date. I know it was a few days prior to my
9  appointment.
10  Q.   Do you recall doing an affidavit very early in
11  this case where you met with an attorney?
12  A.   No. I recall just answering questions or...
13  Q.   Okay. Let me ask you did Mr. Lovett e-mail
14  this document to you or did he hand it to you?
15  A.   He handed it to me. I believe he handed it to
16  me. He said he printed it out from his account
17  somewhere. I don't recall receiving it through
18  e-mail.
19  Q.   Did he tell you why he was giving it to you?
20  A.   There was all kinds of talk as to what, the
21  reason why Mr. Ward was assaulted and he wanted to
22  share the information with me. We don't know whether
23  it was part of a drug deal or drug deal gone sour. I
24  don't even remember the whole content, but I just know

64

1  that after he had shared it with me that this document
2  needed to be in somebody else's hands that's actively
3  investigating the case, not in my hands.
4  Q.   So you decided to turn it over to the attorneys
5  for the state?
6  A.   Yes.
7          MS. BALLARD: That's all I have. Thanks.
8          MR. MARTIN: I have a couple of
9  follow-ups.
10          Let me go off the record here for a
11  moment.
12          (Discussion off the record.)
13  BY MR. MARTIN:
14  Q.   Lieutenant, just a couple of things.
15          When was it that you first learned about
16  the incident involving Robert Johnson at lunch on July
17  10, 2004?
18  A.   It was after chow activities. I'm not sure as
19  to how long chow had taken us into. I know it was
20  probably after 1:00. So I learned of the incident
21  after chow.
22          And then I was on my way over to the T's
23  after finding out that the inmate that was creating
24  the commotion in the chow hall was from my area, so I

65

1  headed over to the T's, was my first stop and probably
2  my only stop after chow because of what had
3  transpired.
4  Q.   In other words, you stayed in the T building
5  until the time that Tim Ward was assaulted?
6  A.   I went, I went over to the T areas and yes, I
7  was in that area after learning that Mr. Ward was
8  assaulted.
9  Q.   And how was it that you learned that
10  Mr. Johnson had made the commotion at lunch?
11  A.   It was just through passing. I left my chow
12  hall and I was talking to another lieutenant, another
13  officer. I'm not even sure who I was talking to, but
14  I was told that there was an incident that had
15  happened in one of the chow halls.
16  Q.   Did you determine whether it was a reported
17  incident?
18  A.   It was too early. It was -- every incident
19  should be reported, but it was too early. I was just
20  learning, I just learned of the incident happening and
21  so I was on my way to find out, get a better grasp on
22  the incident.
23  Q.   Which took you to the T's?
24  A.   Yes.

17 (Pages 62 to 65)

Ward v. Taylor, et al.
John E. Salas

66

1    Q.  But you learned that there was this incident
2  involving this individual.  At the time you didn't
3  know his name, correct?
4    A.  Right.
5    Q.  Did you know where he was housed?
6    A.  It was mentioned it was in the T's, the inmate
7  was from the T's.  And Mr. Lovett was unit 28, which
8  is within the T's.
9    Q.  So did you go and speak with Lovett?
10    A.  I believe I had a conversation with him.  I
11  also had a conversation with the T officers.
12    Q.  And that's when you learned that this guy was
13  returned from the infirmary?
14    A.  Yes.  He was returned from the infirmary and
15  that he was identified and I was shown who the inmate
16  was.  And at that time I don't recall the name, but it
17  was a black inmate, African-American, roughly five
18  foot six to five foot eight and he was going into the
19  shower when I saw him.  And that was the last I had
20  seen of the inmate for that day.
21    Q.  Now, do you know how long he had been housed in
22  the T's at that point?
23    A.  No, sir.
24    Q.  Did you become aware that he tried to jump out

67

1  of a window of one of the other housing units?
2    A.  I had heard of the incident, but I didn't know
3  who the inmate was, and that was in a different
4  building, W building, during...
5    Q.  All right.  Lieutenant, you believe that you
6  talked with Officer Lovett when you got back into the
7  T area.  Is that correct?
8    A.  Right.
9    Q.  And what do you recall, if anything, that
10  Officer Lovett related to you about the incident?
11    A.  Just the way the inmate was acting out, was
12  either screaming at him or saying stuff to him.  I
13  don't recall the whole detail.
14    Q.  Well, didn't Lovett tell you that he thought he
15  was a threat?
16    A.  I don't remember him saying that.  I don't know
17  what had transpired to spark the incident.
18    Q.  Well, did you find that Officer Lovett was
19  pretty concerned about this guy?
20    A.  No.  He had never mentioned that to me.
21    Q.  Lovett was not concerned about him?
22    A.  No, sir.  I said that Lovett didn't mention his
23  concern or severity of concern to me concerning the
24  inmate.

68

1    Q.  And is that how you learned where this man was
2  housed, whether it was T1 or T2?
3    A.  I said earlier that during the course of
4  passing and getting a real brief description that
5  there was an incident that happened in the chow hall,
6  it was identified that the inmate was from the T's.  I
7  don't remember whether it was T1 or T2 until I got to
8  the T area and started inquiring as to who, where is
9  that inmate or is he back?
10    Q.  Well, when was it that you spoke with Lovett in
11  relationship to when you went to T1 and T2?
12    A.  Going through the gate.  He has to open the
13  gate for me.
14    Q.  So you saw Lovett before you went to T1 or T2?
15    A.  Yes.
16    Q.  And Lovett was not able to tell you whether he
17  was in T1 or T2?
18    A.  No, he didn't.
19    Q.  And so you went on your own to try to determine
20  whether he was in T1 or T2.  Is that right?
21    A.  I believe so.
22    Q.  And what is it that the officer in charge of T2
23  told you?
24    A.  He pointed out who the inmate was that returned

69

1  from the infirmary.
2    Q.  All right.  And did he say anything more than
3  that?
4    A.  I don't recall.  I don't believe so.
5    Q.  What was Johnson doing at the time he was
6  pointed out?
7    A.  It appeared like he was going to the shower.
8    Q.  And what was the approximate time that elapsed
9  between that moment when you saw him looking like he
10  was going to go to the shower until the time this
11  incident occurred?  "The incident" meaning Tim Ward's
12  assault.
13    A.  Approximately ten to fifteen minutes.  That's
14  approximately.  I can't be specific.
15    Q.  And was it your recollection that yard had
16  already been called at that point?
17    A.  Yes.
18    Q.  All right.  How was it then that Johnson was
19  able to get out in the yard if yard had already begun?
20    A.  Because Johnson had just returned from the
21  infirmary.  If the yard had already begun prior to him
22  getting there, he may have requested -- I don't know
23  how he specifically got out to yard after it was
24  already begun, but he may have requested to go out to

Wilcox and Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

A000065

Ward v. Taylor, et al.
John E. Salas

70

1    yard.
2          The other thing is that the door to that
3    building could have been unsecured and Johnson just
4    walked out. I don't know. But those are the possible
5    ways he could have gotten out to the yard.
6    Q.  Door was unsecured? That was a secured door,
7    was it not?
8    A.  Yes. But I'm saying those are the
9    possibilities of him getting out there, possible ways.
10   Q.  What was your experience as to the frequency of
11   that secured door being unsecured?
12   A.  None. Because every time I come to visit those
13   buildings, the rover or the officer inside has to open
14   the doors for me.
15   Q.  So you're not aware of that particular door
16   being unsecured?
17   A.  No. And it's not standard practice.
18   Q.  All right. Did you remain, did you remain in
19   that particular building then until the incident
20   occurred or did you go over to the other T building?
21   A.  I went over to the other T building. I don't
22   recall how long I was in that particular building. I
23   may have stepped outside and stood outside just
24   observing for a few minutes before I entered the other

71

1    building.
2          I don't really recall how I had done it,
3    but I was in that area until after the incident.
4    MR. MARTIN: Okay, sir. I don't have
5    anything further.
6          Thank you.
7    BY MS. BALLARD:
8    Q.  I just have two, I think, on the jumping out
9    the window incident.
10         You said you had heard about that
11   incident, correct?
12   A.  Yes.
13   Q.  Were you aware when you heard about it that the
14   inmate who did that was Robert Johnson?
15   A.  No, ma'am.
16   Q.  Were you aware prior to July 10th, 2004 that
17   that was Robert Johnson?
18   A.  No, ma'am.
19   Q.  And when, if you recall, or how long before
20   July 2004 was the window incident?
21   A.  It had to be in the wintertime because when I
22   was being told about the incident, I believe there was
23   snow on the ground and it had to have been in the
24   wintertime.

72

1    Q.  When Keith Lovett spoke to you after coming
2    back from chow and told you about an inmate who had
3    acted up, he didn't use the name Robert Johnson,
4    correct?
5    A.  I don't recall.
6    Q.  You don't recall if he did or you don't
7    recall --
8    A.  I don't recall if he did or not.
9    Q.  You don't recall learning it was Robert Johnson
10   prior to the assault?
11   A.  Right.
12   MS. BALLARD: That's it.
13   MR. MARTIN: Off the record.
14   (Discussion off the record.)
15   MR. MARTIN: Do you want to read and sign?
16   MS. BALLARD: You have the right to look
17   at the transcript that he is reporting to make sure
18   it's accurate and everything, or you can just trust
19   him. He's pretty good. You don't have to do that.
20   If you want to, you can.
21   THE WITNESS: No. I'm fine with it.
22   MS. BALLARD: Thanks.
23   (Deposition concluded at 2:30 p.m.)
24

73

1                INDEX
2    DEPONENT: JOHN E. SALAS          PAGE
3      Examination by Mr. Martin        3
       Examination by Ms. Ballard      50
       Examination by Mr. Hager        61
4      Examination by Ms. Ballard      62
       Examination by Mr. Martin       64
5      Examination by Ms. Ballard      71
6
7    (There were no exhibits marked for identification.)
8
     CERTIFICATE OF REPORTER          PAGE 74
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

19  (Pages 70 to 73)

Ward v. Taylor, et al.
John E. Salas

74

1   State of Delaware  )
                       )
2   New Castle County  )
3
             CERTIFICATE OF REPORTER
4
        I, Kurt A. Fetzer, Registered Diplomate
5   Reporter and Notary Public, do hereby certify that
    there came before me on October 24, 2007, the deponent
6   herein, JOHN E. SALAS, who was duly sworn  by me and
    thereafter examined by counsel for the respective
7   parties; that the questions asked of said deponent and
    the answers given were taken down by me in Stenotype
8   notes and thereafter transcribed by use of
    computer-aided transcription and computer printer
9   under my direction.
10       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
11  examination of said witness.
12       I further certify that reading and signing of
    the deposition were waived by the deponent and
13  counsel.
14       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18       Kurt A. Fetzer, RDR, CRR
19       Certification No. 100-RPR
20       (Expires January 31, 2008)
21
22  DATED:
23
24

Wilcox and Fetzer, Ltd.     Registered Professional Reporters          302-655-0477

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
2004 OCT 26  PM 3: 50

TIMOTHY WARD,                                  )
                                               )
            Plaintiff,                         )
                                               )
      v.                                       )     Civil Action No.    0 4 - 1 3 9 1
                                               )
STANLEY TAYLOR; PAUL HOWARD;                   )
THOMAS CARROLL; JOHN SALAS;                    )     JURY TRIAL DEMANDED
JESSICA DAVIS-BARTON; CERTAIN                  )
UNKNOWN  INDIVIDUAL EMPLOYEES OF               )
THE STATE OF DELAWARE DEPARTMENT               )
OF CORRECTION; and STATE OF DELAWARE           )
DEPARTMENT OF CORRECTION,                      )
                                               )
            Defendants.                        )


## COMPLAINT


## PARTIES

1.    Plaintiff, Timothy Ward (hereinafter referred to as "Plaintiff" or "Tim"), is a

resident of the State of Maryland, and, at all times relevant hereto, was an inmate at the Delaware

Correctional Center, 1181 Paddock Road, Smyrna, DE  19977, SBI Number 00501898.

2.    Defendant, Stanley Taylor, is the Commissioner of Correction for the State of

Delaware, and in that capacity is the Chief Officer of the Department of Correction.

3.    Defendant, Paul Howard, is the Bureau Chief of the Department of Correction.

4.    Defendant, Thomas Carroll, is and was at all times relevant hereto, the Warden of

the Delaware Correctional Center located in Smyrna, Delaware (which Delaware Correctional

Center will hereinafter referred to as the "DCC").

5.    Defendant, John Salas, is and was at all relevant times hereto, a Lieutenant correctional officer at DCC.

6.    Defendant, Jessica Davis-Barton, is a counselor at DCC.

7.    Defendants, unknown individual employees of the DOC, contributed to the shocking and dangerous conditions existing at DCC, and to the occurrence of the events of July 10, 2004, by virtue of their decision-making and/or lack thereof and/or by their negligent omissions or actions.

8.    Defendant, State of Delaware Department of Correction, is a division of the State of Delaware charged with, among other things, maintaining safe and efficiently-run prisons and preventing inmates in those prisons from being harmed.

## JURISDICTION

9.    The United States District Court for the District of Delaware has jurisdiction over the parties in this matter by virtue of the pendency of a federal claim under 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. §§ 1331 and 1343.

## FACTS

10.    At all relevant times hereto, Plaintiff was an inmate at DCC and housed in the minimum security T- Building. He is serving a three-year sentence for armed burglary.

11.    Prior to the events described below, Tim has served his sentence quietly, without incident or write up. Indeed, prior to this incarceration, Tim, who was forty years old when the burglary occurred, had no previous criminal record.

12.    On information and belief, in or around May of 2004, Inmate Robert Johnson was transferred from W-Building to T-Building after attempting to commit suicide by jumping out of

2

a second floor window in the W-Building. He was still housed in the T-Building on July 9 and 10, 2004.

13.    On information and belief, during the night of July 9, 2004 and into the early morning hours of July 10, 2004 Inmate Johnson was awake and causing a commotion throughout the night, which caused others housed in the vicinity of Inmate Johnson's sleeping quarters to endure a sleepless night.

14.    The next day at "chow," Inmate Johnson threatened to rape a correctional officer.

15.    Inmate Johnson also exhibited other curious and erratic behavior and made disrespectful remarks to the correctional officers assigned to the chow hall.

16.    In response to his outrageous behavior from the night before and during chow, correctional officers escorted Inmate Johnson to the Infirmary to be evaluated. There were no medical personnel present in the Infirmary to conduct an evaluation of Inmate Johnson.

17.    On information and belief, following his trip to the Infirmary, Inmate Johnson grew more agitated and angry. The correctional officers promptly released Inmate Johnson into the prison population, which was enjoying recreational time in the T-Building "yard."

18.    There were approximately twelve to fifteen inmates, including Tim Ward, in the recreational yard when Inmate Johnson was sent out into the yard.

19.    During this recreation time, there were two correctional officers assigned to supervise and protect the inmates: Defendant Salas and Officer Lovett.

20.    Defendant Salas was the Lieutenant on duty who was responsible for oversight of and the security for the T-Building yard.

21.    Officer Lovett was responsible for remaining outside in the T-Building yard to supervise the inmates during their recreational time.

3

22. Despite their assigned duties, Officer Lovett and Defendant Salas were inside T-Building on a computer.

23. Outside in the yard, Inmate Johnson approached inmates Richard Shipkowski and Gary Bowers, Jr. and asked them whether any guards were supervising the back portion of the yard. Both inmates indicated that Inmate Johnson was not being supervised at the moment.

24. Meanwhile, in the back portion of the yard, Tim Ward had just completed a workout of lifting weights and doing pushups.

25. Inmate Johnson, keenly aware of the lack of supervision by the correctional officers, approached Tim Ward with his watch wrapped around his knuckles (so as to inflict maximum damage with his blows) and without word, warning or provocation struck an unsuspecting Tim Ward on the right side of his face in the eye socket area. Inmate Johnson then recoiled and struck a dazed and confused Tim Ward in the jaw. This second blow knocked the 5'6", 165 pound Tim Ward unconscious.

26. Inmate Johnson's attack on Tim escalated in savagery as Johnson straddled the now unconscious Tim and repeatedly and brutally punched and kicked him in the face and head. During the course of the beating, Officer Lovett and Defendant Salas, whose duty it was to supervise and protect the inmates, were unaware that the beating was taking place. No other correctional officers were aware of the beating as it occurred.

27. In apparent realization that there would be no correctional officer intervention to halt the beating, Inmate William Boney and another unidentified inmate ran to pull Inmate Johnson off Tim Ward while Inmate Trevor Lyn screamed for help. Other inmates ran to the locked door that leads from the yard and began pounding on the door to alert *somebody* to help Tim.

4

28.    When correctional officers arrived, they took one look at Tim lying spread-eagle and unconscious across the top of a picnic table and announced that he was dead. They provided no medical or any other kind of treatment to him. Instead, they took pictures of his supine body lain out across the picnic table.

29.    Fortunately an alert, unidentified inmate noticed a gurgling sound coming from Tim's mouth. He quickly cleared Tim's throat and turned him over so that he could breathe and would not choke on the blood in his throat.

30.    Tim was taken to the Infirmary on a stretcher at approximately 2:30 p.m. It was observed that Tim had lacerations on his face, a "knot" on his forehead that measured 3" long and 1½" wide, and that his skin color was "black."[1] Based upon the observations made by the staff at the Infirmary, Dr. Allie[2] ordered that Tim be transported to the Kent General Hospital emergency room for sutures and x-rays.

31.    An immediate request was made to the DCC Shift Commander to transport Tim to the hospital in a DCC van. The Shift Commander denied this request.

32.    Eventually, someone from the Infirmary called 911 and an ambulance was dispatched to take Tim to the Kent General Hospital emergency room where he was examined, x-rayed and given a CT scan.

33.    At the hospital, it was determined that Tim's injuries included: a broken nose, a dislocated jaw, damage to his eye, a shattered eye socket, teeth knocked out, other teeth twisted and broken, numerous facial fractures, numerous facial lacerations, bloody masses, tissue drainage and severe bruising. In the days following the attack, Tim's face was so swollen and disfigured that he was unrecognizable and his appearance was characterized as "grotesque."

---

[1] Tim Ward is a Caucasian.
[2] It is unclear whether Dr. Allie was present at the Infirmary or whether she merely provided instruction to the nurses on duty at the Infirmary.

5

**A000072**

34.     Tim was kept at Kent General Hospital for approximately four hours and then returned to DCC where he was admitted to the Infirmary. Tim was awakened during the night by someone asking, "which guard did this to you?" This statement caused Tim intense fear and apprehension as he still had no idea who his attacker was at that time.

35.     During the course of his stay in the Infirmary, Tim was not examined by a medical doctor but was given Motrin and Darvocet for his pain, had two teeth extracted and was put on a full liquid diet.

36.     Tim's family was not notified of the attack. The day after the attack, July 11, 2004, Tim's mother, Louise Ward, and Tim's daughter, Amanda, arrived at DCC for a previously scheduled visit. They were led to the Infirmary without mention as to why they were being taken there. Without warning, a DCC employee opened a door to a room divided by a glass wall, behind which a beaten, bloody, and disfigured inmate stood, and then asked Mrs. Ward, "is this your son?" The virtually unidentifiable individual standing before Louise and Amanda Ward was in fact Tim Ward.

37.     Tim was still clothed in his dirty, bloody clothes, his wounds were still weeping to the extent that he had to wipe them with his soiled shirt, his head was swollen to what has been approximated at almost three times its normal size and his head, lips and eyes were covered with dried blood. He began crying and pawing at the glass divider asking "why did this happen to me?" and "Who did this to me?"

38.     Amanda was so distraught over the sight of her father that a nurse had to be called to lead her out of the room and care for her. Tim's mother began sobbing and begging to be allowed to hold her son.

6

**A000073**

39.     The next day, Mrs. Ward called Tim's counselor, Defendant Davis-Barton, and inquired as to whether Tim had been given clean clothes and had been fed.  Defendant Davis-Barton refused to answer Mrs. Ward's questions.

40.     On July 15, 2004 Mrs. Ward was able to call Tim and speak to him via telephone. Tim informed her that he was wearing the same clothes that he had on when he was attacked on July 10.  Due to his inability to chew and eat any solid food, as well as the DCC's failure to provide him with the a liquid or soft food diet, Tim was starving and asked his mother to put $50 into his commissary account so that he could buy some liquid instant breakfast.  Tim was also having trouble with his coordination, and as a result, had difficulty walking.

41.     On July 19, 2004  Tim was examined by an oral surgeon, Dr. Norman Lippman, D.D.S., who prescribed among other things a soft food diet, nasal spray, Tylenol and Tylenol #3 for pain, a consultation for Tim's nose and a consultation for Tim to see an ophthalmologist[3] to examine and treat the damage to Tim's eye and eye socket.

42.     Despite Dr. Lippman's instruction that Tim have a soft food diet, and despite the fact that he had been diagnosed as having a fractured jaw, the Infirmary instructed that Tim "Start Regular Diet" on July 20, 2004.  Without further examination by a doctor, Tim's stitches were removed and he was released from the Infirmary on this date.

43.     On July 30, 2004, Tim made a medical request because he re-broke his jaw eating the solid food supplied by DCC.  He also complained that his face was swollen and felt "like [it was] being crushed, my right eye is killing me [and] I have no pain medication."  On information and belief Tim was provided no treatment for these complaints.

---

[3] Ophthalmology is: "the branch of medicine dealing with the structure, functions and diseases of the eye." WEBSTERS NEW WORLD DICTIONARY, 997 (2nd College ed. 1980).

7

**A000074**

44.    Tim made another medical request the next day, once again complaining of severe pain – a "10 on a 1 to 10 pain scale." In response, no action was taken, with the exception of scheduling a medical appointment for August 2, 2004.

45.    At his August appointment Tim was instructed to discontinue the Motrin and continue with the Naprosyn for pain. He was also prescribed a consultation with an optometrist[4] – as opposed to a consultation with an ophthalmologist as he had been prescribed. Tim was given no further treatment that day.

46.    On August 8, 2004, Tim made a medical request reporting complications and pain from exposure to the sun. He requested sunglasses because exposure to the sun and bright lights caused his face to swell. He wrote:

> I need sunglasses from the eye doctor because when am [sic] out in the sun my face swells up and my eye hurts very bad. The pain is unbearable. My two front teeth need to be replaced. There is a nerve in my face that aches and strains my right eye. The pain shoots down to my jaw line making it impossible to chew, eat or move my mouth in any way. I need pain medicine. (emphasis in original).

In response, a medical appointment was scheduled *four* days later. He was given no further treatment that day.

47.    On August 10, 2004, Tim's sister, June Ward, called his counselor, Defendant Davis-Barton, to check on Tim. Defendant Davis-Barton reported that the attack was all Tim's fault. Mrs. Ward sensed a cover-up of the incident.

48.    Around this same time, Correctional Officer Lovett approached Tim and told him that the DCC would not let him file his report regarding the day of the incident. In particular,

---

[4] Optometry concerns: "the profession of examining the eyes and measuring errors in refraction and of prescribing glasses to correct these defects." *Id.* at 999.

8

they did not want him to report that he had taken Inmate Johnson to the Infirmary and nobody was present to examine him.

49. Tim arrived for his medical appointment on August 12 hoping for some type of relief. Instead, all that was done was that Tim was scheduled to see an optometrist. Again, he reported the pain a 10 on a 1 to 10 pain scale. He was provided no further treatment that day.

50. Four days later, on August 16, 2004, Tim again filed a medical report indicating:

> I am in extreme pain, for 36 days straight now my eye and face have been aching non stop, I cannot stand the pain, I need sunglasses or an eye patch now. The sun light is the main cause of this irritation & swelling. Need more medication! Also need antibiotics for my nose swelling. (emphasis in original).

51. Again, the only treatment afforded Tim was a medical appointment for a future date.

52. On information and belief, Tim was seen by an optometrist and given a prescription for sunglasses – a prescription that was never filled by DCC.

53. Tim was also having a difficult time with his counselor, Defendant Davis-Barton. She was very rude and argumentative with Tim and with his family who were contacting her to find out how Tim was doing.

54. In addition, Defendant Davis-Barton violated the patient/therapist confidentiality privilege by discussing confidential matters regarding Tim with other inmates.

55. Defendant Davis-Barton also instructed the correctional officer assigned to Tim to make no further calls for a medic for Tim for any reason. This was reported to Tim by the correctional officer himself.

56. Defendant Davis-Barton also instructed Tim to make no further medical requests.

9

**A000076**

57.    Due to these actions, Tim filed a grievance against Defendant Davis-Barton on August 18, 2004 and requested an investigation – the results of which are yet to be reported, despite the two and a half months that have passed since the filing of the grievance and the filing of this Complaint.

58.    Still in excruciating pain and still receiving literally no treatment, Tim reported to medical again on August 23, 2004:

> I need pain medication! I still haven't been put on the list for med pick up and I am in extreme pain, it feels like my face is gonna implode. I need pain meds!! And my Ensure!! (emphasis in original)

59.    The reference to Ensure in his medical report refers to a case of Ensure that Tim's mother had sent to DCC for Tim's consumption. She sent this form of liquid nutrition so that Tim could get proper nutrition that he was not getting due to DCC's refusal to provide Tim the soft food diet prescribed by Dr. Lippman and because Tim could not eat the solid food that was being provided by DCC. Notwithstanding the presence of the Ensure at DCC and Tim's requests for the Ensure, it was not being provided to him.

60.    From the time of his attack on July 10, until late August, Tim and his family had been requesting that officials at DCC provide him with proper medical care. However, he had yet to be examined by a medical doctor since the day of the attack. Due to their frustrations in trying to work with DCC personnel, Tim and his family sought the advice of and hired an attorney.

61.    On August 31, 2004, Tim's attorney wrote to Governor Minner advising her of Tim's situation and the lack of medical care provided since the attack. In response, Tim was admitted to the Infirmary on September 2, 2004.

10

**A000077**

62.    However, being placed in the Infirmary in and of itself did nothing to further Tim's medical care. In fact, being placed in the Infirmary made Tim's situation worse. In the Infirmary, Tim was placed in a 10' x 10' glass-enclosed cell and essentially *ignored*. There were times when he was not given his pain medication. There were times when he was not given food. There were times when he was in so much pain that he would beat on the glass so as to remind the attendants of his need for pain relievers. He was consistently ignored.

63.    While in the Infirmary, Tim was not allowed to shower or change his clothes, his belongings were taken from him, he was no longer allowed to make telephone calls and he was not given his mail or newspaper.

64.    In a letter dated September 2, 2004 to Tim's counsel, the Governor's office contended that Tim had received "substantial medical attention since July 10, 2004."

65.    Tim was placed in the Infirmary by DCC without notifying his family of his whereabouts.

66.    Louise Ward made numerous telephone calls to the DCC to try to find out where Tim was and whether he was getting medical treatment and pain medication. In response, her calls were transferred from one DCC employee to another, but with no answers. In short, she was being given the runaround.

67.    It was also at this time that the guards began to call Tim names due to the publicity brought on by a newspaper article in the <u>Wilmington News Journal</u>.

68.    On September 9, 2004, through an arrangement made by his attorney, and at his family's expense, Tim was permitted to be examined by an outside physician, Dr. Pasquale Fucci. This was the first time that Tim had seen a medical doctor for an examination since the July 10 visit to Kent General Hospital.

11

**A000078**

69.    Dr. Fucci determined that Tim *must* be seen by an ophthalmologist and by an otolaryngologist.[5] Dr. Fucci was concerned that further medical neglect might cause Tim to lose sight in his right eye. He also recommended a follow up MRI of the brain and follow up x-rays of Tim's facial fractures.

70.    As a result of Tim's attorney's request, he was finally released from the Infirmary on or about September 11, 2004.

71.    In mid-September, 2004 Tim was removed from the prison population and put into isolation.

72.    In response to an inquiry by Tim's attorney as to the reason for his placement in isolation, Deputy Attorney General, Richard Hubbard, stated that Tim was not in "isolation," but termed his placement as "Protective Custody."

73.    On or about September 22, 2004, Tim was transferred to Sussex Correctional Institute ("SCI").

74.    On or about October 5, 2004, Tim was seen by Dr. David Larned, M.D., an oculoplastic surgeon who specializes in orbital reconstruction. Dr. Larned opined that Tim needs surgery to his right tripod. This surgery has not yet been scheduled.

75.    It has also been determined that Tim suffers from some hearing difficulties that require testing by an audiologist. He also requires dental surgery. Neither procedure has been scheduled.

76.    Since being at SCI, Tim has continued to request the sunglasses that he was prescribed by the optometrist. His requests have been repeatedly denied.

---

[5] Otolaryngology is "the branch or practice of medicine dealing with disorders of the ear, nose, and throat. *Id.* at 1008.

12

**A000079**

## COUNT I

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983:
### Eighth Amendment – Cruel and Unusual Punishment

77.    Paragraphs 1 through 76 are restated and incorporated as if fully set forth herein.

78.    On information and belief, Defendants, acting under color of state law per 42 U.S.C. § 1983, violated Plaintiff's right to be free from cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution when it acted with intent and/or deliberate indifference to:

> (a) the serious medical condition of the Plaintiff;
>
> (b) the Plaintiff's need for adequate medical care, of which he was denied and/or that which was provided was inadequate;
>
> (c) the Plaintiff's need for adequate food, of which he was denied and/or that which was provided was inadequate; and
>
> (d) the Plaintiff's need for adequate clothing, of which he was denied and/or that which was provided was inadequate.

79.    As a result of Defendants' unlawful actions against Plaintiff, Plaintiff suffered a loss of his liberty without due process of law, with attendant physical injuries, both past and future, physical pain, mental anguish, emotional pain, humiliation, and isolation from human contact.

## COUNT II

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983:
### First Amendment – Freedom of Speech

80.    Paragraphs 1 through 79 are restated and incorporated as if fully set forth herein.

81.    Defendants, acting under color of state law per 42 U.S.C. § 1983, intentionally violated Plaintiff's right to freedom of speech in violation of the First Amendment to the United

13

States Constitution, when they punished him without justification for seeking proper medical care and for filing a prison grievance.

## COUNT III

### Violation of Civil Rights under Color of State Law, 42 U.S.C.§ 1983: Failure to train and maintenance of custom, policies or practices

82.    Paragraphs 1 through 81 are restated and incorporated as if fully set forth herein.

83.    The great and egregious harm caused to Plaintiff was the direct result of the customs, practices, policies and procedures of Defendants, including but not limited to: a failure to properly train and supervise DOC personnel so as to protect inmates' safety and physical well-being; a failure to maintain safe conditions; and a failure to adopt and properly implement practices and policies so as to protect the inmates' safety, physical well-being and appropriate security classification.

84.    As a result of the actions of Defendants, Plaintiff has been subjected to a deprivation of his right to liberty without due process of law, with attendant physical injuries, emotional pain, mental anguish, substantial physical pain and suffering, and loss of the ability to enjoy the experiences of life.

## COUNT IV

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983: State-Created Danger Doctrine (Against All Defendants)

85.    Paragraphs 1 through 84 are restated and incorporated as if fully set forth herein.

86.    The harm caused to the Plaintiff was direct and foreseeable by all Defendants.

14

87.     Defendants, acting under color of state law per 42 U.S.C. § 1983, acted in willful disregard for the safety of the Plaintiff, exhibited gross and reckless negligence which exposed the Plaintiff to substantial risk of serious harm to a degree that shocks the conscience.

88.     The Plaintiff was a member of a discrete class of persons subjected to potential harm as a result of the actions of Defendants, insofar as a relationship existed between Plaintiff and the State of Delaware by virtue of his incarceration by the State of Delaware.

89.     The actions and inactions of each Defendant are sufficient to shock the conscience in that each Defendant exercised authority under color of state law to create an opportunity for danger that otherwise would not have existed, thereby establishing a violation of the Due Process Clause of the Constitution.

90.     As a result of the actions of the Defendants, the Plaintiff has been subjected to a deprivation of his right to liberty without due process of law, with attendant physical injuries, mental anguish, substantial pain and suffering of the highest order, and loss of the ability to enjoy the experiences of life.

## COUNT V

### Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985

91.     Paragraphs 1 through 90 are restated and incorporated as if fully set forth herein.

92.     Defendants conspired to deprive Plaintiff directly and/or indirectly of his Civil Rights, including:

(a)     liberty without due process of law;

(b)     his right to be free from cruel and unusual punishment;

(c)     his right to own personal property; and

(d)     his right to receive mail.

93.    As a result of the actions of Defendants, Plaintiff has been subjected to a deprivation of his right to liberty, with attendant physical injuries, mental anguish, substantial pain and suffering, and loss of the ability to enjoy the experiences of life.

**WHEREFORE,** Plaintiff, Timothy Ward demands that judgment be entered in his favor against all Defendants on the above claims, including an award of compensatory damages, punitive damages, costs of suit, interest, attorneys' fees under 42 U.S.C. § 1988, and any other appropriate or relevant statutory or common law basis, injunctive relief ordering that Plaintiff be given proper medical care, including the pain medication, sunglasses and surgery that he requires and such other and further relief as this Court may deem appropriate.

DATED: October 26, 2004

Plaintiff, TIMOTHY WARD

By his attorneys:

Jeffrey K. Martin, Esquire (ID # 2407)
Timothy J. Wilson, Esquire (ID # 4323)
Margolis Edelstein
1509 Gilpin Avenue
Wilmington, Delaware 19806
(302) 777-4680

Herbert G. Feuerhake, Esquire (ID # 2590)
The Law Office of Herbert G. Feuerhake
521 West Street
Wilmington, Delaware 19801
(302) 658-6101

16

A000083

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TIMOTHY WARD,                                )
                                             )
                    Plaintiff,               )
                                             )
        v.                                   )    Civil Action No. 04-1391-KAJ
                                             )
STANLEY TAYLOR; PAUL HOWARD;                 )
THOMAS CARROLL; JOHN SALAS;                  )
JESSICA DAVIS-BARTON; CERTAIN               )
UNKNOWN INDIVIDUAL EMPLOYEES                 )
OF THE STATE OF DELAWARE                     )
DEPARTMENT OF CORRECTIONS;                   )
and STATE OF DELAWARE                        )
DEPARTMENT OF CORRECTIONS,                   )
                                             )
                    Defendants.              )

## MEMORANDUM OPINION

---

Jeffrey K. Martin, Esquire, Margolis Edelstein, 1509 Gilpin Avenue, Wilmington,
Delaware 19806;
Herbert G. Feuerhake, Esquire, The Law Office of Herbert G. Feuerhake, 521 West
Street, Wilmington, Delaware 19806; Counsel for Plaintiff.

Michael F. Foster, Esquire, Department of Justice, 820 N. French Street, 6th Floor,
Wilmington, Delaware 19801; Counsel for Defendants.

---

March 30, 2006
Wilmington, Delaware



JORDAN, District Judge

## I.    INTRODUCTION

This case involves claims alleging a violation of an inmate's constitutional rights by a corrections facility and several correctional officers.  Before me is a Motion to Dismiss for failure to state a claim upon which relief can be granted (Docket Item ["D.I."] 17; the "Motion"), filed by the defendants, Stanley Taylor, Paul Howard, Thomas Carroll, John Salas, Jessica Davis-Barton, certain unknown individual employees of the State of Delaware Department of Corrections, and the Department of Corrections itself (the "Department") (collectively the "Defendants").

Jurisdiction is appropriate under 42 U.S.C. §§ 1983 and 1985 and 28 U.S.C. § 1331.  For the reasons that follow, the Motion will be granted in part and denied in part.

## II.    BACKGROUND[1]

### A.    The Attack on Ward

While serving a three-year sentence for armed burglary, the plaintiff, Timothy Ward ("Ward") was an inmate at the Delaware Correctional Center ("DCC") in the minimum security T-Building.  (D.I. 1 at ¶ 10.)  In or around May of 2004, another inmate, Robert Johnson ("Johnson"), was transferred to the T-Building after attempting to commit suicide by jumping out of a second-story window in the building where he was previously held.  (Id. at ¶ 12.)

---

[1] The following background information is based on Ward's allegations, which are assumed to be true for the purposes of this 12(b)(6) motion.

1

A000085

On July 10, 2004, due to threats he made to a guard and disruptive behavior in the evenings, Johnson was escorted to the infirmary for his mental condition to be evaluated, but no medical personnel were present at the time. (*See id.* at ¶ 16.) Johnson was then released into the prison population, which was having recreational time in the "yard". (*Id.* at ¶ 17.) Defendant Salas and an individual named Lovett were the correctional officers responsible for the oversight of the recreation break; however, they were inside the T-Building using a computer.[2] (*Id.* at ¶¶ 19, 22.) Ward was in the back of the yard finishing a workout when he was approached by Johnson, who had wrapped his wrist watch around his fist. (*Id.* at ¶ 24.) Johnson, without word, warning, or provocation struck Ward on the right side of his face by his eye socket. (*Id.* at ¶ 25.) Johnson then struck Ward in the jaw, knocking him unconscious. (*Id.*) Johnson then straddled Ward and continued to beat him while inmates tried to pull Johnson away and alert the correctional officers of the attack. (*Id.* at ¶ 26.) When the correctional officers finally arrived and looked at Ward, they believed he was dead. (*Id.* at ¶ 28.)

B.    Medical Treatment Following the Attack

After it was discovered that Ward was breathing, he was taken to the infirmary. (*Id.* at ¶ 30.) At the infirmary, it was observed that Ward had lacerations on his face, a knot on his forehead three inches long and an inch and a half wide, and that his skin was discolored. (*Id.*) Infirmary personnel immediately requested that Ward be transferred to the hospital emergency room but the DCC Shift Commander denied that

---

[2] Johnson approached two other inmates and asked whether any guards were supervising the back portion of the yard. Both inmates informed Johnson he was not being supervised at the moment. (*Id.* at ¶ 23.)

2

request. (*See id.* at ¶ 31.) Ward was eventually taken to the hospital where it was determined that he had a broken nose, a dislocated jaw, damage to his eye, a shattered eye socket, numerous broken and missing teeth, other facial fractures, tissue draining, and severe bruises. (*Id.* at 33.) His appearance was characterized as "grotesque". (*Id.*) After four hours at the hospital, Ward was transferred back to the infirmary. (*Id.* at ¶ 34.) He was not examined by a medical doctor at the infirmary but was given Motrin and Darvocet for pain, had two teeth extracted, and was placed on a liquid diet. (*Id.* at ¶ 35.)

On July 11, 2004, Ward's mother and daughter visited the DCC without knowledge of the attack. (*Id.* at ¶ 36.) They found Ward lying in the infirmary covered in blood and still wearing his clothes from the attack. (*Id.* at ¶ 37.) Additionally, Ward's head had swollen to what was approximated as three times its normal size. (*Id.*)

On July 19, 2004 Ward was examined by an oral surgeon who prescribed a soft food diet, Tylenol and Tylenol #3 for the pain, as well as suggesting that Ward see another physician about the injuries to his nose and that he also see an ophthamolgist for treatment of damage to his eye and eye socket. (*Id.* at ¶ 41.) Despite the instructions and reports, the infirmary ordered Ward to start a regular food diet on July 20, 2004, removed his stitches, and released him back into the prison population. (*Id.* at ¶ 42.)

3

C.    Ward's Continued Requests for Medical Attention

On July 30, 2004 Ward made a medical request because his jaw broke again while he was eating solid food provided by DCC.[3] (*Id.* at ¶ 43.) He also complained of great pain in his face and eye. (*Id.*) Ward was provided no treatment in response to those complaints. (*Id.*) The next day Ward made another medical request, but aside from scheduling an appointment for August 2, 2004, no action was taken by the prison. (*Id.* at ¶ 44.)

At the August 2 appointment, Ward was told to take Naprosyn for his pain. (*Id.* at ¶ 45.) He was also prescribed a consultation with an optometrist, rather than with an opthamologist as had previously been suggested. (*Id.*) On August 8, Ward made another medical request because he believed that exposure to the sun and bright lights was causing his face to swell. (*Id.* at ¶ 46.) Ward reported in his request that the pain was so great he could not chew, eat, or move his mouth in any way. (*Id.*) In response to the request, a medical appointment was scheduled for four days later. (*Id.*) At his August 12 appointment, Ward was scheduled to see an optometrist, but given no pain medication. (*Id.* at ¶ 49.) Ward was seen by the optometrist and given a prescription for sunglasses. (*Id.* at ¶ 52.) The prison, however, never had that prescription filled. (*Id.*)

During these difficulties, Ward was finding the prison counselor, Defendant Davis-Barton, to be rude, argumentative, and unhelpful. (*Id.* at ¶ 53.) She instructed the correctional officer assigned to Ward to make no further calls for a medic for Ward

---

[3] It is unclear from the Complaint to whom Ward was making medical requests.

4

for any reason. (*Id.* at ¶ 55.) Davis-Barton also instructed Ward to make no further requests for medical attention. (*Id.* at ¶ 56.) Still in pain and receiving no medical treatment, Ward reported to the infirmary again on August 23, 2004. (*Id.* at ¶ 58.) He requested pain medication for "extreme pain" and also the liquid nutrition his mother had been sending him due to DCC's failure to provide him with the soft diet he had been prescribed. (*Id.*) None of his requests were granted. (*Id.* at ¶ 59.)

Because Ward's condition had not improved and he had not been seen by a medical doctor since the day of the attack, his mother hired an attorney. (*Id.* at ¶ 60.) Ward's counsel sent a letter to the Governor advising the Governor of Ward's situation. (*Id.* at ¶ 61.) In response, Ward was admitted to the infirmary on September 2, 2004. (*Id.*) While in the infirmary, however, Ward was frequently not given his medication and sometimes not fed. (*Id.* at ¶ 62.)[4] He was "placed in a 10' by 10' glass-enclosed cell and essentially ignored." (*Id.*; original emphasis.) Additionally, Ward was mocked by the guards due to the publicity brought on by a newspaper article that detailed his plight. (*Id.* at ¶ 67.)

On September 9, 2004, through an arrangement made by his attorney, Ward was permitted to be examined by an outside physician, Dr. Pasquale Fucci ("Dr. Fucci"). (*Id.* at ¶ 68.) This was the first time Ward had been seen by a medical doctor since he was taken to the hospital on the day of the attack. (*Id.*) Dr. Fucci determined that Ward must be seen by an opthamologist and by an otolaryngologist. (*Id.* at ¶ 69.) Dr. Fucci

---

[4] Ward was also not allowed to shower or change clothes while in the infirmary. (D.I. 1 at ¶ 63.) He was placed in the infirmary without any notification to his family. (*Id.* at ¶ 65.)

5

was concerned that further medical neglect could cause Ward to lose sight in his right eye. (Id.)

At the request of his attorney, Ward was finally released from the infirmary on or about September 11, 2004. (D.I. 1 at ¶ 70.) In mid-September 2004, Ward was removed from the prison population and placed into isolation. (D.I. 1 at ¶ 71.) In late September, Ward was transferred to Sussex County Correctional Institute. (Id. at ¶ 73.) On October 5, 2004, Ward was seen by Dr. David Larned, an oculoplastic surgeon who opined that Ward needed surgery. (Id. at ¶ 74.) It has also been determined that Ward suffers from hearing loss and that he needs dental surgery. (See id. at ¶ 75.)

Ward's Complaint in this case alleges that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. (D.I. 1 at ¶¶ 77-79.) Additionally, Ward claims that the Defendants intentionally violated his First Amendment right to freedom of speech. (Id. at ¶¶ 80-81.) He further alleges that his injuries are due to Defendants' customs, practices and policies (id. at ¶¶ 82-84) and that the willful actions of the state establish a violation of the Due Process Clause of the Fourteenth Amendment (id. at ¶¶ 85-90). Finally, Ward claims that the Defendants conspired to interfere with his civil rights. (Id. at ¶ 92.)

III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." A motion to dismiss requires a court to accept as true all material allegations of the complaint. See Spruill v. Gillis, 372 F.3d 218, 223 (3d Cir. 2004). A court may grant a motion to

6

**A000090**

dismiss only if after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.* 221 F.3d 472, 481-82 (3d Cir. 2000). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir. 1991).

## IV.     DISCUSSION

### A.     Ward's Eighth Amendment Claim

The Defendants move to dismiss Ward's Eighth Amendment claim on the grounds that they are not responsible for Ward's inadequate medical care and, further, that their failure to protect Ward from Johnson does not amount to cruel and unusual punishment. Because Ward has adequately alleged at this stage of the proceedings that the Defendants' denial of medical treatment and failure to protect amounted to cruel and unusual punishment, I will deny the Motion.

#### 1.     Failure to Provide Adequate Medical Care

Ward first alleges that the Defendants' denial of medical care violated his Eighth Amendment rights. Under the Eighth Amendment, the states have a duty to provide "adequate medical care to those it is punishing by incarceration." *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978). The Supreme Court has held that "[i]n order to state a cognizable [Eighth Amendment] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To meet this deliberate indifference

7

**A000091**

standard, a plaintiff must show that a prison official consciously disregarded a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

The Defendants first argue that they did not exercise deliberate indifference to Ward's medical needs because it is their contracted medical provider, First Correction Medical ("FCM"), which is responsible for providing adequate medical treatment. (D.I. 17 at ¶ 2.) Defendants assert that any complaint concerning the quality of medical care must be brought against its contracted provider. (*Id.* at 5.) The Supreme Court has held, however, that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody." *West v. Atkins*, 487 U.S. 42, 56 (1988). Therefore, the Defendants cannot escape liability simply because they contracted with FCM to provide medical services to prisoners in the State's custody.

The question then becomes whether Ward's allegations that the Defendants denied him medical services are sufficient to frame a claim of deliberate indifference to a serious medical need. The Third Circuit has identified several scenarios that meet the deliberate indifference standard, including "where prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Spruill*, 372 F.3d at 235 (citations omitted). Here, Ward alleges that he suffered from serious pain and, given his facial injuries and swelling, that his injuries were noticeable to the Defendants. (D.I. 1 at ¶¶ 36-37.) Despite orders from the infirmary, DCC failed to provide Ward with a soft food diet, which allegedly caused him to re-break his jaw. (*Id.* at ¶ 43.) Ward also alleges that he was consistently denied his subsequent requests for medical attention,

8

and, even when those requests were honored, he was only given pain medication. (*Id.* at ¶¶ 43-45.) Additionally, he claims that defendant Davis-Barton's instructions that Ward's medical requests not be honored demonstrate that she and the guards following her orders "consciously disregarded" a substantial risk of serious harm to Ward. (*Id.* at ¶¶ 55-56.) Finally, the alleged facts in the Complaint can be construed to show that Ward's medical needs were "serious." "[E]xtreme pain and real possibility of permanent injury" can qualify as a serious medical need if "fleshed out by further evidence" during discovery. *Spruill*, 372 F.3d at 236. In addition to the extreme pain Ward alleges, Dr. Fucci opined that further medical neglect could cause Ward to lose vision in his right eye. (D.I. 1 at ¶ 69.) Ward will be given the opportunity to develop through discovery evidence to support the allegations in his Complaint. Therefore, to the extent Ward is alleging the denial of medical treatment violated his Eighth Amendment rights, the Motion to dismiss that claim will be denied.

      2.    Failure to Protect

The Defendants argue that Ward's claim regarding their failure to protect Ward from Johnson must fail because it does not meet the deliberate indifference standard. (D.I. 17 at 11.) The Defendants rely (*id.* at 10-11) on several cases that have dismissed Eighth Amendment claims on the grounds that officials did not have subjective knowledge of the threat posed to an inmate by a fellow inmate. *See Hemauer v. Jefferson County Corrections Dept.*, No. 98-5206, 1999 WL 96752, at *4 (6th Cir. Feb. 2, 1999) (granting summary judgment where plaintiff failed to show defendants'

9

knowledge of risk); *Baker v. Lehman*, 932 F. Supp. 666, 671 (E.D. Pa. 1996) (same); *Jones v. Kelly*, 918 F. Supp. 74, 80 (W.D.N.Y. 1995) (same).

Those cases, however, were all decided at the summary judgment stage, after the development of an evidentiary record. Moreover, I am bound to draw inferences in the plaintiff's favor based on the allegations in the Complaint. *Cf. Hamilton v. Leavy*, 117 F.3d 742, 749 (3d Cir. 1997) (reversing summary judgment against plaintiff because there were facts on record that "could be viewed by a factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids"). Construing the facts here in a light most favorable to Ward, I cannot hold that the Defendants failure to protect Ward could not amount to the sort of deliberate indifference forbidden by the Constitution. The Defendants were aware of Johnson's erratic behavior, as evidenced by their decision to take him to the infirmary. (D.I. at ¶¶ 16-17.) Despite this awareness, when no one was at the infirmary, the guards released Johnson into the general prison population. (*Id.*) Additionally, the guards who were responsible for monitoring the yard when the attack occurred were inside, preoccupied with a computer. (*Id.* at ¶ 22.) Therefore, Ward has adequately alleged that the Defendants' failure to protect amounted to deliberate indifference.

The Defendants also assert that they cannot be held liable without proof that they actually knew of and disregarded an excessive risk to inmate health or safety. *See Farmer*, 511 U.S. at 837. The Supreme Court in *Farmer* reasoned that an allegedly culpable official "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* The

10

Defendants contend that the only factual allegation against Salas was that he was on duty the day of the attack, and, further, that the administrative Defendants, i.e., Commissioner Taylor, Bureau Chief Howard and Warden Carroll, are very unlikely to have had actual knowledge of the threat Johnson posed to Ward.[5] (D.I. 17 at 12.) In regard to Salas, Ward has adequately alleged that he had knowledge of the threat. I need not decide at this stage whether the administrative defendants had actual knowledge of the threat posed by Johnson or by the denial of medical treatment because Ward implicates them as defendants due to their alleged failure to train and maintain appropriate customs, practices, and policies.

B.    Failure to Train and Maintenance of Customs, Policies, or Practices

Defendants contend that Ward has failed to allege facts showing that his injuries are caused by Defendants' policies and a failure to train or maintain safe conditions. (D.I. 1 at ¶ 83.) Both sides raise essentially the same arguments as those raised with respect to the Eighth Amendment claims.[6] Indeed, on those arguments, no further analysis would seem required. However, when dealing with supervisory defendants, as

---

[5] Defendants' brief does not make any contention that Davis-Barton cannot be liable.

[6] Defendants here assert that inadequate medical treatment was provided by the medical contractor and not the defendants. Additionally, defendants argue that they must have taken affirmative action, if they are to be liable under this claim. Ward argues the "deliberate indifference" standard can still be met when the constitutionally cognizable harm is great and there is failure by supervisory officials to respond. Even without adopting Ward's position, Davis-Barton's active role in allegedly instructing Ward not to make medical requests is a satisfactory allegation at this stage of the proceedings. Moreover, the Third Circuit has stated that plaintiffs like Ward cannot be "expected to know without discovery exactly what training policies were in place and how they were adopted". *Carter v. City of Philadelphia*, 181 F.3d 339, 358 (3d Cir. 1999).

11

opposed to defendants who allegedly had direct knowledge of a serious threat to inmate safety, the standard for deliberate indifference is not the "actual knowledge" standard required in *Farmer. See Beers-Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2001). Instead, for Ward to succeed on a claim against supervisors based on prison policy or practices, he must identify a specific policy or practice that the supervisor failed to employ and he must show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).

In his Complaint, Ward alleges that the Defendants failed to properly train and supervise DOC personnel so as to protect inmates' safety and physical well-being and to maintain safe conditions, and that Defendants failed to adopt and properly implement practices and policies so as to protect inmates' safety and physical well-being. (D.I. 1 at ¶ 83.) Ward further alleges that the supervisors failure to correct these risks resulted in his injuries. (*Id.* at ¶ 84.) Therefore, the first and fourth prongs of the *Sample's* test are satisfied.

Though the allegations with respect to the second and third prongs fo the *Sample* test are not as plainly met, there are sufficient allegations to permit further development of the record. *See Carter v. City of Philadelphia*, 181 F.3d 339, 358 (3d. Cir. 1999) (reversing district court's dismissal of plaintiff's claim because requiring

12

plaintiff to identify a policy and attribute it to a supervisor at the discovery stage would be "unduly harsh.").

Finally, the Defendants move to dismiss the policy-and-practice claim based on the affirmative defense of qualified immunity. (D.I. 17 at 16.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Defendants have the burden of establishing that they are entitled to such immunity. *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989). Unlike the actual knowledge test of *Farmer*, the Defendants must make the objective showing that a reasonable person in their position at the relevant time "could have believed, in light of clearly established law, that the alleged conduct comported with established legal standards." *Id.*

The issue, therefore, is whether the Defendants' conduct was objectively reasonable, and, more specifically, whether prison officials in the Defendants' positions could have believed that their conduct did not expose Ward to risk of serious medical harm. I have already held that Ward has adequately alleged actual knowledge on the part of the Defendants under the *Farmer* test. Because it has been determined that Ward has adequately alleged that Defendants' conduct meets the deliberate indifference standard, the same conduct cannot be objectively reasonable and thus the Defendants' qualified immunity defense cannot bar relief at this stage. *See Carter*, 181

13

**A000097**

F.3d at 356 (holding that if plaintiff succeeds in establishing that defendants acted with deliberate indifference to constitutional rights, then defendants' conduct was not objectively reasonable and qualified immunity defense is not available).

C.    Ward's First Amendment Retaliation Claim

Defendants move to dismiss Ward's First Amendment retaliation claim. (D.I. 17 at 13). Ward alleges that Defendants intentionally violated his First Amendment rights by punishing him without justification for requesting medical attention and filing a prison grievance. (D.I. 1 at ¶ 81). Because Ward has adequately alleged the elements of a First Amendment retaliation claim, the Motion is denied.

A prisoner alleging a retaliation claim must show: (1) constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).

First, the filing of lawsuits and grievances and contact with newspapers are protected by the First Amendment. *See id.* (filing complaints is protected); *Smith v. Mesinger*, 293 F.3d 641, 653 (3d Cir. 2002) ("[F]alsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts."). As to the second requirement for a retaliation claim, Defendants assert that Ward's transfer was for his own safety and thus not an "adverse action". (D.I. 17 at 12.) Defendants further argue that Ward had no liberty interest in remaining in the general prison population, thus he was not deprived of any constitutional right. (*Id.*) Ward, however, alleges that in addition to the transfer, the

14

A000098

Defendants also punished him by refusing his requests for medical care and failing to provide him with food and other requirements. (D.I. 1 at ¶¶ 80-81.) Further, the Defendants' reliance on Ward's lack of liberty interest is misplaced. "[T]he law of this circuit is clear that a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Thus, since Ward does not have to prove a liberty interest, nor did he allege that the transfer was the sole retaliatory measure taken by the department, the Defendants' arguments denying there was an adverse action fail at this preliminary stage.

Third, in order to succeed on a First Amendment retaliation claim, a plaintiff must show that the Defendants' actions were motivated by "a desire to punish an individual for the exercise of a constitutional right." *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999.) The Defendants claim that Ward's transfer was done for safety reasons and not because he exercised his First Amendment rights, and therefore Ward fails to meet the causation requirement. As noted above, Ward claims additional actions by the Defendants, aside from the transfer, were undertaken in retaliation. Additionally, Ward claims that the transfer itself was retaliatory. (*See* D.I. 22 at 18.) Viewing the facts in his favor, as I must on this Motion, his allegations of causation are sufficient.

Because all three requirements of a First Amendment retaliation claim are adequately alleged, I will deny the Defendants' Motion to dismiss this claim.

15

D.    Ward's Substantive Due Process Claim Asserting a State Created Danger.

Finally, Defendants move to dismiss Ward's claim that the State violated his substantive due process rights. Ward alleges that the Defendants, by acting in willful disregard for his safety, created an opportunity for danger that otherwise would not have existed and thus acted in a manner shocking to the conscience and violating the Due Process Clause of the Fourteenth Amendment. (D.I. 1 at ¶ 89.) The Defendants challenge this claim by correctly asserting that Ward cannot rely on substantive due process rights when the Eighth Amendment is more specifically tailored to the alleged violations of his rights. (D.I. 17 at 15-16.)

The Supreme Court has held that when there is an "explicit textual source of constitutional protection" against physically intrusive governmental conduct alleged by a plaintiff, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that claim of excessive force used by officers in making arrest must be brought under more directly applicable Fourth Amendment and not Fourteenth Amendment); *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (holding that the "Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners."). Because Ward is a convicted inmate, the treatment

16

**A000100**

he alleges must be challenged under the Eighth Amendment, and thus the Defendants' motion to dismiss the substantive due process claim will be granted. [7]

## V.    CONCLUSION

Accordingly, the Defendants' Motion will be granted as to the conspiracy and substantive due process claims and as to any claims against the Department and against the individual Defendants in their official capacities. In all other respects, the Motion will be denied.

---

[7] In his response to Defendants' motion to dismiss, Ward agrees that he has failed to allege a conspiracy under 42 U.S.C. § 1985 as originally contested in his Complaint. Therefore, the motion to dismiss this portion of the Compliant is granted. (D.I. 22 at 22.)

Defendants also raise the defense of sovereign immunity under the Eleventh Amendment. (D.I. 17 at 16-18.) To the extent Ward is suing the individual Defendants in their official capacities the claims are dismissed. Since the Department "is an agency of the State of Delaware" and is protected by the Eleventh Amendment, the claims against the Department are also dismissed. *Evans v. Ford*, No. Civ.A.03-868, 2004 WL 2009362, at *4 (D. Del. Aug. 25, 2004).

Additionally Defendants argue that they cannot be held liable under the doctrine of respondent superior. (D.I. 17 at 19.) Ward alleges, however, that he is not relying on the doctrine, which is consistent with allegations that he is suing the Defendants in their individual capacities. (D.I. 22 at 24.) At this stage in the proceeding, he has alleged adequate claims against the Defendants. Accordingly, he will have the opportunity to further develop those allegations in discovery.

17

**A000101**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-1391-KAJ |
| | ) | |
| STANLEY TAYLOR; PAUL HOWARD; | ) | |
| THOMAS CARROLL; JOHN SALAS; | ) | |
| JESSICA DAVIS-BARTON; CERTAIN | ) | |
| UNKNOWN INDIVIDUAL EMPLOYEES | ) | |
| OF THE STATE OF DELAWARE | ) | |
| DEPARTMENT OF CORRECTIONS; | ) | |
| and STATE OF DELAWARE | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter

today,

IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (D.I. 17) is

GRANTED as to the Plaintiff's conspiracy and substantive due process claims and as

to any claims against the Department of Corrections and against the individual

Defendants in their official capacities. In all other respects, the Motion is DENIED.

UNITED STATES DISTRICT JUDGE

March 30, 2006
Wilmington, Delaware

1

**A000102**

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TIMOTHY WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY TAYLOR, | ) | C. A. No. 04-1391 *** |
| PAUL HOWARD, THOMAS | ) | |
| CARROLL, JOHN SALAS, | ) | |
| JESSICA DAVIS-BARTON, | ) | |
| CERTAIN UNKNOWN INDIVIDUAL | ) | |
| EMPLOYEES OF STATE OF | ) | |
| DELAWARE DEPARTMENT OF | ) | |
| CORRECTION, and | ) | |
| STATE OF DELAWARE, | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendants/Third Party | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL | ) | |
| DELAWARE, LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## CERTIFICATE OF MAILING AND/OR DELIVERY

The undersigned certifies that on December 10, 2007, she caused the attached, *Appendix to Opening Brief in Support of State Defendants' Motion for Summary Judgment, Volume 1* to be electronically filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Jeffrey K. Martin, Esquire  Daniel McKenty, Esquire
Martin & Wilson, P.A.    Heckler & Frabizzio
1508 Pennsylvania Ave., Suite 1C P.O. Box 128
Wilmington, DE 19806   Wilmington, DE 19899-0128

Herbert G. Feuerhake, Esq.
521 West St.
Wilmington, DE 19801

/s/ Stephani J. Ballard
Stephani J. Ballard, I.D. #3481
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302)577-8400
Attorney for State Defendants