# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TIMOTHY WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1391 *** |
| | ) | |
| STANLEY TAYLOR; PAUL HOWARD; | ) | |
| THOMAS CARROLL; JOHN SALAS; | ) | JURY TRIAL DEMANDED |
| JESSICA DAVIS-BARTON; CERTAIN | ) | |
| UNKNOWN INDIVIDUAL EMPLOYEES OF | ) | |
| THE STATE OF DELAWARE DEPARTMENT | ) | |
| OF CORRECTION; and STATE OF DELAWARE | ) | |
| DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Defendants. | ) | |
| v. | ) | |
| | ) | |
| FIRST CORRECTIONAL MEDICAL | ) | |
| DELAWARE, LLC | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO STATE DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**MARTIN & WILSON, P.A.**

*(signature)*

**JEFFREY K. MARTIN, ESQUIRE**
**TIMOTHY J. WILSON, ESQUIRE**
DE State Bar I.D. No.: 2407
DE State Bar I.D. No.: 4323
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

DATED:        January 23, 2007

**LAW OFFICES OF
HERBERT G. FEUERHAKE**

*(signature) for*

**HERBERT G. FEUERHAKE, ESQUIRE**
DE State Bar I.D. No.: 2590
521 West Street
Wilmington, DE 19801
(302) 658-6101
herblaw@verizonmail.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………..i

Statement of the Nature and Stage of Proceedings………………………………………..1

Summary of Argument……………………………………………………………………4

Statement of Facts………………………………………………………………………....6

    I.      The Assault on Tim Ward: "Could Have Been Prevented."………………………6

          A.     No Correctional Officers in the Recreational Yard:
               Understaffed and Out of Position………………………………………………6

          B.     The Assailant: "This Dude is Going to Go Crazy."………………………8

          C.     Lieutenant Harvey's Response: "He Kind of Blew It Off."………………9

          D.     Lieutenant Salas: Identified Johnson as the Chow Hall
               Perpetrator But Failed to Take Any Action………………………………..10

    II.     Medical Care Issues………………………………………………………………..11

    III.    Retaliation for Media Contact and Contact with the Governor…………………12

Argument…………………………………………………………………………………...14


I.      STANDARD OF REVIEW…………………………………………………………...14

II.     THE DELIBERATE INDIFFERENCE OF DOC PERSONNEL
        TO THE DANGER POSED BY INMATE ROBERT JOHNSON,
        AND THEIR FAILURE TO PROTECT PLAINTIFF TIM WARD
        AT THE TIME AND IN THE VICINITY OF THE BEATING INFLICTED
        UPON HIM BY INMATE JOHNSON, VIOLATED WARD'S
        CONSTITUTIONAL RIGHTS……………………………………………………….14

          A.     Third Circuit case law……………………………………………………14

          B.     Defendant John Salas…………………………………………………………20

          C.     Proposed Defendant Paul Harvey……………………………………………28

III.    THE EXISTENCE OF UNACCEPTABLE CONDITIONS OF
        CONFINEMENT AND WRONGFUL PRACTICES AND

## **TABLE OF AUTHORITIES**

### *U.S. Supreme Court Cases*

Connick v. Myers, 461 U.S. 138, 146-147 (1983).............................................................38

Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1976,
    128 L.Ed.2d 811 (1994)...............................................................16, 17, 33

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10,
    106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)......................................................14, 18

Rhodes v. Chapman, 452 U.S. 337, 345, 69 L.Ed.2d 59, 101 S.Ct. 2392 (1981)............4, 16, 32

Whitley v. Albers, 475 U.S. 312, 319, 89 L.Ed.2d 251, 106 S.Ct.1078 (1986).....................16


### *U.S. Courts of Appeal Cases*

Beers-Capitol v. Whetzel, 256 F.3d 120 (3rd Cir. 2001).........................19, 20, 28, 32, 33, 34

Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1363
    (3rd Cir. 1992)...........................................................................................18

Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988).........................16

Ely v. Hall's Motor Transit Co., 590 F.2d 62 (3d Cir.1978).........................................18

Hamilton v. Leavy, 117 F.3d 742, 746 (3rd Cir. 1997)............................4, 14, 15, 16, 17, 18

Hamilton v. Leavy, 322 F.3d 776 (3rd Cir. 2003).....................................18, 27, 28, 32, 33

Mitchell v. Horn, 318 F.3d 523, 530 (3rd Cir. 2003)...............................................5, 38, 39

Monmouth County Correctional Institutional Inmates v. Lanzaro,
    834 F.2d 326, 346 (3rd Cir. 1987)...............................................................38

Pennsylvania Coal Assn. v. Babbitt, 63 F.3d 231, 236 (3rd Cir. 1995)..............................14

Sample v. Diecks, 885 F.2d 1099, 1118 (3rd Cir., 1989)..............................................34

Spruill v. Gillis, 372 F.3d 218, 235-237 (3rd Cir. 2004).......................................4, 37, 38

POLICIES AT DCC, INCLUDING INADEQUATE STAFFING
AND THE FAILURE TO PROPERLY TRAIN PERSONNEL SO
AS TO ENABLE THEM TO RESPOND TO DANGEROUS
SITUATIONS WHILE UNDERSTAFFED, VIOLATED THE
CONSTITUTIONAL RIGHTS OF PLAINTIFF TIM WARD..............................32

IV.    THE FAILURE OF DOC DEFENDANTS TO AFFORD TO
TIM WARD ADEQUATE MEDICAL CARE IN THE WAKE OF HIS
BEATING VIOLATED HIS CONSTITUTIONAL RIGHT TO BE
FREE FROM CRUEL AND UNUSUAL PUNISHMENT...................................36

V.    THE ACTIONS OF DOC DEFENDANTS IN THE WAKE
OF TIM WARD'S CONTACTS WITH THE MEDIA CONSTITUTED
WRONGFUL RETALIATION IN VIOLATION OF HIS
CONSTITUTIONAL RIGHT TO FREEDOM OF SPEECH...............................38


Conclusion..........................................................................................40

*__Unreported District Court Case__*

Hamilton v. Leavy, 2004 WL 609334 (D.Del., Jordan J., March 24, 2004).......................19, 20
(Copy appended hereto)

*__Statutes and Rules__*

42 U.S.C. § 1983.................................................................................................1, 14

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff, Timothy Ward ("Plaintiff" or "Ward"), filed this Complaint under 42 U.S.C. § 1983 on October 26, 2004, three and a half months following the date of the incident that gave rise to this suit, which was July 10, 2004. Plaintiff named the following as parties defendant: Stanley Taylor, Commissioner of the Department of Correction ("DOC"); Paul Howard, Bureau Chief of the DOC; Thomas Carroll, Warden of Delaware Correctional Center ("DCC"); Lieutenant John Salas, a correctional supervising officer employed by DOC; Jessica Davis-Barton, a correctional supervising counselor employed by DOC; State of Delaware Department of Correction[1]; and finally "certain unknown individual employees of State of Delaware Department of Correction."

Prior to the filing of Defendants' Motion for Summary Judgment, Plaintiff filed a Motion for Leave to Amend Complaint to Add a Party Defendant. (B-000030).[2] Based upon the late notice provided by Defendants and the caselaw, Plaintiff expects that Lieutenant Paul Harvey will be joined as a party in this litigation.[3] Defendants first identified Lieutenant Paul Harvey as having knowledge as to the facts of this case in August 2007 approximately one month prior to the discovery deadline. (B-000011). Plaintiff immediately filed interrogatories and sought from Defendants the nature of Lieutenant Harvey's knowledge. (B-000013). On October 15, 2007 Defendants responded suggesting that Lieutenant Harvey had no further information than any of the other Defendants. (B-000013). Less than two weeks later during the deposition of Correctional Officer Keith Lovett, contrary to Defendant's responses to Plaintiff's

---

[1] The State of Delaware Department of Correction and all State Defendants in their official capacities were dismissed from this litigation pursuant to the Court's Memorandum Opinion and Order dated March 30, 2006. (D.I.26-27). For the purposes of the Motion for Summary Judgment, Plaintiff will argue as if the dismissed parties were never joined in this litigation.

[2] Plaintiff's Appendix will be referred to as (B-0000___). Defendant's Appendix is referred to as (A000___).

[3] Contemporaneous with the filing of this Answering Brief, Plaintiff will file a Reply to Defendants' Opposition to the joinder of Lieutenant Harvey.

Interrogatories, Plaintiff first learned that Lieutenant Harvey had very specific information about the inmate who assaulted Plaintiff. (A000029). Shortly thereafter, Plaintiff, through his counsel, applied for leave of Court to add Lieutenant Harvey as a party defendant.[4]

Plaintiff was an inmate housed at DCC when he was assaulted by another inmate, Robert Johnson ("Johnson"). Immediately prior to this incident, Johnson shouted obscenities and threatened serious bodily injury to a correctional officer. The correctional officer immediately approached Lieutenant Harvey, an on-duty DOC supervising correctional officer, and advised him that Johnson posed a threat of injury to correctional officers or inmates. According to Officer Lovett, Harvey "blew it off" resulting in Johnson being released into the recreational yard with other inmates including Plaintiff. There were no correctional officers in the recreational yard or observing the recreational yard at the time of this incident. Plaintiff was brutally beaten by Johnson.

Plaintiff has made claims of constitutional violations against individual Defendants. Plaintiff has made Eighth Amendment claims on a "failure to protect" theory as well as "a failure to provide adequate medical care" theory as evidenced by the Defendants' deliberate indifference to his serious medical needs.[5] Plaintiff also alleged an Eighth Amendment violation against the supervisory Defendants based on the failure to train/wrongful customs, practices and policies. Additionally, Plaintiff has made a First Amendment claim that he was "punished" by Defendants when the allegations of his Complaint were disclosed to the media as well as to the Governor of Delaware.

---

[4] The specific knowledge of Lieutenant Harvey as it relates to the facts in this litigation will be set forth in substantial detail in the Statement of Facts.
[5] The Court's Memorandum Order also dismissed two theories of recovery: substantive due process as well as the conspiracy claim under 42 U.S.C. § 1985. As was done with the Court's dismissal of some of the parties, for the purposes of this Answering Brief, Plaintiff will not discuss the theories that were dismissed pursuant to Memorandum Opinion and Order.

Plaintiff was released from custody on January 3, 2007. He was available to be deposed in this matter wherein depositions continued until October 24, 2007. For reasons unknown to Plaintiff, Defendants chose not to take the deposition of Timothy Ward.

Plaintiff took the depositions of Defendant Lieutenant John Salas as well as former Correctional Officer Keith Lovett ("Lovett"), who is not a party to this litigation. Lovett's deposition revealed that Lieutenant Paul Harvey had a far more significant and potentially liable role than had been acknowledged by Defendants' in their discovery responses.[6]

Defendants filed their Motion for Summary Judgment and Opening Brief on December 10, 2007. This is Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment.

---

[6] After first being identified in the Supplemental Initial Disclosures filed on August 8, 2007, Plaintiff filed Supplemental Interrogatories seeking the knowledge of Lieutenant Harvey as well as the newly identified witnesses. Harvey's role is described as having responded to the area where Plaintiff was injured, arriving late and finding Plaintiff walking to the infirmary. Harvey was also represented to have been outside the chow hall when inmate Johnson violated the rules and verbally assaulted Officer Keith Lovett. When Lovett testified by deposition at the end of October 2007, for the first time, he revealed that Harvey was well-aware of Johnson's problems and failed to heed Lovett's advice that Johnson was dangerous and should have been segregated from the population.

## SUMMARY OF ARGUMENT

1. Per the standard of review applicable to this case, in order to prevail on their Motion for Summary Judgment, the Defendants must demonstrate that there is no genuine issue as to material facts.

2. Under the standards established by Hamilton v. Leavy, 117 F.3d 742 (3rd Cir. 1997), and other applicable precedent, the evidence as to the actions of Defendant John Salas and Proposed Defendant Paul Harvey establishes genuine issues of material fact with regard to their deliberate indifference to the substantial danger posed to plaintiff Tim Ward, which deliberate indifference provides the basis for direct liability for their failure-to-protect.

3. Under Rhodes v. Chapman, 452 U.S. 337 (1981) and other relevant precedent, the existence of unacceptable conditions of confinement and wrongful practices and policies at DCC, including inadequate staffing and the failure to properly train personnel so as to enable them to respond to dangerous situations while understaffed, violated the constitutional rights of Plaintiff Tim Ward, and evidence of deliberate indifference precludes summary judgment against Defendants Taylor, Howard, Carroll, Salas, and Proposed Defendant Harvey.

4. Under Spruill v. Gillis, 372 F.3d 218, 235-37 (3rd Cir. 2004) and other relevant precedent, the failure of DOC Defendants to afford to Tim Ward adequate medical care in the wake of his beating violated his constitutional right to be free from cruel and unusual punishment, and evidence of deliberate indifference precludes Summary Judgment against Defendants Taylor, Carroll, Howard, and Jessica Davis-Barton.

4

5. Under <u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3rd Cir. 2003) and other relevant precedent, the

actions of DOC Defendants in the wake of Tim Ward's contacts with the media constituted

wrongful retaliation in violation of his constitutional right to freedom of speech, and preclude

Summary Judgment against Defendants Taylor, Carroll, Howard, and Jessica Davis-Barton.

I.    **STATEMENT OF FACTS**

I.    **THE ASSAULT ON TIM WARD: "COULD HAVE BEEN PREVENTED."
      (A000029)**

    A.    **No Correctional Officers in the Recreational Yard: Understaffed and Out of
      Position**

Tim Ward was assaulted in the recreation yard between the housing units T-1 and T-2.

Ward resided in Building T-2. Tim Ward had just completed a work out of lifting weights and

doing push-ups. (B-000001) As Ward was sitting on a picnic table, inmate Robert Johnson

approached Ward from the rear and without warning or provocation, struck Tim Ward on the

right side of his face in the area of his eye socket. *Id.* Inmate Johnson then landed at least one

other blow to Tim Ward's jaw before Tim Ward lost consciousness. *Id.* Other inmates later

reported to Plaintiff that Johnson straddled Ward and repeatedly and brutally punched and kicked

him in the face and head. *Id.*

The attack on Tim Ward was not witnessed by any correctional officers (A000061). In

their Opening Brief, State Defendants cite unsworn witness reports for the proposition that

Officer Drummond "could see into the T-Yard." (Opening Brief at 7).[7]   Plaintiff objects to State

Defendants' further attempts to use these unsworn and unverified Incident Reports as evidence in

this case dispositive motion.

Defendant John Salas was, at the time of the incident, the Area Lieutenant for the area

where the incident occurred. (A000050).   Lieutenant Salas testified that there were no

correctional officers supervising the area where Tim Ward was assaulted. (A000061). Further,

the part of the recreation yard at issue was not observable by the guard tower. (A000061).

---

[7]   Plaintiff takes issue with State Defendants' use of unsworn evidence being used to attempt to dismiss his case.
Further, this is a misstatement of Officer Drummond's Incident Report (A000259). State Defendants are attempting
without sworn or verified evidence to challenge Plaintiff's unrefuted evidence that the inmates in the recreation yard
did not have either correctional officer supervision or observation.

Lieutenant Salas acknowledged that when inmates are out in the yard, it was the responsibility of Unit 28 to be out in the yard. (A000055). Correctional Officer Keith Lovett worked as Unit 28 on the date in question. (A000052). Salas was the supervisor for Unit 28 who was deemed to be the "outside officer." (A000052). The T-1 and T-2 housing units each had a correctional officer assigned, who stayed inside each of their buildings. (A000051). Lt. Salas explained that Unit 28 is to be outside in the yard ninety-nine percent of the time and that this position is tasked to monitor inmate activity when the inmates are out in the yard. (A000055). Salas testified that the only reason for Unit 28 to go inside when the inmates are out in the yard is to check on the status of the building correctional officer. (A000055) The outside officer, Unit 28 is not to do area checks inside the buildings because that is the inside officer's responsibility. (A000055)

At the time of this incident, Salas was in one of the T Buildings. (A000066). Officer Lovett (Unit 28) had supervisory responsibilities for the inmates out in the recreation yard. Lovett was also in one of the T Buildings at the time of the incident doing an area check (A000023). An area check is described as the process of going into the building and doing a walk through and also assisting officers in the building with shakedowns and overall security. (A000023).

Officer Lovett has no recollection of reviewing the standard operating procedures for the Unit 28 position before this incident. (A000021). The testimony of Lt. Salas and Officer Lovett differ markedly with regard to the responsibilities of Unit 28 and whether Lovett should have been in the recreation yard at the time of the incident. Lt. Salas was not aware of the location of Officer Lovett at the time of this incident (A000060). However, Salas did testify that Lovett should not have been doing an area check at the time of this incident (A000060).

7

Lieutenant Salas believes that it is "too great of a responsibility" for one officer to effectively handle the responsibilities of Unit 28. (A000055). Salas expressed his belief about the excess responsibility for Unit 28 to one of his superiors in the chain of command. (A000055). He recalls that this communication was done informally. (A000055). Salas maintains this belief currently with regard to the excessive responsibility for Unit 28 and acknowledges that, "the whole state knows that we're understaffed." (A000056).

B.    The Assailant: "This Dude is Going to Go Crazy." (A000029)

Inmate Robert Johnson was Tim Ward's assailant. Tim Ward did not know Johnson before this incident and had no reason to believe that he would be attacked by Johnson. (TW Affidavit). What Tim Ward did not know was that approximately five months before his assault, Johnson jumped out through a window in another prison building. (B-000028). Johnson received psychiatric intervention and continued taking psychiatric drugs at the time of this assault. Tim Ward also did not know that Johnson was prescribed Ativan, Haldol and Cogentin five days before his assault.[8] These are psychiatric medications that are used in the treatment of psychosis and extreme anxiety. (B-000029).

Officer Lovett supervised the chow hall for lunch on the day of the assault, July 10, 2004. (A000027). During chow, Inmate Johnson became verbally abusive. (A000027). Johnson told Lovett that, "he was going to fuck [Lovett] in the ass." He also called Lovett "a white mother fucker" and stated that "he was going to fuck me in my white ass." (A000027). Lovett described Johnson as having a "glassy-eyed look and [a] look of craziness." (A000029).

Immediately following lunch, Officer Lovett contacted his superior officer, Lieutenant Paul Harvey on the basis of Johnson's verbal abuse as well as Johnson's "glassy-eyed look" and

---

[8]    The records produced by Defendants do not reveal why antipsychotic medications were prescribed at this point or whether Johnson received these medications and was compliant with their prescribed use.

8

his "look of craziness." (A000029). As soon as the inmates were brought back to their housing units, Lovett went to Lieutenant Harvey and said the following: "Lieutenant Harvey, this dude's a problem. This dude is going to go crazy. I don't want to be around when it happens. You better do something." (A000029).

###    C.    Lieutenant Harvey's Response: "He Kind of Blew It Off." (A000029)

In response to Lovett's great concerns over Johnson, Harvey just "kind of blew it off." (A000029). Lovett spoke with Harvey after Johnson went to the infirmary for five or ten minutes and was sent back by the nurse saying that he was "ok." (A000037). Lovett was uncertain as to who sent Johnson to the infirmary.[9] When Lovett asked Harvey about the infirmary visit, Harvey acknowledged that there was no mental health staff on duty at the infirmary. (A000043).

When Lovett spoke with Harvey, Harvey acknowledged to Lovett that he was familiar with Inmate Johnson and that he had had a past incident with Johnson wherein Harvey was assaulted by Johnson in the infirmary. (A000045). Lovett asked Harvey whether he should write a report about Johnson's verbal assaults in the chow hall. Harvey directed that Lovett not write a report on the incident because he knew the inmate's history and that Lovett "should hold back awhile."[10] (A000045). Harvey advised Lovett that Johnson would be seen by "mental health on Monday."[11] (A000046) The incident with Johnson and his assault of Tim Ward occurred on a Saturday.

---

[9] Lovett testified only that he "assumed that Harvey had Johnson taken to the infirmary." (A00037).
[10] Lovett testified that he wrote two incident reports as a result of the incident involving Tim Ward and Robert Johnson. Only one such incident report was produced in discovery despite requests for the second report.
[11] Lieutenant Paul Harvey executed an affidavit on December 18, 2007 in connection with Plaintiff's attempt to add him as a party defendant. In the affidavit, Harvey professes to have "no personal knowledge of the [Ward] incident."

Officer Lovett was concerned that because of the verbal attacks in the chow hall, he believed that Johnson was "having some sort of mental problems and he might be an issue." (A000028). Lovett believed that Johnson should have not been permitted to go out into the T-Yard for recreation. (A000028).

### D.    Lieutenant Salas:    Identified Johnson as the Chow Hall Perpetrator But Failed to Take Any Action

Lieutenant Salas was not aware that inmate Johnson had threatened to rape a correctional officer prior to the attack on Tim Ward. Salas was Area Lieutenant on that shift, and therefore responsible for Inmate Johnson. (A000059). Lt. Salas explained that although he was Area Commander, the reporting chain of command goes from the chow hall officer to the shift commander thereby bypassing Lt. Salas as area commander. Salas testified that this incident should have been reported to him and that it should have been reported to him by Mr. Lovett who was threatened. (A000059). Salas was not aware that Lovett had reported this incident to Lieutenant Harvey. (A000059).

Lieutenant Salas learned of the Johnson chow hall incident sometime after chow. (A000064). He discovered that the inmate causing the commotion was from his area and he went to the T Buildings to get further information. (A000064). He learned of the chow hall incident after talking to another Lieutenant whose identity he could not remember. (A000064).

Salas had a conversation with Lovett as well as the two T-Officers. He learned the identity of Johnson after Johnson returned from the infirmary. Salas recalls that Johnson was going back into the shower at the time he saw him. Officer Lovett relayed to Lieutenant Salas that Johnson was acting out by either "screaming at him or saying stuff to him." (A000065). Lieutenant Salas recalls that Officer Lovett was not concerned about Johnson and that Lovett did not tell Salas that Johnson was a threat. (A000065).

Following his brief visit to the infirmary, Johnson was returned to his housing unit, T-1 and then went out into the recreation yard and assaulted Tim Ward. Lieutenant Salas believes that Johnson may have requested to go out to the recreation yard or that the door to that building could have been unsecured and Johnson just walked out. (A000065, 000066).

## II.    MEDICAL CARE ISSUES

As a result of the assault that occurred on July 10, 2004, Tim Ward sustained numerous and debilitating injuries: a broken nose, a dislocated jaw, damage to his eye, a shattered eye socket, teeth knocked out, twisted, and broken; facial fractures and lacerations; bloody masses; tissue drainage and severe bruising. (B-000002). At this juncture, some three and a half years following the attack, most, if not all, of Plaintiff's injuries have not been addressed. *Id.* In addition to the physical injuries, Plaintiff is suffering from continued psychological damage directly resulting from the trauma he experienced in July 2004 and from the State Defendants lack of care. *Id.*

State Defendants, Stanley Taylor, Paul Howard and Thomas Carroll by virtue of their position within the Department of Correction, have knowledge of Mr. Ward and his numerous requests for medical care. In addition to the media coverage that was generated by this matter, all three defendants were served with the Complaint in this matter in October 2004 just three months after the assault. The issues of Tim Ward's medical care were either known to them or certainly could have been known to them throughout the time of Tim Ward's incarceration which ended in January 3, 2007.

Throughout the course of his incarceration following the July 10 incident, Tim Ward filed innumerable grievances as a result of not getting the medical attention that he sought. (B-000002). In addition, there were numerous times where he was without medication prescribed

11

by physicians and, in particular, pain medication which was necessary for his functioning. *Id.* Tim Ward has been advised by various medical providers that he needs surgery for his orbital fracture, nasal surgery to repair a deviated septum, dental surgery as well as surgery for his jaw. *Id.* None of these surgeries were completed when Tim Ward was an inmate.

Tim Ward also continues to have significant difficulties with migraine headaches and hearing problems that were not addressed during his incarceration.

## III.    RETALIATION FOR MEDIA CONTACT AND CONTACT WITH THE GOVERNOR

For the first two months following the incident, Tim Ward and his family attempted to get medical attention for his various injuries. (B-000002). As a result of lack of medical care given to Tim Ward including the fact that he had not been examined by a medical doctor since the day of the attack, Tim Ward's family hired legal counsel.

Tim Ward's counsel contacted Governor Minner's office requesting that proper medical attention be given to Tim Ward. (B-000003), In apparent response thereto,[12] Tim Ward was sent to the infirmary resulting in less medical care than he received previously. *Id.* In the infirmary, he was, at times, deprived of food and medicine. *Id.* An article regarding the assault on Tim Ward and his lack of medical care appeared in the Wilmington News Journal in early September. *Id.*

Following a nine-day stay in the prison infirmary, Tim Ward was transferred from the prison population and put into isolation. (B-000004). The State Defendants contend that Tim's placement in "protective custody" was necessitated by an altercation that Tim had with another inmate. Plaintiff, believes otherwise because that other inmate did not receive the same treatment. *Id.*

---

[12]  Plaintiff was sent to the infirmary within a couple of days of his counsel's contact with the Governor's office.

Tim Ward was seen by a family physician as well as by an ophthalmologist in the fall of 2004. Both physicians urged that immediate follow-up evaluation and treatment to include surgery be performed. (B-000003). Such evaluation and treatment did not occur while Tim Ward was incarcerated. *Id.*

Plaintiff believes that his reassignment to isolation (protective custody) and the lack of adequate medical care are, in part, due to retaliatory conduct as a result of Plaintiff and Plaintiff's family's contact with government officials (the Governor) and the news media. (B-000004).

## ARGUMENT

### I.    STANDARD OF REVIEW

To the standard of review set forth by the defendants in the Opening Brief, we would add only the following basic propositions: (1) that he moving party bears the burden of proving that no genuine issue of material fact exists, see <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 n.10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); and (2) that the court is to view the underlying facts and all reasonable inferences there from in the light most favorable to the party opposing the motion, <u>Pennsylvania Coal Assn. v. Babbitt</u>, 63 F.3d 231, 236 (3rd Cir. 1995).

### II.    THE DELIBERATE INDIFFERENCE OF DOC PERSONNEL TO THE DANGER POSED BY INMATE ROBERT JOHNSON, AND THEIR FAILURE TO PROTECT PLAINTIFF TIM WARD AT THE TIME AND IN THE VICINITY OF THE BEATING INFLICTED UPON HIM BY INMATE JOHNSON, VIOLATED WARD'S CONSTITUTIONAL RIGHTS.

#### A.    Third Circuit case law

The Third Circuit standard governing an action alleging that prison personnel failed to protect an injured plaintiff inmate is set forth in <u>Hamilton v. Leavy</u>, 117 F.3d 742, 746 (3rd Cir. 1997):

> For an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met. First, the prisoner must demonstrate "that he is incarcerated under conditions imposing a substantial risk of serious harm." . . . Second, the prison officials involved must have a sufficiently culpable state of mind. . . . Specifically, the inmate must show that the official "knows of and disregards an excessive risk to inmate health or safey; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." . . .
>     Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. §1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. . . . [Citations and portions of text omitted].

14

The Hamilton v. Leavy opinion involves a factual context with many similarities to the instant inquiry, and is thus instructive. Plaintiff therein had been the victim of many assaults within the Delaware prison system (stabbings; attacked with a chair; etc.), and additional threats of assault. On at least one occasion, in 1986, he had cooperated with an official investigation into drug trafficking that had led to the arrest of officers and inmates at Gander Hill, placing him in danger as a result of being identified as a "snitch." He had been transferred on numerous occasions over the years, sometimes to out-of-state facilities. In late 1991, he was transferred from a Virginia prison back to Gander Hill for the purpose of prosecuting two actions in the Delaware courts, one of which was an action against Delaware prison officials. When a guard called him a "good telling mother f---ing snitcher," an investigation was performed and a meeting of the Multi-Disciplinary Team ("MDT") at Gander Hill was convened. The MDT unanimously recommended that plaintiff be placed in protective custody. But despite their own recommendation, the MDT members took no immediate action to protect plaintiff, and shortly thereafter the DOC Central Institutional Classification Committee ("CICC") made a unanimous decision to take "no action." Less than two months after this "no action" decision, plaintiff was assaulted by a prisoner, resulting in the need for surgery and metal plates to repair plaintiff's two jaw fractures. The perpetrator stated that he had attacked plaintiff because he was "a snitcher on inmates and officers" at Gander Hill.

Plaintiff Hamilton thereafter filed suit against three members of the MDT and the chairperson of the CICC, alleging deliberate indifference to his Eighth Amendment rights based upon their failure to protect him as a result of their failure to place him in protective custody. The District Court *granted* summary judgment against all defendants; the Third Circuit then *reversed*

as to all defendants. The Third Circuit opinion begins by noting the following basic propositions

applicable to a failure-to-protect claim:

> The Eighth Amendment prohibition against cruel and unusual
> punishment protects prisoners against the "unnecessary and
> wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319,
> 89 L.Ed.2d 251, 106 S.Ct.1078 (1986) (internal quotation marks
> omitted). This constitutional limitation on punishment has been
> interpreted to impose a duty upon prison officials to take
> reasonable measures "'to protect prisoners from violence at the
> hands of other prisoners.'" Farmer v. Brennan, 511 U.S. 825, 114
> S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting from Cortes-
> Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.
> 1988)). While "it is not . . . every injury suffered by one prisoner at
> the hands of another that translates into constitutional liability for
> prison officials responsible for a victim's safety," "being violently
> assaulted in prison is simply not 'part of the penalty that criminal
> offenders pay for their offenses against society.'" Farmer, 114
> S.Ct. at 1977 (quoting Rhodes v. Chapman, 452 U.S. 337, 345, 69
> L.Ed.2d 59, 101 S.Ct. 2392 (1981)). Accordingly, "[a] prison
> official's deliberate indifference to a substantial risk of serious
> harm to an inmate violates the Eight Amendment." Id., at 1974.

117 F.3d at 746.

Against the backdrop of these principles, the Third Circuit then analyzed the facts presented by

plaintiff Hamilton's claim for the presence of the three required factors: (1) substantial risk of

serious harm; (2) deliberate indifference of defendants; and (3) causation. The analysis was

applied first to the defendant chairperson of the CICC, then to the MDT defendants. We will

consider each of these analyses in turn.

First, as to the CICC chairperson (see generally, 117 F.3d at 746-748), the Third Circuit

noted that the District Court had relied upon the chairperson's affidavit, which stated that "'there

was no evidence of a problem'" at Gander Hill, for its finding that there was no credible

evidence of a substantial risk of serious harm. The Third Circuit found that the District Court's

reliance on this affidavit for the proposition that there was no risk of serious harm to plaintiff

was misplaced; rather, the Third Circuit found that the MDT's unanimous recommendation for protective custody constituted evidence of a substantial risk of serious harm, satisfying for summary judgment purposes the first of the three required factors. As to the second required factor, deliberate indifference, the Third Circuit found that the chairperson's decision to ignore the MDT's recommendation, combined with the chairperson's knowledge that plaintiff had required protective custody in the past, was sufficient to create a genuine issue of fact on the issue of deliberate indifference. Finally, on the third factor, namely causation, the Third Circuit found that the close proximity in time of the attack to the failure to authorize protective custody (i.e. within two months) was sufficient to create a genuine issue of fact as to causation; while not using the word "causation," this conclusion is the necessary implication from the discussion at the end of section 4(A) of the opinion, 117 F.3d at 748.

The Third Circuit's analysis with regard to the MDT defendants (117 F.3d at 748-749) first noted that the MDT defendants failed to act on their own recommendation for protective custody, both prior to the CICC's decision rejecting their recommendation, and after that decision. The District Court found that the MDT had acted reasonably in submitting its recommendation to the CICC, precluding liability to plaintiff. The Third Circuit noted the holding in Farmer that a prison official who responds reasonably to a risk to an inmate's safety cannot be found to have acted with a sufficiently culpable state of mind (i.e. deliberate indifference), but found that the analysis in the Hamilton matter could not and should not end with only a consideration of the MDT's mere act of providing a recommendation to the CICC. Indeed, the Third Circuit's statement on this point, and its application to plaintiff Hamilton's claim, is compelling:

> The MDT defendants stated in their affidavits that they "did everything they could" with respect to ensuring Hamilton's safety

17

when they recommended he be placed in protective custody. But
the district court's refusal to consider whether the MDT defendants
could have taken further action failed to give Hamilton the benefit
of all reasonable inferences, to which he is entitled, as the non-
movant. Indeed, Hamilton's counter-argument, asserted in his pro
se complaint, is that the MDT defendants could have taken
additional steps, such as place him in administrative segregation.
Because neither party presented conclusive evidence on this issue,
there remains a genuine issue of material fact regarding whether
the MDT's response to the risk Hamilton faced was reasonable.
Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S.
574, 586, 89 L.ED.2d 538, 106 S.Ct. 1348 (1986) (to survive
summary judgment, non-movant must only show more than "some
metaphysical doubt as to the material facts"); Big Apple BMW,
Inc. v. BMW of North America, 974 F.2d 1358, 1363 (3rd Cir.
1992); ("To raise a genuine issue of material fact [the] opponent
need not match, item for item, each piece of evidence proffered by
the movant.  In practical terms, if the opponent has exceeded the
'mere scintilla' threshold and has offered a genuine issue of
material fact, then the court cannot credit the movant's version of
events against the opponent...."); Ely v. Hall's Motor Transit Co.,
590 F.2d 62 (3d Cir.1978) (any doubts as to the existence of a
genuine issue of material fact will be resolved against the movant).
The failure of the MDT defendants to take additional steps beyond
the recommendation of protective custody could be viewed by a
factfinder as the sort of deliberate indifference to inmate safety that
the Constitution forbids.

117 F.3d at 748-749.

The Third Circuit thus carefully scrutinized the full factual context in Hamilton v. Leavy, rather

than relying on knee-jerk reactions to isolated facts, and specifically noted their obligation to

avoid crediting one side's facts over the other side's facts at the summary judgment stage.

Indeed, the Third Circuit's careful consideration of the facts continued, in a later decision in the

same matter on the issue of, inter alia, qualified immunity, Hamilton v. Leavy, 322 F.3d 776 (3rd

Cir. 2003), and later still, after plaintiff had named additional CICC members as new defendants,

in a District Court opinion that denied a subsequent summary judgment motion as to both the

original defendants and all the new defendants, Hamilton v. Leavy, 2004 WL 609334 (D.Del.,

Jordan J., March 24, 2004).

Finally, a brief consideration of the case of Beers-Capitol v. Whetzel, 256 F.3d 120 (3rd

Cir. 2001) is in order. The Third Circuit in that case applied the principles of Hamilton v. Leavy

in a context where a female resident of a youth detention center alleged that she had been

improperly sexually assaulted by an employee of the facility, Mr. Whetzel. An allegation of

direct liability for deliberate indifference (as opposed to mere supervisory liability) was directed

against a counselor in that facility, one Nora Burley. The Third Circuit stated as follows:

> The plaintiffs' deliberate indifference claims against Burley center
> solely on direct liability, as Burley was not a supervisor.    The
> plaintiffs present fairly substantial evidence of Burley's knowledge
> or awareness of the excessive risk that Whetzel posed to the female
> residents.    Burley testified in a deposition that, while she was at
> YDC, she had heard general rumors from the residents that
> Whetzel was having sex with some of the female residents, but she
> did not investigate these rumors or report them to her supervisors.
> She did, however, make file notes of these rumors "[t]o cover my
> behind, in case it were true."
>     Burley was also told on a couple of occasions that Guyaux
> [another resident] claimed to have a sexual relationship with
> Whetzel.    Burley did not inform her supervisors of this allegation,
> but instead set up a meeting with Whetzel, Guyaux, and another
> counselor to ask Guyaux about it.    Burley also testified that she
> knew McAfee had a sexual interest in Whetzel, although she did
> not report or investigate this.    Finally, and most tellingly, Tate
> testified in her deposition that Burley admitted to her that "she
> kind of knew that [Whetzel] was messing with students" when
> Tate told Burley of Whetzel's assault on her.
>     We are satisfied that the plaintiffs have presented sufficient
> evidence to raise a genuine issue of material fact as to Burley's
> deliberate indifference to the excessive risk Whetzel posed to the
> plaintiffs. [Footnotes and internal references omitted]

As will be seen below, the evidence of the knowledge of a potential problem held by defendant

Salas and proposed defendant Harvey compares favorably in scope and character to that set forth

in Beers-Capitol.

Correctional Officer Keith Lovett had a slightly different description of the duties of the "rover," i.e. Unit 28, which he was performing that day, in particular providing an expanded description of Unit 28's responsibility for area checks inside the buildings (p.43-45, A000023):

> Q. You've used the term area check a couple of times and I meant to ask you what that means.
>     Could you describe that to us, please?
> A. As part of your responsibilities of working that unit number you would have to perform area checks within your assigned area, which would mean going into buildings, doing walk-throughs through the buildings, also assisting officers in the building with shakedowns and overall security of that assigned area.
>     In addition, you would do fence checks and walk-throughs within your area. You –
> Q. I'm sorry. You said fence checks and walk-
> A. Fence checks and walk-throughs through the areas.
>     In addition, you would also check locks and chains that we use to secure the T gates to make sure that they had not been tampered with or were missing or were messed up in any way.
> Q. Some of those area checks you just described are obviously outside the building?
> A. Yes.
> Q. Could you be specific in terms of what type of area checks you performed in the buildings, either T1 or T2?
> A. You would go in the building. You would do an area check in the bathroom. You would check the bathrooms using your senses of observation, sight, smell, hearing. You would go in the bathroom and observe the bathroom area. You would do a walk through the area within the T buildings. You would check, you would check the overall areas of the building. You would check that the doors were secured. There's an exit door that needed to be secured in each building.
> Q. Let me ask you because it's not clear to me. I understand that there's an officer that's assigned to in this case the T2 building.
>     What responsibilities did you have that differed from the officer who was assigned to the inside of the building?
> A. None that I can recall inside the building. You were sort of assisting in his area checks as well.

And then C.O. Lovett provided one final clarification of an "area check" done by "Unit 28," the role assigned to him that day (p. 48-49, A000024):

22

A. . . .The outside and the inside is part of one area check It's one complete unit, one complete area check. You check outside, check the fence line, check the locks, check the building, check the surrounding building, check the bars, check the gates, check the coverings on the windows, so on and so forth.

**After you do your outside, you do the inside. You do a walk-through within the building. You go in the bathroom. You walk up through the building. You check that the fire door is secured.** At that time after you're done with one complete area check, you sign the sheet saying that you've completed an area check. [Emphasis supplied]

Essentially, then, Lieutenant Salas stated his belief that the tasks assigned to Unit 28 were too much for one person to perform, and C.O. Lovett, who was actually assigned the tasks of Unit 28 on July 10, 2004, described those tasks as involving even *more* inside "area check" work than did Salas.

Now that the duties have been described, we turn to a consideration of the events surrounding the July 10, 2004 beating of Mr. Ward. Salas testified that he did not know that the chow hall incident involving C.O. Lovett and inmate Johnson was occurring *at the time* it was occurring because he was covering a different chow hall (Salas deposition, pages 40-41, A000058). Salas described his contemporaneous understanding as follows (p.41, A000058):

Q. So under the procedures that you had in place being the area commander, if you will, were you not supposed to receive notice from the correctional officers, the correctional sergeants that this type of thing was happening.

MS. BALLARD: Objection as to the form.

A. Well sir, we had chow activity going on when it was happening. I was also assigned to monitor the noon meal. I was inside a chow hall. What had occurred was in a different chow hall and it's an ongoing, you know, process **where there's not enough time, there isn't time to sit down and debrief me of what had happened in the chow hall.** It was taken care of by the Lieutenant.

Each chow hall had a lieutenant in it and that lieutenant took care of the situation in that chow hall. At that moment that's there primary responsibility. [Emphasis supplied].

23

Lieutenant Salas did, however, become aware of the chow hall incident prior to the attack on Mr.

Ward (p.56-57, A000062 ):

> Q. . . . At what point did you become aware that some inmate had
> acted out at noon chow?
> A. It was after chow, I believe, right after chow activities were
> completed.
> Q. And who told you that?
> A. I don't recall who it was. I'm not even sure if it was Mr. Lovett
> that had said something. I just was informed that there was an
> incident and Mr. Lovett's name came up and that the inmate was
> taken to the infirmary.
> Q. At that point when you were first informed about the chow
> incident, were you aware that the inmate that acted out was Robert
> Johnson?
> A. No.
> Q. Were you aware that the inmate that acted out was Robert
> Johnson at any time prior to the time that Mr. Ward was assaulted?
> A. No, not by name. **Prior to Mr. Ward being assaulted, I was
> shown the inmate that had been returned to T2,** I believe, to his
> housing unit.
> Q. I'm sorry. Did you say you were shown him?
> A. Yes. That the housing officer – I went to the housing unit and I
> asked the officer, because I was told that he had already been
> returned back to his building, who the inmate was and it was
> pointed at that time who I now believe is Robert Johnson.
> [Emphasis supplied]

Lieutenant Salas went on to testify (p.57-58, A000062 to A000063) to his agreement that the

time when Johnson was pointed out to him was "obviously" before the assault, that the inmates

from building T2 were authorized to be out in the yard at that time, and that although inmates

must elect whether to be in or out during yard time ("It's either you stay in or you stay out," page

58, A000063), that if an inmate is returning from a destination (as inmate Johnson was returning

from the infirmary) after yard has started, the inmate can request to be allowed to go in the yard.

He further testified *that he had the authority* to send someone like Mr. Johnson back to the

infirmary if he was "creating another commotion" (p.60, 61, A000063).

24

When asked whether he had learned about inmate Johnson's visit to the infirmary at the time he first saw Johnson in the T2 building, prior to the attack, Lieutenant Salas testified (p.66-67, A000065):

> A. **Yes. He was returned from the infirmary and that he was identified and I was shown who the inmate was.** And at that time I don't recall the name, but it was a black inmate, African-American, roughly five foot six to five foot eight and he was going into the shower when I saw him. And that was the last I had seen of the inmate for that day.
> \*\*\*
> Q. And what do you recall, if anything, that Officer Lovett related to you about the incident?
> A. **Just the way the inmate was acting out, was either screaming or saying stuff to him.** I don't recall the whole detail. [Emphasis supplied]

Lieutenant Salas related one other significant detail in his deposition, namely that inmate Johnson was able to access the recreation yard where the attack occurred either by the standard procedure whereby an inmate returning from somewhere (in the case of inmate Johnson, the infirmary) could request to go to the yard (p.69, A000065), or the following (p.70, A000066):

> A. The other thing is that **the door to that building could have been unsecured and Johnson just walked out.** I don't know. But those are the possible ways he could have gotten out to the yard. [Emphasis supplied]

Finally, C.O. Lovett stated in his e-mail recitation of relevant events that Lieutenant Harvey had told him, after inmate Johnson had been returned to the T area from the infirmary, that inmate Johnson had not even been seen by a mental health professional: "I then asked Lt. Harvey if everything was ok, he stated that there were no mental health staff on duty, so he would be seen by mental health on Monday" (page A000046).

In sum, the jury in this matter could reach the following conclusions with regard to the above-related testimony of Lieutenant Salas and C.O. Lovett:

· Salas understood that the responsibility of the roving officer assigned as Unit 28 (i.e. Lovett) was overwhelming and, in his opinion, too much for one person.

· Salas had a belief that there was understaffing in Unit 13, which included the area of the assault.

· Salas knew that there had been an incident at chow hall involving an inmate (i.e. Robert Johnson) whose name he did not know ***but who was directly identified to him, in person in the T building, prior*** prior to the attack on plaintiff Ward.

· Salas was aware that the incident involving inmate Johnson was severe enough that Johnson had been sent to the infirmary.

· Salas was aware that Johnson had been ***acting out and screaming*** at Lovett in chow hall.

· Salas was aware that an inmate like Johnson could be sent back to the recreation yard, since Johnson had just arrived at the T building from the infirmary, and Salas further understood that it was possible that the security door to the yard may have been unsecured, enabling Johnson to simply walk out.

· Salas had the authority to send Johnson back to the infirmary if he was causing a commotion.

· Inmate Johnson had not been seen by a mental health professional at the infirmary.

To reiterate from section I.A above, the three factors to be proven in the Third Circuit on a failure-to-protect claim are: (1) substantial risk of serious harm; (2) deliberate indifference of defendants; and (3) causation. As described above in the Statement of Facts and reiterated further below in the discussion about proposed defendant Paul Harvey, it was clear (from C.O. Lovett's testimony) that inmate Johnson posed a substantial risk of serious harm; with Lovett's testimony, there is at the least a genuine issue of material fact on this point. Moreover, in terms of causation, it is not disputed that it was Johnson's presence in the recreation yard and Johnson's violent attack that caused the injuries suffered by plaintiff Ward on July 10, 2004; this attack occurred

just a few minutes after inmate Johnson was returned from the infirmary, so causation would not seem to be at issue, should deliberate indifference be found. The main issue, then, for the purposes of summary judgment on the claims against defendant Salas is whether the various bulleted points set forth immediately above, viewed in a light most favorable to Mr. Ward, could form the basis for a finding of deliberate indifference sufficient to justify a jury verdict in favor of Mr. Ward against Lieutenant Salas.

Mr. Ward submits that, taking into account the analysis of the Third Circuit in Hamilton v. Leavy, there exists at the least a genuine issue of material fact on the assertion of deliberate indifference on the part of defendant Salas. Just as an attack *on* plaintiff Hamilton was reasonably foreseeable based upon the circumstances in that case, so an attack *by* inmate Johnson was reasonably foreseeable in the immediate aftermath of the chow hall incident, particularly given the fact that, as noted above in the Statement of Facts, that no one from the Department of Correction was present providing supervision of the recreation yard at the time and place of the attack. Thus, given Lieutenant Salas's belief as to the difficulties faced by the Unit 28 rover in performing an "overwhelming" series of tasks, and his understanding of the seriousness of a chow hall incident that had resulted in an inmate being sent to the infirmary to be checked, as well as the fact that Johnson had been specifically pointed out to him inside building T1 after Johnson's return and identified as the inmate who had been involved in the incident; and, finally, his understanding of Johnson's potential access to the recreation yard by either a request or through an unsecured door, a jury could reasonably find that his failure to ensure that inmate Johnson would, at the least, be observed and supervised during his yard time constituted deliberate indifference to a substantial threat that resulted in the devastating attack on plaintiff Ward. Just as a jury question existed as to whether the MDT defendants in Hamilton v. Leavy

27

could have done more in that case, and just as a jury question existed as to whether the CICC

defendants in that case had properly ignored the factors that warned of danger to plaintiff

Hamilton therein, so there is jury question herein on the appropriateness of the actions of

Lieutenant Salas.

Finally, the holding of the Third Circuit in <u>Beers-Capitol v. Whetzel</u> described above

with regard to defendant Burley in that case militates strongly in favor of a finding that summary

judgment is inappropriate as to defendant Salas herein. Salas was at least as well-informed and

on notice of a potential danger as was defendant Burley in that case.

### C.    Proposed Defendant Paul Harvey

Correctional Officer Lovett provided dramatic testimony with regard to his interactions

with Lieutenant Paul Harvey relating to the chow hall incident with inmate Johnson, as set forth

above in the Statement of Facts. Lovett's testimony is powerful insofar as he is adamant both as

to his dislike for inmates, and yet his belief that plaintiff inmate Tim Ward suffered

unnecessarily in this instance, largely as a result of Harvey's failure to heed his warnings. His

testimony about what happened after the chow hall incident but before the attack on Mr. Ward

will be compelling at trial, and is worth considering at length (p. 65-69, A000028 to A000029):

> A. So this is true and honestly when this whole thing, when I found
> out that I would have to come here – I don't support inmates by
> any means. I don't support nothing about inmates.
> Q. You don't support Tim Ward, do you?
>     MS. BALLARD: Objection to the form.
> A. As far as you made the statement that Tim considers me a
> friend, I'm not a friend to any inmate.
>     What happened that day was wrong. It could have been
> prevented. After that incident happened, I went to Lieutenant
> Harvey, told Lieutenant Harvey "This guy's got some problems.
> This dude's got some major fucking problems. He's going to bust
> loose. Something is going to go down."
> Q. Excuse me. But tell me, when did you see Lieutenant Harvey?
> Right after this happened?

A. Right after. When the inmates were brought back to the building, I went to Lieutenant Harvey and said, "Lieutenant Harvey, this dude's a problem. This dude is going to go crazy. I don't want to be around when it happens." I said, "You better do something," in which case C/O Dunn took Robert Johnson over to the infirmary. The infirmary said there was nothing wrong with him; he was fine. He went back to the building and then did what he did.

And I don't know if you guys have that on record, if you even knew that that had happened, but that was something that I really had planned to keep to myself, but being that I'm here I don't want to come off that I'm hiding anything or anything. And as much as I don't support inmates suing anybody and I can't stand fucking inmates, to be honest with you, I'm not going to sit here and bullshit through this thing. I'm going to tell you the truth. I'm going to tell you exactly what happened no matter who stands to gain the most out of this situation.

The situation could have been prevented and I'm just going on record as saying that. No matter what happens here, I want to be honest and I want to be truthful to the whole situation and that's it because I've been struggling with that situation for a while.
***

Q. What was Harvey's response to your great concern that you expressed to him immediately after this happened.

A. He kind of blew it off.

Q. Did he acknowledge that he knew anything about Robert Johnson?

A. Yes. He probably, he probably had said something to the fact that he was just, he was just, he was just talking shit and he was, you know, just, just, just another crazy inmate.

Q. How long did you talk with Lieutenant Harvey?

A. Just for a couple of minutes. The lieutenant would be out on the boulevard at the boulevard gate.

I distinctly remember going back and going back after the inmates were secured in the building and told Harvey what had happened. I was more alarmed at the fact that Robert Johnson was kind of glassy eyed and he kind of was real shitty looking when the incident had taken place in the chow hall. And I didn't feel uncomfortable or anything with him in the chow hall. I did feel like, you know, he could have incited other inmates to misbehave, but fortunately the situation went very smoothly after that. I think that the other inmates kind of laughed at him and the fact that he was misbehaving and acting the way he was. I think that I showed great restraint in dealing with what he was doing in the chow hall, but his glassy-eyed look and his look of craziness really brought me to want to contact Lieutenant Harvey on the situation.

29

. . . At that time I went over to sp20/sp21 where Lt Harvey was running chow, I then asked to speak to him and he agreed. I then notified him of the incident that just took place. I told him I was not a snitch and was not concerned about the Sgt in the chow hall but more about inmate Robert Johnson, and that he seemed like he wasn't thinking straight. At that time he notified me that he was familiar with that inmate and that he had a past incident with him. He also notified me that he was the guy who jumped out the window in W building, he also told me he was assaulted by the same inmate in the infirmary. I at that time asked Lt Harvey did he want me to write a report on the chow hall incident, he stated that he knew the inmates history and that I should hold back a while and he would go see him after chow.

When chow was over, Lt Harvey came to T-1, then called unit 25/26 to help escort Robert Johnson to the infirmary. Within 10 mins Robert Johnson was returned to T-1, I then asked Lt Harvey if everything was ok, he stated that there was no mental health staff on duty, so he was seen by a nurse who then informed Lt Harvey that he would be seen by mental health on Monday.

It is undisputed, then, that, based upon the above evidence, the following factors pertain to

Lieutenant Harvey's involvement in this matter:

· Harvey was aware that Lovett was extremely concerned about inmate Johnson's "glassy eyed" stare and "look of craziness," and Lovett's concern that Johnson was going to "bust loose" and that something was "going to go down," because Lovett warned him about these things *directly.*

· Harvey was aware that no mental health person had evaluated inmate Johnson in the infirmary.

· Harvey had returned inmate Johnson to the general prison population in the area of the T buildings without properly providing for appropriate surveillance of Johnson.

· Harvey failed to provide Lieutenant Salas with sufficient information with regard to the failure to have Johnson seen by a mental health evaluator, as well as the existence of the prior incident where Johnson attempted to jump out a window and the prior altercation between Johnson and Harvey that had occurred at the infirmary.

All these items create genuine issues of material fact with regard to Harvey's liability. Just as the

mere existence of a decision by the CICC that there would be no protective custody of the

plaintiff in <u>Hamilton v. Leavy</u> did not absolve the MDT defendants therein of their further responsibility to act without deliberate indifference to what they perceived as a serious threat, so the act of the infirmary nurse in releasing Johnson without a mental health evaluation did not absolve defendant Harvey of his responsibility to act reasonably and without deliberate indifference to the serious danger that Johnson posed to other inmates (or, for that matter, other DOC personnel) in the agitated state so graphically described by C.O. Lovett. Moreover, just as the <u>Beers-Capitol v. Whetzel</u> holding re defendant Burly therein strongly implies the existence of at least a genuine issue of material fact as to proposed defendant Harvey herein, just as it did for defendant Salas as described above.

**III.    THE EXISTENCE OF UNACCEPTABLE CONDITIONS OF CONFINEMENT AND WRONGFUL PRACTICES AND POLICIES AT DCC, INCLUDING INADEQUATE STAFFING AND THE FAILURE TO PROPERLY TRAIN PERSONNEL SO AS TO ENABLE THEM TO RESPOND TO DANGEROUS SITUATIONS WHILE UNDERSTAFFED, VIOLATED THE CONSTITUTIONAL RIGHTS OF PLAINTIFF TIM WARD.**

In <u>Rhodes v. Chapman</u>, 452 U.S.337 (1981), the U.S. Supreme Court first expressly found that "[c]onditions . . ., alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusal . . .", 452 U.S. at 347. The concurring opinion notes the importance of judicial intervention to remedy such deprivations:

> Public apathy and the political powerlessness of inmates have contributed to the pervasive neglect of the prisons. . . . Prison inmates are 'voteless, politically unpopular, and socially threatening.' . . . Under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions. Insulated as they are from political pressures, and charged with the duty of enforcing the Constitution, courts are in the strongest position to insist that unconstitutional conditions be remedied, even at significant financial cost.

452 U.S. at 358-359 [citations and portions of text omitted].

The instant matter presents this Court with precisely the sort of unconstitutional conditions that lead to inhumane outcomes. The major culprit here: the chronic understaffing of Delaware's prisons. Over time, understaffing leads to tragedies like that which befell plaintiff Ward herein. The constellation of factors at play on July 10, 2004 - a crazed inmate like Robert Johnson; an ineffectively monitored and temporarily unsupervised exercise yard in the T-area; unheeded warnings from Corrections Officer Keith Lovett; and an unsuspecting victim like plaintiff Tim Ward, in the wrong place at the wrong time and without eyes in the back of his head – were a time bomb waiting to explode. Lieutenant Salas expressed his belief that no one person could perform the responsibilities assigned to C.O. Lovett as Unit 28. There appeared to be no adequate procedure in place to insure that an inmate like Robert Johnson, who had not received a mental health screening at the infirmary, would be adequately supervised until such time as a mental health screening occurred.

In the case of Beers-Capitol v. Whetzel, 256 F.3d 120, 130-135 (3rd Cir. 2001), the Third Circuit summarized deliberate indifference analysis with regard to a threat of violence as follows:

> From Farmer and Hamilton we extract the following precepts. To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837, 114 S.Ct. 1970. The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. See id. at 837-838, 114 S.Ct. 1970. **However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the extent that the excessive risk was so obvious that the official must have known of the risk.** See id. at 842, 114 S.Ct. 1970. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know

> of the risk, he took reasonable steps to prevent the harm from
> occurring. *See id.* at 844, 114 S.Ct. 1970.

256 F.3d at 133 (emphasis supplied).

Thus, while "*should* have known" liability is insufficient, it is replaced by a close analog, "so obvious that the official *must* have known." The Beers-Capitol opinion differentiates the nature of this liability as between the *direct* deliberate indifference of those defendants "on the scene," so to speak (such as Salas and Harvey, whose conduct allowed the agitated inmate Johnson to be in the prison yard immediately prior to the beating of Mr. Ward) versus the less direct deliberate indifference implicating supervisors for deficient policies (see extended discussion in Beers-Capitol, 256 F.3d at 133 to 135 with regard to the applicable tests, and at 135 to 143 with regard to specific application of the tests to various classes of defendants). In this case, the less direct claim is made against supervisors Salas and Harvey, as well as defendant administrators Stanley Taylor, Paul Howard, and Thomas Carroll.

As noted in Beers-Capitol v. Whetzel, claims against supervisors for deficient policies must meet the four-part test of Sample v. Diecks, 885 F.2d 1099, 1118 (3rd Cir., 1989). Under Sample, to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury, (2) the supervisor was aware that the unreasonable risk was created, (3) the supervisor was indifferent to that risk, and (4) the injury resulted from the policy or practice.

The existence of an understaffing problem was expressly noted by Lieutenant Salas; indeed, as he testified, "the whole state knows that we're understaffed" (p. 30 of his deposition, found at A000056). He testified that he may have relayed this information to superiors

informally, "in passing" (p.29, A000055). The plain fact of the matter is that understaffing has

been a longstanding and chronic problem at DCC, and in the DOC in general. As Salas testified

with regard his ability to take the time to compare notes with the lieutenant in charge of the chow

hall where inmate Johnson had originally acted up, "there's not enough time, there isn't time to

sit down and debrief me of what had happened in that chow hall. It was taken care of by the

lieutenant" (p. 41, A000058). When one looks at all the factors that contributed to the beating of

Tim Ward as they are discussed in section II above, it becomes disconcerting to recognize that

all these factors took place in a context in which:

> · there was apparently no policy in place which would guide
> correctional officers as to how to handle a context in which an
> agitated inmate such as Robert Johnson has been taken to the
> infirmary for evaluation, and then sent immediately back into the
> general prison population on the grounds that no mental health
> evaluation would be available that day (a policy insuring that such
> an inmate would be carefully watched or even segregated from
> other inmates, or individually locked down, would have been
> appropriate under such circumstances);
>
> · there was apparently no policy in place insuring that an area
> commander such as Lieutenant Salas would be properly debriefed
> on the status of inmates returning to his care after a chow hall
> marred by a "glassy eyed" inmate with a "look of craziness";
>
> · there was no policy in place to insure that inmates in the T
> building recreation yard would be properly supervised while the
> "rover" officer (in this case Mr. Lovett) was performing required
> *inside* work, whether area checks or simply checking on the safety
> of another inside officer;
>
> · there was no policy in place to insure that all responsible
> correctional personnel would be made aware of the identity of an
> inmate who had attempted to jump out of a window such as Mr.
> Johnson;
>
> · there was no policy in place enabling Lieutenant Salas to learn in
> a timely fashion not only that Johnson had jumped out a window,
> but also that he had had an earlier altercation with Lieutenant
> Harvey in the infirmary; and

· there was no policy in place providing adequate numbers of
security personnel to maintain order in the recreation yard of the T
buildings and prevent the sort of hideous beating suffered by Mr.
Ward.

All these policy problems are so obvious that Defendants must have known of their existence

and could have remedied the unreasonably dangerous conditions created thereby, and their

failure to do so has resulted in the serious injuries suffered by Mr. Ward. Moreover, there were

no proper policies in place to insure that an inmate injured to the serious extent that Mr. Ward

was injured would receive proper medical treatment (see generally, discussion in next section).

IV.    THE FAILURE OF DOC DEFENDANTS TO AFFORD TO TIM WARD
        ADEQUATE MEDICAL CARE IN THE WAKE OF HIS BEATING VIOLATED
        HIS CONSTITUTIONAL RIGHT TO BE FREE FROM CRUEL AND UNUSUAL
        PUNISHMENT.

As noted in the Statement of Facts, Tim Ward was not deposed by defendants in this

matter. He has filed an affidavit which appears at B-000002 to B-000004. This affidavit reads, in

pertinent part:

Johnson initially struck me on the right side of my face in the area
of my right eye. He landed at least one other blow before I may
have lost consciousness. I later learned from other inmates that
Johnson straddled me and repeatedly and brutally punched and
kicked me in the face and head. . . . As a result of the assault, I
suffered the following injuries: a broken nose; dislocated jaw;
damage to my right eye; a shattered eye socket; teeth knocked out
and/or twisted and/or broken; numerous facial fractures; numerous
facial lacerations; bloody masses; tissue damage and severe
bruising. I am suffering from continuing psychological injuries as I
continually relive the assault and my medical problems since the
attack. **I received no psychological counseling in prison
following the attack. Except for having some limited dental
surgery, I have not had any further surgical treatment to
address the physical injuries I sustained.** I have been advised by
various medical providers that I need to have surgery on my tripod
fracture, the septum in my nose, my jaw dislocation and various
dental surgery to repair and replace the damage to my teeth. **While
incarcerated, I filed countless medical call slips and grievances**

36

> **with regard to the medical care that I sought and was denied.**
> **At various points during my incarceration, I have been**
> **deprived of food and medication. In particular, there were**
> **numerous times where I was denied pain medication.** The
> intensity of my pain reached the highest levels of pain and was
> often intolerable. I have had constant eye pain and I am beset with
> what have been considered to be migraine headaches since the time
> of the incident. . . . Until the time my family retained an attorney, I
> had not been examined by a physician outside of First Correctional
> Medical and Kent General Hospital Emergency room. (Paragraph
> numbers omitted; emphasis supplied).

This deplorable litany of unattended pain and suffering spells out an Eighth Amendment claim

for failure to provide adequate medical care. The Third Circuit identified the standards applicable

in an Eighth Amendment case asserting deliberate indifference to medical needs in Spruill v.

Gillis, 372 F.3d 218, 235-237 (3rd Cir. 2004). That case states that "unnecessary and wanton

infliction of pain or deliberate indifference to the serious medical needs of prisoners are

sufficiently egregious to rise to the level of a constitutional violation. . . ." 372 F.3d at 235.

Noting that the standard is clearly met when a doctor intentionally inflicts pain on a prisoner, the

Third Circuit then identified "several other scenarios that satisfy" the relevant standard,

including the following (omitting citations and internal quotations):

> Most relevant to this case are (1) where prison authorities deny
> reasonable requests for medical treatment . . . . and such denial
> exposes the inmate to undue suffering or the threat of tangible
> residual injury, . . . and (2) where knowledge of the need for
> medical care [is accompanied by the] . . . intentional refusal to
> provide that care.

372 F.3d at 235.

Finally, the Spruill opinion notes that the relevant standard requires deliberate

indifference on the part of the prison officials and it requires the prisoner's medical needs to be

serious, 372 F.3d at 235-236.

The Spruill opinion then applies these standards, in the context of a motion to dismiss, to allegations raised against both medical and non-medical officials. The injuries stated by plaintiff Ward satisfy the "serious" requirement; compare the assertions in Mr. Ward's affidavit to the discussion of the plaintiff's less serious "back condition" which was found to satisfy the standard in Spruill, 372 F.3d at 236, and the indifference he has identified is egregious. Even with regard to the non-medical defendants in this matter, such as DOC commissioner Stanley Taylor and warden Thomas Carroll, the nature of the instant matter is such that the standards of administrative neglect established in Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3rd Cir. 1987), discussed in Spruill, 372 F.3d at 237, are met. The serious and obvious nature of the injuries suffered by Mr. Ward, coupled with the indifference he has identified, are sufficient to create a genuine issue of material fact as to the deliberate indifference to lack of adequate medical care.

## V. THE ACTIONS OF DOC DEFENDANTS IN THE WAKE OF TIM WARD'S CONTACTS WITH THE MEDIA CONSTITUTED WRONGFUL RETALIATION IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO FREEDOM OF SPEECH.

As noted by Judge Jordan in his decision on the Motion to Dismiss in this case (D.I. #72, March 30, 2006; A000098 to A000099), the filing of lawsuits and grievances and contact with the newspapers is protected First Amendment activity. Moreover, insofar as the lawsuits, grievances, and newspaper contact at issue herein all bear directly on basic problems in the administration of the State of Delaware's prison system, including unsafe conditions and lack of adequate medical care, they clearly invoke important matters of public concern, as outlined in Connick v. Myers, 461 U.S. 138, 146-147 (1983).

In the same decision, Judge Jordan noted the three-part test for a First Amendment retaliation claim identified in Mitchell v. Horn, 318 F.3d 523, 530 (3rd Cir. 2003): (1)

38

constitutionally-protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of the constitutional rights and the adverse action taken against him. As noted above, Mr. Ward engaged in protected First Amendment activity, satisfying the first prong. Moreover, the inadequate medical care (described in more detail above) together with the inappropriate transfer (set forth in the Statement of Facts, supra) constitute adverse actions, findings which are also law of the case per Judge Jordan's opinion. With regard to the third element of the Mitchell requirements, namely *causation*, the retaliatory *motivation* of the defendants presents a jury question.

## CONCLUSION

For the foregoing reasons, Plaintiff Timothy Ward respectfully requests this Honorable

Court to deny State Defendants' Motion for Summary Judgment.


**MARTIN & WILSON, P.A.**


**JEFFREY K. MARTIN, ESQUIRE**
**TIMOTHY J. WILSON, ESQUIRE**
DE State Bar I.D. No.: 2407
DE State Bar I.D. No.: 4323
1508 Pennsylvania Avenue
Wilmington, DE  19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

DATED:      January 23, 2007

**LAW OFFICES OF**
**HERBERT G. FEUERHAKE**


**HERBERT G. FEUERHAKE, ESQUIRE**
DE State Bar I.D. No.: 2590
521 West St
Wilmington, DE 19801
(302) 658-6101
herblaw@verizonmail.com
*Attorney for Plaintiff*

40

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

# H

Hamilton v. Leavy
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Jerome HAMILTON, Plaintiff,
v.
Faith LEAVY, Pamela Faulkner, William Queener,
Frances Lewis, George M. Dixon, Jack W.
Stephenson, Deborah L. Graig, Joanne Smith, Dennis
Loebe, Eldora C. Tillery, Francis Cockroft, Jerry
Borga, Richard Shockley, Defendants.
No. Civ.A. 94-336-KAJ.

March 24, 2004.

John W. Shaw, Young, Conaway, Stargatt & Taylor,
Paul P. Welsh, Joelle Eileen Polesky, Morris,
Nichols, Arsht & Tunnell, Joseph R. Slights, III,
Nancy M. Law, Morris, James, Hitchens & Williams,
Bernard A. Van Ogtrop, Cooch & Taylor, Deborah
Cirilla, Sellis, Akin & Herron, P.A., Wilmington, DE,
for Plaintiff.
James B. O'Neill, Stuart B. Drowos, Marc P.
Niedzielski, Thomas H. Ellis, Department of Justice,
Wendy R. Danner, Attorney General's Office,
Wilmington, DE, for Defendants.

## MEMORANDUM ORDER

JORDAN, J.

### I. Introduction

*1 The procedural history and the factual
background of this case have been previously set
forth in detail in published and unpublished
opinions.[FN1] For present purposes, it is sufficient to
state that the Third Circuit Court has remanded the
case to this court to "reconsider whether the
defendants are entitled to quasi-judicial absolute
immunity" and to address the law of the case doctrine
and whether the Defendants [FN2] are entitled to
qualified immunity. Hamilton v. Leavy, 322 F.3d
776, 786-787 (3d Cir.2003)

FN1. See Hamilton v. Leavy, 322 F.3d 776

(3d Cir.2003) ("Hamilton II"); Hamilton v.
Leavy, No. Civ. A. 94-336-GMS, 2001 WL
848603 (D.Del. July 27, 2001); Hamilton v.
Leavy, 117 F.3d 742 (3d Cir.1997) (
"Hamilton I"); and Hamilton v. Lewis, No.
94-336-SLR, 1995 WL 330728 (D.Del. May
26, 1995).

FN2. The "Defendants" are Faith Leavy
("Leavy"), Pamela Faulkner ("Faulkner"),
William Queener ("Queener"), Frances
Lewis ("Lewis"), George Dixon ("Dixon"),
Jack Stephenson ("Stephenson"), Deborah
Craig ("Craig"), JoAnne Smith ("Smith"),
Dennis Loebe ("Loebe"), Eldora Tillery
("Tillery"), Francis Cockroft ("Cockroft"),
Jerry Borga ("Borga"), and Richard
Shockley ("Shockley").

Presently before me is the Defendants' renewed
motion for summary judgment (D.I. 260; the
"Motion"). Also before me is Plaintiff Jerome
Hamilton's ("Hamilton") cross-motion for partial
summary judgment (D.I. 268; the "Cross-Motion")
and Hamilton's "Motion to strike and/or for leave to
file a short reply to defendants supplemental
submission in support of summary judgment
following remand" (the "Motion to Strike").
(D.I.313.) For the reasons set forth herein, the
Defendants' Motion (D.I.260) will be denied,
Hamilton's Cross-Motion (D.I.268) will be granted,
and Hamilton's Motion to Strike (D.I.313) will be
denied.

### II. Discussion

#### A. Quasi-judicial absolute Immunity

"Quasi-judicial absolute immunity attaches when
a public official's role is 'functionally comparable' to
that of a judge." Hamilton II, 322 F.3d at 785 (quoting
Butz v. Economou, 438 U.S. 478, 513, 98 S.Ct. 2894,
57 L.Ed.2d 895 (1978)). In a Memorandum Opinion
issued in July 2001, the Defendants were held not to
be entitled to quasi-judicial absolute immunity
because quasi-judicial immunity "generally does not
extend to prison officials."(D.I. 242 at 14.) Cited in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

support of that conclusion was *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), which held that a committee of prison officials who disciplined an inmate after a hearing was not entitled to quasi-absolute judicial immunity. (*Id.*) The Third Circuit pointed out, however, that *Cleavinger* does not "hold *per se* that prison officials can never receive quasi-judicial immunity."*Hamilton II,* 322 F.3d at 785 (citing *Cleavinger,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507). The Third Circuit explained that "*Cleavinger* requires that [a court] analyze whether the particular defendants ... are entitled to [quasi-judicial] immunity" and this court "did not do so." *Id.* at 785.The Third Circuit also explained that in *Cleavinger,*"the Supreme Court analyzed the independence and safeguards accompanying the committee's decision-making process" before holding that members of a prison disciplinary committee could not receive quasi-judicial immunity, and, that in this case, they did "not know what facts pertaining to the committees' independence and safeguards were sufficiently proven for summary judgment purposes."*Id.* Accordingly, the Third Circuit remanded this case in order for this court to consider "whether the defendants are entitled to quasi-judicial absolute immunity."*Id.*

**\*2** In *Cleavinger,* the Supreme Court stated that the following factors are "characteristic of the judicial process" and are to be considered in determining the applicability of quasi-judicial absolute immunity:

(a) the need to assure that the individual can perform his functions without harassment or intimidation: (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process and (f) the correctability of error on appeal

474 U.S. at 202 (citing *Butz,* 438 U.S. at 511). Applying these principles to the members of a federal prison's discipline committee, which heard cases where inmates were charged with prison rules violations, the Supreme Court held that the members of this disciplinary committee were not entitled to quasi-judicial absolute immunity because they did not perform a classic adjudicatory function. *Cleavinger,* 474 U.S. at 203. "Unlike a federal or state judge," the members of the discipline committee were "not independent" because they were "not professional hearing officers, as are administrative law judges ... instead [they were] prison officials ...

temporarily diverted from their usual duties."*Id.* at 203-204.The Supreme Court also found that the committee members were "employees of the Bureau of Prisons and they [we]re the direct subordinates of the warden who reviews their decision."*Id.* at 204.Finally, the Supreme Court found that because these discipline committee members "work[ed] with the fellow employee who lodge[d] the charge against the inmate upon whom they s[a]t in judgment ... [they] are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee."*Id.*

Furthermore, in *Cleavinger,* the Supreme Court also found that because few of the "procedural safeguards contained in the Administrative Procedure Act" were present, the members of the disciplinary committee were not entitled to absolute immunity.

The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

*Cleavinger,* 474 U.S. at 206.

After further discovery upon remand, the following evidence was presented with regard to the independence and procedural safeguards utilized by the Multi-Disciplinary Team ("MDT") [FN3] and the Delaware Department of Corrections Central Institutional Classification Committee ("CICC").[FN4] Like the members of the discipline committee in *Cleavinger,* members of the MDT and CICC are prison employees. (D.I. 267 at 16.) Similarly, MDT and CICC members are direct subordinates of the warden, who can veto or change their decisions.*Id.* Furthermore, neither the MDT nor the CICC worked under the state or federal Administrative Procedures Acts and inmates are not permitted to have legal representation before either the MDT or the CICC, inmates are not provided with lawyers, inmates are not permitted to call or cross examine witnesses, discovery is not permitted, and there is no burden of proof. (*Id.* at 17.)

> FN3. Leavy, Faulkner, and Queener are members of the MDT. (See D.I. 242 at 1.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

FN4. Lewis is the chairperson of the CICC. Dixon, Stephenson, Craig, Smith, Loebe, Tillery, Cockroft, Borga, and Shockley are members of the CICC. (See D.I. 242 at 1.)

*3 In support of its assertion that the CICC defendants are entitled to quasi-judicial immunity, the Defendants assert that the CICC is independent. (D.I. 261 at 11) (citing *Cleavinger* ). The Defendants claim that the CICC is independent because it is made up of staff members representing a cross section of bureau personnel, which ensures that decisions affecting a particular inmate are objective, and that members are limited to three year appointments and must remain off the CCIC before being re-appointed. (*Id.* at 12-13.)The Defendants further argue that the CCIC is independent because internal procedures require a CCIC member to abstain from voting on a matter where the individual has made a recommendation as a member of the MDT. (*Id.* at 13.)The Defendants also claim that there are safeguards in the CCIC's decision-making process because appeals of CICC are directed to the Office of the Classification Administrator. (*Id.*)

These arguments, however, are not well founded. Overriding the factors claimed for independence is the reality that, like the members of the discipline committee in *Cleavinger,* the members of the MDT and CICC are not hearing officers with any status independent of the prison bureaucracy; they are prison officials (D.I. 262 at A235.) The members of the MDT and the CICC, like the members of the discipline committee in *Cleavinger,* are subordinates of the warden, who can veto or change their decisions. (*Id.* at 423-424, A328-329.)Simply put, MDT and CICC members are not independent in the quasi-judicial sense; they are prison officials who are subordinate to the warden and they do not perform a classic adjudicatory function. Because neither the MDT nor the CICC was independent or subject to procedural safeguards in its decision-making process, the MDT and CICC defendants are not entitled to quasi-judicial absolute immunity.

B. Qualified Immunity

In *Hamilton II,* the Third Circuit stated that, "[i]n determining whether to grant summary judgment on qualified immunity grounds, a court must first consider whether '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged

show the officer's conduct violated a constitutional right" (quoting *Saucier v. Katz,* 544 U.S. 194, 201 (2001)).322 F.3d at 786. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."*Id.*

The Third Circuit, in *Hamilton II,* explained that in *Hamilton I:*
[W]e held that Hamilton had raised a genuine issue of material fact whether defendants Leavy, Faulkner, Queener and Lewis acted with deliberate indifference to Hamilton's safety in violation of the Eighth Amendment. The District Court's opinion [FN5] did not discuss whether a constitutional violation occurred other than to note that we held in *Hamilton I* that a genuine issue of material fact existed as to the reasonableness of the defendants' conduct. The Court then skipped ahead to address the second prong in the qualified immunity analysis. It seems to us likely that, in so doing, the Court tacitly applied the law of the case doctrine, reasoning that *Hamilton I* had conclusively resolved for summary judgment purposes the first prong of the qualified immunity analysis.

FN5.*Hamilton v. Leavy,* No. Civ. A. 94-336-GMS, 2001 WL 848603 (D.Del. July 27, 2001).

*4 322 F.3d at 787. The Court remanded the case for this court to decide whether the law of the case doctrine applied to defendants Leavy, Faulkner, Queener (the "MDT defendants") and Lewis. *Id.* Defendants Dixon, Stephenson, Craig, Smith, Loebe, Tillery, Cockroft, Borga, and Shockley (the "CICC defendants") were added to the case since *Hamilton I,* and therefore "lacked the opportunity to argue that they had not violated Hamilton's Eighth Amendment rights."*Id.* The Third Circuit stated that "[o]n remand, they will have the opportunity to do so."*Id.*

1. The MDT Defendants and Lewis

"The law of the case doctrine 'limits relitigation of an issue once it has been decided' in an earlier stage of the same litigation ."*Hamilton II,* 322 F.3d at 787. However, "[r]econsideration of a previously decided issue may ... be appropriate when the record contains new evidence."*Id.*"But this is so only if the new evidence differs materially from the evidence of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

record when the issue was first decided and if it provides less support for that decision ... Accordingly, if the evidence at the two stages of litigation is 'substantially similar,' or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply."*Id.* (citations omitted).

The Third Circuit, in *Hamilton I,* noted that the "record indicates that the MDT defendants took no immediate action following its recommendation to the CICC that Hamilton should be placed in protective custody. It also took no action after that recommendation was rejected."117 F.3d at 748. The Third Circuit concluded that "while it appears that the MDT defendants acted reasonably in following the internal prison procedures by recommending to the CICC that Hamilton be placed in protective custody, the reasonableness of their actions following the rejection of that recommendation remains a question."*Id.* The Third Circuit further noted that "[b]ecause neither party presented conclusive evidence on [the] issue" of whether the MDT defendants could have taken additional steps beyond recommending that Hamilton be placed in protective custody, such as placing him in administrative segregation, "there remains a genuine issue of material fact regarding whether the MDT's response to the risk Hamilton faced was reasonable."*Id.* at 748."The failure of the MDT defendants to take additional steps beyond the recommendation of protective custody could be viewed by a factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids."*Id.* at 749.

After conducting additional discovery following remand by the Third Circuit in *Hamilton II,* the Defendants argue that "the undisputed record establishes that the MDT defendants had no authority other than to provide the recommendation that they did for protective custody" for Hamilton, and "[a]ccordingly, there is no basis for a constitutional claim against the ... MDT defendants."(D.I. 261 at 21.) The record is disputed, however, because Hamilton points out that the Classification Procedures Manual establishes that the MDT defendants "ha[d] the power to 'initiate[ ] protective custody requests' at any time" and that "the shift commander can authorize the placement of the inmate requesting protective custody on administrative transfer pending the outcome of a formal investigation."[FN6](D.I. 267 at 23.) The Classification Procedures Manual also provides that the MDT defendants "have the ability to initiate protective custody reviews at any time."[FN7](*Id.*)

Because this evidence not only does not materially deviate from the evidence in the record when *Hamilton I* was decided, but provides additional support for the *Hamilton I* decision, I find that the law of the case doctrine applies. *See Hamilton II,* 322 F.3d at 787. Therefore, the Third Circuit's holding of *Hamilton I* that "Hamilton had raised a genuine issue of material fact whether the MDT defendants acted with deliberate indifference to Hamilton's safety in violation of the Eighth Amendment" is the law of the case. *Id.* at 786.

> FN6. The Defendants argue that the MDT does "not have the authority to place anyone in administrative segregation" and that Hamilton "was already in administrative segregation." (D.I. 261 at 21.) However, the issue is whether the MDT defendants could have taken any steps beyond its recommendation to the CICC that Hamilton be placed in protective custody, and Hamilton's evidence shows that this is a genuine issue of material fact.

> FN7. The Defendants assert that these protective custody reviews, or follow-up reclassifications, are every six months (D.I. 273 at 6), but the Manual says that "in cases where the MDT feels a more frequent review is appropriate, they may do so."(D.I. 262 at A340.)

*5 The Defendants contend that with respect to defendant Lewis, the record generated after *Hamilton I* "is materially different from the record on which the Court of Appeals based its decision."(D.I. 261 at 25.) First, the Defendants assert that the Third Circuit erroneously identified more assaults in *Hamilton I* as the basis for their conclusion that Hamilton "has a long history of being assaulted throughout the Delaware prison system."117 F.3d at 744. The Defendants also imply that the Third Circuit erroneously understood those attacks to have occurred at Gander Hill rather than at the DCC. (D.I. 261 at 25.) Second, the Defendants state that Hamilton's cellmate was not at Gander Hill until more than a month after the MDT's recommendation and the CICC's decision to take no action. (*Id.*) Third, the Defendants claim that the attack occurred after Hamilton's cellmate learned he was a "snitcher," which was more than a month after Lewis, as part of the CICC, decided to take no action. (*Id.*) Fourth, the Defendants argue that Lewis did not have knowledge of Hamilton's grievance of March 25, 1992. (*Id.*)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Finally, the Defendants state that the Superior Court ordered Hamilton to remain at Gander Hill.(*Id.*)

These contentions are irrelevant to the Third Circuit's findings in *Hamilton I* that "Lewis was made aware of a substantial risk to Hamilton's safety when she reviewed the MDT's unanimous recommendation to place Hamilton in protective custody," that "Lewis had good reason to believe that the MDT's fears were well-founded since Lewis herself approved Hamilton for protective custody on two prior occasions," and that "since Lewis should be charged with knowledge of Hamilton's known cooperation with prison officials and the subsequent branding of Hamilton as a 'snitch,' ... a fact finder could infer that Lewis knew that the threat to Hamilton's safety was imminent."177 F.3d at 747. The Third Circuit found that Lewis knew that Hamilton was at risk of an assault based on facts known in June 1992, not of an assault specifically by his cellmate. *See Benner v. McAdory,* 165 F.Supp.2d 773, 778 (D.N.J.2001) ( "[A] failure to protect claim does not require that the plaintiff specifically identify the attacker as a threat prior to the occurrence of the attack"). Because the evidence that the Defendants cite does not differ materially from the evidence considered by the Third Circuit in *Hamilton I,* I hold that the law of the case applies to Lewis.

The second prong of the qualified immunity defense is that the constitutional right must be clearly established. *Hamilton II,* 322 F.3d at 787. This court found that "Hamilton's right to be protected from known risks was clearly established in August 5, 1992 ."[FN8]*Id.* However, the Third Circuit explained that this was not sufficient. "[T]he question is whether a reasonable public official would know that his or her specific conduct violated clearly established rights."*Id.* For the MDT defendants, it is whether a reasonable person serving on the MDT would know that doing nothing beyond recommending that Hamilton be placed in protective custody would likely violate his constitutional rights. For Lewis, it is whether a reasonable CICC chairperson would know that a decision to take "no action" on the MDT recommendation violated clearly established rights.

> FN8. August 5, 1992 was the day that Hamilton was attacked by his cellmate.

*6 The Defendants do not argue whether a reasonable MDT member would know that doing nothing beyond merely recommending to the CICC

that Hamilton be placed in protective custody, or whether a reasonable chairperson of the CICC would know that not placing Hamilton in protective custody after receiving such a recommendation by the CICC violated clearly established rights. (D.I. 261 at 28-29.) Rather, the Defendants argue that the MDT defendants and Lewis had no reason to know that Hamilton's safety was in danger. (*Id.*) The Defendants' argument, however, does not meet the standard for establishing whether a public official is entitled to qualified immunity because their argument is subjective, and the standard is objective, not subjective. *See Grant v. City of Pittsburgh,* 98 F.3d 116, 121 (3d Cir.1996). Moreover, the evidence suggests that the MDT defendants and Lewis did know that Hamilton faced a "substantial risk of serious harm" if he were placed in the general prison population, and thus violated his violated his Eighth Amendment right by failing to protect him.[FN9]*Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because the law of the case applies to the MDT defendants and Lewis, and neither the MDT defendants nor Lewis has produced evidence that a reasonable official in their positions would not have protected Hamilton, they are not entitled to qualified immunity.

> FN9. The Third Circuit stated that after considering "Hamilton's history of violent clashes throughout the Delaware prison system, and acknowledg[ing] his statement that 'protective custody concerns exist throughout the state,' ' the MDT defendants "concluded, unanimously, that Hamilton was in such danger as to justify isolating him from the general population in protective custody." *Hamilton I,* 117 F.3d at 747. "The MDT's recommendation that Hamilton be placed in protective custody was evidence that "Hamilton faced a substantial risk of serious harm." *Id.* The Third Circuit also stated that "the facts constitute sufficient circumstantial evidence upon which a factfinder could conclude that Lewis 'must have known' of the risk to Hamilton's safety." *Id.*

### 2. The CICC defendants

Subsequent to *Hamilton I,* Hamilton amended the complaint to add the CICC defendants. Because the Defendants never argued whether the CICC defendants violated Hamilton's Eighth Amendment

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

rights, the Third Circuit remanded the case in order to give them the opportunity to do so. *Hamilton II,* 322 F.3d at 787.

The Defendants argue that Tillery did not violate Hamilton's Eighth Amendment right to be protected from "violence at the hands of other prisoners,"*Farmer,* 511 U.S. at 833, because she was not a member of the MDT and not a member of the CICC on the date that the CICC defendants determined to take "no action" on the MDT's recommendation to place Hamilton in protective custody. (D.I.261 at 21.) Citing to the record, Hamilton claims that at the time Hamilton was attacked by his cellmate, Tillery was a "classification officer" and her job was to "review MDT recommendations to ensure the MDT made proper recommendations based on the inmates' institutional history and individual circumstances."(D.I. 267 at 30.) Hamilton asserts that Tillery's review of the same materials reviewed by the MDT "allowed her to acquire the same knowledge of the danger to Mr. Hamilton's safety known to the MDT and to act, as permitted by [the] Classification Guidelines Manual, to protect him by initiating the protective custody procedures."(*Id.*) The Defendants do not respond to these claims. Thus, taken in a light most favorable to Hamilton, a reasonable fact finder could conclude that Tillery violated Hamilton's Eighth Amendment right by failing to protect him.

*7 The Defendants argue that Smith, Dixon, and Cockroft did not violate Hamilton's Eighth Amendment rights because they were not present at the CICC meeting when the "no action" decision was made with regard to the MDT's recommendation. (D.I. 261 at 21-22.) Hamilton argues that even though they were not present, Smith, Dixon, and Cockroft had the authority to initiate "protective custody procedures at any time."(D.I. 267 at 31-32.) The Defendants did not respond to these allegations. (D.I.273.) Accordingly, taken in a light most favorable to Hamilton, the facts that Hamilton has alleged are sufficient for a reasonable fact finder to conclude that Smith, Dixon, and Cockroft violated his constitutional rights.

Defendants argue that Stephenson, Craig, Loebe, Borga and Shockley, the CICC defendants that were present when the "no action" decision was taken on the MDT's recommendation, did not violate Hamilton's Eighth Amendment rights because they were not responsible for his safety and even if they were, Hamilton's "failure to cooperate with the MDT evinces a clear waiver of any Eighth Amendment claim."(D.I. 261 at 23-24.) Hamilton points to evidence in the record that the CICC was responsible for his safety (D.I. 267 at 28), and that claims that the CICC discussed his case when they decided to take "no action," and that Lewis, Stephenson, Craig, Loebe, Borga and Shockley were therefore "aware of a substantial risk to Hamilton's safety when [they] reviewed the MDT's unanimous recommendation to place Hamilton in protective custody."*Hamilton I,* 117 F.3d at 747. Because there is evidence that the CICC was responsible for Hamilton's safety, and because the Defendants do not deny Stephenson's, Craig's, Loebe's, Borga's and Shockley's knowledge of a general risk to Hamilton's safety, and because there is no basis for the Defendants allegation that Hamilton waived his constitutional rights by failing to cooperate, I hold that, taken in a light most favorable to Hamilton, a reasonable fact finder could conclude that Stephenson, Craig, Loebe, Borga and Shockley violated his constitutional rights.

As discussed above, the next question is "whether a reasonable public official would know that his or her specific conduct violated clearly established rights."*Hamilton II,* 322 F.3d at 787. On this issue, the Defendants have not submitted any evidence that a reasonable CICC member would not know that following the MDT's recommendation that Hamilton be placed in protective custody violated his Eighth Amendment right to be protected from violence at the hands of other prisoners.[FN10](*See* D.I. 261 at 28-29.) Because a reasonable fact finder could conclude that the CICC defendants violated his Eighth Amendment rights, and the Defendants have not submitted any evidence that a reasonable CICC member would not know that not acting on an MDT recommendation to protect Hamilton violated his clearly established rights, the CICC defendants are not entitled to qualified immunity. Therefore, the Defendants' Motion will be denied.

> FN10. "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right."*Donahue v. Gavin,* 280 F.3d 371, 378 (3d Cir.2002)"Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the objective reasonableness of the defendant's belief in the lawfulness of his actions."*Id.* The burden

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

was thus on the Defendants to establish the objective reasonableness of their belief in the lawfulness of their actions, and they have failed to provide evidence in that regard.

C. Hamilton's motion to strike

*8 Because the Defendants' Motion is denied, Hamilton's Motion to Strike is moot and will therefore be denied.

III. Conclusion

Accordingly, the Defendants' Motion (D.I.260) is DENIED, Hamilton's Cross-Motion (D.I.268) is GRANTED, and Hamilton's Motion to Strike (D.I.313) is DENIED as moot.

D.Del.,2004.
Hamilton v. Leavy
Not Reported in F.Supp.2d, 2004 WL 609334 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Jeffrey K. Martin, the undersigned counsel for Plaintiff in the above-captioned case,

hereby certify that the foregoing *Plaintiff's Brief in Opposition to the Opening Brief in Support*

*of Defendants' Motion for Summary Judgment* was filed via CM/EMF on January 18, 2009 to

the following:

Stephani J. Ballard
Department of Justice
Carvel State Office Building
820 N French St
Wilmington, DE 19801

Daniel L. McKenty
Heckler & Frabizzio
800 Delaware Avenue, Suite 200
P.O. Box 128
Wilmington, DE 19899-0128


**MARTIN & WILSON, P.A.**

**JEFFREY K. MARTIN, ESQUIRE**
**TIMOTHY J. WILSON, ESQUIRE**
DE State Bar I.D. No.: 2407
DE State Bar I.D. No.: 4323
1508 Pennsylvania Avenue
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

**LAW OFFICES OF**
**HERBERT G. FEUERHAKE**

**HERBERT G. FEUERHAKE, ESQUIRE**
DE State Bar I.D. No.: 2590
521 West St
Wilmington, DE 19801
(302) 658-6101
herblaw@verizonmail.com
*Attorney for Plaintiff*


DATED:    January 23, 2007