## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY WARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-1391 JJF |
| | ) |
| STANLEY TAYLOR, PAUL HOWARD, | ) |
| THOMAS CARROLL, JOHN SALAS, | ) JURY TRIAL DEMANDED |
| PAUL HARVEY, JESSICA DAVIS-BARTON, | ) |
| CERTAIN UNKNOWN INDIVIDUAL | ) |
| EMPLOYEES OF THE STATE OF DELAWARE | ) |
| DEPARTMENT OF CORRECTION, and | ) |
| STATE OF DELAWARE | ) |
| DEPARTMENT OF CORRECTION, | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT

### PARTIES

1. Plaintiff, Timothy Ward (hereinafter referred to as "Plaintiff" or "Tim"), is a resident of the State of Maryland, and, at all times relevant hereto, was an inmate at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE 19977, SBI Number 00501898.

2. Defendant, Stanley Taylor, is the Commissioner of Correction for the State of Delaware, and in that capacity is the Chief Officer of the Department of Correction.

3. Defendant, Paul Howard, is the Bureau Chief of the Department of Correction.

4. Defendant, Thomas Carroll, is and was at all times relevant hereto, the Warden of the Delaware Correctional Center located in Smyrna, Delaware (which Delaware Correctional Center will hereinafter referred to as the "DCC").

5. Defendants, John Salas and Paul Harvey, are and were at all relevant times hereto, Lieutenant correctional officers at DCC.

6. Defendant, Jessica Davis-Barton, is a counselor at DCC.

7. Defendants, unknown individual employees of the DOC, contributed to the shocking and dangerous conditions existing at DCC, and to the occurrence of the events of July 10, 2004, by virtue of their decision-making and/or lack thereof and/or by their negligent omissions or actions.

8. Defendant, State of Delaware Department of Correction, is a division of the State of Delaware charged with, among other things, maintaining safe and efficiently-run prisons and preventing inmates in those prisons from being harmed.

## JURISDICTION

9. The United States District Court for the District of Delaware has jurisdiction over the parties in this matter by virtue of the pendency of a federal claim under 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. §§ 1331 and 1343.

## FACTS

10. At all relevant times hereto, Plaintiff was an inmate at DCC and housed in the minimum security T-Building. He is serving a three-year sentence for armed burglary.

11. Prior to the events described below, Tim has served his sentence quietly, without incident or write up. Indeed, prior to this incarceration, Tim, who was forty years old when the burglary occurred, had no previous criminal record.

12. On information and belief, in or around May of 2004, Inmate Robert Johnson was transferred from W-Building to T-Building after attempting to commit suicide by jumping out of a second floor window in the W-Building. He was still housed in the T-Building on July 9 and 10, 2004.

13. On information and belief, during the night of July 9, 2004 and into the early morning hours of July 10, 2004 Inmate Johnson was awake and causing a commotion throughout the night, which caused others housed in the vicinity of Inmate Johnson's sleeping quarters to endure a sleepless night.

14. The next day at "chow," Inmate Johnson threatened to rape a correctional officer.

15. Inmate Johnson also exhibited other curious and erratic behavior and made disrespectful remarks to the correctional officers assigned to the chow hall, all of which was made known to defendant Lieutenant Harvey.

16. In response to his outrageous behavior from the night before and during chow, correctional officers escorted Inmate Johnson to the Infirmary to be evaluated. There were no mental health personnel present in the Infirmary to conduct an evaluation of Inmate Johnson, a fact known to defendant Harvey.

17. On information and belief, following his trip to the Infirmary, Inmate Johnson grew more agitated and angry. The correctional officers promptly released Inmate Johnson into the prison population, which was enjoying recreational time in the T-Building "yard."

18. There were approximately twelve to fifteen inmates, including Tim Ward, in the recreational yard when Inmate Johnson was sent out into the yard.

19. During this recreation time, there were two correctional officers assigned to supervise and protect the inmates: Defendant Salas and Officer Lovett.

20. Defendant Salas was the Lieutenant on duty who was responsible for oversight of and the security for the T-Building yard.

21. Officer Lovett was responsible for remaining outside in the T-Building yard to supervise the inmates during their recreational time.

3

22. Despite their assigned duties, Officer Lovett and Defendant Salas were inside T-Building on a computer.

23. Outside in the yard, Inmate Johnson approached inmates Richard Shipkowski and Gary Bowers, Jr. and asked them whether any guards were supervising the back portion of the yard. Both inmates indicated that Inmate Johnson was not being supervised at the moment.

24. Meanwhile, in the back portion of the yard, Tim Ward had just completed a workout of lifting weights and doing pushups.

25. Inmate Johnson, keenly aware of the lack of supervision by the correctional officers, approached Tim Ward with his watch wrapped around his knuckles (so as to inflict maximum damage with his blows) and without word, warning or provocation struck an unsuspecting Tim Ward on the right side of his face in the eye socket area. Inmate Johnson then recoiled and struck a dazed and confused Tim Ward in the jaw. This second blow knocked the 5'6", 165 pound Tim Ward unconscious.

26. Inmate Johnson's attack on Tim escalated in savagery as Johnson straddled the now unconscious Tim and repeatedly and brutally punched and kicked him in the face and head. During the course of the beating, Officer Lovett and Defendant Salas, whose duty it was to supervise and protect the inmates, were unaware that the beating was taking place. No other correctional officers were aware of the beating as it occurred.

27. In apparent realization that there would be no correctional officer intervention to halt the beating, Inmate William Boney and another unidentified inmate ran to pull Inmate Johnson off Tim Ward while Inmate Trevor Lyn screamed for help. Other inmates ran to the locked door that leads from the yard and began pounding on the door to alert *somebody* to help Tim.

28.     When correctional officers arrived, they took one look at Tim lying spread-eagle and unconscious across the top of a picnic table and announced that he was dead. They provided no medical or any other kind of treatment to him. Instead, they took pictures of his supine body lain out across the picnic table.

29.     Fortunately an alert, unidentified inmate noticed a gurgling sound coming from Tim's mouth. He quickly cleared Tim's throat and turned him over so that he could breathe and would not choke on the blood in his throat.

30.     Tim was taken to the Infirmary on a stretcher at approximately 2:30 p.m. It was observed that Tim had lacerations on his face, a "knot" on his forehead that measured 3" long and 1½" wide, and that his skin color was "black."[1] Based upon the observations made by the staff at the Infirmary, Dr. Allie[2] ordered that Tim be transported to the Kent General Hospital emergency room for sutures and x-rays.

31.     An immediate request was made to the DCC Shift Commander to transport Tim to the hospital in a DCC van. The Shift Commander denied this request.

32.     Eventually, someone from the Infirmary called 911 and an ambulance was dispatched to take Tim to the Kent General Hospital emergency room where he was examined, x-rayed and given a CT scan.

33.     At the hospital, it was determined that Tim's injuries included: a broken nose, a dislocated jaw, damage to his eye, a shattered eye socket, teeth knocked out, other teeth twisted and broken, numerous facial fractures, numerous facial lacerations, bloody masses, tissue drainage and severe bruising. In the days following the attack, Tim's face was so swollen and disfigured that he was unrecognizable and his appearance was characterized as "grotesque."

---

[1] Tim Ward is a Caucasian.
[2] It is unclear whether Dr. Allie was present at the Infirmary or whether she merely provided instruction to the nurses on duty at the Infirmary.

34. Tim was kept at Kent General Hospital for approximately four hours and then returned to DCC where he was admitted to the Infirmary. Tim was awakened during the night by someone asking, "which guard did this to you?" This statement caused Tim intense fear and apprehension as he still had no idea who his attacker was at that time.

35. During the course of his stay in the Infirmary, Tim was not examined by a medical doctor but was given Motrin and Darvocet for his pain, had two teeth extracted and was put on a full liquid diet.

36. Tim's family was not notified of the attack. The day after the attack, July 11, 2004, Tim's mother, Louise Ward, and Tim's daughter, Amanda, arrived at DCC for a previously scheduled visit. They were led to the Infirmary without mention as to why they were being taken there. Without warning, a DCC employee opened a door to a room divided by a glass wall, behind which a beaten, bloody, and disfigured inmate stood, and then asked Mrs. Ward, "is this your son?" The virtually unidentifiable individual standing before Louise and Amanda Ward was in fact Tim Ward.

37. Tim was still clothed in his dirty, bloody clothes, his wounds were still weeping to the extent that he had to wipe them with his soiled shirt, his head was swollen to what has been approximated at almost three times its normal size and his head, lips and eyes were covered with dried blood. He began crying and pawing at the glass divider asking "why did this happen to me?" and "Who did this to me?"

38. Amanda was so distraught over the sight of her father that a nurse had to be called to lead her out of the room and care for her. Tim's mother began sobbing and begging to be allowed to hold her son.

39. The next day, Mrs. Ward called Tim's counselor, Defendant Davis-Barton, and inquired as to whether Tim had been given clean clothes and had been fed. Defendant Davis-Barton refused to answer Mrs. Ward's questions.

40. On July 15, 2004 Mrs. Ward was able to call Tim and speak to him via telephone. Tim informed her that he was wearing the same clothes that he had on when he was attacked on July 10. Due to his inability to chew and eat any solid food, as well as the DCC's failure to provide him with the a liquid or soft food diet, Tim was starving and asked his mother to put $50 into his commissary account so that he could buy some liquid instant breakfast. Tim was also having trouble with his coordination, and as a result, had difficulty walking.

41. On July 19, 2004 Tim was examined by an oral surgeon, Dr. Norman Lippman, D.D.S., who prescribed among other things a soft food diet, nasal spray, Tylenol and Tylenol #3 for pain, a consultation for Tim's nose and a consultation for Tim to see an ophthalmologist[3] to examine and treat the damage to Tim's eye and eye socket.

42. Despite Dr. Lippman's instruction that Tim have a soft food diet, and despite the fact that he had been diagnosed as having a fractured jaw, the Infirmary instructed that Tim "Start Regular Diet" on July 20, 2004. Without further examination by a doctor, Tim's stitches were removed and he was released from the Infirmary on this date.

43. On July 30, 2004, Tim made a medical request because he re-broke his jaw eating the solid food supplied by DCC. He also complained that his face was swollen and felt "like [it was] being crushed, my right eye is killing me [and] I have no pain medication." On information and belief Tim was provided no treatment for these complaints.

---

[3] Ophthalmology is: "the branch of medicine dealing with the structure, functions and diseases of the eye." WEBSTERS NEW WORLD DICTIONARY, 997 (2nd College ed. 1980).

44. Tim made another medical request the next day, once again complaining of severe pain – a "10 on a 1 to 10 pain scale." In response, no action was taken, with the exception of scheduling a medical appointment for August 2, 2004.

45. At his August appointment Tim was instructed to discontinue the Motrin and continue with the Naprosyn for pain. He was also prescribed a consultation with an optometrist[4] – as opposed to a consultation with an ophthalmologist as he had been prescribed. Tim was given no further treatment that day.

46. On August 8, 2004, Tim made a medical request reporting complications and pain from exposure to the sun. He requested sunglasses because exposure to the sun and bright lights caused his face to swell. He wrote:

> I need sunglasses from the eye doctor because when am [sic] out in the sun my face swells up and my eye hurts very bad. The pain is unbearable. My two front teeth need to be replaced. There is a nerve in my face that aches and strains my right eye. The pain shoots down to my jaw line making it impossible to chew, eat or move my mouth in any way. <u>I need pain medicine</u>. (emphasis in original).

In response, a medical appointment was scheduled *four* days later. He was given no further treatment that day.

47. On August 10, 2004, Tim's sister, June Ward, called his counselor, Defendant Davis-Barton, to check on Tim. Defendant Davis-Barton reported that the attack was all Tim's fault. Mrs. Ward sensed a cover-up of the incident.

48. Around this same time, Correctional Officer Lovett approached Tim and told him that the DCC would not let him file his report regarding the day of the incident. In particular,

---

[4] Optometry concerns: "the profession of examining the eyes and measuring errors in refraction and of prescribing glasses to correct these defects." *Id.* at 999.

8

they did not want him to report that he had taken Inmate Johnson to the Infirmary and nobody was present to examine him.

49. Tim arrived for his medical appointment on August 12 hoping for some type of relief. Instead, all that was done was that Tim was scheduled to see an optometrist. Again, he reported the pain a 10 on a 1 to 10 pain scale. He was provided no further treatment that day.

50. Four days later, on August 16, 2004, Tim again filed a medical report indicating:

> I am in extreme pain, for 36 days straight now my <u>eye</u> and <u>face</u> have been aching non stop, I <u>cannot</u> stand the pain, I need sunglasses or an eye patch now. The sun light is the main cause of this irritation & swelling. Need more medication! Also need antibiotics for my nose swelling. (emphasis in original).

51. Again, the only treatment afforded Tim was a medical appointment for a future date.

52. On information and belief, Tim was seen by an optometrist and given a prescription for sunglasses – a prescription that was never filled by DCC.

53. Tim was also having a difficult time with his counselor, Defendant Davis-Barton. She was very rude and argumentative with Tim and with his family who were contacting her to find out how Tim was doing.

54. In addition, Defendant Davis-Barton violated the patient/therapist confidentiality privilege by discussing confidential matters regarding Tim with other inmates.

55. Defendant Davis-Barton also instructed the correctional officer assigned to Tim to make no further calls for a medic for Tim for any reason. This was reported to Tim by the correctional officer himself.

56. Defendant Davis-Barton also instructed Tim to make no further medical requests.

57.     Due to these actions, Tim filed a grievance against Defendant Davis-Barton on August 18, 2004 and requested an investigation – the results of which are yet to be reported, despite the two and a half months that have passed since the filing of the grievance and the filing of this Complaint.

58.     Still in excruciating pain and still receiving literally no treatment, Tim reported to medical again on August 23, 2004:

> I need pain medication! I still haven't been put on the list for med pick up and I am in extreme pain, it feels like my face is gonna implode. I need pain meds!! And my Ensure!! (emphasis in original)

59.     The reference to Ensure in his medical report refers to a case of Ensure that Tim's mother had sent to DCC for Tim's consumption. She sent this form of liquid nutrition so that Tim could get proper nutrition that he was not getting due to DCC's refusal to provide Tim the soft food diet prescribed by Dr. Lippman and because Tim could not eat the solid food that was being provided by DCC. Notwithstanding the presence of the Ensure at DCC and Tim's requests for the Ensure, it was not being provided to him.

60.     From the time of his attack on July 10, until late August, Tim and his family had been requesting that officials at DCC provide him with proper medical care. However, he had yet to be examined by a medical doctor since the day of the attack. Due to their frustrations in trying to work with DCC personnel, Tim and his family sought the advice of and hired an attorney.

61.     On August 31, 2004, Tim's attorney wrote to Governor Minner advising her of Tim's situation and the lack of medical care provided since the attack. In response, Tim was admitted to the Infirmary on September 2, 2004.

62. However, being placed in the Infirmary in and of itself did nothing to further Tim's medical care. In fact, being placed in the Infirmary made Tim's situation worse. In the Infirmary, Tim was placed in a 10' x 10' glass-enclosed cell and essentially *ignored*. There were times when he was not given his pain medication. There were times when he was not given food. There were times when he was in so much pain that he would beat on the glass so as to remind the attendants of his need for pain relievers. He was consistently ignored.

63. While in the Infirmary, Tim was not allowed to shower or change his clothes, his belongings were taken from him, he was no longer allowed to make telephone calls and he was not given his mail or newspaper.

64. In a letter dated September 2, 2004 to Tim's counsel, the Governor's office contended that Tim had received "substantial medical attention since July 10, 2004."

65. Tim was placed in the Infirmary by DCC without notifying his family of his whereabouts.

66. Louise Ward made numerous telephone calls to the DCC to try to find out where Tim was and whether he was getting medical treatment and pain medication. In response, her calls were transferred from one DCC employee to another, but with no answers. In short, she was being given the runaround.

67. It was also at this time that the guards began to call Tim names due to the publicity brought on by a newspaper article in the Wilmington News Journal.

68. On September 9, 2004, through an arrangement made by his attorney, and at his family's expense, Tim was permitted to be examined by an outside physician, Dr. Pasquale Fucci. This was the first time that Tim had seen a medical doctor for an examination since the July 10 visit to Kent General Hospital.

69. Dr. Fucci determined that Tim *must* be seen by an ophthalmologist and by an otolaryngologist.[5] Dr. Fucci was concerned that further medical neglect might cause Tim to lose sight in his right eye. He also recommended a follow up MRI of the brain and follow up x-rays of Tim's facial fractures.

70. As a result of Tim's attorney's request, he was finally released from the Infirmary on or about September 11, 2004.

71. In mid-September, 2004 Tim was removed from the prison population and put into isolation.

72. In response to an inquiry by Tim's attorney as to the reason for his placement in isolation, Deputy Attorney General, Richard Hubbard, stated that Tim was not in "isolation," but termed his placement as "Protective Custody."

73. On or about September 22, 2004, Tim was transferred to Sussex Correctional Institute ("SCI").

74. On or about October 5, 2004, Tim was seen by Dr. David Larned, M.D., an oculoplastic surgeon who specializes in orbital reconstruction. Dr. Larned opined that Tim needs surgery to his right tripod. This surgery has not yet been scheduled.

75. It has also been determined that Tim suffers from some hearing difficulties that require testing by an audiologist. He also requires dental surgery. Neither procedure has been scheduled.

76. Since being at SCI, Tim has continued to request the sunglasses that he was prescribed by the optometrist. His requests have been repeatedly denied.

---

[5] Otolaryngology is "the branch or practice of medicine dealing with disorders of the ear, nose, and throat. *Id.* at 1008.

## COUNT I

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983: Eighth Amendment – Cruel and Unusual Punishment

77. Paragraphs 1 through 76 are restated and incorporated as if fully set forth herein.

78. On information and belief, Defendants, acting under color of state law per 42 U.S.C. § 1983, violated Plaintiff's right to be free from cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution when it acted with intent and/or deliberate indifference to:

> (a) the serious medical condition of the Plaintiff;
>
> (b) the Plaintiff's need for adequate medical care, of which he was denied and/or that which was provided was inadequate;
>
> (c) the Plaintiff's need for adequate food, of which he was denied and/or that which was provided was inadequate; and
>
> (d) the Plaintiff's need for adequate clothing, of which he was denied and/or that which was provided was inadequate.

79. As a result of Defendants' unlawful actions against Plaintiff, Plaintiff suffered a loss of his liberty without due process of law, with attendant physical injuries, both past and future, physical pain, mental anguish, emotional pain, humiliation, and isolation from human contact.

## COUNT II

### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983: First Amendment – Freedom of Speech

80. Paragraphs 1 through 79 are restated and incorporated as if fully set forth herein.

81. Defendants, acting under color of state law per 42 U.S.C. § 1983, intentionally violated Plaintiff's right to freedom of speech in violation of the First Amendment to the United

States Constitution, when they punished him without justification for seeking proper medical care and for filing a prison grievance.

### COUNT III

#### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983: Failure to train and maintenance of custom, policies or practices

82. Paragraphs 1 through 81 are restated and incorporated as if fully set forth herein.

83. The great and egregious harm caused to Plaintiff was the direct result of the customs, practices, policies and procedures of Defendants, including but not limited to: a failure to properly train and supervise DOC personnel so as to protect inmates' safety and physical well-being; a failure to maintain safe conditions; and a failure to adopt and properly implement practices and policies so as to protect the inmates' safety, physical well-being and appropriate security classification.

84. As a result of the actions of Defendants, Plaintiff has been subjected to a deprivation of his right to liberty without due process of law, with attendant physical injuries, emotional pain, mental anguish, substantial physical pain and suffering, and loss of the ability to enjoy the experiences of life.

### COUNT IV

#### Violation of Civil Rights under Color of State Law, 42 U.S.C. § 1983: State-Created Danger Doctrine (Against All Defendants)

85. Paragraphs 1 through 84 are restated and incorporated as if fully set forth herein.

86. The harm caused to the Plaintiff was direct and foreseeable by all Defendants.

87. Defendants, acting under color of state law per 42 U.S.C. § 1983, acted in willful disregard for the safety of the Plaintiff, exhibited gross and reckless negligence which exposed the Plaintiff to substantial risk of serious harm to a degree that shocks the conscience.

88. The Plaintiff was a member of a discrete class of persons subjected to potential harm as a result of the actions of Defendants, insofar as a relationship existed between Plaintiff and the State of Delaware by virtue of his incarceration by the State of Delaware.

89. The actions and inactions of each Defendant are sufficient to shock the conscience in that each Defendant exercised authority under color of state law to create an opportunity for danger that otherwise would not have existed, thereby establishing a violation of the Due Process Clause of the Constitution.

90. As a result of the actions of the Defendants, the Plaintiff has been subjected to a deprivation of his right to liberty without due process of law, with attendant physical injuries, mental anguish, substantial pain and suffering of the highest order, and loss of the ability to enjoy the experiences of life.

## COUNT V

### Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1985

91. Paragraphs 1 through 90 are restated and incorporated as if fully set forth herein.

92. Defendants conspired to deprive Plaintiff directly and/or indirectly of his Civil Rights, including:

(a) liberty without due process of law;

(b) his right to be free from cruel and unusual punishment;

(c) his right to own personal property; and

(d) his right to receive mail.

93. As a result of the actions of Defendants, Plaintiff has been subjected to a deprivation of his right to liberty, with attendant physical injuries, mental anguish, substantial pain and suffering, and loss of the ability to enjoy the experiences of life.

**WHEREFORE**, Plaintiff, Timothy Ward demands that judgment be entered in his favor against all Defendants on the above claims, including an award of compensatory damages, punitive damages, costs of suit, interest, attorneys' fees under 42 U.S.C. § 1988, and any other appropriate or relevant statutory or common law basis, injunctive relief ordering that Plaintiff be given proper medical care, including the pain medication, sunglasses and surgery that he requires and such other and further relief as this Court may deem appropriate.

Plaintiff, TIMOTHY WARD

By his attorneys:

/s/ *Jeffrey K. Martin*
JEFFREY K. MARTIN, ESQUIRE
DE Bar I.D. No.: 2407
Martin and Wilson, P.A.
1508 Pennsylvania Ave
Wilmington, DE 19806
(302) 777-4681
jmartin@martinandwilson.com
*Attorneys for Plaintiff*

/s/ *Herbert G. Feuerhake*
HERBERT G. FEUERHAKE, ESQUIRE
E Bar I.D. No.: 2590
Herbert G. Feuerhake
521 West St
Wilmington, DE 19801
(302) 658-6101
herblaw@verizonmail.com
*Attorneys for Plaintiff*

DATED: June 10, 2008